## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STEVEN R. PERLES, ESQ. and
PERLES LAW FIRM, P.C.,

               Petitioners,

v.

ALLEN L. ROTHENBERG, ESQ.,
THE LAW FIRM OF ALLEN L.
ROTHENBERG, and
THE ROTHENBERG LAW FIRM LLP,

               Respondents.

Civil Action No. <u>25-cv-8219</u>

### PETITION TO VACATE ARBITRAL AWARD

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, including 9 U.S.C. §§ 10 and 12, Petitioners Steven R. Perles, Esq. and Perles Law Firm, P.C. (collectively, "Perles") bring this proceeding to vacate the Final Award, dated July 7, 2025, in *Rothenberg v. Fay, et al.*, JAMS Ref. No. 1425036110 (the "Arbitration").[1]

### NATURE OF THE ACTION

1.      This petition is necessitated by the bad-faith efforts of Allen L. Rothenberg, Esq., The Law Firm of Allen L. Rothenberg, and The Rothenberg Law Firm LLP (together, "Rothenberg") to pursue Perles, as well as other co-counsel, Thomas Fortune Fay and the Fay Law Group (together, "Fay") for millions of dollars in undeserved and unearned attorneys' fees. Rothenberg has already collected over $59 million in fees for doing nothing more than locating

---

[1] Consistent with the local practice in this District, Petitioners will submit additional supporting documents, including a memorandum of law, in support of this Petition in accordance with any briefing schedule set by the Court.

and referring a subset of potential plaintiffs to Perles and Fay—work that Rothenberg outsourced to a non-attorney third party for a mere few thousands of dollars. Thereafter, Rothenberg brought the underlying arbitration to try to recover even more fees, while also challenging Perles and Fay's representation of their joint clients. Despite Rothenberg's unabashed greed and the express terms of a contract between the parties, the arbitrator Hon. Stephen G. Crane (Ret.) (the "Arbitrator") issued an excessive and flawed award in Rothenberg's favor, not only granting him millions of dollars in fees, but also over $11 million in sanctions for alleged failures by Fay (not Perles) to disclose to Rothenberg communications that Fay made in furtherance of the ethical duty to inform clients of Rothenberg's misconduct. The award exceeded the Arbitrator's authority and manifestly disregarded the law, and it should be vacated in its entirety.

2.      In 1983, a truck bomb, targeting American forces, exploded at a U.S. Marine barracks in Lebanon. The death toll was 241 U.S. servicemen, including 220 Marines. The tragedy is among the deadliest attacks on U.S. military personnel in recent history. The atrocity had been sponsored and carried out by Iran.

3.      In and around early 2001, Perles and Fay formed a joint venture to pursue claims against foreign state sponsors of terrorism, on behalf of, in particular, the victims of the families of the 241 Marines and U.S. personnel affected by the bombing of the Marine barracks (collectively the "Beirut Marines").

4.      Perles and Fay had experience litigating under an exception to the Foreign Sovereign Immunities Act ("FSIA"), but they sought to collborate with a personal injury attorney with resources that could locate potential plaintiffs. Accordingly, Perles and Fay engaged Rothenberg in June 2001 as referring counsel, with his sole role being to locate potential plaintiffs. Rothenberg enticed Perles and Fay with promises of teams of paralegals and resources to locate

each member of the affected families.  On this promise, Perles and Fay agreed to pay Rothenberg one third of any net attorney fees realized for his referred individuals.  Perles and Fay later learned that Rothenberg outsourced virtually all of his investigative efforts to a single, non-attorney third party whom he paid less than $8,000.

5.     Perles and Fay, on the other hand, performed substantive (and substantial) legal work, assembling the case that eventually became *Deborah D. Peterson, et al. v. The Islamic Republic of Iran*, et al., Civil No. 1:01-cv-02094-RCL, filed in the U.S. District Court for the District of Columbia that same year.  While Rothenberg referred only some of the 811 plaintiffs in *Peterson*, Perles and Fay served Iran with process and prevailed in a bench trial in 2003. By 2007, after years of additional damages work by Perles and Fay and other attorneys (not Rothenberg), Perles and Fay secured a $2.66 billion judgment against Iran.  Despite the judgment, the challenge became locating assets and collecting on the judgment on behalf of the plaintiffs.

6.     Rothenberg's shoddy investigative efforts did not uncover all the Beirut Marines. Thus, as these events unfolded, Perles and Fay, and others, had to file similar follow-on cases against Iran.  As Fay and Perles (and other lawyers) prevailed in obtaining judgments in those follow-on cases against Iran, Rothenberg began demanding additional fees obtained in the follow-on cases, although he had not located those plaintiffs or performed any legal work to secure the judgments. In November 2007, Perles and Fay refused to share any further fees with Rothenberg. But, in order to avoid a public disagreement that could prejudice the plaintiffs, Perles and Fay executed an express fee-sharing agreement for their jointly represented plaintiffs but specifically struck out Rothenberg's request to share in fees from clients he did not originate or otherwise represent.  Rothenberg signed this revised agreement.

7.     The new agreement did not deter Rothenberg from pursuing additional fees for himself.  Indeed, he began participating in unrelated cases against Iran, and hired Stroock & Stroock & Lavan LLP ("Stroock") to represent those plaintiffs (and himself personally) in pursuing collections against Iran.

8.     This culminated in Stroock intervening in an enforcement action for Iranian assets that had also been pursued by Perles and Fay for the *Peterson* plaintiffs' benefit.  This troubling development meant that Stroock, representing Rothenberg, pitted itself against Rothenberg's *Peterson* plaintiffs, seeking to reduce the *Peterson* plaintiffs' recovery from the same assets to which Rothenberg's other clients sought recompense, all for his personal pecuniary benefit.  Rothenberg's actions constituted a clear conflict of interest for his representation of the *Peterson* plaintiffs, and it directly resulted in reducing the *Peterson* plaintiffs' recovery by hundreds of millions of dollars, once the parties resolved Stroock's intervention efforts.

9.     Rothenberg, having already recovered millions of dollars of fees for subcontracting out the task of locating plaintiffs (which shoddy efforts failed to locate them all) but doing no actual legal work, should have been satisfied.  But he was not.

10.     In 2021, Rothenberg initiated the Arbitration against Perles and Fay, seeking millions more. In his demand, Rothenberg claimed that Perles and Fay, because they allowed the *Peterson* clients to share amounts collected from Iran with other Beirut Marines (some of which Fay and Perles originated but none of which Rothenberg found), unjustly increased their *pro rata* share of attorneys' fees at the expense of Rothenberg's alleged legal fees.  But Rothenberg ignored why this sharing was so crucial.  First, as testified to at the Arbitration by Lynn Derbyshire, the national spokesperson for the Beirut Marines, Fay and Perles were explicitly instructed to abide by the Marine Corps ethos of "No Man Left Behind" and to include the follow-on cases in any

enforcement efforts.  Second, without such sharing agreements, Congress would not have passed the necessary legislation to allow the *Peterson* plaintiffs (and others) to collect from Iran.  Despite these good reasons to share in collection amounts, Rothenberg made clear during the Arbitration his position that his clients, the *Peterson* plaintiffs, had no right to reduce his fee by entering into sharing agreements with other Beirut Marines.

11.     As the arbitration proceeded, Rothenberg's claims morphed into something larger. At his deposition in 2023, Rothenberg criticized Perles and Fay's litigation decisions on behalf of their jointly-represented plaintiffs, claiming that Perles and Fay cost the *Peterson* plaintiffs millions of dollars by entering into sharing agreements. This testimony, which alluded to ethical conflicts, essentially fractured the parties' joint representation arrangement, and compelled Perles and Fay to seek the advice of a legal ethics expert as to whether they were ethically mandated to make any disclosure to their clients.  Rothenberg, for his part, claimed that he essentially ended any substantive representation of the *Peterson* plaintiffs by erecting a "Chinese wall" and refusing any information regarding ongoing efforts to enforce their judgment, including their efforts to defend against interventions by Rothenberg's other clients.

12.     In the wake of Rothenberg's allegations, and consistent with the ethical advice they had received, Perles and Fay determined that they had to inform the *Peterson* clients of Rothenberg's testimony, as their clients had a right to know of Rothenberg's views regarding his ongoing role in their representation, his views regarding their lack of authority to compromise his fees via sharing agreements, and his claims for money, all of which might affect their future enforcement efforts.

13.     Thus, on April 16, 2024, Perles and Fay wrote a letter to the *Peterson* plaintiffs, informing them of Rothenberg's claims in the Arbitration. This ethically-required disclosure incensed Rothenberg, who thereafter initiated a flurry of activity before the Arbitrator.

14.     In response, the Arbitrator did not issue an order prohibiting Perles and Fay from communicating with the *Peterson* plaintiffs, as any such order would have made no sense from an ethical perspective.  Instead, on May 15, 2024, the Arbitrator issued Procedural Order 7, simply requiring Perles and Fay to disclose any future communications with the *Peterson* plaintiffs about Rothenberg or the Arbitration. Procedural Order 7 provided no process or timing for such notice.

15.     In the months that followed, many *Peterson* plaintiffs, apparently offended by Rothenberg's claims, terminated his representation. Rothenberg did not inform the Arbitrator of any of these terminations when they happened.

16.     Eventually, the Arbitration concluded in September 2024.  In March 2025, weeks after the parties submitted their post-hearing briefs, Rothenberg moved for sanctions against Perles and Fay, submitting as evidence three emails from Fay (not Perles) to *Peterson* plaintiffs concerning Rothenberg.  Rothenberg requested that both Perles and Fay be sanctioned for failing to disclose Fay's communications and claimed that because Rothenberg's clients had terminated him, his recovery of fees might be jeopardized.  Rothenberg argued that Perles and Fay both should have to make up any shortfall in attorney fees caused by his terminations by *Peterson* plaintiffs.

17.     In response, the Arbitrator reacted with strong indignation.  In an interim sanctions award, the Arbitrator claimed that Perles and Fay had been prohibited from such communications, drew what the Arbitrator termed an "adverse inference" against both Perles and Fay, whom he believed were "cloaking themselves in the Rules of Professional Conduct to steal [Rothenberg's] fees," and sanctioned them, granting Rothenberg's requested relief.

18.     There were many problems with the Arbitrator's sanctions award, including that: (1) the Arbitrator ***never*** prohibited the communications for which he sanctioned Perles and Fay, (2) any alleged failure to inform Rothenberg caused him no harm, and (3) Perles never actually violated any order of the Arbitrator.  But when Perles moved the Arbitrator to reconsider the interim award on these grounds, the Arbitrator was unmoved.  On July 7, 2024, the Arbitrator issued a corrected sanctions award, removing his claim that Fay's communications were prohibited, but nevertheless leaving the sanctions award against Perles (and Fay) in place.  The same day, the Arbitrator also issued his final award on the substantive issues before him, finding that Perles and Fay were unjustly enriched at Rothenberg's expense, despite the parties' express contract.

19.     This meant that the Arbitrator's final award was flawed in almost every possible respect. Both his sanctions award and final award exceeded his authority under the parties' arbitration agreement and the JAMS Comprehensive Arbitration Rules & Procedures (the "JAMS Rules").  In particular, the sanctions award reached issues and facts that the parties never agreed to arbitrate, and the Arbitrator's sanctions remedy grossly exceeded his authority under JAMS Rule 29.  Worse, the Arbitrator also manifestly disregarded the law, including the well-established rule that a party may not recover for unjust enrichment where an express contract exists.  For these reasons, and as further discussed below, the Arbitrator's sanctions and final award should be vacated in its entirety.

## PARTIES

20.     Petitioner Steven R. Perles is the founder and owner of the Perles Law Firm. He is an attorney licensed to practice law in the District of Columbia and resides in Florida.

21.     Petitioner Perles Law Firm, P.C. is a professional corporation with its principal place of business located at 816 Connecticut Avenue, NW, 12th Floor, Washington, D.C. 20006.

22.     Respondent Allen L. Rothenberg is an attorney practicing in New York, Washington, D.C., and Pennsylvania.  Upon information and belief, Rothenberg resides in Philadelphia, Pennsylvania.

23.     Respondent The Rothenberg Law Firm LLP has offices in New York (450 7th Ave, 44th Fl, New York, NY 10123; 169 Wythe Ave, Ste 204, Brooklyn, NY 11249; 17 Main St, Ste 314, Monsey, NY 10952); Pennsylvania (1420 Walnut St, Philadelphia, PA 19102); and New Jersey (811 Church Rd, Cherry Hill, NJ 08002; 1 University Plaza Hackensack, NJ 07601; 300 Boulevard of the Americas, Ste 100, Lakewood, NJ 08701).

24.     Respondent The Law Firm of Allen L. Rothenberg is a sole proprietorship.  Upon information and belief, it is located in Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

25.     This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and the amount in dispute exceeds $75,000.

26.     Mr. Perles is a citizen of Florida.

27.     Perles Law Firm, P.C. is a citizen of the District of Columbia.

28.     Rothenberg is a citizen of Pennsylvania.  This Court has personal jurisdiction over Rothenberg because he owns and runs The Rothenberg Law Firm LLP, which has three offices in New York; he is barred in New York; and he has consented to arbitration in New York.

29.     Upon information and belief, the Rothenberg Law Firm LLP is a citizen of New York, New Jersey, and Pennsylvania.  This citizenship is based on the citizenship of all of the Rothenberg Law Firm LLP's limited partners, all of whom appear to reside in New York, New Jersey, or Pennsylvania.

30.     Upon information and belief, the Law Firm of Allen L. Rothenberg is a citizen of Pennsylvania.

31.     Venue is proper in this Court because the underlying arbitration was conducted in New York, New York.  9 U.S.C. § 10(a); *see also* 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A.     Factual Background

### 1.     Perles and Fay File and Pursue the *Peterson* Action

32.     Perles was one of the first attorneys to successfully pursue a case against a foreign sovereign for injury to U.S. citizens and eventually specialized in private litigation against state sponsored terrorism. In or around early 2001, he was approached by a retired Marine Corps general who lost a son in the Beirut barracks bombing about pursuing a case on behalf of the Marines (or their families) who were killed and wounded in the attack.

33.     Perles agreed, and in early 2001, Perles made an agreement with Fay to work together to pursue cases against Iran under the Foreign Sovereign Immunities Act in connection with Iran's involvement in the 1983 bombing of a Marine barracks in Lebanon. As part of this agreement, and as a matter of convenience, Fay and Perles created the Fay and Perles FSIA Litigation Partnership (the "Partnership").

34.     The barracks bombing, which was carried out by a suicide bomber and resulted in the deaths of 241 servicemembers, has been characterized as "the most deadly state-sponsored terrorist attack made against American citizens prior to September 11, 2001." *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 47–48 (D.D.C. 2003).

35.     Perles and Fay conducted an extensive investigation to uncover evidence of Iran's involvement in the bombing, including by working "on the ground" in Lebanon.

36.     Rothenberg did not participate in this investigative work, nor was he brought on by Perles and Fay to assist with the litigation relating to the bombing.  Rothenberg's stated role was "to assist with certain client management matters including the referral of specific cases and the

9

opening of estates for the decedents in each case you have referred." Rothenberg's involvement was limited to signing up victims of the bombing for the litigation that became *Peterson*. Ex. 1.

37.    Pursuant to a letter agreement on June 6, 2001, Perles, Fay, and Rothenberg agreed that the three of them would "share equal thirds of the net fees earned in the prosecution of the counts brought on behalf of each claimant [Rothenberg had] referred to [Fay and Perles], as evidenced by the submission to [Perles' office] of an executed original retainer agreement." *Id.*

38.    Accordingly, certain *Peterson* plaintiffs that were referred by Rothenberg entered into written contingent retainer agreements with Perles, Fay and Rothenberg, pursuant to which each plaintiff agreed to pay the attorneys, contingent upon and to the extent of collection, a fee of 33 and 1/3 percent of the total gross recovery from all claims and causes of action against Iran and its agents, plus an amount equal to the necessary expenses to prepare, prosecute, and administer the case. These retainer agreements also provided that a portion of the fee that was a percentage of total gross recovery would be distributed to each of the Attorneys in an equal share.

39.    In 2001, Perles and Fay filed *Peterson v. The Islamic Republic of Iran*, No. 1:01-cv-02094 (later consolidated with *Boulos v. Islamic Republic of Iran*, No. 1:01-cv-02684) (collectively, "*Peterson*"), in the District Court for the District of Columbia. *Peterson*, which was brought against Iran and its security apparatus, the Iranian Ministry of Information and Security, was the first litigation filed relating to the barracks bombing. Rothenberg was not involved in drafting the complaint or conducting the trial in the *Peterson* Action.

40.    In 2003, following a bench trial, the *Peterson* court issued a liability judgment in favor of the plaintiffs on all issues of liability. *Peterson*, 264 F. Supp. 2d at 65.

41.     Perles actively participated in much of the work done to prepare for trial, such as securing the cooperation and testimony of a key witness.  Fay served as lead counsel in the bench trial. Rothenberg did not participate in the trial.

42.     In issuing its monetary judgment in favor of the plaintiffs, the *Peterson* court appointed special masters to consider the individual damages claims. To conduct the damages phase of *Peterson*, Perles and Fay began obtaining, organizing, and preparing evidence to support each client's claims, and hired 14 damages attorneys through the Partnership to assist with the efforts.  Rothenberg was not involved in the damages phase.

43.     In September 2007, the Court awarded total damages of approximately $2.66 billion, delineating a specific dollar award for each plaintiff. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 60 (D.D.C. 2007).

## 2.     Perles, Fay, and Rothenberg Confirm Their Agreement Regarding the Splitting of Fees Via the Co-Counsel Agreement

44.     On November 21, 2007, Rothenberg wrote to Fay and Perles to memorialize their agreement anew regarding how to divide the fees collected in the Peterson Action in a letter titled "Division of Fees—Peterson et al. v. Iran" (the "Draft Co-Counsel Agreement").  Ex. 2.

45.     In the Draft Co-Counsel Agreement, Rothenberg also proposed a "further" agreement regarding *future* cases:

> Further, we understand that in light of the publicity generated by the joint efforts of our firms in Peterson et al. v. Iran, we have begun to receive inquiries with respect to the possibility of representation of additional servicemen, servicemen's estates, family members, and/or family members' estates. Should any of us be asked to bring claims on behalf of servicemen, servicemen's estates, family members, and/or family members' estates previously unrepresented by our firms, we agree that prior to the commencement of representation, we will provide each other the opportunity, in writing, to handle such matters jointly. We further agree that any legal fee received will be divided equally among those of us who elect to participate in said representation, after the payment of fees to any co-counsel whom we may engage. However, this agreement in no way obligates any of us to prosecute actions on behalf of new claimants.

11

*Id.* at 1.

46.     Fay and Perles expressly rejected Rothenberg's proposed "further" agreement as to future cases, clearly crossing out that entire paragraph and initialing the strike-through. Perles and Fay signed the version of the letter with the above paragraph stricken on November 27, 2007. *Id.* This paragraph was **not** included in the final version of the agreement, which was signed by Perles and Fay on November 28 (the "Co-Counsel Agreement").   Ex. 3.

47.     The Co-Counsel agreement thus memorialized Perles, Fay, and Rothenberg's agreement that attorneys' fees derived from claims on behalf of a specified set of Beirut bombing victims who were *clients of all three attorneys* would be divided evenly among their firms:

> We agree that, as co-counsel, each of our respective firms is to receive one-third of the net attorneys' fee achieved in [*Peterson v. Iran*] from all claims on behalf of the 101 servicemen or their estates as named in the attached list compiled by Tom [Fay] and his staff. Each of our three firms is also to receive one-third of the net attorneys' fee resulting from damages awarded in this matter at any time to any of the listed servicemen's family members or those family members' estates.

Ex. 3 at 1.

48.     The Co-Counsel Agreement only addressed how to divide fees in the *Peterson* Action with respect to the approximately 560 plaintiffs that Rothenberg referred.  It did not address any future claims or cases.  *Id.* at 1-3.

49.     The Co-Counsel Agreement, like the Draft Co-Counsel Agreement, stated that it "shall supersede any prior agreements between us and our firms regarding this matter."  *Id.* at 1.

### 3.     Perles and Fay Litigate the Follow-On Actions Without Rothenberg's Involvement

50.     While the *Peterson* Action was in progress, Perles and Fay's separate investigative efforts uncovered other Beirut Marines who had claims against Iran relating to the Beirut barracks bombing but were not involved in the *Peterson* Action.  If Rothenberg had correctly performed his duties and recruited *all* of the potential plaintiffs with claims relating to the Beirut barracks

bombing, all such plaintiffs would have already been involved in the *Peterson* Action, but Rothenberg had not, and additional plaintiffs had to be located and represented.

51.     After the liability judgment was entered in *Peterson*, a series of new lawsuits were filed against Iran and its security apparatus. These suits used the liability findings in the Peterson Action to win judgments on behalf of other Beirut Marines and are referred to as the "Follow-On Cases." Some of the Follow-On Cases, referred to here and in the Arbitration as "Direct" Follow-On Cases, were generated by the publicity of the *Peterson* Action.  While Perles and Fay worked to attract the Direct Follow-On plaintiffs, they had insufficient resources to handle all of those claims on their own, and thus brought on co-counsel to handle those actions

52.     In addition to the Direct Follow-On Cases, there were also a number of "Indirect" Follow-On Cases, that were still built around the findings in the *Peterson* Action but were brought by other attorneys.  Neither Perles nor Fay had a direct relationship with the plaintiffs in the Indirect Follow-On Cases.

53.     Rothenberg was not involved in the Direct or Indirect Follow-On Cases in any capacity.

54.     The monetary judgments ultimately awarded in the Follow-On Cases collectively totaled approximately $1.39 billion, in addition to the award entered in favor of the plaintiffs in the Peterson case.

### 4.     Fay and Perles Commence Enforcement Litigation Relating to the Clearstream Assets

55.     As soon as the Court entered damages judgments in the *Peterson* Action in 2007, Fay and Perles began efforts to collect on the judgments.

56.     In mid-2008, through their investigation, Perles and Fay discovered Iranian assets worth roughly $2.1 billion held in an account owned by Clearstream, an international securities

transfer system provider, in a branch of Citibank in New York City (the "Clearstream Assets"). The assets were owned by Bank Markazi, the central bank of Iran.

57.     Realizing that the Clearstream Assets, which consisted of both cash and U.S.-denominated securities, could quickly be moved out of the control of U.S. authorities, Perles and Fay retained other counsel to assist with the collection effort, and secured a writ of execution and restraining orders that prevented Iran from moving the Clearstream Assets out of New York. Rothenberg was not involved in any of these efforts.

58.     In 2010, enforcement counsel on behalf of the *Peterson* plaintiffs commenced a turnover action (the "Clearstream Turnover Action") in the District Court for the Southern District of New York, seeking an order directing that Citibank turn the Clearstream Assets over to the court. *Peterson v. Islamic Republic of Iran*, No. 1:10-cv-04518 (S.D.N.Y.). Perles and Fay were heavily involved in the efforts of enforcement counsel, but Rothenberg was not involved in the Clearstream Turnover Action whatsoever.

59.     The *Peterson* plaintiffs were not the only ones who sought to recover from the Clearstream Assets. Plaintiffs in lawsuits related to terrorist acts sponsored by Iran (other than the 1983 truck bombing of the Beirut Marines' barracks) filed their own competing claims against the Clearstream Assets.

60.     The plaintiffs in four of those unrelated actions against Iran—*Greenbaum*, *Acosta*, *Kirschenbaum*, and *Beer*—retained Rothenberg as an attorney (the "Rothenberg Intervenors").[2] After judgments were procured in these cases, Rothenberg retained Stroock as collections counsel.

---

[2] *See Greenbaum v. Islamic Republic of Iran*, No. 1:02-cv-02148 (D.D.C.), *Acosta v. Islamic Republic of Iran*, No. 1:06-cv-00745 (D.D.C.), *Kirschenbaum v. Islamic Republic of Iran*, Nos. 1:03-cv-01708 and 1:08-cv-01814 (D.D.C.), and *Beer v. Islamic Republic of Iran*, Nos. 1:06-cv-00473 and 1:08-cv-01807 (D.D.C.).

Stroock, representing Rothenberg, then filed to intervene in the Clearstream Turnover Action on behalf of the Rothenberg Intervenors.

61.     Rothenberg's ability to recover attorneys' fees on behalf of the Rothenberg Intervenors, pursuant to contingent retainer agreements, depended on their ability to collect from the Clearstream Assets.  To try to do just that, some the Rothenberg Intervenors argued in the Clearstream Turnover Action that their claims had priority over the claims of Rothenberg's other clients, the *Peterson* plaintiffs.

62.     Thus, the Rothenberg Intervenors challenged the very ability of the *Peterson* plaintiffs, Rothenberg's clients, to recover against the Clearstream Assets. These actions presented a clear conflict of interest for Rothenberg.

> **5.     Plaintiffs in the *Peterson* Action and Follow-On Cases Enter into Agreements Relating to the Clearstream Assets**

63.     In February 2012, Perles and Fay began addressing with the *Peterson* plaintiffs a potential sharing agreement relating to the Clearstream Assets.  In a letter, Fay explained that because the attachment for the *Peterson* judgments was for an amount that exceeded the value of the Clearstream Assets, if the court agreed that the *Peterson* attachment had priority, then only the *Peterson* claims—and not the claims of the Follow-On plaintiffs—would be paid out. On the other hand, if the court found that other claims had priority, the *Peterson* claimants would be unable to collect at all.

64.     As an alternative, Fay explained that if the *Peterson* plaintiffs and those other Beirut Marines in the Follow-On cases agreed to a sharing agreement concerning the funds recovered, all Fay and Perles represented plaintiffs with claims related to the Beirut barracks bombing, not only the *Peterson* plaintiffs, could recover in an amount proportional to their damages.  This arrangement would follow the Marines ethos of "No Man Left Behind," and speed up the collection

effort. Although a sharing agreement would reduce the amount each *Peterson* plaintiff recovered if they prevailed on the priority issue, it would also avoid the risk that the *Peterson* plaintiffs recover nothing.

65.     In this letter, Fay asked each of the *Peterson* plaintiffs to advise Fay and Perles whether they consented to share funds from the Clearstream Assets with the Follow-On Plaintiffs who were also victims of the Beirut bombing. He also asked whether they consented to Fay and Perles negotiating an agreement with the intervenors whose claims did not arise from the Beirut bombing. In any event, Rothenberg promised that Fay and Perles would continue to pursue enforcement against other Iranian assets on the plaintiffs' behalf until they succeeded in collecting the full amount of damages.

66.     Every one of the *Peterson* plaintiffs, including those who were also represented by Rothenberg, consented to the proposed sharing agreements.

67.     On February 21, 2012, Perles and Fay signed an understanding, on behalf of the *Peterson* plaintiffs and plaintiffs they represented in the Follow-On Cases, with counsel for plaintiffs in the other actions relating to the Beirut barracks bombing (the "Marines Cooperation Agreement" or the "Follow-On Agreement"). Ex. 4. Many of the counsel in question had already obtained judgments against Iran, some had not.

68.     Nevertheless, the parties to the Marines Cooperation Agreement agreed not to seek to invalidate one another's claims in the Clearstream Turnover Action, and that the total amounts collected by the parties would be pooled and distributed in proportion to each group's judgment amount, after accounting for collection costs. The parties also authorized Perles and Fay to enter into further agreements with other groups that had claims against the Clearstream Assets and agree

that amounts recovered by those groups would also be divided in proportion to each group's amount of compensatory damages award.

69.     On June 5, 2012, Perles and Fay contacted the *Peterson* plaintiffs to inform them that they had completed negotiations with counsel for the other plaintiffs with claims in the Clearstream Turnover Action (whose claims arose out of different Iranian attacks than the 1983 Beirut Marines bombing), titled the "Litigation Cooperation and Settlement Agreement," and requested that each plaintiff indicate their consent or non-consent to that agreement.  Ex. 5.  The Litigation Cooperation and Settlement Agreement directed that 87% of the funds recovered from the Clearstream Assets would be directed to the plaintiffs whose claims arose from the Beirut barracks bombing (the "Marines' Share"), and the other 13% to other plaintiffs, earning it the nickname the "87/13 Agreement." *Id.* § 2.2.1.

70.     The Litigation Cooperation and Settlement Agreement only included plaintiffs who had already obtained compensatory damages awards against Iran at the time of the agreement, and clarified that the division of recoveries that it set forth "shall not in any way alter or impact any prior agreements among the individual members of Creditor Party groups and with their respective counsel regarding the division of recoveries within each respective group and any recoveries within any of such groups to subordinate claims to recoveries, all of which prior agreement[s] shall remain in full force and effect." *Id.* § 2.2.3.

71.     Fay's letter to the *Peterson* plaintiffs explaining the Litigation Cooperation and Settlement Agreement made it clear that the Marines Cooperation Agreement still applied and would determine how the 87% would be divided among all of the Marine plaintiffs, even those whose claims were further behind. Every *Peterson* plaintiff consented to the Litigation Cooperation and Settlement Agreement.

72.     The parties to the Litigation Cooperation and Settlement Agreement, eleven groups of "Creditor Plaintiffs" who all had judgments against Iran based on Iran's sponsorship of various acts of terrorism, "believe[d] it to be in their mutual best interests to join resources and cooperate to recover funds in the [Clearstream Turnover Action] to satisfy the Creditor Judgments against Iran, and to equitably share in any recovery of the Clearstream Assets awarded in satisfaction of the Creditor Judgments."  *Id.* at R-6.  Accordingly, they "agreed to resolve all claims and disputes as between and among themselves in and relating to the [Clearstream Turnover Action] … and cooperate with each other to obtain a turnover of the Clearstream Assets." *Id.* at R-7.

73.     The Litigation Cooperation and Settlement Agreement also provided that "the payment of any attorneys' fees … incurred by [each group's] respective counsel … will be governed by each [group's] agreement with its respective counsel." *Id.* § 2.5.

**6.     Perles Lobbies Congress, Which Results in the Clearstream Assets Being Turned Over**

74.     Around this same time, Perles lobbied Congress to pass the Iran Threat Reduction and Syria Human Rights Act, which would permit the recovery of the Clearstream Assets, once the plaintiffs established Iran's ownership. 22 U.S.C. § 8772.

75.     Perles was instrumental in drafting and securing the passage of this legislation that proved crucial to the collection of the Clearstream Assets.  A critical piece to ensuring Congress' passage of the Act was Perles' assurance that all victims of Iran-backed terrorism—including all of the victims of the 1983 bombing and all of the victims of other Iran-backed terror attacks—had agreed to share the Clearstream Assets, pursuant to the Marines Cooperation Agreement and the Litigation Cooperation and Settlement Agreement. The Act would not have been passed without proof of these agreements to share the Iranian funds among a wider group of victims (as opposed to the victims of a single case).

18

76.    In 2013, the district court in the Clearstream Turnover Action granted summary judgment in favor of the *Peterson* plaintiffs and directed Citibank to turn over the Clearstream Assets to the court. Accordingly, the court created a Qualified Settlement Fund (the "QSF") into which the proceeds of the Clearstream Assets were to be deposited.

77.    The Second Circuit unanimously affirmed the district court's orders under the Act directing the turnover of the Clearstream Assets and the establishment of the QSF. *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 193 (2014).    The validity of 22 U.S.C. § 8772 was then challenged before the Supreme Court, which eventually ruled that the statute was valid, thus clearing the way for the distribution of funds from the QSF.  Fay and Perles were instrumental in the efforts at the Supreme Court, while Rothenberg again did not participate.

78.    Ultimately, approximately $1.65 billion collected from the Clearstream Assets was allocated for the Beirut plaintiffs. Distributions were made from the QSF between late 2016 and 2020.  This occurred after approximately 16 years of litigation and hard work by Fay and Perles, with virtually no participation by Rothenberg.

### 7.    Perles, Fay, and Rothenberg Agree to Arbitrate Their Disputes

79.    The arbitration agreement between the parties arose out of multiple disputes.

80.    In December 2017, in the midst of a hearing in a separate arbitration brought against Perles, Fay, and Rothenberg by David Cook, a collections attorney that Perles and Fay retained at Rothenberg's recommendation in 2008.[3]  During the Cook arbitration, Perles, Fay and Rothenberg executed an arbitration agreement that resolved the parties' dispute over the apportionment of any

---

[3] Unbeknownst to Perles and Fay at the time, Rothenberg had already engaged Cook as collection counsel in *Greenbaum* and *Acosta* to recover from the Clearstream Assets on behalf of non-Beirut plaintiffs. When Perles and Fay learned of this conflict, they raised the issue with Cook, who withdrew from the non-Beirut cases.

liability in the Cook arbitration (the "Arbitration Agreement" and also provided that Rothenberg,

Perles, and Fay would submit a separate "Fee Dispute" to binding arbitration.  Ex. 6.

81.    The Arbitration Agreement defined the "Fee Dispute" as follows:

> A dispute (the "Fee Dispute") has arisen among the Parties relating to the attorneys' fees and litigation expenses in *Peterson v. Islamic Republic of Iran*, No. 10-4518 (S.D.N.Y.) and Nos. 01-2094 and 01-2684 (D.D.C.), *Valore v. Islamic Republic of Iran*, Nos. 03-1959, 06-516, 06-750 and 08-1273 (D.D.C.), *Murphy v. Islamic Republic of Iran*, No. 06-596 (D.D.C.), and *Estate of Bland v. Islamic Republic of Iran*, No. 05-2124 (D.D.C.) (collectively, the "Beirut Marine Cases"). The Fee Dispute is over whether Rothenberg is entitled to compensation from Fay and Perles caused by and/or related to sharing agreements between the plaintiffs and/or their attorneys in the Beirut Marine Cases (the "Beirut Marine Plaintiffs") and Marine victim and family plaintiffs (not represented by Rothenberg) and/or their attorneys in other actions against the Islamic Republic of Iran (collectively, with the Beirut Marine Plaintiffs, the "Marine Plaintiffs").

*Id.* Recital A.

82.    The Parties agreed to submit the Fee Dispute to binding arbitration with JAMS. *Id.*

§ II.A.  The Parties' Arbitration Agreement incorporated the JAMS Rules.  *Id.*

**B.    Procedural History**

**1.    Rothenberg's Demand**

83.    On September 14, 2021, Rothenberg filed a Demand for Arbitration, asserting

claims for breach of contract and unjust enrichment, in an amount "to be determined at the time of

the award but presently in excess of $20 million (the "Demand"). Ex. 7 ¶¶ 37-47; pp. 9-10.

84.    Rothenberg alleged, *inter alia,* the existence of oral agreements to split fees on all

cases.  *Id.* ¶¶ 1, 5-6.

85.    Rothenberg alleged that the November 28, 2007, Co-Counsel Agreement, pursuant

to which the three firms would evenly divide the attorneys' fees derived from claims on behalf of

specific plaintiffs, was reached to resolve a dispute in which Rothenberg claimed entitlement to

one-third of the fees "attributable to all plaintiffs in the Peterson Action."  *Id.* ¶¶ 8, 10. He further

alleged that the Co-Counsel Agreement "included an implied covenant not to take action to impair the rights of the other parties to the agreement," and claimed that he was unaware that Fay and Perles had failed to abide by some unsubstantiated and unproven agreement "not to take on additional Beirut plaintiffs." *Id.* ¶¶ 12–13.

86.    The Demand further alleged that the Follow-On cases were contrary to the Parties' alleged agreement not to recruit any more Beirut plaintiffs. *Id.* ¶ 14.

87.    Rothenberg also took issue with the Marines Cooperation Agreement, asserting that it diluted Rothenberg's attorneys' fees under the Co-Counsel Agreement by reducing the *Peterson* Plaintiffs' recovery, but still benefitted Perles and Fay as it allowed them to share the recovery with the Follow-On Plaintiffs, "for whom Respondents claimed a greater share of attorneys' fees." *Id.* ¶ 19; *see also id.* ¶ 26 ("[T]he Follow-On Agreement substantially reduced Rothenberg's attorneys' fee under the Co-Counsel Agreement … by diluting the Peterson Plaintiffs' claim to the Clearstream Assets").  He also alleged that this amounted to a further breach of the Co-Counsel Agreement because Perles and Fay failed to account for Rothenberg when it came to recovering from the Follow-On Actions.  *Id.* ¶ 35.

88.    Despite the so-called "Chinese Wall," Rothenberg alleged that Perles and Fay "concealed the Follow-On Agreement" from him and unjustly enriched themselves at Rothenberg's expense and violated the covenant of good faith and fair dealing." *Id.* ¶¶ 29, 34.

89.    Rothenberg also sought a declaratory judgment "setting forth his entitlement to future attorneys' fees from under the Co-Counsel Agreement sufficient to remedy the dilution and other damages caused by Respondents' improper actions." *Id.* ¶ 45.

90.    In Order No. 2 ("Procedural Order 2"), the Arbitrator limited the scope of the Arbitration to the "claims [that] are set forth in a Demand for Arbitration dated September 14,

2021, with attachments," which Rothenberg expressed "no intention to amend or supplement." Ex. 8. ¶ 4. The parties also agreed "that the interpretation of the Arbitration Agreement shall be governed by New York Law." *Id.* ¶ 6. The Arbitrator later determined that New York law also governed the determination of the Fee Dispute.

91.     The arbitration instituted by Rothenberg was not resolved quickly. Despite Rothenberg filing his Demand for Arbitration on September 14, 2021, the arbitration did not hold its first hearings until October 30, 2023. The arbitration then spanned a total of ten days of hearings until the arbitration closed almost a year later, on September 25, 2024.

### 2.     Discovery in the Arbitration Proceedings Uncovers Issues Relating to Rothenberg's Compliance with His Ethical Obligations

92.     During the pendency of this drawn-out arbitration, Rothenberg began taking new and evolving positions about his joint representation of the *Peterson* plaintiffs. In particular, during his deposition in September 2023, Rothenberg took new positions directly adverse to the advice that Perles and Fay provided to the *Peterson* plaintiffs.

93.     For example, Rothenberg testified at his deposition regarding his opinion that the parties to the Marines Cooperation Agreement "had no right to reduce [his] fee," and that the *Peterson* plaintiffs "should have been able to collect their full amount. If they wanted to go ahead and give some money to these other people, donate it, give it to them for some reason because they were Marines or whatever … that's on them, but not to reduce my fee." Ex. 9 at 151–152. He also asserted that the *Peterson* plaintiffs did not have "full information … as to what they were doing" because "they were taking a reduction and Mr. Perles and Mr. Fay were increasing their fee." *Id.* at 180. In Rothenberg's opinion, the Marines Cooperation Agreement provided "no benefit" to the *Peterson* plaintiffs, and "Perles and Fay forced" the Marines Cooperation Agreement "on the clients." *Id.* at 205–06.

94.    Despite all this, Rothenberg admitted that he "never" communicated any of these purported concerns with the Marines Cooperation Agreement to his clients. *Id.* at 201; 205-06.

95.    Instead, he patently prioritized his own interests in attorneys' fees above the interests of his clients, ignoring that without the Marines Cooperation Agreement and the Litigation Cooperation and Settlement Agreement, his clients likely would not have recovered *anything* from the Clearstream Assets.

### 3.    Perles and Fay Inform the *Peterson* Plaintiffs of Rothenberg's Claims

96.    As a result of Rothenberg's troubling statements, Perles and Fay consulted with ethics counsel regarding Rothenberg's conflicted claims. In 2024, ethics counsel advised Fay and Perles that Rothenberg's actions raised serious concerns, and that because Perles and Fay were now aware of Rothenberg's unethical conduct, they had a mandatory obligation to inform their jointly-represented clients.

97.    On the advice of ethics counsel, Fay and Perles sent a letter on April 16, 2024, to the affected clients and Rothenberg's counsel to inform them of Perles and Fay's concern that Rothenberg "may have violated duties owed to [the clients]." Ex. 10 at 1 The letter explained Rothenberg's new claims and asserted that (i) it was "doubtful that anything would have been collected" from the Clearstream Assets without the sharing agreements," and (ii) "if Mr. Rothenberg truly believed that the Marines Sharing Agreement was improper, then he should have told you that at some point and not just advanced claims seeking more attorney fees for himself regardless of what you actually received." *Id.* at 2-3. Perles and Fay emphasized that they had an ethical duty to inform the clients of information that might affect the clients' ability to collect on their judgments against Iran and provided the clients with Rothenberg's contact information in case they wanted to communicate with Rothenberg.

98.     Shortly after its issuance, Rothenberg sought an order from the Arbitrator requiring Perles and Fay to retract their April 16, 2024 letter. The Arbitrator refused this request and did not prohibit Perles and Fay from communicating with the *Peterson* plaintiffs.  Instead, in Procedural Order 6, the Arbitrator ordered Perles and Fay to provide Rothenberg the names and addresses of all the clients who received the letter, so that Rothenberg could send his own letter in response. On May 28, 2024, Rothenberg wrote to the *Peterson* plaintiffs to ask that they "reserve judgment until receiving [his] response" to the letter from Fay and Perles, "which may or may not come before the arbitration is resolved."  Upon information and belief, Rothenberg never sent the promised follow-up.

99.     Beginning on April 22, 2024, many of the *Peterson* plaintiffs who had been referred by Rothenberg wrote to him to terminate his services. Rothenberg did not disclose the terminations to Perles and Fay until December 2024, and did not specify which *Peterson* plaintiffs terminated him.  The *Peterson* plaintiffs that terminated Rothenberg did not terminate Perles and Fay.

100.    Following the April 16, 2024 letter and consequent terminations, Rothenberg requested that Perles and Fay (i) escrow certain attorneys' fees of which Rothenberg might be deprived as a result of these terminations, (ii) provide updates on collection efforts for additional Iranian assets, and (iii) disclose communications with the *Peterson* plaintiffs about Rothenberg.

101.    The Arbitrator granted this relief.  Procedural Order 7 ordered Perles and Fay "to facilitate, and not contest" Rothenberg's claim to payment of a "pro rata share of legal fees" in another collection action—this one regarding a property at 650 Fifth Avenue in New York City— "on account of the same individual Peterson plaintiffs from whom [Rothenberg] received legal fees" in the Clearstream Turnover Action.  Ex. 11 at 1-2.  Accordingly, the Arbitrator ordered Fay and Perles to deposit into an escrow account a total of $3,200,000 "in attorneys' fees received from

the 650 Fifth Avenue Action settlement," which the Arbitrator described as "the disputed attorneys' fees." *Id.* at 6.

102.    Procedural Order 7 also directed Fay and Perles to provide Rothenberg "with a detailed written statement of all communications with the Peterson Plaintiffs, who are [Rothenberg's] clients, regarding [Rothenberg], the April 16, 2024, letter, or the subject of this arbitration" and to "continue" to do so "for any past, present and future communications with the Peterson Plaintiffs who are the Claimant's clients." *Id.* at 9-10.

### 4.    Rothenberg is Erroneously Awarded Sanctions

103.    Following Procedural Order 7, it appears that Fay continued to communicate with the *Peterson* plaintiffs regarding Rothenberg's conduct and the ethical concerns it raised, including with clients who had already terminated Rothenberg.

104.    Following Procedural Order 7, it is undisputed that Perles did ***not*** communicate with any *Peterson* plaintiffs concerning Rothenberg, although Procedural Order 7 did not prohibit such communications.

105.    On March 17, 2025, Rothenberg moved for sanctions under JAMS Rule 29. Rothenberg attached three communications between Fay and the *Peterson* plaintiffs concerning Rothenberg, arguing that the communications violated the Arbitrator's order because they were not disclosed.  Rothenberg also asserted that there must have been additional communications not disclosed, because the communications in question were only inadvertently sent to Rothenberg.

106.    Rothenberg's motion for sanctions solely relied on examples of Fay's communications with clients.  Rothenberg did not introduce a shred of evidence indicating that Perles sent, let alone was aware of, any similar communications.

107.    Perles and Fay both objected to the motions for sanctions on the basis of the scope of the Arbitrator's sanctions authority, the scope of the arbitration, and their own ethical duties,

under the D.C. Rules of Professional Conduct, to disclose their concerns to their clients. Perles'
opposition also raised the lack of evidence against Perles, clarifying that neither he, nor any other
member of the Perles Law Firm, had communicated with any of Rothenberg's clients about the
subject of the April 16, 2024, letter.

108.     Despite Rothenberg's failure to proffer evidence against Perles, the Arbitrator
granted Rothenberg's motion for sanctions in full. *See* Ex. 12 ("Interim Award").  Central to
awarding sanctions was the Arbitrator's claim that he had "enjoined [Perles and Fay] from
communicating any adverse information about the [Rothenberg] to any of the *Peterson* plaintiffs,"
and he drew what he called an "adverse inference … that the respondents are cloaking themselves
in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he
represents in the *Peterson* action." *Id.* at 5, 17-18.  He rejected Perles' arguments concerning his
lack of culpability, suggesting that he was "throw[ing] Respondent Fay under the bus" even though
"he never disclaims Respondent Fay's communications." *Id.* at 10.

109.     Citing his sanctions authority under JAMS Rule 29, the Arbitrator awarded
"payment to [Rothenberg] of any shortfall in attorneys' fees from the *Peterson* plaintiffs that he
represented when the [Qualified Settlement Fund] distributed the Clearstream I asset, due to his
discharge of representation of any of them, and the attorneys' fees he collects from their
recoveries" in ongoing collections actions, "or any other matter from which these clients recover
payments on their judgments." *Id.* at 18.

110.     Perles moved for reconsideration and vacatur of Procedural Order 7 and of the
Interim Award.  *See* Ex. 13.  Perles argued that the Perles Respondents did not carry out any
"communications in violation of [Procedural Order 7]" and indeed, the alleged offending letter
that led to the flurry of activity—the April 16, 2024 letter—was sent *before* Procedural Order 7

was issued.  *Id.* at 5.  Additionally, Perles submitted (1) an affidavit confirming that he was not aware of Ms. Fay's communications with clients and did not "instigate or encourage" her communications; and (2) evidence that Perles and Fay sought the advice of ethics counsel relating to the April 16, 2024 letter and any communications with the *Peterson* plaintiffs.

111.    Despite Perles' new affidavit, the Arbitrator denied Perles' motion for reconsideration on July 7, 2025, but decided to "correct" his Interim Award to reflect that Perles and Fay were only required to disclose communications to Rothenberg.  Ex. 14.  Other than removing this critical finding which undergirded the Interim Award, the arbitrator did not otherwise change his ruling (the "Sanctions Award").  The Arbitrator dated this Sanctions Award *nunc pro tunc* to April 10, 2025.

### 5.    The Arbitrator Issues a Final Award, Incorporating the Final Sanctions Award

112.    On July 7, 2025, the Arbitrator also issued his final award, ruling on the substantive issues before him (the "Final Award").  *See* Ex. 15.

113.    While the Arbitrator did find that some of Rothenberg's claims failed, he found in favor of Rothenberg on portions of his claims for unjust enrichment and declared that "Respondents shall pay to the Claimant 21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of" certain Indirect Follow-On Cases, "without the Claimant's 21.61% of those fees coming into Respondents' possession," awarding Rothenberg millions of dollars in attorneys' fees from clients who had never hired him.  *Id.* at 47-49, 53-54.

114.    Critical to the instant motion, the Arbitrator also incorporated the Sanctions Award (issued the same day) into the Final Award.  In the Final Award, the only overlap between the Sanctions Award and the Final Award was that Rothenberg's request for an award of attorneys' fees and costs was denied, except for the costs awarded pursuant to the Sanctions Award.

### 6. Fay Seeks Vacatur of the Final Award

115.    On September 12, 2025, Thomas Fortune Fay and the Fay Law Group, P.A., filed their own action by filing to vacate the Final Award, including the Sanctions Award.

## GROUNDS FOR VACATING THE AWARD

## I.    THE SANCTIONS AWARD SHOULD BE VACATED

### A.    The Sanctions Award exceeded the Arbitrator's authority under 9 U.S.C. § 10(a)(4)

116.    Perles incorporates the foregoing paragraphs as if fully set forth herein.

117.    Under Section 10(a)(4) of the FAA, this Court may vacate an arbitration award if it finds that the arbitrator "exceeded their powers." 9 U.S.C. § 10(a)(4). Courts will vacate awards under this subsection where an arbitrator's award exceeds the scope of the parties' arbitration agreement. *See N.Y. Stock Exch. Arb. v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) (vacating award of punitive damages where parties agreed that New York law, which prohibits such damages, governed the arbitration), such as where an award conflicts with the forum and rules that the parties agreed would govern their arbitration. *See Kashner Davidson Sec. Corp. v. Mscisz*, 531 F.3d 68, 77 (1st Cir. 2008) (affirming vacatur of arbitration award where panel disregarded applicable rules of arbitral forum to sanction party improperly); *PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 265 (5th Cir. 2015) (affirming vacatur of arbitration award where arbitrator applied incorrect rules to arbitration).

118.    Here, the Sanctions Award incorporated in the Final Award sought to punish Perles and Fay for purportedly violating Procedural Order 7, which, among other things, ordered Perles and Fay to provide Rothenberg "a detailed written statement of all communications with the Peterson Plaintiffs, who are [Rothenberg's] clients, regarding [Rothenberg], the April 16, 2024,

letter, or the subject of this arbitration" and to "continue" to do so "for any past, present and future communications with the Peterson Plaintiffs who are the Claimant's clients." Ex. 14 at 9-10.

119.    The Arbitrator's authority to order sanctions for any violation of Procedural Order 7 was limited by JAMS Rule 29, which provides an arbitrator the ability to "order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator." Such sanctions "may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; [and] drawing adverse inferences." In "extreme cases," an Arbitrator may determine an issue in the arbitration "adversely to the Party that has failed to comply."

120.    In his Sanctions Award, the Arbitrator purported to draw the adverse inference against both parties that "respondents are cloaking themselves in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he represents in the *Peterson* action." *See* Ex. 14 at 17.

121.    On the basis of this so-called adverse inference, the Arbitrator awarded Rothenberg substantive relief, specifically, "any shortfall in attorneys' fees from the *Peterson* plaintiffs that he represented when the [qualified settlement fund] distributed the Clearstream I asset, due to his discharge of representation of any of them, and the attorneys' fees he collects from their recoveries" in ongoing collections actions, "or any other matter from which these clients recover payments on their judgments." *Id.* at 17-18.

122.    This Sanctions Award has far-reaching and indefinite consequences. It requires Perles and Fay to pay Rothenberg any and all attorneys' fees that he loses out on as the result of *Peterson* plaintiffs terminating him as their attorney, even if these attorneys' fees arise as part of

future collection efforts on Iranian assets, and even if Rothenberg is found by a court of competent jurisdiction to have been terminated for cause as a result of ethical misconduct.   Perles estimates that this Sanctions Award is likely to result in at least $11 million being awarded to Rothenberg.

123.    The Sanctions Award exceeded the Arbitrator's authority in several respects.

### i.    *The Sanctions Award exceeded the scope of the arbitration and JAMS Rule 29.*

124.    First, the JAMS Rules did not authorize the Arbitrator to award Rothenberg millions of dollars on the basis of a limited factual record concerning issues not subject to the parties' arbitration agreement and without a hearing.

125.    Under JAMS Rule 29, arbitrators are able to order both procedural sanctions, such as excluding certain evidence from consideration, and, in rare and extreme cases (which is not this case), substantive sanctions, including adjudicating an issue in a party's favor.  But this authority is not unlimited, and the plain intent of JAMS Rule 29 is to ensure that any sanctions award is issued within the scope of the parties' arbitration agreement.

126.    The parties here agreed to arbitrate only whether Rothenberg was "entitled to compensation from Fay and Perles" related to "sharing agreements between the plaintiffs and/or their attorneys" in *Peterson* and the Follow-On cases.  Ex. 6.

127.    Despite the narrow scope of the parties' Arbitration Agreement, the Arbitrator used the Sanctions Award to reach and address entirely new issues, all of which are outside the scope of the parties' agreement.  Case in point: the Arbitrator's "adverse inference" concluded that Perles and Fay were attempting to "steal" Rothenberg's fees by having *Peterson* plaintiffs fire him in 2024.  Ex. 14 at 17.  This adverse inference and the facts supporting it were completely unrelated to the fee dispute at the heart of the parties' arbitration agreement—which concerned fee-sharing agreements entered into by the parties years earlier.  The Sanctions Award also sought to remedy

conduct (*i.e.*, Fay purportedly contacting *Peterson* plaintiffs in 2024) that the Arbitrator had not prohibited in his orders, nor heard evidence on during the arbitration. Even worse, its consequences extend to potential future collection efforts by Perles and Fay on behalf of their clients.

128.    In fact, the Sanctions Award was so unrelated to the issues before the Arbitrator that he did not even rely on any of those facts or his adverse inference in governing the procedure of the arbitration or rendering the substantive portion of the Final Award. *See* Ex. 15. This shows that even to the Arbitrator, the issues decided as part of the arbitration and the issues underlying the sanctions were ***entirely separate***. This discrepancy only underscores that the Sanctions Award was entirely outside the scope of the parties' arbitration agreement and JAMS Rule 29.

129.    The Arbitrator used the Sanctions Award to bootstrap into the arbitration an issue that was plainly beyond the scope of the arbitrable dispute in order to punish Perles and Fay for what he viewed as wrongful conduct. But an arbitrator's jurisdiction is set by the parties' agreement, and just because a new dispute arises between those parties during the course of a long arbitration, it is not automatically merged into the pending arbitration.

130.    Indeed, by sanctioning Perles and Fay to dispense his own brand of justice, the Arbitrator sought to fashion a broad, multimillion dollar remedy more akin to how a court might use its inherent contempt powers. *See Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 578 (S.D.N.Y. 2024) (noting that an arbitrator exceeds his powers where he "effectively dispenses his own brand of ... justice"). But it is well-established that arbitrators do ***not*** have inherent contempt powers, and, unlike courts, their sanctions must remain within the four corners of the parties' arbitration agreement. *See Interchem Asia 2000 PTE Ltd. v. Oceana Petrochemicals AG*, 373 F. Supp. 2d 340, 359 (S.D.N.Y. 2005) (vacating award in part after court

concluded that arbitrators do not have inherent authority to impose sanctions outside the arbitration agreement of the parties); *Certain Underwriters at Lloyd's, Lond. v. Argonaut Ins. Co.,* 264 F. Supp. 2d 926, 945 (N.D. Cal. 2003) (vacating order of arbitrator that imposed monetary, contempt-like sanctions on party because "there [was] no basis in either the FAA or the arbitration agreement for the sanctions imposed").

131.    Because the facts and issues underlying the Sanctions Award were outside the scope of the parties' arbitration agreement, the Arbitrator exceeded his jurisdiction and the scope of JAMS Rule 29.

> ii.    ***Even if the Sanctions Award was within the scope of the parties' arbitration agreement, the Arbitrator violated JAMS Rule 29.***

132.    Even if the Sanctions Award fell within the scope of the parties' arbitration agreement, however, the Arbitrator still exceeded his authority under JAMS Rule 29.

133.    JAMS Rule 29 expressly requires sanctions to be based on the "failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator."

134.    In the Interim Award, the Arbitrator claimed that he had enjoined Perles and Fay from "communicating any adverse information about the Claimant to any of the Peterson plaintiffs or their counsel until the Final Award is issued in this arbitration" in Procedural Order 8.  Ex. 12 at 5.    But no such prohibition was in Procedural Order 8 (or Procedural Order 7 or any other order).  When Perles pointed out this error in his motion to reconsider the Interim Award, the Arbitrator merely removed this language from the Sanctions Award.  *Compare* Ex. 12, *with* Ex. 14.

135.    Following this edit, the Sanctions Award only purported to sanction Perles and Fay for violating Procedural Order 7's requirement that they disclose to Rothenberg any

communications with the *Peterson* plaintiffs "regarding the Claimant, the April 16, 2024, letter, or the subject of this arbitration." Ex. 11 at 9; *see* Ex. 14 at 17.

136.    But neither Rothenberg nor the Arbitrator identified any failure by Perles to disclose any communications with *Peterson* plaintiffs. In Rothenberg's motion for sanctions, his sole evidence of any sanctionable activity consisted of three undisclosed emails, all sent by Fay, **not Perles**.

137.    The Arbitrator disregarded this lack of evidence against Perles. When Perles opposed Rothenberg's motion on the grounds that he had not violated any order, the Arbitrator fired back in the Sanctions Award that Perles "never disclaim[ed]" Fay's communications, or "indicate[d] that she was acting clandestinely without his knowledge or even his consent or support." *See* Ex. 14 at 10, n. 1.

138.    Therefore, despite the complete lack of evidence of any violation by Perles, the Arbitrator sanctioned Perles the same as Fay. This sanction clearly exceeded the Arbitrator's authority, as Perles had not "fail[ed] to comply" with any order.

139.    Compounding the Arbitrator's error, when Perles submitted an affidavit in connection with his motion to reconsider in which he denied any knowledge of Fay's communications with the *Peterson* plaintiffs, the Arbitrator denied Perles' motion on the sole grounds that Perles should have submitted this evidence in opposition to Rothenberg's original sanctions motion. But the Arbitrator ignored that Perles had no need to submit such evidence in opposition to Rothenberg's motion for sanctions because Rothenberg never submitted any evidence of non-compliance by Perles that he had to rebut, thereby unjustifiably shifting the burden of proof from Rothenberg to Perles.

140.    The Arbitrator exceeded his sanctions authority under JAMS Rule 29.  Rather than sanctioning Perles for any non-compliance, the Arbitrator sanctioned Perles on the basis of Fay's conduct alone.  This finding was plainly wrong.  *See Republic of the Phil. v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) (vacating lower court's sanctions award and emphasizing that "[a] district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers . . . . If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney.").

### iii.    *The Arbitrator exceeded his authority by issuing a draconian sanctions award.*

141.    Finally, even putting aside the fact that the Sanctions Award was outside the scope of the parties' Arbitration Agreement and not based on Perles' failure to comply with any order, it also exceeded the Arbitrator's authority under JAMS Rule 29 because the Sanctions Award is grossly disproportionate and draconian.

142.    JAMS Rule 29 requires any sanction ordered by an arbitrator to be "appropriate," indicating that a sanction should not be arbitrary and capricious, nor grossly disproportionate to the non-compliance at issue.  Courts recognize similar limits on their abilities to sanction parties. *See Bulkmatic Transp. Co. v. Pappas*, 99 Civ. 12070 (RMB) (JCF), 2002 U.S. Dist. LEXIS 8360 at *7 (S.D.N.Y. May 9, 2002) ("Generally speaking, sanctions should be proportional to the gravity of the offense in order to preserve their deterrent effect. Neither should they be overused, used to sanction conduct that is not inherently culpable, or invoked when other solutions are available.").

143.    Here, the Sanctions Award was not "appropriate" at all.

144.    According to the Arbitrator in his final Sanctions Award, he sanctioned Perles and Fay for Fay's purported failure to disclose three email communications between her and certain *Peterson* plaintiffs, in violation of his Procedural Order 7, which he handed down on May 15,

2024.  The Arbitrator also concluded that there were likely additional communications between Fay and the *Peterson* plaintiffs that had not been disclosed, although there was no proof of such communications.

145.    But, even if Fay had failed to disclose communications with *Peterson* plaintiffs, the Arbitrator's Sanctions Award was in no way tailored or proportional to remedy this non-disclosure. No order ever prevented Fay, Perles or Rothenberg from communicating with the *Peterson* plaintiffs, and Rothenberg himself communicated with the *Peterson* plaintiffs by letter in May 2024.  And there would have been no reason to ever order such a prohibition, as the *Peterson* plaintiffs remained the clients of Perles and Fay, and there was no basis to legislate what they could say to their clients, let alone what they were ethically obligated to disclose to their clients. *See* D.C. Rules of Professional Conduct § 1.4(a) ("A lawyer shall keep a client reasonably informed about the status of a matter . . . ."); 22 NYCRR 1200.0, Rule 1.4(a)(3) ("A lawyer shall: keep the client reasonably informed about the status of the matter.").

146.    In his Interim Award, the Arbitrator intended to compensate Rothenberg for Fay's communication alerting the *Peterson* plaintiffs of Rothenberg's alleged ethical misconduct. The Arbitrator deemed these communications to have violated an order which he did not actually issue. The Arbitrator appeared to have reasoned that but for Fay's letter, the *Peterson* plaintiffs would not have terminated Rothenberg, and Rothenberg would have suffered no diminution in fees. However, even after recognizing that he had not prohibited communications with the *Peterson* plaintiffs, the Arbitrator nevertheless left the quantum of monetary sanction unchanged.  He simply swapped the basis of the sanctions order to a failure to *notify* Rothenberg of otherwise permissible communications. This stubborn adherence to his original sanction was not "appropriate" and

entirely unmoored from any harm caused by the violation; the alleged failure to inform Rothenberg of certain communications caused him zero financial harm.

147.    In fact, in response to the original April 16, 2024 letter informing the clients of Rothenberg's conduct and statements, Rothenberg himself wrote to the *Peterson* plaintiffs on May 28, 2024, asking that they reserve judgment until he could respond to the letter from Fay and Perles.    In the almost year and a half since then, Rothenberg has not, to the best of Perles' knowledge, provided any promised response. A few days of notice of subsequent communications by Fay would have manifestly made no difference as Rothenberg is unwilling or unable to justify, contextualize, or otherwise explain his conduct to the clients.

148.    Nevertheless, the Arbitrator used his Sanctions Award to try to undo what he perceived to be the effect of conduct—*i.e.*, the clients' firing of Rothenberg—that was outside the scope of the arbitration. And the Arbitrator did so even after he eventually admitted that Perles and Fay's April 16, 2024 letter and Fay's later communications did not violate any order. The result was a draconian Sanctions Award worth millions more than the underlying claims, which the Arbitrator refused to reconsider, even after (i) he was corrected that Perles and Fay had not been enjoined from communicating with *Peterson* plaintiffs about the arbitration or Rothenberg, (ii) Perles submitted evidence that he had not violated the Arbitrator's order, and (iii) Perles submitted evidence he and Fay had actively sought to *avoid* enriching themselves in the event that clients terminated Rothenberg.

149.    The Sanctions Award grossly exceeded the scope of the Arbitrator's authority, as it was not "appropriate" to award Rothenberg millions of dollars from Perles and Fay as a remedy for Fay's purported failure to disclose communications that were not otherwise prohibited.  *See*

*Mscisz*, 531 F.3d at 79 (vacating sanctions award from arbitration panel where it violated applicable rules).

150.    The overbreadth of the Sanctions Award also ignored that the original April 16, 2024 letter—sent prior to Procedural Order 7 and not the purported basis for the Arbitrator's sanctions—was consistent with Perles and Fay's ethical obligations to inform their clients of material issues that could affect their representation.  Rothenberg and the Arbitrator may not have liked that the *Peterson* plaintiffs learned of Rothenberg's claims, but that does not mean that Perles and Fay acted wrongfully.  Among other things, the *Peterson* plaintiffs had a right to know that Rothenberg was making claims that called into question his ability to zealously represent the *Peterson* plaintiffs while self-isolated behind a "Chinese wall," and to know that Rothenberg believed that they, his clients, had no right to enter into settlements and sharing agreements that would benefit them but reduce his fees.  Fay's communications with clients were factual, truthful and necessary to provide the clients with material information – the idea that such an attorney communication could result in sanctions is contrary to rules governing attorney ethics.

## B.    The Sanctions Award manifestly disregarded the law.

151.    The Sanctions Award should also be vacated because the Arbitrator manifestly disregarded the law.  Courts in the Second Circuit recognize that arbitration awards may be vacated for manifestly disregarding the law as a judicial gloss on, or an independent basis from, the FAA. *Weiss v. Sallie Mae, Inc.,* 939 F.3d 105, 108 (2d Cir. 2019).

152.    By exceeding his authority under the parties' arbitration agreement and JAMS Rules when he issued the Sanctions Award, the Arbitrator also manifestly disregarded the applicable laws.  Accordingly, all of the aforementioned grounds for vacating the Sanctions Award

also justify vacatur of the Sanctions Award on the basis of the Arbitrator's manifest disregard of the law.

153.    The Arbitrator manifestly disregarded the law in his Sanctions Award in two additional ways, both of which involve public policy. A court may vacate an arbitration award if it determines that enforcement of the award would violate a public policy that is "well defined and dominant and must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011).

154.    *First*, the Arbitrator manifestly disregarded the Rules of Professional Conduct that govern fee-sharing obligations between attorneys. Although the Arbitrator held that arguments concerning the Rules of Professional Conduct "are beyond the jurisdiction of the Arbitrator," such a holding cannot be correct given that fee sharing is routinely arbitrated.  Ex. 14 at 13.  Indeed, because the Rules of Professional Conduct govern fee sharing, they would be a part of any such process. *See Koster, Brady & Nagler v. Callan*, 199 A.D.3d 458 (1st Dep't 2021) (applying the Rules of Professional Conduct to a fee sharing dispute).

155.    For example, D.C. Rule of Professional Conduct Rule 1.5(e) provides that "[a] division of a fee between lawyers who are not in the same firm may be made only if," among other things, "[t]he client is advised, in writing, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged" and "[t]he client gives informed consent to the arrangement."  Similar rules exist in New York. 22 NYCRR 1200.0, Rule 1.5(g) ("A lawyer shall not divide a fee for legal services with another lawyer who is not associated in the same law firm unless … the client agrees to employment of the other lawyer after a full disclosure that a

division of fees will be made, including the share each lawyer will receive, and the client's agreement is confirmed in writing").

156.    Plainly, these Rules of Professional Conduct place the decision concerning attorneys' fees and how they are to be shared in the hands of clients, not attorneys or arbitrators. This reflects a particularly "well defined and dominant" public policy.  *See* Restatement (Third) of the Law Governing Lawyers § 47 (2000) (observing that "fee-splitting arrangements" are "not permissible" absent "disclosure and client consent"); ABA Model Rules of Pro. Conduct r. 1.5(e) (Am. Bar Ass'n 2020); *Matter of Silverberg*, 75 A.D.2d 817, 819 (2d Dep't 1980) (staying arbitration of contract on the ground that the contract's "division of legal fees without regard to services actually rendered" is "void and against public policy").

157.    Nevertheless, when the Arbitrator handed down the Sanctions Award, he essentially rewrote the fee-sharing arrangements that the *Peterson* plaintiffs had agreed to by ordering Perles (and Fay) to make up any shortfall of attorneys' fees that Rothenberg might experience as a result of Rothenberg being discharged by the *Peterson* plaintiffs.  In doing so, the Arbitrator awarded Rothenberg legal fees for clients who had ended their engagement with him, violating public policy and manifestly disregarding the law.

158.    *Second*, the Arbitrator manifestly disregarded the public policy against punitive damages being awarded in arbitration.

159.    Courts in the Second Circuit have repeatedly vacated the portions of awards providing punitive damages on the basis that New York public policy prohibits punitive damages in arbitration. *See, e.g.*, *N.Y. Stock Exch. Arb. v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) (vacating punitive damages in award under NY law because "the propriety of an award of punitive damages for the conduct in question ... [is a] question [ ] of state law."); *N.Y.*

*Stock Exch. Arb. between Fahnestock & Co. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991) (affirming vacatur of punitive damages in award).

160.    Even though the Arbitrator did not characterize his Sanctions Award as punitive damages, there is no question it was punitive in nature, as the Arbitrator sought to punish Fay and Perles for what he perceived as improper conduct, even though such conduct was not proscribed by his orders and caused no prejudice or financial harm to Rothenberg.

161.    Because the Sanctions Award was punitive in nature, it violated public policy and should be vacated for its manifest disregard of the law.

## II.    THE FINAL AWARD SHOULD BE VACATED

### A.    The Final Award exceeded the Arbitrator's authority under 9 U.S.C. § 10(a)(4)

162.    Perles incorporates the foregoing paragraphs as if fully set forth herein.

163.    As discussed above (*see supra* Section I.A.), this Court may vacate an arbitration award if it finds that the arbitrator "exceeded their powers."  9 U.S.C. § 10(a)(4).

164.    An arbitrator exceeds his power if he "has ruled on issues not presented to him by the parties, or otherwise exceeded the scope of the authority granted to him by the contractual provision providing for arbitration." *Matter of Arb. Between Melun Indus., Inc. & Strange*, 898 F. Supp. 990, 992 (S.D.N.Y. 1990).

165.    The Final Award exceeded the Arbitrator's power by ruling on a so-called "branch" of Rothenberg's unjust enrichment claim which was outside the scope of the parties' Arbitration Agreement and absent from Rothenberg's Demand for Arbitration.

166.    Pursuant to the Arbitration Agreement, the parties agreed to arbitrate their Fee Dispute "over whether Rothenberg is entitled to compensation from Fay and Perles caused by and/or related to sharing agreements" entered into in connection with specified Follow-On

Actions. Ex. 6, Recital A. In line with the parties' agreed upon scope of the arbitration, Rothenberg's Demand sought damages arising from the dilution of Rothenberg's attorneys' fees under the Co-Counsel Agreement, resulting from the Marines Cooperation Agreement. Ex. 7 ¶ 18.

167.    Specifically, because the Co-Counsel agreement entitled Rothenberg to one-third of the net attorneys' fees achieved in the Peterson Action, the Demand sought only to recover damages concerning the dilution of Rothenberg's fee by allowing other Iran-backed terrorism victims to share in the recovery. *See id.* ¶ 40 (alleging Respondents "breached the Co-Counsel agreement when they recovered from certain of the attorneys in the Follow-On Actions for harm to their attorneys' fees in the Peterson Action"); ¶ 45 (seeking "declaratory judgment setting forth his entitlement to future attorneys' fees under the Co-Counsel Agreement sufficient to remedy the dilution").

168.    In his Procedural Order 2, the Arbitrator memorialized the scope of the Arbitration as expressly limited to such claims, providing: "The claims are set forth in a Demand for Arbitration dated September 14, 2021, with attachments." Ex. 8 ¶ 4.  Procedural Order 2 further declared that Rothenberg had "no intention to amend or supplement [his] pleadings." *Id*.

169.    Further, the Final Award states that after Rothenberg "raised with the Respondents the issue of his fee dilution by virtue of the Marines Cooperation agreement … [t]he parties later entered into the December 4, 2017, Arbitration Agreement to submit the fee dispute to binding arbitration with JAMS." Ex. 15 at 19-20.

170.    Notwithstanding the clear scope of the Arbitration set forth in the Arbitration Agreement and Demand as limited to the purported dilution of Rothenberg's attorneys' fees under the Co-Counsel Agreement, the Final Award rests on an entirely separate theory of recovery. The Arbitrator instead granted Rothenberg millions of dollars based on Fay and Perles' "negotiating

fees for themselves in the Indirect Follow-On Cases," because those cases "used the 'work product' from the Peterson Action to obtain judgments," one-third of which belonged to Rothenberg. *Id.* at 46-47.

171.    This holding resulted from the Arbitrator's recognition of a "second branch" of Rothenberg's unjust enrichment claim, which he found to fall outside the scope of the Co-Counsel Agreement entirely. *Id.* at 43.

172.    However, the parties never agreed to arbitrate this purported "branch" of Rothenberg's unjust enrichment claim which rested on new allegations "that the Respondents negotiated fees for themselves in the Indirect Follow-On Cases to the exclusion of the Claimant." *Id.* at 46. The Fee Dispute submitted to arbitration as reflected in the Arbitration Agreement and Demand does not involve this issue which, as the Arbitrator explicitly recognized, had nothing to do with the claims alleged in the Demand. *Compare* Ex. 7 ¶ 34 ("By entering into the Follow-On Agreement, Respondents took action that substantially reduced Rothenberg's attorneys' fees under the Co-Counsel Agreement."), *with* Ex. 15 at 47 ("The November 27, 2007, Co-Counsel Agreement had nothing to do with the use of the Peterson work product and did not touch on it whatsoever."). Indeed, Rothenberg proposed this arrangement in a draft of the Co-Counsel Agreement in 2007, which Fay and Perles specifically rejected. Ex. 2.

173.    As a result, the Arbitrator failed to rule on the issues strictly before him. Instead, seeking to "dispense his own brand of ... justice," the Arbitrator remedied what he apparently felt was an unjust outcome for Rothenberg by determining issues that should have been the subject of litigation, not arbitration. *See Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 578 (S.D.N.Y. 2024) (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)).

174.     Because the Arbitrator exceeded the scope of his authority, the Final Award should be vacated. *See Melun Indus., Inc. & Strange*, 898 F. Supp. at 992; *see also Subway Int'l, B.V. v. Subway Russ. Franchising Co., LLC,* No. 21-cv-7362 (JSR), 2021 U.S. Dist. LEXIS 235335, at *12 (S.D.N.Y. Dec. 8, 2021) (vacating final award which decided a claim that was not presented by the parties).

### B.     The Arbitrator Manifestly Disregarded the Law in Issuing the Final Award

175.     In issuing the Final Award, the Arbitrator also manifestly disregarded well-defined, explicit, and clearly applicable legal principles in at least three regards.

#### i.     *The Arbitrator's Award of Unjust Enrichment Manifestly Disregarded the Rules of Professional Conduct.*

176.     Pursuant to the New York Rules of Professional Conduct, "[a] lawyer shall not divide a fee for legal services with another lawyer who is not associated in the same law firm unless … the client agrees to employment of the other lawyer after a full disclosure that a division of fees will be made, including the share each lawyer will receive, and the client's agreement is confirmed in writing." 22 NYCRR 1200.0, Rule 1.5(g); *accord* D.C. Rule of Professional Conduct Rule 1.5(e) ("A division of a fee between lawyers who are not in the same firm may be made only if … [t]he client is advised, in writing, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged" and "[t]he client gives informed consent to the arrangement.").

177.     Here, the Arbitrator found that because Rothenberg owned one-third of the Peterson Action work product, Fay and Perles were unjustly enriched by using that work product to negotiate fees for themselves in the Follow-On Cases to Rothenberg's exclusion. Ex. 15 at 46-48.

As a result, the Arbitrator awarded Rothenberg as damages "21.61% of the attorneys' fees from the Indirect Follow-On Cases from past and future recoveries in those cases." *Id.* at 62, n. 34.

178.    However, this violated the public policy embodied in the Rules of the Professional Conduct.   The plaintiffs in the Indirect Follow-On Cases never hired Rothenberg, they did not consent to him receiving attorneys' fees in connection with their actions, and they never even benefited from his limited work as part of the *Peterson* action.   Perles and Fay contributed more than a decade of onerous work and leadership that resulted in the liability decision and all the subsequent enforcement proceedings, which assisted the plaintiffs in the Indirect Follow-On Cases in procuring judgments against Iran.   By contrast, Rothenberg's only involvement was locating and referring a portion of the *Peterson* plaintiffs.

179.    Thus, the Arbitrator's award of unjust enrichment manifestly disregards the rules of professional conduct concerning the division of legal fees.

### ii.    The Final Award Manifestly Disregarded the Law on Unjust Enrichment.

180.    Under New York law, a party is unable to recover under theory of unjust enrichment when a contract governs the parties' relationship. *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006). Because the theory of unjust enrichment lies as a quasi-contract claim, "[i]t is an obligation the law creates *in the absence of any agreement.*" *Id.* (citing *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)) (emphasis in original).

181.    Here, the Arbitrator concluded that Perles, Fay, and Rothenberg had entered into a valid contract when they signed the Co-Counsel Agreement, pursuant to which the parties agreed to share equally in the attorneys' fees earned from the Peterson Action. Ex. 15 at 35-38.

182.    Fay and Perles specifically "crossed out the paragraph referencing the obligation to provide one another with the right to handle jointly any claims that came their way in the future." *Id.* at 33-34. Rothenberg agreed to this modified form of the Co-Counsel Agreement, and the Arbitrator found that his decision to "stand down on this request" for a share of the attorneys' fees from new cases constituted part of the consideration sufficient to support the Co-Counsel Agreement. *Id.* at 36-37.

183.    Despite concluding that the scope of the Co-Counsel Agreement did not cover the issue of Rothenberg's entitlement to fees from the Follow-On Cases (*id.* at 46-47), the Arbitrator held that the existence of the Co-Counsel Agreement did not bar this "branch" of Rothenberg's unjust enrichment claim. *Id.*

184.    Here*,* the parties specifically bargained to exclude Rothenberg's entitlement to attorneys' fees from Follow-On Cases in the Co-Counsel Agreement, forming the very consideration to support its validity. *Id*. at 33-34.  Indeed, Rothenberg conceded as much in his Pre-Hearing Brief.

185.    Therefore, the Arbitrator manifestly disregarded the law barring unjust enrichment claims where a contract exists. *See Beth Isr. Med. Ctr.*, 448 F.3d at 586; *see also G & G Invs., Inc. v. Revlon Consumer Prods. Corp*., 283 A.D.2d 253, 253 (1st Dep't 2001) ("Since a valid contract exists governing the subject matter in dispute, the cause of action for unjust enrichment is untenable.").

> ### iii.    *The Arbitrator's Award Manifestly Disregarded the Law on Unclean Hands.*

186.    In response to the Demand, Perles asserted the affirmative defense of unclean hands as a bar to Rothenberg's claim for equitable relief based on his numerous acts of misconduct during

the Clearstream Asset collection effort, which diluted the Peterson Plaintiffs' recovery and attorneys' fees to which Fay and Perles were entitled, to Rothenberg's own benefit.

187.    Specifically, as asserted in Perles' Response, Rothenberg represented plaintiffs in four other separate actions against Iran, the Rothenberg Intervenors. Instead of entering his appearance as counsel in these cases, Rothenberg hired the law firm of Stroock & Stroock & Levan to act as trial counsel, which obtained judgments in each of the cases and undertook collection on them by intervening in the Turnover Action.

188.    That intervention threatened the ability of the plaintiffs in the *Peterson* Action and Follow-On Cases to recover and forced them to agree to share their award with the intervening plaintiffs through the Litigation Cooperation and Settlement Agreement.

189.    These agreements reduced the recovery of Rothenberg's *Peterson* clients and also resulted in additional fees paid to Rothenberg and less to Perles and Fay.

190.    The Arbitrator failed to address whatsoever Perles' arguments that Stroock, which also represented Rothenberg personally, threatened the *Peterson* plaintiffs' recovery of the Clearstream Asset by its intervention in the Turnover Action.  Rothenberg's connection with Stroock concerning its efforts to challenge the *Peterson* plaintiff's entitlement to any of the Clearstream Asset in favor of his other clients (the Rothenberg Intervenors) is precisely the sort of wrongful conduct that should bar him from relying on unjust enrichment to recover from Fay and Perles.

## **PRAYER FOR RELIEF**

Accordingly, Petitioners request that the Court enter an Order that:

A.    Vacates the Final Award, including the Sanctions Award incorporated therein;

B.    Grants such other and further relief as the Court shall deem just and proper.

Dated:  New York, New York
        October 3, 2025

                                    **MORRISON COHEN LLP**

                                    By:  _/s/ Danielle C. Lesser_
                                         Danielle C. Lesser
                                         Edward P. Gilbert
                                         909 Third Avenue
                                         New York, NY 10022
                                         (212) 735-8600
                                         dlesser@morrisoncohen.com
                                         egilbert@morrisoncohen.com

                                    *Attorneys for Petitioners Steven R. Perles,*
                                    *Esq. and Perles Law Firm, P.C.*