# Exhibit 9



# Transcript of Allen Rothenberg, Esquire

**Date:** September 20, 2023
**Case:** Rothenberg, et. al. -v- Fay Law Group, P.A., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

1 (1 to 4)

**1**

```
1  JAMS COMPREHENSIVE ARBITRATION
2  NEW YORK, NEW YORK
3  JAMS REF. NO:  1425036110
4  -------------------------------------------X
5  ALLEN L. ROTHENBERG, ESQ., THE LAW FIRM
6  OF ALLEN L. ROTHENBERG, and THE
7  ROTHENBERG LAW FIRM LLP,
8                    Claimants,
9           And
10 THOMAS FORTUNE FAY, ESQ., THE FAY LAW GROUP, P.A.,
11 STEVEN R. PERLES, ESQ., PERLES LAW FIRM, P.C.,
12 and FAY and PERLESFSIA LITIGATION PARTNERSHIP,
13                    Respondents.
14 -------------------------------------------
15 D E P O S I T I O N, of ALLEN ROTHENBERG,
16 ESQ., the Claimant, the stenographic notes of
17 the proceedings in the above-entitled matter,
18 as taken by and before, TRACY COOK, a
19 Certified Court Reporter, Registered
20 Professional Reporter and Notary Public of the
21 State of New Jersey, held at the offices of
22 FOX ROTHSCHILD LLP, 997 Lenox Drive building 3
23 Lawrenceville, New Jersey 08648 on Wednesday,
24 September 20, 2023, commencing at
25 approximately 11:45 in the morning.
```

**2**

```
1  A P P E A R A N C E S:
2  Attorneys on behalf of Allen L. Rothenberg, Esq.
3      FOX ROTHSCHILD
4      BY:  PETER BUCKLEY, ESQ.
5      2000 Market Street, 20th Floor
6      Philadelphia, Pennsylvania 19103
7      215-299-2150
8
9  Attorney on behalf of Allen L. Rothenberg, Esq.
10     BY: HARRY ROTHENBERG, ESQ.
11     450 7th Avenue, 44th Floor
12     New York, New York 10123
13     212-563-0100
14
15 Attorneys on behalf of Respondent, Steven
16 Perles and Perles Law Firm
17     BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC
18     BY:  GEOFFREY T. HERVEY, ESQ.
19     7315 Wisconsin Avenue, Suite 800 West
20     Bethesda, Maryland 20814
21     301-656-2707
22
23
24
25
```

**3**

```
1  Attorneys on behalf of Fay Respondents
2      FAY LAW GROUP, P.A.
3      By: TIM ALTEMUS, ESQ.
4      6205 Executive Boulevard
5      Rockville, Maryland 20852
6
7  ALSO PRESENT:  ENRIQUE CASAS, VIDEOGRAPHER
8         and STEVE PERLES
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1         I N D E X   O F   W I T N E S S
2
3  WITNESS        DIRECT  CROSS  REDIRECT RECROSS
4  ALLEN ROTHENBERG
5      MR. HERVEY  6
6      MR. ALTEMUS     161
7
8         I N D E X   O F   E X H I B I T S
9         (RETAINED BY COUNSEL.)
10 EXHIBIT DESCRIPTION            PAGE
11 42  DEMAND          8
12 43  AGREEMENT       12
13 44  COVER PAGE      27
14 45  REPORT          85
15 46  LETTER          95
16 47  LETTER          100
17 48  AGREEMENT       109
18 49  LETTER          124
19 50  LETTER          131
20 51  E-MAIL          137
21 52  CHART           139
22 53  EXCERPTS        155
23 54  RETAINER        161
24 55  AGREEMENT       171
25 56  E-MAIL          177
```

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

2 (5 to 8)

Page 5

1       MR. BUCKLEY:  Mr. Rothenberg
2   will affirm.
3       THE VIDEOGRAPHER:  Here begins
4   media number one in the videotaped deposition
5   of Allen Rothenberg in the matter of
6   Rothenberg, et al. versus Fay Law Firm, PA
7   in the JAMS Comprehensive Arbitration New
8   York, New York.  Case number 1425036110.
9   Today's date is September 20, 2023 and the
10  time on the video monitor is 11:45 a.m.
11      The videographer today is Enrique Casas
12  representing Planet Depos.  This video
13  deposition is taking place at 997 Lenox Drive,
14  Lawrenceville, New Jersey.
15      Will counsel please voice identify
16  themselves and state who they represent?
17      MR. HERVEY:  I'm Geoffrey Hervey.
18  Counsel for Respondent, Steven Perles and
19  Perles Law Firm.
20      MR. ALTEMUS:  Tim Altemus from Fay
21  Law Group here on behalf of the Fay
22  Respondents in this arbitration.
23      MR. BUCKLEY:  Peter Buckley with
24  Fox Rothschild on behalf of Mr. Allen
25  Rothenberg as the Plaintiff and claimant.

Page 6

1       MR. ROTHENBERG:  Harry Rothenberg
2   also here on the behalf of the Plaintiff and
3   the claimant.
4       MR. HERVEY:  And in the room also
5   is Mr. Steven Perles one of the Respondents.
6       THE VIDEOGRAPHER:  The court
7   reporter today is Tracy Cook Burwell
8   representing Planet Depos.  The witness will
9   now be sworn in.
10      A L L E N   R O T H E N B E R G,
11  called as a witness, having been affirmed by a
12  Notary Public of the State of New Jersey, was
13  examined and testified as follows:
14      DIRECT EXAMINATION
15  BY MR. HERVEY:
16  Q.  Good morning, Mr. Rothenberg.
17  A.  Good morning.
18  Q.  As you know, I'm Geoffrey Hervey.  I
19  represent Steve Perles and Perles Law Firm.
20  Have you ever had your deposition taken
21  before?
22  A.  Yes, I have.
23  Q.  And as an attorney, have you taken
24  depositions?
25  A.  Yes, I have.

Page 7

1   Q.  So you're familiar with the rules.
2   We'll skip the vast majority of those.  I have
3   just a few that I would like to repeat.
4   A.  Sure.
5   Q.  If you don't understand a question I
6   ask, please tell me you don't understand it.
7   Will you do that?
8   A.  Sure.  Just keep your voice up a
9   little.
10  Q.  Okay.  Can you hear me okay?
11  A.  Yes.
12  Q.  Okay.  Thank you.  If you need to take
13  a break, please tell me.
14  A.  I will.
15  Q.  I'm happy to take a break, as long as
16  there's not a question pending.
17  All right.  Mr. Rothenberg, are you
18  taking any medicines that would interfere with
19  your ability to understand or respond to any
20  of my questions today?
21  A.  No, sir.
22  Q.  Are you under the influence, got to
23  ask, of alcohol or drugs that would interfere
24  with your ability to answer or understand or
25  respond to any of my questions?

Page 8

1   A.  No.
2   Q.  Are you suffering from any medical,
3   mental or physical condition that would
4   interfere with your ability to understand or
5   respond to my questions?
6   A.  Not to understand the questions, but as
7   you know, I've got a hip replaced.  I'm going
8   to have to get up and walk around a little
9   bit, got a couple other things, but I'm
10  coherent.
11  Q.  Okay.  That's good.  Do you have any
12  questions before we start?
13  A.  No, sir.
14      (Exhibit 42 marked for identification.)
15  Q.  All right.  Let me show you what I'm
16  going to have marked Exhibit Number 42, which
17  I will represent as the Demand For Arbitration
18  that was filed.  Mr. Rothenberg, is Exhibit 42
19  the Demand For Arbitration that was filed on
20  your behalf in this arbitration matter?
21  A.  What?
22  Q.  Do you know if this is arbitration
23  demand that was filed on your behalf --
24  A.  I read it here, but I assume it is.
25  You gave it to me and Peter's looked it over

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

**9**

1  and Harry.  I guess it is.
2  Q.  The claimants listed are Allen
3  Rothenberg, Esq., the Law Firm of Allen
4  Rothenberg and Rothenberg Law Firm,
5  LLP.  What's the difference between The Law
6  Firm of Allen Rothenberg and the Rothenberg
7  Law Firm, LLP?
8  **A.  Oh, Rothenberg Law Firm was a sole**
9  **proprietorship.  I have six of my children who**
10 **are now partners and my wife and we formed a**
11 **partnership.**
12 Q.  Are both of those entities still in
13 existence?
14 **A.  I believe everything is in existence.**
15 Q.  Okay.
16 **A.  Still some carryover things.**
17 Q.  All right.  Are all three, you and the
18 two entities all claiming recoveries in this
19 case?
20 **A.  They'll be one recovery.**
21 Q.  That's what I wanted to know.
22 **A.  Yeah, one recovery.**
23   MR. BUCKLEY:  We'll take just one.
24   MR. HERVEY:  All right.  Thank you,
25 Peter.

---

**10**

1  Q.  You're an attorney, correct, Mr.
2  Rothenberg?
3  **A.  Yes, sir.**
4  Q.  Thank you.  And you're admitted to
5  practice in Pennsylvania, The District of
6  Columbia and New York; is that right?
7  **A.  Yes, sir.**
8  Q.  Anywhere else?
9  **A.  And the federal courts of -- in New**
10 **York, Pennsylvania, and D.C.**
11 Q.  Okay.  Anywhere else?
12 **A.  And the Supreme Court.  No other state.**
13 Q.  Okay.  Thank you.
14 **A.  The United States Supreme Court.**
15 Q.  And in your work as an attorney, have
16 you advised clients on contract matters?
17 **A.  On contract matters?  I'm not a**
18 **commercial lawyer, so I don't know if**
19 **tangentially if I ever would have, but --**
20 Q.  You're mostly a trial lawyer; is that
21 right?
22 **A.  Mostly personal injury lawyer.**
23 Q.  Okay.  In your practice as a personal
24 injury lawyer, do you have written retainer
25 agreements with your clients?

---

**11**

1  **A.  Yes, we do.**
2  Q.  And in your mind, what's the purpose of
3  a written retainer agreement between the
4  attorney and the client?
5    MR. BUCKLEY:  Objection.  You can
6  answer.
7  Q.  You can answer.  He objects for the
8  record.
9    MR. BUCKLEY:  You can answer.
10 **A.  Establishes the attorney/client**
11 **relationship.**
12 Q.  Anything else?
13 **A.  And specifies the fee.**
14 Q.  And what do you mean it and specifies
15 the fee?
16 **A.  In a retainer agreement it would say**
17 **that the attorney, generally we have and most**
18 **is a contingent fee agreement and it says that**
19 **in general, that we would layout all the**
20 **costs, the client would not be responsible if**
21 **we lost the case.  There's no fee and no**
22 **costs.  We would take care of that.  In the**
23 **event that we win, there would be a**
24 **percentage.**
25 Q.  A percentage of the recovery?

---

**12**

1  **A.  A percentage of the recovery.  Yes,**
2  **sir.**
3  Q.  And that fee is paid by the client; is
4  that right?
5  **A.  Yes.**
6  Q.  All right.  You indicated contingency
7  matters.  Do you mostly work on contingency
8  today?
9  **A.  Just about always.**
10 Q.  And how long has that been the case?
11 **A.  About 52 years.**
12 Q.  Okay.  So you were a contingency lawyer
13 in 2000, 2001; is that right?
14 **A.  Yes.**
15 Q.  All right.  You do not bill by the
16 hour, do you, Mr. Rothenberg?
17 **A.  No.**
18 Q.  Do you put your contingency fee
19 arrangements with clients in writing?
20 **A.  Yes.**
21   (Exhibit 43 marked for identification.)
22 Q.  Mr. Rothenberg, showing what was just
23 marked as Exhibit Number 43.  Have you seen
24 this before?
25 **A.  Let me look at it.**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

13

1    Q. Please.
2    A. I see what it says, but it does not
3 necessarily reflect the relationship.
4    Q. Do you remember getting this?
5    A. I don't remember getting it, but it's
6 fine, you know. Sent to me, my address.
7    Q. Let me ask you to look at the very
8 first page of Exhibit 43, which is a fax cover
9 sheet. You see where it says fax number kind
10 of in the middle of the page?
11    A. Uh-huh.
12    Q. Is that your fax number for your
13 office?
14    A. I believe it is a fax number of my
15 Philadelphia office.
16    Q. Do you have any reason to believe you
17 did not receive this letter?
18    A. No reason whatsoever.
19    Q. Okay. Does this reflect the initial
20 agreement that you had with Mr. Fay and Mr.
21 Perles regarding the representation of clients
22 in the Marine Corp. bombing barracks matter?
23       MR. BUCKLEY: Objection. You can
24 answer.
25    A. It does not.

---

14

1    Q. How does it not reflect the agreement
2 among you?
3    A. When I convinced Perles and Fay to
4 undertake the representation of the Marines,
5 we were going to split it three ways. My
6 duties consisted of primarily bringing in the
7 plaintiffs and any lobbying that had to be
8 done to get legislation passed and to make
9 sure that the -- whatever we gathered from the
10 clients would go -- would go to Mr. Fay. Mr.
11 Fay was to handle litigation totally, And
12 Steve, I'm not sure what he would do, but he
13 was going to help in some way Mr. Fay and
14 communicate. I guess communicate with the
15 clients.
16    Q. And when did you reach that agreement
17 with Mr. Fay and Mr. Perles?
18    A. After numerous meetings that we had to
19 -- when I convinced them to take the cases. I
20 approached them because I had seen publicity
21 and I approached Steven who took the publicity
22 for other cases that I had with Mayor Kahana,
23 may he rest in peace, and his son and did that
24 and then he said, look, this is not big enough
25 for us to invest the time, the effort and

---

15

1 everything else, so you got to have something
2 bigger. So I got him something bigger.
3    Q. That's the Marines barracks case?
4    A. I really knew nothing about it. It
5 wasn't my area of expertise, but I went to a
6 fellow Harvey Zuckerman. Harvey worked with
7 John Lehman, Alexander Hague, George Schultz.
8 I think it was called the Farm Relations
9 Committee. He would come to my afternoon
10 prayer service in my office, And I went to him
11 and I said what can I have that's really, you
12 know, could really do something with and
13 without blinking in about three seconds, ten
14 seconds he says the Beirut Marines, the
15 bombing Marines. And I said, great. I went
16 back. I had a number of meetings with Tom and
17 Steve on the road until we finally decided to
18 undertake that.
19    Q. Do you remember when that occurred?
20 What year? Let me see if I can help you out.
21 Take a look at paragraph one of the Demand For
22 Arbitration, which is on page two. That is
23 Exhibit 42.
24    A. Yeah, it would have been before 9/11.
25 Before the --

---

16

1    Q. That was 2001, right?
2    A. Yeah. It would have been before
3 9/11/2000.
4    Q. Okay.
5    A. 1999.
6    Q. Okay. Well, let me ask you a question.
7    A. Not sure.
8    Q. All right. Paragraph one of the demand
9 says --
10    A. Let me get to it.
11    Q. That's double-sided, so it's on the
12 other page.
13    A. Wait, wait. Let me go to it. Where is
14 it?
15    Q. Paragraph one.
16    A. Paragraph one.
17    Q. Right.
18    A. Yes, sir.
19    Q. In or around 2000, pursuant to an oral
20 agreement, whereby each attorney would be
21 entitled to one-third of the net attorney fees
22 and it goes on from there. What is your
23 recollection of what the terms of that oral
24 agreement were?
25    A. As I just said, I would gather the

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

17

1  plaintiffs and do whatever had to be done
2  lobbying and helping to pass any requisite
3  legislation and Mr. Fay would handle --
4  totally handle litigation and I was never
5  really sure what Steve was going to do except
6  to help Mr. Fay to some extent and do whatever
7  -- whatever was necessary.
8      Q.  And your role was, as you said, to
9  refer plaintiffs into litigation?
10  A.  No, no.  Not to refer.  We were
11  supposed to be together on this.  We were
12  supposed to be co-counsel on this.  Not to
13  refer.  To bring in the plaintiffs for the
14  three of us.
15     Q.  Who was going to bring in the
16  plaintiffs?
17  A.  Me.
18     Q.  That was your job?
19  A.  My job.  Yes, sir.
20     Q.  And then once they were brought in,
21  what were you doing in terms of the work on
22  behalf of those plaintiffs?
23  A.  As far as the litigation went?
24     Q.  Yes.
25  A.  That was Mr. Fay.  As far as lobbying,

18

1  I did extensive work.
2      Q.  Okay, and who did you -- did you work
3  with lobbyists?
4  A.  First thing I did was, I didn't know.
5  I got, um, the number one lobbyist in
6  Washington who was a friend of mine from a
7  different -- different life that he had.  He
8  was making movies and he was the head of the
9  Republic -- I gave him an office in my
10  building and I heard he was a lobbyist, so I
11  called him and lo and behold, I found out that
12  he was the number one lobbyist in Washington.
13     Q.  Do you remember the name?
14  A.  Jack Abramoff.  Sure, I spoke to him
15  earlier this week and Tom Spebring right over,
16  had a few meetings and then I got a call from
17  Jack.  Yeah, I really want to do this and
18  blah, blah, blah and then I get a call.  He
19  says the New York Times is following him
20  around.  The Post.  I didn't know what the
21  heck he was talking about.  Apparently, as you
22  know, there is a problem with Indians.  I
23  think the New York Times did an expose because
24  he represented Indians, from what I understand
25  his story, that --

19

1      Q.  Mr. Rothenberg, I'm going to interrupt
2  you and I do apologize.
3  A.  Go ahead.  I'm sorry.
4      Q.  Think you've answered my question and
5  I'm concerned about --
6  A.  Jack Abramoff was the lobbyist that I
7  took them to, yes.
8      Q.  Thank you.  I'm just concerned about
9  time and I know you might want to leave.
10  A.  Yes, sir.  Thank you.
11     Q.  So you were going to help locate the
12  plaintiffs?  Is that the word you used?  Find
13  them to bring into the case?
14  A.  We were going to have -- we were going
15  to get the plaintiffs to engage us.
16     Q.  All right.
17  A.  And I, you know, go ahead.
18     Q.  And that was -- Tom was going to
19  litigate the case.
20  A.  Yes.
21     Q.  Steve was going to do whatever Steve
22  was going to do?
23  A.  Right.
24     Q.  And you were going to locate plaintiffs
25  and take care of lobbying; is that fair?

20

1  A.  No.  No.  I was going to work together
2  with them on the lobbying.
3      Q.  Okay.
4  A.  But that was a big part of what I was
5  supposed to be was to do the lobbying, yes.
6      Q.  But Fay and Perles were going to secure
7  the judgements.  That is not something you
8  were going to work on; is that right?
9  A.  Tom Fay was.
10     Q.  Okay.  He did 100 percent of the trial,
11  as far as you know?
12  A.  Absolutely.
13     Q.  Okay.  Do you recall that Mr. Perles
14  and Mr. Fay visited your office in
15  Philadelphia before you formalized your
16  engagement?
17  A.  Before we agreed.  I kind of specify
18  the chronology, but I know they were -- they
19  did this at my office, yes.
20     Q.  Do you remember showing them
21  advertisements when they visited your office
22  of ads that you had run for personal injury
23  cases?
24  A.  I don't remember that.
25     Q.  Do you remember whether you told them

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

**21**

1 that you would run similar advertisements for
2 plaintiffs for the Marine bombing case?
3 **A. I don't remember that, but the ad that**
4 **I took I found out through a neighbor whose**
5 **father-in-law was a -- was a Marine, best**
6 **periodical to do and it was Leatherneck**
7 **magazine and we created an ad just as I had**
8 **with my own. Yes, yes. We ran the ad in the**
9 **Leatherneck magazine.**
10 Q. And how big was the ad that you ran in
11 Leatherneck? A full page? Half a page?
12 Quarter of a page? Do you remember?
13 **A. Quarter, third, half.**
14 Q. You don't remember?
15 **A. I'm not sure.**
16 Q. How many times did that ad run, as far
17 as you could recall?
18 **A. I can't recall.**
19 Q. Was it more than once?
20 **A. Yes.**
21 Q. And who paid for that?
22 **A. I did.**
23 Q. Did you run -- other than the
24 Leatherneck magazine ad, did you run ads in
25 other publications? Any other print ads for

**22**

1 --
2 **A. No.**
3 Q -- Plaintiffs.
4 **A. No, but I hired -- I hired a woman who**
5 **was savvy with the internet at that point to**
6 **go after these plaintiffs, and one of my --**
7 **one of my assistants found Judy Young, gold**
8 **star mother. We met with Ms. Young and she**
9 **was actually the head -- I understand, the**
10 **head of the whole group, so she signed with us**
11 **and then she was kind enough to send out a**
12 **letter to the group saying, look, I can't**
13 **recommend these guys and I can't say, no. I**
14 **want you to hear what they have to say and I**
15 **signed with them and that also opened the door**
16 **substantially.**
17 Q. Okay. Did you run any television ads
18 looking -- for plaintiffs?
19 **A. No. No.**
20 Q. How about any radio ads?
21 **A. No.**
22 Q. Did you tell Mr. Fay or Mr. Perles that
23 you were going to run either --
24 **A. No.**
25 Q. Let me finish my question.

**23**

1 **A. Oh.**
2 Q. You were going to run either television
3 or radio ads?
4 **A. No.**
5 Q. You mentioned somebody that you brought
6 in. Was that Colleen Delaney?
7 **A. Yes, it was.**
8 Q. She ended up suing you?
9 **A. Yeah. I think she took a page from**
10 **Perles and Fay. They had a woman working for**
11 **her. What the heck was her name? I can't**
12 **think of it. Colleen was a lawyer and I paid**
13 **her. Apparently, there was a big lawsuit**
14 **between the Perles and Fay where Fay tried to**
15 **disbar Mr. Perles. They would -- somebody who**
16 **worked for them, they didn't pay her**
17 **apparently and she thought she had an**
18 **entitlement to one-third. There was then,**
19 **after this thing was concluded and I paid her**
20 **and she was gone, apparently she had a meeting**
21 **with Perles and Fay that I didn't really know**
22 **anything about and she then decided after the**
23 **this thing was done that, hey, this is a good**
24 **idea. I'll ask for a third. And we went**
25 **ahead and we wound up, I settled it and I paid**

**24**

1 **because I brought her in. Perles and Fay --**
2 **wasn't fair and I paid her $175,000.00. She**
3 **did an excellent job, but she wasn't entitled**
4 **to anything and she knew it, but it was worth**
5 **it to give it to her. She did -- I considered**
6 **a bonus for a job well done.**
7 Q. So you mentioned that you think she had
8 a meeting with either Mr. Fay or Mr. Perles or
9 both?
10 **A. I know she had a meeting with Mr.**
11 **Perles and Mr. Fay.**
12 Q. How do you know that?
13 **A. She told me. They told me in**
14 **Washington. I think just when they were**
15 **filing after -- after the time went -- I was**
16 **gathering the plaintiffs, then I'm sure you're**
17 **going to ask me later what -- some other**
18 **things that happened during it, but I think**
19 **when they filed, she went down to Washington**
20 **and met with them.**
21 Q. When they filed the Peterson complaint?
22 **A. When Peterson was filed. Finally the**
23 **big thing and finally, finally it was filed**
24 **and she went to Washington to meet. Actually,**
25 **unbeknownst to me, I didn't find out until**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

25

1  afterwards. I think from either Steve or Tom
2  or she told me. She had a meeting with them
3  in Washington.
4      Q. When do you think you found that out?
5      A. After the meeting.
6      Q. In the early 2000s or recently?
7      A. Well, when they filed -- I think the
8  only way you can tell is when they filed the
9  complaint, the first complaint.
10     Q. The Peterson complaint?
11     A. The Peterson, right.
12     Q. What do you mean that's the only way I
13  could tell what?
14     A. You're asking me to remember. I don't
15  remember specifically the date or time, but
16  it's easy to tell because I think it was the
17  day or the day before they filed this. You
18  can find that date.
19     Q. Okay. So before -- around the time
20  that Peterson complaint was filed, I've lost
21  you. I'm sorry. What happened?
22     A. Delaney had a meeting in Washington
23  with Perles and Fay.
24     Q. Okay, And either Fay or Perles or
25  Delaney told you that?

26

1      A. Maybe all three of them told me. I
2  can't recall.
3      Q. All right. So, are you aware of the
4  fact that there was some investigation that
5  was conducted in the Middle East for facts
6  related to the bombing case?
7      A. I don't know what you're referring to.
8      Q. Well, There was a video obtained of a
9  Hamas member? Are you familiar with that?
10     A. I don't know what you're -- Tom was
11  collecting. I mean, obviously we saw --
12  anything that I saw relative to that, I knew
13  about it or told Tom about, but I don't
14  remember a specific video.
15     Q. Okay. Did you -- well, let me just --
16     A. Sure.
17     Q. Did you participate in any of the
18  investigation on the ground in the Middle
19  East?
20     A. No. That was for Tom.
21     Q. Okay. Do you know who Skip Brandon is?
22     A. Skip Brandon. The name is vaguely
23  familiar. Maybe he worked for Tom or Tom
24  engaged him. I don't know who he was. May
25  have been an investigator. I don't know.

27

1      Since you said it in the same terms, if you
2  had said to me absent what you said before
3  investigation I would have said, I heard the
4  name, but I have know idea what his
5  relationship was.
6      Q. Okay. All right. Mark this as the
7  next one.
8          (Exhibit 44 marked for identification.)
9      Q. Showing you what is Exhibit Number 44,
10 and I will represent that this is nothing
11 other than -- well, this is just the cover
12 page and the last page of a 498 page complaint
13 that was filed in the Peterson case. It looks
14 like it was filed on October 3 of 2001.
15     A. Uh-huh.
16     Q. Is that consistent with your
17 recollection, Mr. Rothenberg?
18     A. It appears to be around the time period
19 2001. Wait a minute. This was filed before
20 or after 9/11? Was 9/11 -- September 11,
21 2001?
22     Q. I think so.
23     A. So maybe filed it right afterwards. I
24 don't know. It would have been. Yeah. It
25 would have been around that time.

28

1      Q. Did you participate in the drafting of
2  the complaint --
3      A. No.
4      Q -- itself?
5      A. No.
6      Q. Who did that?
7      A. Tom Fay.
8      Q. Did you review a draft of it?
9      A. I do not recall. My job was to zero in
10 and find the specific plaintiffs. It wasn't
11 like a mass teller. We zeroed on that and got
12 -- go ahead.
13     Q. Sorry. That was your focus to zero in
14 on the plaintiffs?
15     A. Yes, And the lobbying I got them Jack.
16     Q. Anybody else?
17     A. Oh, sure did.
18     Q. Who else?
19     A. After Jack Abramoff when he -- I think
20 Tom panicked. Came to me on a Sunday. He
21 hired Camans and a couple of other guys with a
22 ridiculously high agreement, 21 percent and
23 they were going to get it done within two or
24 three months and if not, they still had a
25 ridiculously high agreement, which they

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

29

1 weren't going to pay and all kind of arguments
2 and as a matter of fact, one guy had some
3 malicious intent for Steve because apparently
4 he had -- Steve owed him money from before,
5 but put on it that and I was able to get an
6 agreement. I was -- it was my job to
7 negotiate an agreement with these guys, which
8 I did reducing it from seven percent to four
9 percent and they were ineffective. They
10 couldn't do the job. So I --
11    Q. Sorry To keep interrupting you.
12    A. Go ahead.
13    Q. Do you recall any name of any of these
14 other --
15    A. Yeah. Shelly Camans.
16    Q. Anybody else?
17    A. Well, Bregman was with him.
18    Q. Michael Bregman?
19    A. Michael Bregman who was the one who had
20 the animosity to Steve who, and, um.
21    Q. How about --
22    A. Actually, he -- he committed a murder
23 and killed himself.
24    Q. Michael Bregman did?
25    A. Yeah.

---

30

1    Q. I didn't know that.
2    A. I really think I saved Steve's life by
3 negotiation. Go ahead, but that's irrelevant.
4    Q. You heard of Murray Amatae?
5    A. Well, let me tell you with Murray
6 Amatae. I went ahead and they really needed
7 good lobbyists, so through an attorney in --
8 in New Jersey, I found Steven Selm, a lobbyist
9 in New Jersey. Steven Selm then introduced me
10 -- the attorney in Trenton is Lenny Kaplan,
11 political figure. He would raise money for
12 Arlen Spector and he was on the democratic
13 side. He said Steve Selm is the best one.
14 Steven Selm was a state lobbyist. He
15 introduced me to Gibson, Dunn and Crutcher and
16 McGuire Woods. Gibson Dunn I met with Mel
17 Levine, former congressman and I met with, oh,
18 my. He ran for -- I think he ran for senate.
19 I'm trying to think of his name. I'm blacking
20 out on it.
21    Q. That's okay.
22    A. One of them, And to convince Gibson
23 Dunn to do it on a contingency fee, they
24 didn't do contingency fee. At the same time,
25 Mr. Fay was trying to get Mr. Perles

---

31

1 disbarred. I'm trying to negotiate these guys
2 to get them on a contingency fee and one of
3 young associates says borrow money and pay us.
4 We don't work on contingency fee. In the
5 meantime, I was negotiating with McGuire Woods
6 and maybe some others. McGuireWoods is Frank
7 Donatelli. Levin and -- I can't think of the
8 guy -- I'll think of it.
9    Q. That's okay.
10    A. Wait a minute. Wait a minute. Wait a
11 minute.
12    Q. Well, if you could just give me the
13 names, that would be helpful because I'm
14 mindful of the time.
15    A. I'll give you the names.
16    Q. Thanks.
17    A. So anyway, I finally got Gibson Dunn to
18 do it on a contingency basis and McGuireWoods
19 to do it on a contingency basis, but they
20 wasn't going to do it themselves. Neither one
21 wanted to work with the other one. I
22 convinced them to work together, and then
23 Steve and Tom introduced me to Murray Amatae.
24 Murray Amatae, same thing. He didn't want to
25 work contingency fee. He said, okay. I'll do

---

32

1 it, but I want to do it myself, but since the
2 other two guys were working together, then we
3 went -- I put all three together. Gibson,
4 Dunn, and Crutcher. We called it the dream
5 team. We are called it Gibson, Dunn and
6 Crutcher, McGuireWoods and Murray Amatae and
7 it was really directed -- it was almost like a
8 military operation. We had constant meetings
9 in Washington. Had to keep running to
10 Washington. Frank Donatelli ran the show.
11    Q. Let me interrupt you again.
12    A. Yes, sir.
13    Q. What was the lobbying for? Why was it
14 needed?
15    A. Requisite Legislation.
16    Q. For what?
17    A. To make it easier to collect the money,
18 to, you know, having guys on the list, on the
19 terrorist list. As a matter of fact, the
20 initial -- I'll skip. Apparently, Steve and
21 Tom had some other interest in other cases.
22 Nothing to do with Beirut bombing. It would
23 help them also. It would help them -- I
24 didn't care about that. I had no interest in
25 those cases, but I figured, if it would help

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

33

1  them, fine and what happened was, one of the
2  outfits that we had, interesting story, was
3  the Iraq was on there and another attorney had
4  nothing to do with us, a professor at
5  Georgetown had a 300 million dollar judgment
6  against Saddam Hussein for torturing citizens,
7  for torturing servicemen and would have been
8  there. George Bush wanted Iraq to go forward,
9  so he vetoed the bill. The question would be
10 vetoed or not. Steve and I, what are we going
11 to do? Tom wanted to go to Supreme Court and
12 it was at my suggestion he did not. We
13 modified the bill and then Bush signed it. We
14 got the --it was attached to the
15 appropriations bill, defense appropriations
16 bill and finally we got it passed. Yes, sir.
17    Q. How long -- over what period of time
18 did these events occur?
19    A. Oh, geez.
20    Q. I mean, approximately. How many years?
21    A. It was -- to get them? It was -- I
22 think it was -- it was months where I had to
23 go ahead And I was hiring these guys.
24 Stopping Tom and Steve from killing each
25 other. Well, not literally. Figuratively.

34

1     Q. Right.
2     A. I would get calls ten times a day from
3  Tom telling me terrible things about Steve.
4  From Steve to Tom. What's he trying to disbar
5  me? Let him just sue me civilly, which we
6  did, you know, and apparently they had a joint
7  account. Steve took out the money to defend
8  against this lawsuit. I can't think of her
9  name. The woman that worked for them.
10    Q. That's okay. I'm just trying to find
11 out over what period of time. I'm sorry to
12 keep interrupting you.
13    A. It is hard to say.
14    Q. Okay. All right. That's fair and
15 you're familiar with the fact that after the
16 liability judgment was obtained for Peterson
17 and the damages judgment was obtained for
18 Peterson that enforcement work proceeded
19 to collect on the judgment? You are familiar
20 with that?
21    A. Yes. Yes. I brought in Cook who
22 contacted me and then, as you know, it didn't
23 work out.
24    Q. We'll get to that, but you were not
25 personally involved in hunting for assets to

35

1  satisfy the judgements, were you?
2     A. Interesting question. Um, I may have
3  had some suggestions. We're going to sue.
4  Tom was a trillion dollars there. Cook, there
5  is a trillion dollars. We are going to go
6  after Boeing and other companies that we're
7  dealing with. That we're dealing with Iran
8  and every possible thing. So I'm sure I gave
9  some suggestions.
10    Q. But that's not you're -- looking for
11 assets to satisfy judgments is not what you
12 do?
13    A. No. I gave some suggestions. We
14 should go after this one. Go after that one
15 and, yeah.
16    Q. You're not a collections lawyer?
17    A. No, sir.
18    Q. And that's why you brought David Cook
19 in?
20    A. Yes, sir.
21    Q. Okay. You're familiar with Levy --
22    A. Well, actually, I wanted them to see
23 David Cook. Cook contacted me and I wanted to
24 give him a test first on smaller cases that I
25 had because they didn't take the other cases.

36

1  Cook originally was going to have the
2  Greenbaum case and then gave that up.
3  Apparently, he, um, got some notice of assets
4  and everybody else got notice, but never told
5  me about it. Steve and Cook knew about it.
6  Never told me about it and because I isolated
7  myself.
8     Q. What do you mean you isolated yourself?
9     A. I built a Chinese wall around myself.
10    Q. How so?
11    A. Because we had to go and hire other
12 collection counsel. As a matter of fact, it
13 was my vision to have collection counsel more
14 than one. No exclusivity and I had talked to
15 Cook. It's very surprising and he was going
16 to do it at a higher -- for the small amount.
17 Just a guy doing a radio deal and a
18 television. Big television deal and a small
19 radio deal. Well, I was going to do the big
20 television deal, but I tested on the radio
21 deal. The radio deal didn't work. So I
22 didn't do the television deal. Same thing
23 here. If he could collect for them, he
24 could brag that he had OJ --what's it Goldman.
25 The poor victim of OJ. He could do this. Do

37

1  this. He is going to get the money blah,
2  blah, blah. I said do it. Get something,
3  then I'll give you the Marines and he said he
4  would do the Marines at a far lower figure.
5  It really bothered me. It made me nuts. Two
6  things. He gave up my client, which was
7  freshly signed. Didn't tell me that he
8  recovered. Steve knew about it. He knew
9  about it. Breached that duty and he hired him
10 at a much higher price. You know, for the
11 Marines he would have done it very cheaply. I
12 could never figure that out. Same thing I
13 could never figure out the crazy price that
14 Tom Fay, the 21 percent and the seven percent.
15 It was bizarre.
16   Q. Hang on one second. Hang on.
17   A. Yes.
18   Q. We'll get to Mr. Cook.
19   A. Sure.
20   Q. Let me ask you about some of the
21 enforcement work that went on.
22   A. Sure.
23   Q. Are You aware there was a deposition
24 conducted in Italy?
25   A. Yes.

38

1   Q. Okay, And Mr. Vogel did that?
2   A. Yes.
3   Q. You didn't do that, did you?
4   A. No.
5   Q. What, to your knowledge, was learned at
6 that deposition?
7   A. I think what happened was that the --
8 after the bill was passed, that Iran or I
9 believe -- I didn't even know about Clear
10 Stream. Whoever did it, took the money and
11 put it in an account. I'm trying to think of
12 the name, an Italian bank. U.S. something.
13 Italian Bank.
14   Q. UBAE?
15   A. What?
16   Q. UBAE. Bonk UBAE?
17   A. No.
18   Q. Markazi?
19   A. No. An Italian bank.
20   Q. Oh, an Italian bank.
21   A. An Italian bank. So Cook went over
22 there and deposed the Italian gentlemen who
23 were the officers of the bank and he said,
24 hey, it is owned by Gaddafi. The Libyans are
25 really the directors and then there was an

39

1  issue where they wanted to give up 250 million
2  dollars, they said it was a charity and Tom --
3  he'd consult with me. Should we do that? I
4  said, look, I don't know if it'll make it
5  easier and I subsequently I think Tom told me
6  that wasn't a charity. It was fee for Gaddafi
7  for hiding the money. $250,000.00,
8  but this was like the day after the bill was
9  passed, they tried to put it in an Italian
10 bank. They put it somewhere else. It was
11 Clear Stream. We're going to sue -- oh,
12 what's the name of it? Citibank. Citibank,
13 but Citibank was start. They interplayed the
14 money --
15   Q. Hold on. I'm just talking about the
16 deposition.
17   A. Sorry. Go ahead.
18   Q. So you didn't conduct any research, Mr.
19 Rothenberg, into Luxembourg security laws, did
20 you?
21   A. No.
22   Q. Okay. You didn't conduct any research
23 in Luxembourg banking laws, did you?
24   A. No.
25   Q. All right. Do you know what OFAC is?

40

1   A. I didn't even know that Luxembourg was
2  involved in it because there was a wall around
3  me. Office of Financial Asset Control.
4   Q. Did you have any conversations with
5 OFAC related to Peterson?
6   A. No. It was Cook and Steve said that he
7 did.
8   Q. Okay.
9   A. But apparently they gave this
10 information to multiple parties.
11   Q. All right. So do you know who Charles
12 Mooney is?
13   A. It's another name that's very familiar,
14 but I don't know who he is.
15   Q. You can't identify him today?
16   A. No.
17   Q. Do you know what work Mr. Mooney might
18 have done?
19   A. I just said I don't know who he is.
20   Q. Okay. You didn't do any work with him
21 as far as you recall?
22   A. I don't know who he is. The name is
23 slightly familiar, but I do not know who he
24 is.
25   Q. That's okay. Do you know what the

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

41

1  dematerialized security is?
2  **A. A what?**
3  Q. A dematerialized security?
4  **A. I do not know.**
5  Q. Do you know what the Regulatory
6  Fundamentals Group is?
7  **A. No.**
8  Q. Do you know who Cari Stinebower is?
9  **A. No.**
10  Q. Do you know who Stuart Levy is?
11  **A. Stuart Levy, was he -- I know he was --**
12  **was he ever secretary to treasurer? I don't**
13  **know. I know he was in the administration.**
14  **I've heard the name. He was a powerful member**
15  **in the administration.**
16  Q. Do you know who Sean Thornton is?
17  **A. Who?**
18  Q. Sean Thornton?
19  **A. Not even a familiar name.**
20  Q. How about the law firm -- do you know
21  about -- let me start over.
22  **A. Go ahead.**
23  Q. Do you know who the law firm of
24  Vilret-Avocats is?
25  **A. Who?**

42

1  Q. Vilret-Avocats?
2  **A. The way you're saying it must be an**
3  **Italian law firm that he hooked up with.**
4  Q. I think it is in Luxembourg, actually.
5  **A. Then I don't know who they are. I know**
6  **nothing about Luxembourg. That's not what I**
7  **was supposed to do. That's not what I did.**
8  Q. Okay, and we talked about --
9  **A. And I stayed far away from it.**
10  Q. All right.
11  **A. So it was not a conflict.**
12  Q. As far as you know, the enforcement to
13  collect on the judgment proceeded in the
14  Southern District of New York, correct?
15  **A. Yes, I believe so. Yes.**
16  Q. All right. And you didn't participate
17  in the Southern District of New York action
18  against Clear Stream, did you?
19  **A. No, no. Sorry. I didn't participate**
20  **in the Souther District of New York what?**
21  Q. Enforcement action against Clear Stream
22  assets?
23  **A. Did I actively participate?**
24  Q. Yes.
25  **A. No, I did not actively participate.**

43

1  Q. Did you participate inactively some
2  other way?
3  **A. I would assume that since our -- I was**
4  **a co-counsel, that I would have been named on**
5  **something. I don't know.**
6  Q. Okay.
7  **A. The answer is I don't know.**
8  Q. All right. Are you aware that there
9  were challenges to the Peterson's ability --
10  **A. Yes, I am.**
11  Q. What is your ability with the
12  challenges?
13  **A. I knew nothing. I told you it was a**
14  **separate. I had Strook to represent the other**
15  **clients that I had that they knew about**
16  **because I came with Kahana and Greenbaum from**
17  **the lady -- the lady that was killed in Sbarro**
18  **bombing, unfortunately, and Kirschenbaum,**
19  **friend of my son Ross, he was injured in one**
20  **of the attacks, and who else? Ellie Beer's**
21  **cousin who was the head of United Hatzalah,**
22  **his cousin and who else? Greenbaum,**
23  **Kirschenbaum, Beer. Well, Acosta, Carlos**
24  **Acosta. The cop that was chasing him, shot**
25  **him. Great guy. Great guy. And, um, Acosta,**

44

1  **Greenbaum, Kirschenbaum, Beer. Probably**
2  **another one. I don't remember the name.**
3  Q. Okay.
4  **A. I could identify the name.**
5  Q. Those are the ones I'm familiar with.
6  **A. So Strook. And I tried to get Strook.**
7  **I had an idea. I didn't want Cook to have**
8  **exclusivity. They signed him with**
9  **exclusivity. Ridiculous. I wanted Strook to**
10  **get in there and Cook and many others. I**
11  **brought -- I brought Perles and Fay to Strook,**
12  **And Perles had a fight with the counsel for my**
13  **co-counsel, Barry Leibowitz, former attorney,**
14  **U.S. attorney and the whole thing broke up.**
15  **So that didn't happen so Strook decided to**
16  **represent them and what's his name? Cook was**
17  **going to represent him. Terrible what Cook**
18  **did. Terrible.**
19  Q. Hold on.
20  **A. And I was kept out of it and I got a**
21  **letter. Let me try to be specific, answer**
22  **your question specifically. I got an e-mail,**
23  **a letter saying what are you doing? You're**
24  **trying to knock the Marines out. I'm like,**
25  **what are you talking? I had no idea what he**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

45

1  is talking about.  You call Strook off.
2  Strook is trying to knock me out.  Trying to
3  knock the Marines out.  I had no idea what was
4  going on.
5      Q.  So that was being done by Strook,
6  right?
7      A.  Strook.
8      Q.  And Strook, just for clarity, Strook is
9  Strook and Strook and Levan.  The law firm in
10 New York; is that right?
11     A.  I think it's called Strook now.
12     Q.  It's just Strook?
13     A.  Strook and Levan.
14     Q.  Okay.
15     A.  But apparently it wasn't only Strook.
16 That information was given out to everybody,
17 so it was Rubin going after them.  There was
18 -- was it Haskell?  Habish.
19     Q.  Habish?
20     A.  Habish.  DLA Piper.  It was everybody
21 was running in there trying to get position
22 and apparently Tom and Steve filed improperly.
23     Q.  What do you mean?
24     A.  They filed improperly.  They were being
25 knocked out.

---

46

1      Q.  What is your understanding of the
2  improper filing?
3      A.  My understanding is they lost priority
4  because they didn't file properly and Strook
5  did.
6      Q.  Was that the 1610C order?
7      A.  Probably 16AC -- whatever it is.
8      Q.  That's not something you're familiar
9  with?
10     A.  No, I'm not.  I don't do that type of
11 work.
12     Q.  What type of work?
13     A.  Collection.
14     Q.  Okay.
15     A.  Collection.  So I didn't know until Mr.
16 Fay did it and went crazy and, you know, then
17 they all got together apparently and so it was
18 not to fight each other.  And DLA Piper I
19 think was Richard Kremen from DLA Piper and
20 who was it?  Rubin and then I think there was
21 a guy from Providence, Rhode Island.
22 Everybody was having a field day when OFAC
23 disclosed to everybody about these assets.
24     Q.  Well, the first group to move to
25 intervene in the collection action, wasn't

---

47

1  that spearheaded by the Strook firm?
2      MR. BUCKLEY:  Objection.
3      Q.  If you know.
4      A.  I don't know.
5      Q.  Are you familiar with --
6      A.  But I do know that Tom had the
7  impression that it was Strook that was killing
8  him, but apparently there was a lot of people.
9  There was a hearing and they got together and
10 at some point they did a sharing agreement.  I
11 have to take a break.
12     Q.  Okay.  We'll take a break.
13     THE VIDEOGRAPHER:  We're going off
14 the record.  The time is 12:24 p.m.
15     (Recess taken.)
16     THE VIDEOGRAPHER:  We are back on
17 the record.  The time is 1:06 p.m.
18     Q.  Back on the record here.  Do you know
19 what FSIA is?
20     A.  Yes.
21     Q.  What is it?
22     A.  Foreign Sovereign Immunities Act.
23     Q.  But you're not really familiar with it,
24 are you?
25     MR. BUCKLEY:  Objection.  You can

---

48

1  answer.
2      A.  I don't know what you mean by familiar.
3      Q.  Well, do you remember you had your
4  deposition taken in the Cook matter in August
5  of 2017?
6      A.  I know I had my deposition taken, yes.
7      Q.  Mr. Folkenflik I think asked you some
8  questions.
9      A.  Folkenflik.
10     Q.  You remember him?
11     A.  Yes.
12     Q.  It's hard to forget him, isn't it?
13     A.  He's all right.  He did his job.
14     Q.  Yes, he did, and then he asked you, are
15 you familiar with FSIA and your answer was not
16 really.
17     A.  Yeah.  Same answer.
18     Q.  Okay, and then same with TRIA, T-R-I-A?
19     A.  Yeah.
20     Q.  You didn't participate in the appeal to
21 the second circuit in the enforcement action,
22 did you?
23     MR. BUCKLEY:  Objection.  You can
24 answer.
25     A.  No, but I paid for Vogel.  In the same

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

13 (49 to 52)

---

49

1  thing like Perles.  We paid the guy.  That was
2  his job.  That was his job.  We weren't
3  involved in that.  We weren't involved in any
4  of that.
5      Q.  You didn't argue it or write the
6  briefs?
7      A.  No.
8      Q.  And same thing with the Supreme Court
9  matter.
10     MR. BUCKLEY:  Objection.
11     A.  I hired --
12     Q.  Ted Olsen?
13     A.  Actually, I recommended somebody else,
14 but Tom insisted on Ted Olsen.  He had
15 gravitas.  I think five members of supreme
16 court went to the wife's funeral.  It was
17 horrible.  He was -- he had everything.  So I
18 -- I was consulted on it.  I recommended my
19 vice president Lynn Copea, National Jewish
20 Commission, Nat Lewin, who had extensive
21 experience in it, but we stayed with --
22     Q.  You need to slow down just a little bit
23 for the reporter.
24     A.  But he only wanted Ted Olsen and he made
25 the right decision.  Not that the other one

---

50

1  wouldn't have been just as good, but
2  he wanted Ted Olsen.  Ted Olsen did a fine
3  job.
4      Q.  Did you participate in the appeal to
5  the supreme court?
6      MR. BUCKLEY:  Objection.
7      A.  No.  Of course not.  That wasn't what
8  we -- none of the other guys did either.
9      Q.  It wasn't your job?
10     A.  It wasn't nobody's job.  We hired
11 people to do that.
12     Q.  Okay.
13     A.  We hired -- what's his name?  Olsen and
14 others.  Gibson, Dunn and Crutcher who I
15 brought in initially.  They did -- because
16 Olsen was with them and they had a girl in
17 Houston who did the appeal.  In fact, a
18 really good writer in the Houston office of
19 Gibson, Dunn and Crutcher.  She was the one
20 who did it.
21     Q.  How about Matt McGill?  You remember
22 him?
23     A.  Sure.  Matter of fact, Matt McGill was
24 his assistant and he was subsequently used in
25 other cases, in another supreme court case

---

51

1  that Steve was involved and I was involved.
2      Q.  Were you communicating with the clients
3  at an point in the Peterson matter?
4      MR. BUCKLEY:  Objection.
5      A.  That was Steve's job.  We agreed to be
6  one voice.  I would have loved it one voice.
7      Q.  But you didn't?
8      A.  One voice.  No, the voice was Steve.
9  Steven and perhaps Tom with him, but one
10 voice.  They did a website with one voice.
11     Q.  Well, during the enforcement action in
12 the Southern District of New York --
13     A.  Yes, sir.
14     Q  -- did you consider the plaintiffs tat
15 you had referred into the litigation to be
16 your clients?
17     MR. BUCKLEY:  Objection.
18     A.  Say this again.
19     Q.  During the enforcement action in the
20 Southern District of New York.
21     A.  Yeah.
22     Q.  Let me back up a minute.
23     A.  Yes, sir.
24     Q.  You had a number of the plaintiffs in
25 the Peterson action --

---

52

1      A.  Yes.
2      Q  -- were your clients, right?
3      A.  Yes.  I considered all of them my
4  clients.
5      Q.  All of who?
6      A.  All of the plaintiffs.
7      Q.  In which case?
8      A.  In the Peterson case and in the Kahana,
9  Kirschenbaum, Greenbaum and Beer cases.
10     Q.  Okay.  Did you consider --
11     A.  But I stayed out of it.
12     Q.  Because you had Strook involved in
13 enforcement?
14     A.  Because Strook was involved.  With
15 Barry Leibowitz took care of Strook and Tom
16 was supposed to take care of Vogel, but I did
17 go to meetings later with Vogel.  That's
18 probably where I found out about Italy.  I
19 don't think I knew anything about it before
20 because we had a meeting with Vogel.  I think
21 it was a time they got rid of Cook
22 because Cook didn't do his job.  Trying to
23 remember that, but Vogel told me.  I didn't
24 know any of this stuff.  Any of the
25 enforcement.  Any Clear Stream stuff or 16A3B

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

14 (53 to 56)

---

53

1  whatever it is. 16A3B. I didn't know any of
2  this stuff. I didn't know that they were
3  knocked out until Tom Fay told me and then it
4  was outraged.
5      Q. You didn't know who was knocked out?
6      A. That Peterson was knocked out or was it
7  there was an attempt to knock Peterson out.
8  I'm not even sure exactly what happened.
9  Apparently Tom -- Tom did not
10 file properly and Strook and others did file
11 properly and then they had to share because
12 each one was going to fight the other one.
13 You're better off sharing this thing
14 than killing each other.
15     Q. That's why the sharing went in place?
16     A. As far as I know. As far as I know.
17     Q. Okay.
18     A. And that is an assumption on my part.
19 I can't tell you because that's what I'm
20 concluding that --
21     Q. When -- go ahead.
22     A  -- because they were all killing each
23 other. Look, let's all get together. Let's
24 fight Iran, the bad guys, rather than
25 ourselves. This is ridiculous. You got the

---

54

1  clients. You got everything else. Divvy it
2  up, which is what they did, which is what they
3  did.
4      Q. When you say they were killing each
5  other, what did you mean by that? Not
6  literally.
7      A. I'm sorry. I'm sorry. Figuratively.
8      Q. That's okay.
9      A. Figuratively they were attacking each
10 other. There was infighting for the different
11 groups trying to position themselves.
12     Q. What different groups?
13     A. To get priority.
14     Q. Which different groups?
15     A. Pardon me?
16     Q. You said the different groups.
17     A. As I said before, Strook, Peterson,
18 Rubin, Habowitch, and what do you call it?
19 DLA Piper with Cobert Towers cases and I
20 think there was a California and a few others.
21     Q. Okay.
22     A. Everybody was in it.
23     Q. Okay. All right. Let me get back to
24 the beginning of this. In 2000, 2001 --
25     A. Sure.

---

55

1      Q. How many lawyers did you have in the
2  firm at that time? Do you remember?
3      A. Oh, gee wiz.
4      Q. Yes. I don't know how many I have
5  today, but I get to ask you the questions. Do
6  you remember how many you had in 2000, 2001?
7      A. There may be a letterhead here.
8      Q. Okay.
9      A. I can count it.
10     Q. It would be on the letterhead?
11     A. Yeah.
12     Q. Okay. That's fair. We talked about
13 Colleen Delaney before. Was there anybody
14 else working with you to locate --
15     A. Jack Gellner.
16     Q. Jack Gellner?
17     A. Jack Gellner in my office. He is the
18 one who got the meeting with Judy Young and we
19 both went over there and as I said, she signed
20 with us and she was kind enough to send out a
21 letter to everyone saying that, I'm not
22 recommending them and I'm not telling you no,
23 but I signed with them and I want you to hear
24 what they have to say and the list that she
25 had -- what's his name? Fay's friend,

---

56

1  LaSpata.
2      Q. LaSpata?
3      A. LaSpata's sister.
4      Q. Carmella?
5      A. She's not a lawyer. I think it's
6  Carmella who got it and started
7  doing it and signed it because she's not a
8  lawyer for LaSpata. I don't think LaSpata
9  knew from too much.
10     Q. Okay. So other than Delaney and
11 Gellner, anybody else working with you to try
12 to identify potential plaintiffs for the case?
13     A. Well, I'm sure there's others. There
14 were others.
15     Q. Working with you?
16     A. In the office.
17     Q. Do you remember who they are?
18     A. Gee wiz.
19     Q. Long time ago, right?
20     A. I'm trying to think who I would have
21 polled. Maybe -- I don't recall.
22     Q. Okay.
23     A. You know, tangentially involved.
24     Q. During the time that you and people
25 with --

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

**57**

1   A. But the principals were Colleen and
2   Jack.
3   Q. Okay.
4   A. Were the principals. I'm sure there
5   were, you know.
6   Q. Well, during the time that Colleen and
7   Jack and maybe you were trying to find
8   plaintiffs, what else were you working on that
9   wasn't related to the Marine's case?
10   A. What else was -- I'm sorry?
11   Q. What other cases were you -- what other
12   matters were you working on in that 2000, 2001
13   time period?
14   A. We had a personal injury firm.
15   Q. Were you busy?
16   A. Personal injury, products liability,
17   medical malpractice, but fortunately, I had a
18   lot of people to delegate things to. I
19   spent an inordinate amount of time, which Adam
20   Zisserman, another one, would tell you on the
21   Marines everyday. Fielding calls from Tom,
22   fielding calls from Steve. Trying to get the
23   lobbyists. I was totally committed to this
24   thing. Decided we are going to get it done.
25   Q. So What period of time are you talking

**58**

1   about now?
2   A. I'm talking about for years that we
3   had.
4   Q. Okay.
5   A. For years it was constant.
6   Q. If I can, I'll try to focus you in a
7   little bit more.
8   A. Sure.
9   Q. Let's say 2001, can you estimate what
10   percentage of your time you were spending
11   trying to find plaintiffs for that case?
12   A. Personally?
13   Q. Yes.
14   A. Zero.
15   Q. You and your firm?
16   A. My firm a lot of time.
17   Q. But you said you zero personally?
18   A. Personally other than talking. I
19   didn't physically go into the internet and do
20   it. The only thing I did, I talked to Judy
21   Young. Maybe spoke to a few of the clients,
22   but I wasn't the one communicating.
23   Q. It was other people?
24   A. There were other people that were doing
25   it. That was their job.

**59**

1   Q. Were those other people all part of
2   your firm?
3   A. All paid by my -- my firm, yes.
4   Q. Were they employees?
5   A. Yes.
6   Q. Or contractors?
7   A. Yes.
8   Q. Employees?
9   A. Delaney was -- was contract. Jack was
10   -- may he rest in peace, was an employee,
11   long-time employee. Jack and there were
12   others, too. There were others, too. I'm
13   trying to think of one young fellow. I can't
14   even think of his name. He went to Baltimore.
15   I don't remember the name. We did a
16   tremendous job.
17   Q. So I'm going to ask you --
18   A. We discovered a Gaskell guy. Shocking.
19   Go ahead.
20   Q. You discovered a what?
21   A. A Gaskell.
22   Q. Dan Gaskell?
23   A. Surfaced, yeah.
24   Q. Okay. All right. Let me ask you to
25   take a look at the Demand For Arbitration,

**60**

1   which we marked as Exhibit 42.
2   A. Yes, sir. Where is it?
3   Q. It's this one, and I want to ask you
4   about --
5   A. Wait, wait. Which one?
6   Q. This one here that you got in your
7   hand.
8   A. Yeah. Yeah.
9   Q. And I want to ask you about paragraph
10   four. If you could take a look at paragraph
11   four. You see that? Okay. Mr. Rothenberg,
12   she's trying to write it down, so read it
13   quietly to yourself.
14   A. Okay. Sorry.
15   Q. That's okay. Did you read the
16   paragraph?
17   A. Yeah.
18   Q. Okay. So you say here after filing the
19   Peterson action, Fay and Perles began using
20   the platform that the Peterson action had
21   provided to recruit additional Beirut
22   plaintiffs and then it goes on.
23   A. Actually, they did it before.
24   Q. Okay.
25   A. We had agreed that once this thing was

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

61

1  filed, Tom said no more cases. No more cases.
2  That is the end of it. Not taking anymore
3  cases. Don't take anymore cases. I never
4  took another case. My firm never took
5  another case, and then I found out about
6  Gaskell and said, oh, we want to get it
7  faster. So that's why we got Gaskell. I said
8  what are you doing? And he got Gaskell, and
9  Gaskell was filing, I guess, on behalf of
10 Perles and Fay.
11    Q. So when did this occur that there was
12 this communication -- hold on. Let me finish
13 my question.
14    A. Go ahead.
15    Q. That there was a communication about
16 not taking on anymore cases?
17    A. Right. Tom was setting a date and kept
18 pushing it back so we were able to get more
19 plaintiffs. In fact, I had two-thirds of the
20 plaintiffs. That's what I thought it
21 was. I didn't know about these other
22 plaintiffs that he was still recruiting. They
23 went to where ever and still recruiting. That
24 was the end. He said we are done. That
25 done. We're filing. That is it. Whatever we

62

1  have, that's it. And ultimately I found out
2  that, you know, that that was it and we had
3  the list that we -- that you'll see. I'm
4  jumping ahead. I said I think 150. Had 150.
5  I had 101, so --
6     Q. Okay. So let me stop you there.
7     A. I figured they got to 50, which they
8  shouldn't have had, but like a bartender, you
9  know a bartender is working for you and you
10 know he's stealing, but as long as he doesn't
11 steal too much. I figured if I had two-thirds
12 I thought we had trillions of dollars. All
13 this money is there. You know, I didn't even
14 know we were going to need collection agents
15 because Tom estimated that he was going to get
16 the money. No problem. Get this thing done.
17 You get the judgment. We were
18 going to collect zillions of dollars for the
19 clients and, of course, we'll get our fee.
20    Q. All right, well, you say here that --
21 and I'm saying you, it is your demand for
22 arbitration.
23    A. Sure. Sure.
24    Q. Fay and Perles used the platform of
25 Peterson to recruit additional plaintiffs.

63

1  What does that mean? What does that mean to
2  you?
3     A. It means they -- to me it means that
4  they continued -- that they continued to
5  recruit additional clients.
6     Q. How did they do that?
7     A. Unbeknownst to me. Well, Steve heard
8  him say they went down to South Carolina and
9  they did a luncheon, which I wasn't invited
10 to. Yeah, they were going down there. Don't
11 go. You don't have to go. It's no big deal.
12 We're going to go down there. It would be
13 nice to go. I didn't know they were signing
14 more plaintiffs, and I didn't know that they
15 were inviting Honaman and whoever the other
16 ones are. Their landlord Honaman and
17 somebody else. I don't know, but the platform
18 that they used obviously that I'm learning
19 more about it today wasn't just that there
20 were guys that got cases. They went down to
21 recruit. They actually went down to recruit
22 and after telling me and I abided by it,
23 just like I let Steve talk to the clients. We
24 abided by it. No more clients. That is it.
25 That's it. Nobody. That is it. Done.

64

1     Q. Well, let me ask you to look at
2  paragraph six of the demand.
3     A. Yes, sir.
4     Q. Which says later Fay and Perles
5  indicated they would no longer recruit
6  additional Beirut plaintiffs and at
7  Respondent's request, the parties orally
8  agreed not to take on additional plaintiffs
9  seeking to pursue recovery.
10    A. I think the chronology is off.
11    Q. The chronology is off in the demand?
12    A. Yes.
13    Q. Okay.
14    A. I think we are wrong here. I think
15 we're wrong because once the thing was filed,
16 that was it. That's when I was told not to
17 recruit anymore clients.
18    Q. Okay, but you said you relied --
19 paragraph seven in reliance on the agreement,
20 you didn't take on more cases?
21    A. I didn't take on more cases. I
22 stopped, and you could see how many cases I
23 brought in for the three of us before they
24 started even getting the first plaintiff.
25    Q. Okay.

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

17 (65 to 68)

---

**65**

1    A.  And then I stopped.  You will see if
2  you look at the chronology, you'll see there
3  was no cases ever taken in after that.
4    Q.  And is it your testimony that you
5  stopped because Fay told you --
6    A.  Because Tom Fay told me, yes, we can't
7  take anymore.  I said, look, there's people
8  calling, so we extended the date, extended the
9  date, and extended the date and finally that
10  was date, it was done.  No more.
11    Q.  The date being the date it was filed?
12    A.  The date of filing, right.  That is
13  when Delaney went down to celebrate whatever
14  it was.
15    Q.  So October of 2001 it was filed?
16    A.  Whatever the date was.  Whenever it was
17  filed.  Yes, sir.
18    Q.  So and am I correct then that all of
19  the plaintiffs that you and your people
20  referred into the case, found for the case
21  were included in the Peterson case?  All of
22  your clients?
23      MR. BUCKLEY:  Objection.  Don't forget
24  Bonk.
25      MR. HERVEY:  What's that?

---

**66**

1      MR. BUCKLEY:  Don't forget Bonk.
2      MR. HERVEY:  Fair enough.
3    A.  As far as I know.
4    Q.  What I mean is --
5    A.  There was one client.  I think the
6  client is from Louisiana and Pennsylvania that
7  they had to do -- the law wasn't supposed to
8  be filed.  Something else to include them.
9    Q.  They were kicked out because at the
10  time under the state law --
11    A.  Right, right, right.  Exactly.  Exactly
12  and then he filed another one, right.
13    Q.  Those are the Bonk plaintiffs?
14    A.  I guess so.  Yes.
15    Q.  All right.  So other than those two
16  lawsuits, you were not -- strike that.
17      So the last time that you recruited a
18  plaintiff for the bombing cases was --
19    A.  Would have been before they filed.
20    Q.  Not after?
21    A.  Not after.
22    Q.  Okay.
23    A.  Yes, sir.
24    Q.  All right.  Where is this?  If you look
25  at paragraph seven, it says in reliance, and

---

**67**

1  we looked at this a minute ago.  This is
2  paragraph -- Exhibit 42, Demand for
3  Arbitration.  In reliance on Respondent's
4  request, that the parties and
5  the party's oral agreement not to take on
6  additional Beirut plaintiffs, Rothenberg
7  stopped his successful effort to recruit
8  Beirut plaintiffs.
9    A.  Correct.
10    Q.  Okay.  What --
11    A.  That was by when they filed.
12    Q.  All right.
13    A.  So it may be a little -- little thing
14  with the thing, but it's absolutely correct.
15  The only thing is it may be the chronology.  I
16  stopped when I was told to stop the date of
17  filing.
18    Q.  Okay.
19    A.  And if you look at the contingent fees
20  agreement that I have, I'm sure it will
21  correspond to what I'm saying.
22    Q.  So as far as you know, there aren't
23  contingent fee agreements that have your name
24  on it that are after the Peterson case was
25  filed?

---

**68**

1    A.  To the best of my knowledge, I would be
2  very surprised.  I would be very surprised.
3    Q.  Okay.
4    A.  Delaney was done.  Jack stopped.
5  Everything stopped.  We stopped.
6    Q.  Okay.  So your issue --
7    A.  That was my directive, yes.
8    Q.  Well, your main complaint, if you will,
9  today is that there were other cases that came
10  along after that were filed.
11      MR. BUCKLEY:  Objection.
12    Q.  Is that fair?  You call them the follow
13  on cases.
14    A.  No.  I mean, what I think happened was
15  Tom and Steve entered into a pay to play
16  situation where they would let other people in
17  if they gave them a referral.
18    Q.  What cases are you talking about?
19    A.  From other follow -- what they are
20  calling follow along attorneys.
21    Q.  Do you know what the names of those
22  cases are?
23    A.  No.
24    Q.  All right.  So I'm going to give you
25  some names and just see if there are others

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

18 (69 to 72)

69

1  that you can think of. I see Valor and Bland,
2  Murphy, Davis, Anderson Fain, Taylor, O'Brien,
3  Brown.
4      **A. Yeah, I don't know.**
5      Q. You don't know those?
6      **A. I didn't know any of those guys.**
7      Q. You said there was a pay to play. What
8  did you mean by that?
9      **A. If they gave a referral to Steve and**
10 **Tom, as Steve said, then they would take them.**
11 **There was one group I think you said that**
12 **didn't pay them, so they didn't take them.**
13     Q. Was that Relvas?
14     **A. Huh?**
15     Q. Was that the Relvas Group?
16     **A. Relvas, yes.**
17     Q. What is your understanding of Fay
18 Perles extracting a fee in return for these
19 cases, this pay to play? Where do you get
20 that understanding?
21     MR. BUCKLEY: Objection. I'll
22 instructing the witness not to answer to the
23 extent he's revealing attorney/client
24 communications, but if you have an
25 independent source of knowledge about that,

70

1  you can answer.
2      MR. HERVEY: Fair enough.
3      Q. Why do you say that, without getting
4  into anything what Peter might have told you.
5      MR. BUCKLEY: I told him.
6      Q. Other than what Peter told you, why do
7  you think there is a pay to play that Fay and
8  Perles -- I don't want to know what Peter may
9  have told you, but what did you know
10 independently?
11     **A. What did I know? I didn't know**
12 **anything.**
13     Q. What about now without --
14     **A. Now, well, now I understand what their**
15 **game was.**
16     Q. What is your understanding?
17     **A. Not only did they take additional**
18 **plaintiffs and recruited additional**
19 **plaintiffs, after I was told not**
20 **to do anything, but they got other guys who --**
21 **who apparently guys who were supposed to take**
22 **-- Tom was in charge of that and take, um,**
23 **what do you call it? Damage depositions.**
24 **Went out and took and got more cases and**
25 **they got a referral and they may have had**

71

1      **taken some of the cases. They didn't want to**
2  **be bothered with them and gave it to the other**
3  **people. Say, here, you take them. Follow**
4  **what we're doing and I will get a referral out**
5  **of it.**
6      Q. Why do you think they requested a
7  referral?
8      MR. BUCKLEY: Objection. Objection.
9      Q. Why?
10     **A. Why? To make money.**
11     Q. No. No. That's a poor question. Other
12 than what you may have heard from Peter or
13 your lawyers, why do you say that Fay and
14 Perles took a referral for these other cases?
15     **A. I think I didn't know anything about**
16 **this until Harry I think picked up, but I**
17 **think he saw a sheet. How they were going in**
18 **and these other lawyers were getting**
19 **money. My understanding was that I had 101**
20 **families. There was 150 families. LaSpata,**
21 **the sister got, all right, I've got two-thirds**
22 **of it. It's going to be a zill -- okay. I**
23 **didn't know I was diluted down to a third**
24 **rather than two-thirds. They didn't ask me if**
25 **they wanted to go ahead and dilute -- and I**

72

1      **also I found out either attorneys or whatever**
2  **that never told the clients that they were**
3  **going to make more money. Apparently from**
4  **what I saw, they told the clients they were**
5  **going to make less money and it turns out, if**
6  **the clients agree to let the others in, they**
7  **were going to get more money based on the**
8  **referrals that they were going to get. It's**
9  **unbelievable.**
10     Q. Is that something that you have an
11 independent understanding of?
12     **A. What do you mean independent**
13 **understanding of?**
14     Q. Well, when you say that they actually
15 made more money, how did you come up with that
16 conclusion?
17     **A. It was pointed out to me by my son and**
18 **my attorney.**
19     Q. And for purposes of this case, your son
20 Harry is part of the defense team or the
21 lawyer team.
22     **A. Yes.**
23     Q. So I don't want to know what he told
24 you either.
25     **A. Yeah.**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

73

1    Q. Because he's a lawyer in this, right?
2    **A. I never looked at the numbers.**
3    Q. Okay. All right.
4    **A. I didn't know what the heck was going**
5    **on. I assumed that I was going to get**
6    **two-thirds of the -- two-thirds of whatever**
7    **the recovery was.**
8    Q. Well, do you know that -- there was a
9    statement that was made.
10   **A. Go ahead.**
11   Q. And I think you're referring to a
12   statement from 2012 where Tom Fay sent a
13   letter saying, you know, we may make less. We
14   don't object to this cut and pay. Is
15   that what you're talking about?
16   **A. I didn't see that letter until much**
17   later when it was shown to me.
18   Q. Okay.
19   **A. But, in fact, they said -- like he**
20   **said, we're going to make less money and, in**
21   **fact, he made more money.**
22   Q. Do you know why -- do you know whether
23   that statement was true or not at the time it
24   was made in 2012?
25   **A. Well, I think he knew -- of course it**

74

1    **was. Of course it was. He**
2    **knew what he was going to do.**
3    Q. What is the basis of your statement?
4    **A. Because he did it.**
5    Q. Who did it?
6    **A. Tom and Steve got referrals from these**
7    **other lawyers. They got the kickbacks.**
8    Q. Okay. So why are you calling it a
9    kickback?
10   **A. Whatever you call it because to get in,**
11   **you had to pay them. You had to pay for a**
12   **referral.**
13   Q. How did you develop that understanding?
14   **A. Steve said it himself today.**
15   Q. When? Today?
16   **A. In his deposition. He said -- what do**
17   **you call it? What's the name of them?**
18   Q. Relvas.
19   **A. Wouldn't pay them, so they didn't get**
20   **in.**
21   Q. Is that what he said? Is that what you
22   heard?
23   **A. That's what it sounded like to me.**
24   Q. Did you hear that they didn't come in
25   because they did not want to come in if they

75

1    were only going to be allowed in if the other
2    Peterson plaintiffs would have to agree to let
3    them in?
4    **A. That's kind of weak. I don't believe**
5    **that.**
6    Q. You don't believe that, but did you
7    hear that?
8    **A. It doesn't make sense. Everybody**
9    **couldn't -- nobody could come in unless the**
10   **other Peterson clients agreed to it, and I**
11   **wasn't asking for a donation. I wasn't asked**
12   **to donate my fee, you know, Mr. Perles and**
13   **Mr. Fay wanted to donate their fee, fine. You**
14   **know, if I get a case and I decide, which I do**
15   **many times, that I want to give a lot of money**
16   **to charity, I could do that, but I don't -- I**
17   **don't suffer my co-counsel when somebody sends**
18   **me a file. They are not punished for it. We**
19   **get a lot of referrals to my firm and I don't**
20   **punish them. If I decide to reduce**
21   **something, I don't punish or take less. They**
22   **still get theirs.**
23   Q. All right. Well, I want to make sure I
24   Understand your testimony.
25   **A. Yeah.**

76

1    Q. Sitting here today, Mr. Rothenberg, are
2    you able to say whether or not the statement
3    made in 2012 that they would make less money
4    was true or not at the time it was made?
5    **A. Well, you're asking me for an**
6    **assumption. Based on the facts that I've**
7    **learned afterwards, this was right**
8    **before they knew what they were doing.**
9    Q. But do you know whether it was true or
10   false at the time that that statement was made
11   in 2012?
12   **A. I can't say definitively.**
13   Q. Okay.
14   **A. I can't say definitively, but obviously**
15   **they knew what they were doing. They weren't**
16   **stupid. They would get the approval and then**
17   **they go out and get the referrals.**
18   Q. Well, let me --
19   **A. This is their modis operandi with**
20   **everything they do.**
21   Q. What do you mean by that?
22   **A. Because they like to take the money in.**
23   **They don't like to pay it out and they want to**
24   **make as much as they can.**
25   Q. Well, what other cases are you talking

77

1  about?
2    A. Pardon me?
3    Q. What other cases are you --
4    A. Apparently, it is the same thing with
5  where they didn't want to pay the lobbyists
6  and they didn't want to pay apparently where
7  they were sued by the girl. I can't think of
8  her name. Kaplan was it? They didn't
9  want to pay. It was another guy that sued
10  them and another guy and the brother-in-law.
11  All of a sudden -- and I have to thank Steven
12  for this. There was a suit by Tom's
13  brother-in-law and right away I get a call
14  from --
15    Q. Jay Glen?
16    A. Huh?
17    Q. Jay Glen?
18    A. Glen. I got a call from Steve and he
19  said, oh, you better lawyer up and I said,
20  what are you talking about? Because we're
21  being sued. Thank God, I was able to get
22  the finest firm. That's when I got Fox
23  Rothschild in there to defend against Glen and
24  I think they finally settled and we paid part
25  of that. We paid part of that. Matter of

78

1  fact, I think we paid more than our share.
2  Ridiculous.
3    Q. Okay. Let me ask you to take a look at
4  what was marked earlier in this case as
5  Exhibit Number 24.
6    A. Yes, sir. Difference of fees.
7    Q. So take a look at Exhibit 24, if you
8  would please, Mr. Rothenberg.
9    A. Yes. Finally -- finally we couldn't
10  get Steve to sign anything. Finally made the
11  list that I saw that I had two-thirds of the
12  cases and he said, oh, I didn't know you
13  had that many. I had two-thirds of the cases
14  obviously, you know, brought in very quickly,
15  and LaSpata. If you'll see here, there's on
16  my listing, 101 and there was 150 -- 55
17  altogether. That was my understanding, so I
18  was willing to let him steal from me with the
19  other 50, but I let it go, so, yes, I was
20  aware of it. I didn't know about the rest.
21    Q. Why did you let it go?
22    A. What?
23    Q. Why did you let it go?
24    A. Because as I said, you know, as I've
25  heard this from someone had a bar. You own a

79

1  bar and the bartender is stealing. As
2  long as he doesn't steal too much, there's so
3  much money involved, I let it go. I wasn't
4  going to fight him then.
5    Q. Is it your testimony that -- well, we
6  looked earlier, I think, and I'm going to --
7  pardon my reach, Mr. Rothenberg.
8    A. Yes, sir.
9    Q. We looked earlier at Exhibit Number 43.
10    A. Uh-huh.
11    Q. Talking about the arrangement between
12  you and Mr. Fay and Mr. Perles, and we also
13  talked about an understanding that you had, an
14  oral understanding in 2000 regarding the
15  payment of fees to you in connection
16  with the Marine barracks case.
17    A. At our request to join this action in
18  order to assist with certain -- my request,
19  they joined. At my request, they joined. I
20  went to Steve and he brought in Tom.
21    Q. Well, did you write them and say this
22  letter is wrong?
23    A. I didn't write this.
24    Q. I understand.
25    A. It wasn't that big a deal. Let him say

80

1  it. If he wants to have the ego trip to say
2  that he did it, let him do it.
3    Q. Well, why didn't you correct him?
4    A. What?
5    Q. Why didn't you correct him?
6    A. There's no reason to do it. The main
7  thing is that was it.
8    Q. But that was wrong at the time according
9  to you, right?
10    A. Yes, it was wrong. Yes, it was wrong.
11  It was wrong, but it was wrong to the extent
12  not to the -- what actually happened that we
13  should share in it. He didn't say that. He
14  just had the chronology wrong that I agreed to
15  assist them. Bologna. They agreed to come
16  in, you know, to me. If you wanted to look at
17  it like that, it's not a big deal.
18    Q. All right. This is Exhibit 24. That I
19  put in front of you.
20    A. Yes, sir.
21    Q. That I put in front of you. No, that's
22  the earlier one.
23    A. Which one?
24    Q. Talking about this one.
25    A. Yes.

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

81

1    Q. Pardon my reach.
2    A. Yes.
3    Q. Okay. That's a letter of November 27,
4  2007.
5    A. Correct.
6    Q. Right? You remember that? You signed
7  it?
8    A. Yes, I do.
9    Q. Your letter?
10   A. I wrote it.
11   Q. Why did you send this?
12   A. Because I was worried that Steve Perles
13  was going to try and steal more from me, so I
14  had to get something defined and Tom listed
15  the cases that LaSpata had and listed the
16  cases that I had and that was it. Made an
17  agreement with LaSpata. He was a really sweet
18  guy. He didn't know what was going on with
19  anything. That if he -- which he did. He
20  tried to garbage pick from me. If he went --
21  if there was a client that was deposed and in
22  that deposition they found there was a sister
23  or a brother and LaSpata signed them, he
24  wouldn't get that case. I would get it
25  and vise versa. If I went and my people

82

1  signed up a case, LaSpata had the other thing,
2  I think it was mine. Maybe there was one case
3  that LaSpata had first because I signed them
4  all first.
5    Q. Were you trying --
6    A. We're talking 101 families out of 150
7  families. Two-thirds.
8    Q. So the point was to nail down which
9  families you were going to get credit for?
10   A. Exactly.
11   Q. All right. So --
12   A. Or to make sure I'm going to get credit
13  altogether. I'm dealing with very slippery
14  people here.
15   Q. To make sure you were going to get
16  credit under your deal with Fay and Perles as
17  to --
18   A. One-third, one-third, one-third.
19   Q. And so the point was to nail down that
20  you're going to get credit for these 101
21  families, right?
22   A. Out of 150.
23   Q. Out of 150?
24   A. Yes.
25   Q. So you --

83

1    A. And that's what I thought it was. I
2  never dreamed they were going to go out and
3  recruit more. I never dreamed they were going
4  to have referral counsel. I never dreamed
5  they were going to shake down people and say
6  I'll let you in here if you pay me money. I
7  never knew any of this. A lot of it I didn't
8  understand or know until the distribution was
9  made and it was pointed out to me.
10   Q. All right. Well, this letter Exhibit
11  24 is dated November 27th of 2007.
12   A. Yes.
13   Q. And the Peterson case was filed in
14  October of 2001.
15   A. Yes.
16   Q. So in between that time, are you saying
17  that you didn't have any understanding of any
18  of the following cases?
19   A. No. No. I didn't know about any of
20  the following cases.
21   Q. You didn't know anything about it?
22   A. No. No.
23   Q. So is there anything in -- I mean, were
24  you trying to come up with any new
25  responsibilities for you or Fay or Perles in

84

1  this letter of Exhibit 24?
2        MR. BUCKLEY: Objection.
3    A. Any responsibilities? No, you know, we
4  did whatever had to be done.
5    Q. Per your original working relationship?
6    A. Yeah, I did whatever had to be done and
7  visiting, which I didn't know. They knew all
8  of a sudden came with collection, and I had to
9  get involved with Cook and brought in because
10  I thought Tom was going to do the collection.
11  We didn't renew it and then found out they
12  couldn't, so we had to go get collection
13  counsel and then I brought in Cook.
14   Q. But that happened later, right?
15   A. Yes, but you asked me what else. Oh,
16  and still -- yeah, go ahead.
17   Q. Okay. That was my question.
18   A. Go ahead. Go ahead.
19        MR. BUCKLEY: Remember, it's December
20  2017 was the --
21        MR. HERVEY: I haven't gotten there.
22        MR. BUCKLEY: December, 20, 2007 was
23  Cook. So it was, like, a month later.
24        MR. HERVEY: You're not supposed to do
25  that. Thank you, though.

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

85

1  BY MR. HERVEY:
2     Q. All right. So you were entitled to
3  share in the fees with respect to the
4  plaintiffs related to these 101 --
5     **A. Yes, sir.**
6     Q  -- service personnel.
7     **A. Yes.**
8     Q. And I don't know if you want to look at
9  it or not. The expert witness report that you
10  submitted in the arbitration -- is it
11  Buchakjian? Is that how you pronounce his
12  name? Let's go ahead and mark it.
13        (Exhibit 45 marked for identification.)
14     Q. Exhibit 45, which I've just handed you,
15  I will represent what was provided to the
16  mediator and to us as Respondent's counsel and
17  it's the report of your expert witness.
18     **A. Okay.**
19     Q. Have you seen this, Mr. Rothenberg, if
20  you remember?
21     **A. I am really not familiar with it.**
22     Q. Okay.
23     **A. I probably glanced at it, but I didn't**
24  **really look at it.**
25     Q. All right. So if you look at -- he has

86

1  got his exhibits numbered at the top of the
2  page here.
3     **A. Where am I looking? I'm sorry. Where**
4  **am I looking? I'm sorry? Where am I looking?**
5     Q. Well, if you look at the tops of the
6  pages, it's got Exhibit 4 point whatever. I
7  want you to look at the end of Exhibit 4.3.
8  Let me -- you know what? I'll just ask you a
9  question. He lists 558 plaintiffs
10  attributable to you. Does that sound right to
11  you?
12     **A. If you extrapolate 101 families and**
13  **they had, you know, that is part of the**
14  **family. I guess that is right. I don't know.**
15     Q. Okay, but I mean, you don't have any
16  reason to disagree with the report?
17     **A. No reason to agree. No reason to**
18  **disagree.**
19     Q. Okay. All right. Fair.
20     **A. By rights, they should have paid me on**
21  **all of them.**
22     Q. All right. So this letter Exhibit 24.
23     **A. Yeah.**
24     Q. In November of 2007, you don't say in
25  here anything about an oral agreement not to

87

1  take on any new cases?
2     **A. No.**
3     Q. Why not?
4     **A. I just didn't take any on.**
5     Q. Well, why didn't you mention that in
6  here?
7     **A. Why?**
8     Q. Why not?
9     **A. Well, why yeah.**
10     Q. Okay.
11     **A. It had nothing to do with it.**
12     Q. Okay.
13     **A. These were the cases. This is what I**
14  **had. I hadn't taken any cases for quite --**
15  **for a few years. I didn't take anymore cases.**
16     Q. But didn't you actually ask for an
17  agreement from them regarding new cases that
18  they said no to in 2007?
19     **A. That was -- no, that was cases --**
20     Q. No.
21     **A. That was -- what's his name? Just give**
22  **me a second.**
23     Q. Sure.
24     **A. What the hell is his name? The Marine.**
25     Q. Valor?

88

1     **A. He was a Marine. A lawyer. They**
2  **hired --**
3     Q. Gaskell? Dan Gaskell?
4     **A. Dan Gaskell. Steve had a fight. He**
5  **left. The Dan Gaskell cases. That's what I**
6  **was referring to.**
7     Q. So let me show you what was marked this
8  morning as Exhibit Number 40, which is --
9     **A. Sure.**
10     Q  -- I will represent is a version of
11  your letter from six days earlier with a
12  paragraph that has a strike through it.
13     **A. Right.**
14     Q. So that paragraph is something that you
15  asked Fay and Perles to agree to, right?
16     **A. Right. I wanted them to give me at**
17  **least part of what Dan Gaskell signed.**
18     Q. So is it your testimony that the
19  paragraph that's stricken here was, in your
20  mind, referring to cases that Dan Gaskell was
21  handling?
22     **A. Let me read this.**
23     Q. Okay. Go ahead.
24     **A. Yeah, because I think what had**
25  **happened, we were getting -- there were calls**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

89

1  from people, what are we going to do now?  So
2  we didn't do anything.  I didn't do anything.
3      Q.  Who didn't do anything?
4      A.  I didn't do anything.  I was told not
5  to do anything.
6      Q.  Who told you that?
7      A.  Tom.  Tom.
8      Q.  But that was in two thousand and --
9      A.  It was now, too.  That was it.  I was
10 done.  We didn't take anymore cases.  Now, the
11 I don't know if the "we" is referring to them,
12 to me.  I don't know.  That "we" is --
13     Q.  You're reading from the exhibit when
14 you say "we"?
15     A.  Yeah, yeah, yeah, yeah.  I don't know
16 what the "we" is, which "we" I'm talking
17 about.  Whether we got calls or they got
18 calls, so I don't know.
19     Q.  All right.  Well --
20     A.  But I assume that in good faith just
21 like, you know, just like we did and that was
22 it.
23     Q.  Well, you asked for this paragraph to
24 be included and they struck it out, right?
25     A.  Yeah, yeah, yeah, yeah, yeah.

90

1      Q.  But in final letter, you did not
2  include that paragraph, did you?
3      A.  In what?  No, no, no.
4      Q.  Exhibit 24.
5      A.  They took it out.
6      Q.  And that was okay with you?
7      A.  It was okay because I thought that's
8  what I got.  What's the date of this thing?
9  207.  What's the date of the thing with 101?
10     Q.  Well, let's look at them both.
11     A.  Probably in close proximity.
12     Q.  The one in your hand is Exhibit number
13 40.
14     A.  And which is the one with the list?
15 November 27th and November 21st.  Yes, that
16 was it.  The 101 plaintiffs were mine out of
17 155.  Gee, I didn't think you got that many.
18 Got two-thirds of cases.  I said, yeah.  I
19 should have had 100 percent of the cases.  I
20 wasn't aware of any follow on cases, the
21 pay to play cases.
22     Q.  Well, you were aware of the fact that
23 Dan Gaskell was working with plaintiffs.
24     A.  Not that time.  He was the guy
25 involved.  What happened was, we were getting

91

1  cases, as it was my job to do, my firm's job
2  to do, and all of a sudden a guy named
3  Dan Gaskell shows up and what's going on?  Who
4  is this guy?  What's this all about?  Well,
5  you worked with -- so I got Dan Gaskell.  What
6  I understand what happened is, he was signing
7  up for Fay and Perles, rather than Fay, Perles
8  and Rothenberg.  Got the same list apparently
9  -- LaSpata's sister got the list against the
10 Judy Young and they figured, look, why should
11 we give Rothenberg a third?  I'm assuming
12 this.  Well, maybe I shouldn't make
13 assumptions.
14     Q.  Don't make assumptions.
15     A.  And that was an opportunity to go ahead
16 and get another piece of the pie.
17     Q.  All right, so --
18     A.  That's what I'm dealing with.
19     Q.  I want to make sure I understand your
20 testimony.
21     A.  Yeah.
22     Q.  Is it your testimony that the paragraph
23 that is stricken in Exhibit Number 40.
24     A.  Yeah.
25     Q.  Referred in your mind to the cases that

92

1  Dan Gaskell was handling?
2      A.  No.  No.  I think what it referred to
3  is just as it is.  The cases that Dan Gaskell,
4  what he was handling, cases he was signing it
5  for them and then I understand that Gaskell
6  and not unlikely had a fight with Steve.  He
7  left.  I didn't know what that was all about,
8  but this was for calls.  What do you do when
9  people are calling?  He said, we didn't do
10 anything.  That was it.  It's done.  It's done
11     Q.  But weren't they asking -- weren't you
12 asking them in this paragraph that with new
13 cases that came in, you would get a fee split?
14     A.  But no.  No, no, no.  It was really
15 asking whether we should take new cases.  What
16 are we going to do with them?
17     Q.  That's what you meant?
18     A.  That's what I understand, yes.
19     Q.  And they struck that out?
20     A.  Struck it out.
21     Q.  So you read that strike out to mean we
22 are not going to take on cases?
23     A.  We're done.  We're done.
24     Q.  But you didn't put that in the -- you
25 didn't say in this letter of Exhibit 24 --

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

93

1    A. Yes.
2    Q. -- that was signed --
3    A. Yes.
4    Q. -- you didn't say, we've agreed not to
5  take on any new cases?
6    A. No, I did not put that in there.
7    Q. Because you didn't think --
8    A. Foolishly. Well, no. They probably
9  wouldn't have signed it.
10    Q. Why do you say that?
11    A. Huh?
12    Q. Why do you say that?
13    A. Because that's the schtick that Steve
14  pulls, you know.
15    Q. So you didn't ask?
16    A. What?
17    Q. You didn't ask to put in here a
18  statement that you're not going to take on the
19  new cases?
20    A. No, I did not. No, I did not. I had
21  no idea that they were going to take on new
22  cases or actually they didn't take on new
23  cases. They took the fees from other guys who
24  had new cases. They didn't take in any new
25  cases. I think in the strict letter of the

94

1  interpretation, they didn't take in any new
2  cases. They just got fees from cases that
3  other guys took.
4    Q. Well, how did those cases originate if
5  you understand how that happened?
6    A. Not sure, but I heard today in Steve's
7  testimony is that they went to Camp Lejeune
8  where they had -- what do you call it? Damage
9  guys who went out on their own and once they
10  learned what we were doing, they started
11  signing up people on their own.
12    Q. What was your understanding as to when
13  that occurred?
14    A. I didn't know until Steve's -- Steven's
15  testimony.
16    Q. Well, what was your understanding today
17  as to when that occurred?
18    A. When that occurred? I guess when they
19  were taking damage testimony.
20      MR. BUCKLEY: Geoff, I'll give you some
21  latitude here, but now you're asking the
22  witness to basically testify not about his
23  personal knowledge, but about what
24  his understanding of Steve's testimony was.
25    Q. Fair enough. Before Mr. Perles

95

1  testified today, had you heard anything about
2  this meeting at Camp Lejeune?
3    A. Meeting at Camp Lejeune where they were
4  signing people? No. They were going down to
5  pay respect to the Marines --
6    Q. Hold on. I just wanted to know --
7    A. Not signing any cases. No. Cases were
8  already signed, but they were going, you know,
9  very nice, paying respect and that was it.
10  That was the purpose of the meeting. Not to
11  sign up cases. Absolutely not or I would have
12  gone. I would have gone.
13    Q. Hold on. Let me ask you a question.
14    A. I've never been to Camp Lejeune. I
15  don't know if I would have drank the water,
16  but I would have gone.
17    Q. Okay. I'm mindful of the time and
18  trying to get you out of here, so --
19    A. I'm sorry.
20    Q. So bear with me while I interrupt you.
21      (Exhibit 46 marked for identification.)
22    Q. Showing you Exhibit 46, Mr. Rothenberg,
23  a letter, dated November 20, 2007, do you
24  remember that letter?
25    A. Let me look at it.

96

1    Q. Yeah, okay. That's fair. I'm just
2  asking if you remember it. Read it to
3  yourself, please, because she's going to try
4  to write down, otherwise.
5    A. Yes. Yes.
6      (Off the record talk.)
7    Q. I have some questions that are really
8  only related to the first paragraph. You're
9  certainly welcome to read the whole thing, but
10  that's really what I'm going to ask you about.
11    A. Kagy. It wasn't Kaplan. I think it
12  was Kagy was the name of this lady that went
13  after. Not Kaplan. Kaplan I think worked for
14  -- Kagy. That was her name. What was her
15  first name?
16    Q. Ann Marie.
17    A. Ann Marie. Yeah. That was the one.
18  Kagy. Gee whiz. Who is Stanebloom? Mr.
19  Steinbaum with Perles' consent was removing
20  amounts from the escrow account.
21    Q. I really only have a question on the
22  first paragraph.
23    A. A diversion. I have -- because that's
24  what he did. Mr. Perles reportedly stated to
25  that he will not settle the case. That's

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

25 (97 to 100)

---

97

1  his privilege. Mr. Perles comes in, why
2  didn't he just sue me instead of trying to get
3  him disbarred while I'm trying to negotiate
4  with these lobbying firms. Yes, I asked for
5  at least 18 percent out of the ones that
6  Gaskell signed up. So he said, no, I'm not
7  giving you anything. I finally signed and
8  said, look, the hell with it. You know, they
9  are stealing from me. I know they are
10 stealing from me, but there's that much money
11 involved. Let the thing proceed with the deal
12 with these crazy guys, with Tom putting Steve
13 in jail and Steve grabbing anything he can.
14 Steve should have started an insurance company
15 with the motto, we take the money in, we don't
16 pay it out. That's his --
17   Q. Do you remember what cases Mr. Gaskell
18 filed?
19   A. I have no idea.
20   Q. Do you know what plaintiffs he
21 represented?
22   A. I have no idea.
23   Q. But your memory is that this letter
24 referred to the fact that Mr. Fay said they
25 are not paying you part of a fee with respect

---

98

1  to Gaskell --
2    A. That is correct. They -- Tom said he
3  would do it, but Steve wouldn't sign it. I
4  did the whole thing. Without me, there's no
5  Marines. There's nothing. I put the whole
6  thing. My idea. Everything. Put it
7  together. Convinced them to do it and all of
8  a sudden they decided they are going to make
9  more money to hire a guy that signed up with
10 the two of them. Can you take a break for a
11 minute?
12        MR. HERVEY: Sure.
13        THE VIDEOGRAPHER: We are going
14 off the record. The time is 1:51 p.m.
15        (Recess taken.)
16        THE VIDEOGRAPHER: We are back on
17 the record. The time is 2 p.m.
18 BY MR. HERVEY:
19   Q. Okay. Mr. Rothenberg.
20   A. Yes, sir.
21   Q. Did you ever speak with General Keith
22 Smith?
23   A. Who?
24   Q. Keith Smith?
25   A. I don't think I ever heard the name.

---

99

1    Q. How about Comadon Grey?
2    A. Who?
3    Q. Comadon Grey of the Marine Corp., did
4  you ever talk to him?
5    A. No.
6    Q. How about PX Kelly of the Marines?
7    A. It is possible that we had -- we
8  brought the Marines into -- what was it? The
9  Red Robin Inn a couple of times and maybe I
10 met them there, but I don't recall the names.
11 I may have spoken to some of them. I don't
12 recall.
13   Q. Okay. Fair.
14   A. For which of course I paid a third
15 every time we brought them.
16   Q. Okay. Hang on there, if you will. I'm
17 going to try and see if I could cut some of
18 this out.
19   A. I may have met them. I don't recall.
20 I really don't recall.
21   Q. Okay.
22   A. I know I spoke at the meetings that we
23 had and that maybe they came in afterwards. I
24 don't remember the names. There were a lot of
25 people.

---

100

1    Q. Wait for a question.
2    A. I can't remember the names.
3    Q. Wait for a question, please, sir.
4    A. What?
5    Q. Just wait for a question, please.
6    A. I thought you asked me about these
7  guys.
8    Q. I did, but I think you answered it.
9  Did you answer it?
10   A. Yeah. I don't know who they are. I
11 may have met them. I may have spoken to them,
12 but I do not recall. I have no current
13 recollection.
14   Q. Okay. Mark this.
15   A. If they were there. Are they
16 plaintiffs? I don't remember.
17     (Exhibit 47 marked for identification.)
18   Q. Showing you what was just marked
19 Exhibit 47 for identification. She's got to
20 change the number, Mr. Rothenberg.
21 Forty-seven. Okay. Mr. Rothenberg, I know
22 it's hard, but do your best to read it to
23 yourself quietly because she's going to try to
24 write it down, otherwise.
25   A. May I ask you to please speak up? It

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

26 (101 to 104)

---

101

1  is hard for me to hear you.
2  Q. Okay. I was just saying that when you
3  try to read it --
4  **A. I'm 83 years old. I'm here.**
5  Q. I appreciate that.
6  **A. I'm answering every question to the**
7  **best of my knowledge and ability and**
8  **truthfully. Sometimes I can't hear you.**
9  Q. Thank you. I'll try to speak up. Do
10 you remember getting Exhibit 47?
11 **A. Let me read it. Fay Kaplan. Yeah.**
12 **Kaplan was with Fay. Wasn't that other one.**
13 **I made a mistake. Her name was not -- Kaplan**
14 **was not the one that was suing Perles and**
15 **Fay. It was Kagy. Kagy. Closure --**
16 Q. Do you remember getting this letter?
17 **A. Do I remember getting this letter?**
18 Q. Yes.
19 **A. Absolutely not. I don't remember.**
20 Q. Do you know why -- do you know whether
21 this list that is attached to Exhibit 47 is
22 the same as the list that was attached to
23 exhibit --
24 **A. Do I know if this list -- I don't know.**
25 Q. You don't know? Okay. Do you know why

---

102

1  it was sent to you seven years after the
2  November 2007 letter?
3  **A. No.**
4  Q. Okay. Let me switch topics with you,
5  sir.
6  **A. I don't even know if I ever saw this**
7  **letter. This was -- I may have. I may have,**
8  **but I really -- obviously it was sent to me.**
9  **My address. Names of clients. I cannot -- I**
10 **have no personal recollection of it.**
11 Q. Okay. You can set that one aside.
12 **A. Okay.**
13 Q. You're familiar with the Clear Stream
14 -- what they call the Clear Stream asset?
15 **A. I'm not that familiar with it. I mean,**
16 **I know it was there and then there is a lot of**
17 **things going back and forth and I think this**
18 **is where we got it from. Clear Stream run. I**
19 **don't know. Citibank. I don't know if Clear**
20 **Stream put the money with that Italian bank or**
21 **if it was Clear Stream that had it with a bank**
22 **Markazi, whatever. I'm not sure.**
23 Q. Do you remember when you first became
24 aware of the existence of what we've called
25 the Clear Stream asset?

---

103

1  **A. Not really. It could have been when**
2  **Tom Fay wrote this letter. Wrote the emails**
3  **and letters screaming that I'm undermining**
4  **him.**
5  Q. But do you remember sitting here today
6  when you first became aware of the asset?
7  **A. I do not**
8  Q. Okay.
9  **A. I'm making that assumption when Tom**
10 **told me about it.**
11 Q. All right. Do you remember when -- do
12 you remember --
13 **A. He asked me --**
14 Q. Hold on, sir. Do you remember that
15 there was a public hearing in June of 2008
16 regarding collection?
17 **A. No.**
18    MR. BUCKLEY: Objection.
19 Q. All right. Do you --
20    MR. BUCKLEY: Are you representing,
21 Geoffrey, that that hearing was public?
22    MR. HERVEY: There was a hearing.
23 Well, let me ask you this.
24 Q. Are you aware of a hearing in which Mr.
25 Vogel questioned a man named Mark Gem.

---

104

1  **A. Who?**
2  Q. Mark Gem, G-E-M.
3  **A. I don't even know who Martin Gem is.**
4  Q. Do you have any recollection of
5  attending a hearing at which that happened?
6  **A. No. I didn't attend such a hearing.**
7  Q. I'm sorry?
8  **A. I never went to such a hearing.**
9  Q. Okay.
10 **A. To the best of my recollection, I don't**
11 **think I went to any hearing with a Mr. Gem. I**
12 **don't even know who he was.**
13 Q. Okay. Fair. All right. You talked a
14 little earlier about these four cases.
15 Greenbaum, Acosta, Beer and Kirschenbaum.
16 **A. Acosta, Kirschenbaum, Greenbaum, Beer.**
17 Q. And Beer is spelled B-E-E-R, but it's
18 pronounced Beer; is that right?
19 **A. Beer, right**
20 Q. There are four of them.
21 **A. Yeah.**
22 Q. The shorthand we've been using, you
23 probably haven't, but we've been using is
24 GABK. Greenbaum, Acosta, Beer, Kirschenbaum.
25 If I use that, will you understand that is

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

105

1  what I'm talking about?
2  **A. Yes, sir.**
3  Q. Okay. Thank you. Is it your
4  understand that judgments were obtained in
5  each of those cases against Iran?
6  **A. Yes.**
7  Q. But the judgments were not arising out
8  of the Beirut barracks bombing, correct?
9  **A. No, no, no.**
10  Q. They were not arising out of that?
11  **A. No.**
12  Q. There were other acts of terrorism for
13  which Iran was responsible, right?
14  **A. Yes.**
15  Q. Okay. Those cases all proceeded to
16  judgment in the U.S. District Court in D.C.?
17  **A. They all what?**
18  Q. Proceeded to judgment in the U.S.
19  District Court D.C.?
20  **A. Yes. Yes.**
21  Q. Okay. They were your cases?
22      MR. BUCKLEY: Objection.
23  Q. You were the lawyer representing the
24  plaintiffs?
25  **A. I was co-counsel on those cases.**

---

106

1  Q. With Mr. Leibowitz?
2  **A. Barry Leibowitz.**
3  Q. Okay.
4  **A. Well, first it was when -- when Perles**
5  **faced they didn't want to the Kahana anymore.**
6  **Not going to do this, I got David Butler.**
7  **Another great lawyer. Swidler Berlin**
8  **and then when 9/11 happened, they had an**
9  **office in the Chrysler Building. They got**
10  **frightened and they dropped it. He almost**
11  **lost his partnership. They voted to get**
12  **rid of the case, so I had to find somebody**
13  **else and I got Barry Leibowitz.**
14  Q. Okay.
15  **A. And Barry Leibowitz -- there were other**
16  **cases referred. Actually, the cases --**
17  **Greenbaum was Harry's case. He was a neighbor**
18  **of Harry's and his wife was killed in the**
19  **Sbarro attack. Kirschenbaum was a friend of**
20  **my friend -- of Ross. What do you call it?**
21  **Um, and Beer -- it was Ellie Beer who was --**
22  **who founded the United Hatzalah, which I gave**
23  **a --**
24  Q. Yes.
25  **A -- a med -- what do you call it? A meta**

---

107

1  **cycle, which they go and they say, like, keep**
2  **getting letters of the -- all the Arabs that**
3  **they saved and all the Jews they saved.**
4  **Unbelievable guy. His family in Cleveland, he**
5  **lost a relative there and Mayor Kahana was a**
6  **friend of mine for many, many years and Acosta**
7  **was --**
8  Q. Hold on, Mr. Rothenberg. Hold on a
9  minute.
10  **A. Yeah.**
11  Q. You mentioned a Mayor Kahana a couple
12  of times. Is that the same as the Acosta --
13  **A. Yeah.**
14  Q  -- case or is it a different matter?
15  **A. No. It is the same as Acosta.**
16  Q. Okay. Acosta was the guard or
17  policeman who was shot by the assassin?
18  **A. After Nasir killed --**
19  Q. Kahana.
20  **A. Kahana, which he was acquitted of**
21  **incidentally. It was a whole other story. We**
22  **wanted to do the investigation.**
23  Q. Don't get off track here.
24  **A. Anyway, he shot Irving Frankel, my**
25  **client, and then he goes outside and Carlos is**

---

108

1  **there dressed -- he's a post office cop,**
2  **dressed as a cop. Carlos said he thought he**
3  **was chasing -- he was going after -- so, you**
4  **know, Nasir shoots him and he takes out and he**
5  **shoots -- what's his name?**
6  Q. So when you referred to -- earlier you
7  were talking about the Kahana case, is
8  that what --
9  **A. That's Acosta.**
10  Q. That's Acosta?
11  **A. That's Acosta. That is there --**
12  Q. There is not a separate Kahana case?
13  **A. No. I could tell you a lot of stories.**
14  Q. Save those for later.
15  **A. I will. I will. Off the record I'll**
16  **tell you unbelievable stories.**
17  Q. All right. Later today. All right.
18  So with respect to those four cases what I
19  called GABK.
20  **A. Yeah.**
21  Q. Collection and enforcement proceeded in
22  New York, right?
23  **A. Yes.**
24  Q. To collect on the judgment?
25  **A. Yes.**

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

28 (109 to 112)

109

1    Q. And you said earlier that you engaged
2 Strook. Let's just call it Strook.
3    **A. I originally engaged Cook. Not Strook**
4 **figuring if he could collect on the smaller**
5 **cases, he will be able to get the other ones**
6 **and then he dumped it and I got -- I**
7 **was able to get Strook.**
8    Q. Okay.
9    **A. One of the partners happened to be a**
10 **fan of Kahana.**
11    Q. One of the partners of Strook?
12    **A. Yeah.**
13    Q. Who was that?
14    **A. Chuck. I forget his name. I think he**
15 **died and then he got -- what's his name, um,**
16 **Jaime Bernard to do it and Bernard was --**
17 **incredible amount of work. As much or**
18 **more than Vogel when we were together.**
19    Q. Hold on. She needs to mark this.
20    (Exhibit 48 marked for identification.)
21    A. When you get old, that's what happens.
22 I'm getting tired. I'll do the best I can.
23    Q. Just take a look at Exhibit 48 if you
24 would, please.
25    **A. Absolutely.**

110

1    Q. I'm going to ask you some questions
2 about it. Try to read it to yourself, sir.
3    **A. Is there anything specific? It's a**
4 **long agreement. Takes a long time to read it.**
5 **What do you want?**
6    Q. Fair enough. So the fourth physical
7 page in --
8    **A. The fourth page.**
9    Q. Actually, it's got a signature on it.
10 Is that you signature on it, on the fourth
11 physical page? Next page, sir? The page
12 after that.
13    **A. Absolute forgery. No, that's my**
14 **signature.**
15    Q. Okay. So this is the agreement between
16 you and Strook; is that right?
17    **A. And Sessun and Barry.**
18    Q. Okay. And it relates to three of the
19 cases. Kirschenbaum, Beer and Acosta; is that
20 right?
21    **A. I guess so. Yeah.**
22    MR. BUCKLEY: Just make it clear,
23 Geoff. The exhibit has an amendment.
24    **A. Greenbaum had not yet been dropped, I**
25 **guess.**

111

1    Q. So if you look at the last two pages,
2 there's some numbers at the bottom. These are
3 actually documents your client -- your client.
4 Your lawyer produced 2019 and 2020. Do you
5 see that in the lower right-hand corner?
6    **A. I'm sorry.**
7    Q. Lower right-hand corner. They are
8 numbered.
9    **A. 2017?**
10    Q. Yes. Look at 2019 and 2020.
11    MR. BUCKLEY: Last two pages, Allen.
12    THE WITNESS: What?
13    MR. BUCKLEY: Last two pages.
14    THE WITNESS: 2020?
15    Q. Yes. The last two pages.
16    **A. 2019.**
17    Q. Yes, and the one after that.
18    **A. And 2019 and 2020.**
19    Q. Thank you. So this is an amendment to
20 the agreement and it adds Greenbaum; is that
21 right?
22    **A. I guess.**
23    Q. Well, you're not sure?
24    **A. No. I -- yeah. It must be.**
25    Q. Okay, and is that --

112

1    **A. Correction amendment. Collection**
2 **agreement, okay.**
3    Q. So --
4    **A. Beer, Greenbaum, Kirschenbaum, Acosta.**
5 **Okay. Yes.**
6    Q. So this document that -- you got
7 Greenbaum and the amendment, which are the
8 last two pages, represent your engagement
9 agreement with Strook regarding all four of
10 those cases?
11    **A. Together with Barry, yes.**
12    Q. Okay, and that's your signature on the
13 page --
14    **A. Yes, it is.**
15    Q. Hold on. 2019, right?
16    **A. Yes.**
17    Q. Did you tell the clients you
18 represented in any of the GABK cases that you
19 had engaged Strook to pursue enforcement?
20    **A. I'm sure we did. Yeah.**
21    Q. Do you remember?
22    **A. I don't know if I did it personally or**
23 **it was probably done by Barry or Yetti Kim or**
24 **Adam or somebody. I don't know if I did it**
25 **personally. If I spoke to them.**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

113

1   Q.  Do you know whether anybody told the
2   people that you represented in the GA --
3   **A.  I'm sure.  Yeah.**
4   Q.  Hold on.  I know you say you're sure,
5   but do you know?
6   **A.  Do I know?**
7   Q.  Yes.
8   **A.  I'm sure they did.  I mean, did we**
9   **speak to them?  I'm sure they did.  Harry's**
10  **clients, Ross's client.  We**
11  **told them, of course.**
12  Q.  It's not something you did personally,
13  right?
14  **A.  It may have been something that I did,**
15  **as well.**
16  Q.  You don't remember sitting here today,
17  though?
18  **A.  I don't remember sitting here today.**
19  Q.  And Strook was going to get a fee for
20  their work in connection with the enforcement,
21  right?
22  **A.  Wait a minute.  I think I do remember**
23  **because we told them we had to get them.  I'm**
24  **not sure.  I'm not sure.**
25  Q.  Okay.

114

1   **A.  I'm not sure.**
2   Q.  Okay.  Well, don't guess if you don't
3   know.
4   **A.  Okay.**
5   Q.  Please.
6   **A.  I'm not sure.**
7   Q.  Okay.  So, Strook, the Strook firm was
8   going to get a fee in connection with this
9   work to do the enforcement and collection?
10  **A.  Yeah, of course.**
11  Q.  Right?  Do you recall whether anybody
12  -- well, let me ask you a different question.
13  Did you tell any of the GAB clients
14  yourself that Strook was going to get paid a
15  fee?
16  **A.  Now, you're asking me questions -- I'm**
17  **sure that there -- do I remember picking up**
18  **the phone and telling him?  I'm -- like I said**
19  **I'm sure, but I have no personal recollection**
20  **that I actually did it, but I talked to them.**
21  Q.  Okay.
22  **A.  You know, I talked to Libby.  I've**
23  **known him for many years.  Ross talks to**
24  **Kirschenbaum.  Barry talked to Steve**
25  **Greenbaum.**

115

1   Beer, I mean, you know, of course.
2   Q.  How many clients in total are we
3   talking with these four cases?
4   **A.  Just the four cases.  There weren't**
5   **that many.**
6   Q.  Can you give me an idea how many
7   plaintiffs?
8   **A.  I don't know.**
9   Q.  Was it 20, 50?
10  **A.  No.  No.  No.  No.**
11  Q.  What do you think?
12  **A.  I don't know.**
13  MR. BUCKLEY:  Objection.  You're asking
14  him to guess.  He doesn't know.
15  **A.  I don't know.**
16  MR. HERVEY:  Well, if he can give me an
17  estimate.
18  **A.  Steve, it was only him and for her and**
19  **Acosta was his wife and him.**
20  Q.  Not many?
21  **A.  It wasn't that many.  It wasn't that**
22  **many.  I don't remember.  Certainly we had**
23  **communication.  I wasn't restricted from**
24  **talking to those clients.**
25  Q.  Do you remember the lawyers at Strook

116

1   that were chiefly involved in the enforcement
2   action?
3   **A.  Yeah.  Sure.  Jaime Bernard and I don't**
4   **know.  I can't think of his name.**
5   Q.  Kirk Meckley.
6   **A.  Kirk Meckley.  He recently -- and**
7   **another guy.  Another guy, too.  He recently**
8   **retired.  Semiretired, but it would have been**
9   **Jaime Bernard and Kirk Meckley, yes.  They**
10  **really communicated more with Barry Leibowitz**
11  **than me.**
12  Q.  The Strook lawyers communicated more
13  with Barry Leibowitz than with you?
14  **A.  They communicated with Barry.**
15  Q.  Okay.
16  **A.  I only knew it was if I had to sign**
17  **something or do something.**
18  Q.  All right.  Well, is it your
19  understanding that the Peterson plaintiffs
20  engaged lawyers like Leaview?
21  **A.  Yes.**
22  Q.  Vogel -- let me finish.  And Jim Bonner
23  to pursue collection for the bombing victims
24  in --
25  **A.  I knew about Vogel.  I knew about Cook.**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

117

1  I think Bonner I found out later.
2  Q.  Later.  Okay.  So they were seeking
3  enforcement of the judgments against Iran by
4  going after the Clear Stream assets, right?
5  **A.  Well, going after any asset.**
6  Q.  Okay, but in connection with the action
7  that was filed in the Southern District of New
8  York, that was seeking enforcement against the
9  Clear Stream asset, wasn't it?
10     MR. BUCKLEY:  Objection.
11  **A.  What?**
12     MR. BUCKLEY:  Go ahead.
13  Q.  You can answer.
14  **A.  No.  I didn't really know who.  I know**
15  **they were going after Iranian assets.  That's**
16  **all I know.**
17  Q.  Well, and Strook was going after
18  Iranian assets, as well?
19  **A.  And Strook was going after or companies**
20  **that dealt with Iran.  I think Strook tried to**
21  **get a boat and it sailed and they were trying**
22  **to get some building or something.  They were**
23  **going after Iranian assets.**
24  Q.  Okay.
25  **A.  I didn't know specifically the building**

118

1  or the -- that I found out after.  655th
2  **Avenue and Clear Stream and I'm still, you**
3  **know, a little shaky on it.**
4  Q.  What is your understanding of what the
5  enforcement against Clear Stream -- what's
6  your understanding of what Clear Stream was?
7  Clear Stream 1, I guess.
8  **A.  I had heard that Clear Stream has**
9  **amazing -- had some really bad, bad guys.**
10 **They had money for dictatorships like Papa Doc**
11 **and Baby Doc and Haiti and they were -- I**
12 **don't know.  I wasn't really involved in it.**
13 Q.  Do you understand that the lawyers for
14 the Peterson plaintiffs were trying to seize
15 and enforce against the Clear Stream asset?
16    MR. BUCKLEY:  Now?
17 **A.  I know --**
18 Q.  Back then?
19 **A.  I know now.**
20 Q.  Yes.
21 **A.  What was being done.**
22 Q.  Did you know back then?
23 **A.  I didn't know what was going on until I**
24 **got a letter from Tom.**
25 Q.  When did that happen?

119

1  **A.  When Strook and others tried to knock**
2  **out the Marines because of priority.**
3  **Apparently --**
4  Q.  Okay.
5  **A  -- it was Tom filed incorrectly and the**
6  **others tried to knock it off and then they all**
7  **made peace.**
8  Q.  So Strook tried to knock out of Marines
9  based priority.
10 **A.  Everybody tried to knock out everybody**
11 **else.**
12 Q.  Okay, but Strook tried to knock out the
13 Peterson plaintiffs on behalf on the GABK
14 plaintiffs, right?
15 **A.  You're telling me this now.**
16 Q.  You didn't know that?
17 **A.  That was Tom's -- I didn't know**
18 **anything.**
19 Q.  Why not?
20 **A.  Because I had the Peterson clients and**
21 **I had the other clients.**
22 Q.  The GABK clients?
23 **A.  They built a Chinese wall around me.  I**
24 **wasn't supposed to know anything.  Built it**
25 **with Barry Leibowitz.**

120

1  Q.  How did you build a Chinese wall?
2  **A.  What?**
3  Q.  How did you build a Chinese wall?
4  **A.  The -- what do you call it?  The**
5  **Kahana, Kirschenbaum, Greenbaum and Beer**
6  **communicated with Barry Leibowitz and that was**
7  **it.**
8  Q.  But did you communicate with either the
9  GABK plaintiff group over here or the Peterson
10 plaintiffs that you represented?  Hold on.
11 **A.  Only because I had to --**
12 Q.  Let me finish my question.  About both
13 of them seeking collection from the Clear
14 Stream asset?
15 **A.  I'm sorry?  What?**
16 Q.  Did you ever communicate with the GABK
17 clients or the Peterson clients that you
18 represented about pursuit of the Clear Stream
19 asset?
20    MR. BUCKLEY:  Objection.  I think you
21 have to put a timeframe on that.
22    MR. HERVEY:  Fair enough.
23 Q.  In let's say 2007, 2010?
24 **A.  I don't think I even knew.  I didn't**
25 **know what they were going after.  I knew that**

121

1  Strook was going after a lot of things and I
2  guess Clear Stream was one of them, but I
3  didn't know anything until Tom Fay contacted
4  me.
5  Q.  And when was that?
6  A.  Oh, gee whiz.
7  Q.  Is that when the -- was that before the
8  --
9  A.  When -- I guess, when they tried to
10 knock him out for -- for not filing it the way
11 he should, in the manner in which he should
12 have.
13 Q.  Didn't some of plaintiffs that you
14 represented -- didn't some of the plaintiffs
15 you represented in the Peterson case complain
16 about your involvement in the GABK cases?
17 A.  No.
18 Q.  They didn't?
19 A.  No.
20 Q.  Let me show what was previously marked
21 as Exhibits one and two.
22 A.  Unless it's a letter you're talking
23 about from Judy Young that Tom Fay wrote for
24 her.
25 Q.  Okay.  I'm talking about a letter from

122

1  Judy Young and a letter from Marilou Fluegel,
2  but I don't know who wrote them, so let me ask
3  you about them.  I'm showing you Exhibits one
4  and two.
5  A.  That was when -- I don't even have to
6  look at it.  I'll tell you what they were.  It
7  was very heart breaking.
8  Q.  Well, I would like you to look at it to
9  make sure we're talking about the same thing.
10 A.  That is when Tom Fay attacked me and
11 ran to them and, um, tried and got them to try
12 to dismiss me and I tried to call them, see
13 them.  They cut me out.  They wouldn't talk to
14 me.
15 Q.  All right.
16 A.  They wouldn't talk to me.
17 Q.  Why do you say Tom Fay -- is it your
18 understanding those letters are very similar
19 to each other?
20 A.  Pardon me?
21 Q.  Do you understand that those letters
22 are very similar to each other?
23 A.  Yeah, they are.  It looks like the same
24 letter, yeah.
25 Q.  You say Tom Fay wrote them?

123

1  A.  Especially Judy who -- she's the one
2  that opened it up for everybody and that was
3  heartbreaking that she should write this
4  letter and wouldn't talk to me.  I tried to
5  reach out with a letter.  There is no way in
6  the world I would do something like that and
7  Tom accused me of undermining, that whole
8  thing and, um, firing me.  It was crazy.
9  Q.  So why do you say Tom wrote the letter?
10 A.  Well, Tom is the one who told her not
11 to talk to me.
12 Q.  How do you know that?
13 A.  He told me.  She told me.
14 Q.  Who did?
15 A.  Tom wrote this letter.
16 Q.  How do you know that Tom wrote the
17 letter?
18 A.  Because I was told.
19 Q.  Who told you?
20 A.  Either Tom or -- or she couldn't talk
21 to me.  That Mr. Fay said not to talk to me.
22 Q.  Judy Young you're talking about?
23 A.  Probably.  Probably, but I'm not sure.
24 Yeah.
25 Q.  You wrote back to Judy Young, right?

124

1  A.  Yes, I did.
2  Q.  All right.
3      (Exhibit 49 marked for identification.)
4  Q.  Showing you Exhibit 49.  Is that your
5  letter back to Judy Young?
6  A.  Uh-huh.
7  Q.  You said yes?
8  A.  Yes, sir.
9  Q.  All right.  I want to draw your
10 attention to the bottom of the second page.
11 A.  Uh-huh.
12 Q.  The last paragraph you say, I am
13 disappointed that agreements had not been
14 reached so that everyone can share in the
15 recovery of assets, but it is not my decision
16 now, as all these matters are being handled
17 for all clients respectively by collection
18 counsel.  You wrote that, right?
19 A.  Obviously I did.
20 Q.  In 2011?
21 A.  Yes.  Uh-huh.
22 Q.  So it was your desire at that time in
23 2011 that everyone share in the recovery of
24 assets, as you stated?
25 A.  It had always been -- it had always

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

125

1  been my --
2      MR. BUCKLEY:  Objection.
3  **A. -- my thing that everyone should go**
4  **after Iran.**
5  Q. And share in the recoveries?
6      MR. BUCKLEY:  Objection.
7  Q. And share in the recovery?
8  **A. No, no, no.  Not necessarily.**
9  Q. But they should all go after --
10 **A. But advocate to go after Iran.**
11 Q. Say that again.
12 **A. They had the sharing agreement,**
13 **whatever.**
14 Q. Okay.
15 A. If Strook would have found some assets
16 and levied on them and collected it, that
17 wouldn't go to Peterson, and if Peterson had
18 found some assets, that they -- would not go
19 to Kirschenbaum.
20 Q. If they were all Iranian assets, why
21 wouldn't they?
22 **A. Pardon me?**
23 Q. If they were all Iranian assets why
24 wouldn't they?
25 **A. Because they represented one group of**

126

1  **plaintiffs and the other represented the other**
2  **group of plaintiffs.**
3  Q. Well, hold on.
4  **A. If there was a big enough pile, then**
5  **fine, but if they found individual assets, no,**
6  **it would not.**
7  Q. Why not?
8  **A. Because they didn't represent them.**
9  **Collection counsel --collection counsel was**
10 **independent.**
11 Q. You're saying that they were
12 independent of you?
13 **A. Yeah.**
14 Q. What is the basis of your statement
15 they were independent of you?
16 **A. What you do mean?  Collection counsel**
17 **was going after assets.  Okay?**
18 Q. Right.
19 **A. We had hoped -- my hope was that they**
20 **would get together and find a ton of assets**
21 **and get together, but failing that, whatever**
22 **assets that they would find, as I said, I**
23 **think Strook found a boat that they were**
24 **going to get.  That boat would not have gone**
25 **to Peterson.**

127

1  Q. They found a boat for GABK plaintiffs?
2  **A. They were trying.**
3  Q. Trying to?
4  **A. Yeah.**
5  Q. Okay, but you also represented Peterson
6  plaintiffs, correct?
7  **A. Right, And af Peterson plaintiffs had**
8  **found -- brought an action against Boeing,**
9  **let's say, and the Kahana, Kirschenbaum**
10 **Greenbaum, then were not in it.  That would**
11 **go to Peterson.**
12 Q. But hold on a second.  I understand
13 that -- was there a collection against this
14 boat you're talking about?
15 **A. No, they didn't get it.**
16 Q. Okay.
17 **A. And they tried again to get another one**
18 **and they didn't get it, but the United States**
19 **seized the boat and apparently they seized the**
20 **boat from Iran and even though the**
21 **immunity was stripped from Iran, the**
22 **United States asserted their immunity saying**
23 **that we are the ones that have to be sued.**
24 **We're not giving you permission to sue Us.**
25 Q. But did you know about what Strook was

128

1  trying to do with respect to the boat?
2  **A. I didn't know until afterwards.**
3  Q. How long afterwards?
4  **A. I don't know, and the other one was**
5  **more recent.**
6  Q. What other one?
7  **A. If Peterson finds some assets and they**
8  **go ahead and collect those assets, they would**
9  **not be sharing with Kahana, Kirschenbaum or**
10 **Greenbaum or Beer.  If Kahana, Kirschenbaum,**
11 **Greenbaum and Beer -- if Strook finds assets**
12 **for them, they are not going to share**
13 **it.  Why would they share that?  They had**
14 **their duty to those clients.  They were**
15 **collection counsel.**
16 Q. Right.
17 **A. Independent for those clients.**
18 Q. Okay, but what about you?  You
19 represent GABK clients and Peterson clients at
20 the same time.
21 **A. Yes.  Yes.  I am not a collection**
22 **lawyer.  I wasn't collecting the money for**
23 **them.**
24 Q. Okay, but Strook is working for you,
25 aren't they?

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

33 (129 to 132)

---

129

1    A.  Well, they working for Barry and me.
2  Remember, Barry had an interest in it, too,
3  and Barry -- and the same thing that -- that
4  Perles and Fay or anyone else, Perles and Fay
5  would not expect to get assets that a boat
6  that Strook would find, and Strook would not
7  expect to get an asset -- but if it was
8  something that they both went after, then it's
9  a problem.  They have to share it.
10      MR. BUCKLEY:  I'm going to jump in
11 here.  You guys are in like a hypothetical
12 universe here and you need to --
13      MR. HERVEY:  No.  We're not.  Not at
14 all.
15      MR. BUCKLEY:  You're asking him --
16      MR. HERVEY:  You can make an objection
17 on a hypothetical if you want, but I'm going
18 to keep asking questions.
19      MR. BUCKLEY:  Okay.
20      MR. HERVEY:  Thank you.
21      MR. BUCKLEY:  I'm objecting to the
22 questions about hypotheticals and I'm
23 objecting to the questions that require Mr.
24 Rothenberg to perform some sort of
25 analysis here while he's being deposed.

---

130

1      MR. HERVEY:  Okay.  Fair enough.
2      THE WITNESS:  Okay.
3  BY MR. HERVEY:
4    Q.  Is it your understanding, Mr.
5  Rothenberg, that the Strook firm moved to
6  intervene in the Peterson collection action in
7  Southern District of New York?
8    A.  I did not know that until after the
9  fact.
10   Q.  So you didn't know it while it was
11 going on?
12   A.  I did not know that.  I found out from
13 Mr. Fay.
14   Q.  Did you try to keep informed of what
15 was going on with the Strook firm with that?
16   A.  No. No.
17   Q.  Why not?
18   A.  Because I stayed independent.  They
19 were doing what they were doing.  Barry
20 Leibowitz had that and I stayed independent
21 with the Peterson.  I didn't -- I wasn't privy
22 to that to tell Strook anything and I didn't
23 tell Strook what Peterson was doing.  I didn't
24 tell Peterson what Strook was doing, and
25 frankly, had nothing to tell because I didn't

---

131

1  know anything.
2      (Exhibit 50 marked for identification.)
3    Q.  I just want to confirm --
4    A.  Can I see this a minute?
5    Q.  Yes.  Let me tell you what I think it
6  is and just ask you what --
7    A.  What is this?
8    Q.  Is this your letter to Marilou Fluegel
9  responding to her letter to you.
10   A.  Right.  Same thing.
11   Q.  It is the same as the one with Judy
12 Young, basically?
13   A.  Right.
14   Q.  Okay.  That is all I wanted to know.
15 You can could put that aside.
16   A.  This is the same response to the Fay
17 letter that they signed.  Go ahead.
18   Q.  You think Fay wrote the Fluegel letter,
19 too?
20   A.  Yeah. Yeah.
21   Q.  For the reasons you said before?
22   A.  Yeah.
23   Q.  Okay.  Let me show you what was marked
24 earlier Exhibit Number 19.  Hold on.  Let's
25 tidy up.

---

132

1    A.  This is a letter from Fay to Perles.
2    Q.  Well, my main question is going to be
3  about the attachment.
4    A.  The what?
5    Q.  The attachment to it.
6    A.  I'm sorry.  About what?
7    Q.  The attachment.  Excuse me.  The
8  attachment to the letter.
9    A.  No.  I'm not familiar with this
10 agreement.
11   Q.  Do you know whether this is the same
12 Exhibit C that was attached to your Demand For
13 Arbitration, which is Exhibit 42?
14   A.  I don't know.  I'm not familiar with
15 this.
16   Q.  Okay.  Are you familiar today with this
17 document, Exhibit 19?
18   A.  You just handed it to me.  I wasn't
19 familiar with it until you handed it to me.
20   Q.  Okay.  You can set that aside.
21   A.  I am still not familiar with it.
22   Q.  What's that?
23   A.  I didn't read it.  I'm not familiar
24 with it, but you handed me the document.
25   Q.  Okay.  Showing you what was marked

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

133

1  previously as Exhibit Number 10.
2  **A. Let me take a break.**
3  THE VIDEOGRAPHER: We are going
4  off the record. The time is 2:32 p.m.
5  (Recess taken.)
6  THE VIDEOGRAPHER: We are back on
7  the record. The time is 2:51 p.m.
8  BY MR. HERVEY:
9  Q. Okay. Are you doing okay, Mr.
10  Rothenberg? Can we do a few more hours or how
11  are you feeling?
12  **A. I don't know if I can do a few more**
13  **hours.**
14  Q. You'll let me know if you need to stop?
15  **A. Yeah. Is there any chance of**
16  **continuing tomorrow?**
17  Q. Probably not tomorrow.
18  MR. BUCKLEY: Let's just keep going,
19  Geoff. I talked to him about all the stuff he
20  knows about. Go ahead.
21  Q. All right. You let me know if you need
22  to stop or need a break, but we'll keep going.
23  I put in front of you Exhibit Number
24  10, Litigation Corporation Settlement
25  Agreement and I'm going to ask you if

134

1  recognize that.
2  **A. Actually, I do.**
3  Q. Do you know what it is?
4  **A. Yes, it is a settlement agreement. A**
5  **sharing agreement it looks like. I don't know**
6  **if I've ever seen it.**
7  Q. Okay.
8  **A. Well, 11. I heard of these names.**
9  **Howser.**
10  Q. Do you know what they are? What the
11  names are?
12  **A. What? Levin, Howser?**
13  Q. Yes.
14  **A. Yeah. I think Howser is represented by**
15  **DLA Piper. Levin somebody else. I don't**
16  **know. I don't know.**
17  Q. All right.
18  **A. I think that I, um, I think that -- I**
19  **don't know if I really saw this.**
20  Q. Okay.
21  **A. I don't if I ever saw this agreement**
22  **until now.**
23  Q. Let me ask you to take a look at --
24  **A. I don't think I ever saw this**
25  **agreement. It's possible, but I don't**

135

1  recognize it.
2  Q. Okay.
3  **A. No.**
4  Q. Do you recognize that as a sharing
5  agreement?
6  **A. I guess. It looks like they are all in**
7  **there.**
8  Q. Don't guess. I mean, do you know?
9  MR. BUCKLEY: Geoff, you're asking him
10  questions about a document he doesn't
11  recognize, so everything he answers is going
12  to be a guess.
13  MR. HERVEY: All right.
14  BY MR. HERVEY:
15  Q. So let me show you paragraph 25 of
16  Exhibit 42, which is the Demand For
17  Arbitration. If you take a look
18  at that. I'll just read it. It says June
19  2012, respondents signed another sharing
20  arrangement with creditors holding judgments
21  against Iran knowing that their actions with
22  respect to the follow on agreement had harmed
23  Rothenberg. Respondents did not mention or
24  include the plaintiffs in the Davis, Anderson,
25  Fein, Taylor, or O'Brien and Brown actions in

136

1  that agreement. Do you see that in paragraph
2  25?
3  **A. I see that.**
4  Q. So is it your -- do you know -- okay.
5  **A. What?**
6  Q. Do you know why -- is your
7  understanding that those cases were not
8  included in exhibit --
9  MR. BUCKLEY: Objection.
10  **A. I don't even recognize any of the**
11  **names.**
12  Q. Okay.
13  **A. Davis, Anderson, Fein, Taylor, but who**
14  **the hell are they? They were more follow on**
15  **attorneys?**
16  Q. Or cases. You don't know?
17  MR. BUCKLEY: Objection.
18  **A. These are attorneys, right?**
19  Q. No. They are cases. Do you recognize
20  the names?
21  MR. BUCKLEY: Objection.
22  **A. They are cases.**
23  MR. BUCKLEY: Asked and answered. Wait
24  for a question, Allen.
25  THE WITNESS: Okay.

Transcript of Allen Rothenberg, Esquire

Conducted on September 20, 2023

---

137

1      MR. HERVEY:  Well, he thought they were
2  attorneys, so --
3      MR. BUCKLEY:  Well, they are what they
4  are, Geoff.  If he says they are an ice cream
5  sandwich, they still would be plaintiffs.
6      A.  I don't know.
7      Q.  That is all I wanted to know is if you
8  know what they are.  Can you mark this?
9      (Exhibit 51 marked for identification.)
10     Q.  Showing you Exhibit 51.  It is an
11  e-mail from Kirk MacLean to the various
12  people.  It does not include you with a draft
13  document attached.
14     Do you recall ever seeing this document
15  before?
16     A.  No.
17     Q.  No.  Okay.
18     A.  I don't recognize the name.
19     Q.  That's all right.  If you don't
20  recognize the document, I'm not going to ask
21  you a question.
22     A.  No, I do not.
23     Q.  Okay.  Do you have an understanding,
24  Mr. Rothenberg, as to whether the Greenbaum,
25  Acosta, Beer and Kirschenbaum cases ended up

138

1  sharing in the recovery from the Clear Stream
2  asset with the Peterson plaintiff?
3      A.  Yes.
4      Q.  What is your understanding of that
5  sharing?
6      A.  There was a sharing agreement and a
7  very small percentage went to Kirschenbaum and
8  some went to Howser and some went to Rubin and
9  some went to Levine, I guess.  All the names
10  that you have there.
11     Q.  Well, do you know how much money
12  actually went to those GABK cases out of that?
13     A.  I don't know.
14     Q.  You got a fee out of that, didn't you?
15     MR. BUCKLEY:  Objection.
16     MR. HERVEY:  What's the objection?
17     MR. BUCKLEY:  It's unclear what you
18  mean out of that.
19     MR. HERVEY:  Okay.  Fair enough.
20  BY MR. HERVEY:
21     Q.  You got a fee as a result of the fact
22  that the Greenbaum, Acosta, Beer and
23  Kirschenbaum plaintiffs shared in the recovery
24  from the Clear Stream asset; is that correct?
25     A.  Yes, I did.

139

1      Q.  Do you remember how much it was?
2      A.  I do not.
3      (Exhibit 52 marked for identification.)
4      Q.  Showing you Exhibit 52.  I'll represent
5  to you that this is a chart that was provided
6  to me in this arbitration matter by your
7  attorneys, and it reflects that you received
8  $7,923,503.82 in fees from the distribution
9  from Clear Stream 1.  Is that consistent
10  with your recollection?
11     MR. BUCKLEY:  On account of the GABK
12  cases.
13     MR. HERVEY:  Correct.  Thank you.
14     A.  That would be gross.  Of course,
15  co-counsel had to be paid.
16     Q.  Who is co-counsel?
17     A.  It depends.  I had --
18     Q.  Barry Leibowitz?
19     A.  Ross on the Kirschenbaum case.  Harry
20  on the Greenbaum case.  I'm not sure -- and,
21  of course, Barry Leibowitz, and I guess
22  Strook.  I don't know if this is after Strook
23  or before Strook.  I don't know.  Strook, I
24  guess.
25     Q.  Was Strook paid out of your fee?

140

1      A.  I don't recall.
2      Q.  Do you -- sitting here today, do you
3  know how much money you ended up with by way
4  of fees as a result of the Greenbaum, Acosta,
5  Beer and Kirschenbaum?
6      A.  I don't know.
7      Q.  Let me finish the question.  The GABK
8  cases?
9      A.  I don't know, but I never recruited for
10  these cases.  They were just, you know, I
11  never recruited for these cases and they, of
12  course, were aware that I had these cases, but
13  I do not recall what the net was to my firm.
14     Q.  Okay.
15     A.  I do not recall.  When was this?  I
16  don't know if --
17     MR. BUCKLEY:  Just wait for the next
18  question, Allen.
19     A.  He asked me about Strook.  I don't know
20  whether this is after Strook or before Strook,
21  but I suspect it's before Barry and before my
22  co-counsel.
23     Q.  Okay, and you received fees, attorney
24  fees, with respect to the distribution from
25  the Clear Stream, QSF in favor of the Peterson

141

1 plaintiffs, as well, didn't you?
2 **A. Yes, I did.**
3 Q. Do you know how much that was?
4 **A. I do not.**
5 Q. Let me show you what we looked at
6 before as Exhibit Number 45, which is the
7 report of your expert witness.
8 Q. Okay. If you look -- Exhibit 45 you
9 looked at earlier is the report of your expert
10 witness. If you look at the -- it says page
11 two in the upper right-hand corner?
12 **A. Page two.**
13 Q. There is a chart.
14 **A. There's a chart.**
15 Q. Do you see that? You just flipped past
16 it, sir.
17 **A. Page two. That is what you're**
18 **referring to?**
19 Q. Yes. I think so. There is a -- a pie
20 chart there?
21 **A. Yes.**
22 Q. And it says attorney fees actual.
23 Rothenberg, $59,947,508.00. Do you see that?
24 Do you see that, sir?
25 **A. Yes.**

142

1 Q. Is that how much you received in the
2 way of attorney fees out of the Clear Stream
3 QSF?
4 **A. That's what it says. I don't know.**
5 Q. Do you have any reason to believe
6 that's incorrect?
7 MR. BUCKLEY: Objection. He just said
8 that.
9 **A. I don't know.**
10 Q. And those were attorney fees; is that
11 right?
12 MR. BUCKLEY: Objection.
13 Q. Attorney fees?
14 **A. I'm just looking at this thing. I**
15 **don't know. I have no recollection.**
16 Q. Okay. Asking about the sharing
17 agreement --
18 **A. Other attorneys -- go ahead.**
19 MR. BUCKLEY: Allen.
20 Q. Let me ask you a question. I think we
21 Established earlier based on the report here
22 that -- well, at least according to the report
23 you represented 558 of the individual
24 plaintiffs in the Peterson case, more or
25 less.

143

1 **A. That could be correct. I remember the**
2 **101 families, so if that extrapolates to 500**
3 **and something, that would make sense.**
4 Q. Did any one of the 558 plaintiffs
5 contact you to ask about the sharing before it
6 went into effect?
7 **A. No. That was the agreement I had with**
8 **Mr. Perles and Mr. Fay. They would be one**
9 **voice. They were the only ones contacting the**
10 **clients.**
11 Q. So you were not communicating with the
12 clients about that?
13 **A. No. No.**
14 Q. Do you know why sharing was eventually
15 entered into among the Peterson GABK
16 plaintiffs and the other groups?
17 **A. Well, from what I understand, they were**
18 **fighting over the Clear Stream assets, which**
19 **apparently maybe there was some other assets.**
20 **Yes. The 650 and instead of fighting each**
21 **other, they decided to work together and**
22 **stripped then of an awful lot of work on this.**
23 Q. What is your understanding as to the
24 potential consequence of their fighting each
25 other?

144

1 MR. BUCKLEY: Objection.
2 **A. What is?**
3 Q. Why was it important not to have them
4 fighting with each other?
5 **A. Because they would be fighting over**
6 **priority and if Fay is correct, that Peterson**
7 **would have knocked -- Strook could have**
8 **knocked out -- could have knocked out --**
9 **knocked out Peterson and gotten the whole --**
10 **the full extent of their judgment, which**
11 **wouldn't have been very nice and same thing**
12 **with Howser and the same thing with**
13 **Levin and the same thing with Rubin and same**
14 **thing -- did they represent -- I think the**
15 **Colbert Towers, DLA Piper. Maybe that is**
16 **Howser.**
17 Q. Do you have an understanding as to
18 whether sharing was something that was
19 considered in connection with the passage of
20 legislation related to the recoveries?
21 MR. BUCKLEY: Objection.
22 **A. I don't know the answer.**
23 Q. You don't know the answer. Do you know
24 whether -- never mind. Let me rephrase that.
25 Did you ever hear from any of the

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

145

1  plaintiffs that the Marine mantra or motto,
2  whatever, that Marines don't leave Marines
3  behind?
4      MR. BUCKLEY:  Objection.
5      Q.  Did you ever hear anybody say that to
6  you?
7      **A.  I may have heard that as a**
8  **justification for taking the -- for letting**
9  **the other people in.**
10     Q.  Where did you hear that?
11     **A.  Maybe from Tom.**
12     Q.  From Tom?
13     **A.  Yeah.**
14     Q.  Did you ever communicate with Lynn
15  Durshire?
16     **A.  No.**
17     Q.  Do you know who she is?
18     **A.  I know she is.  She's the one who stood**
19  **up and she gave the, you know, was a plaintiff**
20  **and spoke.  She was an actress, I think, so**
21  **she spoke well and they used her in the**
22  **front.**
23     Q.  Was she like a spokesperson?
24     **A.  Yeah.  I think she was like a**
25  **spokesperson, but I didn't know her.  I may**

---

146

1  **have spoken to her a couple of times, but I**
2  **really don't know her.  I have spoken to her**
3  **in person.  We had in person things.  Never**
4  **spoke to her.  I don't think I ever spoke to**
5  **her over the phone.  I may have for some**
6  **reason.  I don't remember, but I was supposed**
7  **to stay away from and not communicate**
8  **with them.  There may have been a reason.  She**
9  **may have called me for some reason at some**
10  **point.**
11     Q.  Are you aware of a potential
12  settlement, if you will, involving the 650
13  Fifth Avenue matter you talked about?
14     **A.  I know there's 650 Fifth Avenue.  I**
15  **know there is a potential settlement.**
16     Q.  Are you aware of a letter that went to
17  the Marine plaintiffs suggesting that they
18  again share the recoveries with all the
19  Marines?
20     **A.  No.**
21     Q.  You're not aware of that?  Let me show
22  you what is marked earlier as Exhibit 8.  Have
23  you seen Exhibit 8 before?
24     **A.  No.**
25     Q.  You never saw it before?

---

147

1      **A.  No.**
2      Q.  Okay.
3      **A.  Never saw this.**
4      Q.  Okay.
5      **A.  Never saw this.  It's interesting.**
6      Q.  Why is it interesting?
7      MR. BUCKLEY:  Objection.
8      MR. HERVEY:  He's volunteering stuff.
9      MR. BUCKLEY:  Listen, if we are going
10  to try to get us through the end of the day,
11  asking Mr. Rothenberg what he thinks is
12  interesting is not going to get us there.
13     MR. HERVEY:  I don't know about that.
14  Depends on what he says.
15     MR. BUCKLEY:  Well, his opinions about
16  what is interesting are not part of the
17  deposition.
18     MR. HERVEY:  Well, I don't know what
19  he's going say.
20     MR. BUCKLEY:  Go ahead and ask a
21  question.
22  BY MR. HERVEY:
23     Q.  Why is it interesting, Mr. Rothenberg?
24     MR. BUCKLEY:  No.  No.  I'm objecting to
25  you asking the witness about what's

---

148

1  interesting in a document that he's never seen
2  before.
3      MR. HERVEY:  He volunteered.
4      **A.  It says here Fay and Perles and then**
5  **they put separate Fidelis, the Marine.**
6      Q.  Okay.
7      **A.  Joint venture to provide justice for**
8  **the victims.  Okay.**
9      MR. BUCKLEY:  Go ahead, Geoff.  Ask a
10  question.
11     **A.  Go ahead.  Go ahead.**
12     Q.  Have you talked to any of your clients
13  in the 558 or whatever it is plaintiffs in the
14  Peterson case about the possibility of sharing
15  involving a 650 Fifth Avenue case?
16     **A.  Again, I have not breached that**
17  **agreement, but I'm not supposed to talk to**
18  **them from the get-go.**
19     Q.  So you have not talked to them?
20     **A.  No.  Attempted.  Attempted, but stayed**
21  **away.**
22     Q.  Do you think that they should not be
23  sharing with other Marine families?
24     MR. BUCKLEY:  Objection.  He is not
25  here to offer his opinions about a settlement

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

149

1 that really hasn't been shared with him.
2     MR. HERVEY: Peter, please. Just
3 object and stop this. This is improper.
4     MR. BUCKLEY: No, there is nothing
5 improper.
6     MR. HERVEY: It's improper. It is a
7 speaking objection. If it is a form of the
8 question, all other objections are
9 preserved and you know that.
10     MR. BUCKLEY: I'm objecting and I'm
11 instructing the witness not to answer what his
12 opinions are about a 650 Fifth Avenue
13 settlement that hasn't been shared with him.
14 BY MR. HERVEY:
15     Q. Okay. Do you think that the sharing
16 among the various Marines families was wrong?
17     MR. BUCKLEY: Objection.
18     Q. Before.
19     MR. BUCKLEY: Objection. Which sharing
20 are you talking about?
21     MR. HERVEY: In the Clear Stream I
22 matter.
23     MR. BUCKLEY: Are you talking about the
24 sharing?
25     MR. HERVEY: Peter, please. If he

150

1 doesn't understand, he can tell me he doesn't
2 understand.
3     MR. BUCKLEY: I don't understand.
4     MR. HERVEY: That's too bad. If he
5 doesn't understand, he gets to tell me that.
6 Not you.
7     MR. BUCKLEY: Are you talking about the
8 follow on agreement or are you talking about
9 the 8713 agreement?
10     MR. HERVEY: He can tell me what he
11 understands or doesn't understand. Not you.
12     MR. BUCKLEY: Objection. Ambiguous.
13     MR. HERVEY: Thank you.
14 BY MR. HERVEY:
15     Q. Mr. Rothenberg.
16     A. What is the question?
17     Q. I will try it again and I'll make both
18 of you happy.
19     A. What is the question?
20     Q. Okay. Is it your understanding that
21 there was a sharing of the Clear Stream
22 distribution in which the various Beirut
23 bombing victims plaintiffs shared the
24 recoveries with each other? Do you understand
25 that that happened? Yes or no?

151

1     A. That the -- are you talking about only
2 the Marines or are you talking about the
3 others?
4     Q. The sharing among the Marine families.
5     A. Among the Marines?
6     Q. Yes.
7     A. I think that --
8     MR. BUCKLEY: Objection. Go ahead.
9 You can answer.
10     A. Okay. I think that the agreement that I
11 thought was for 150 cases, 101 of mine and 50
12 of the other ones, they could have -- if they
13 decided to give money away.
14     Q. Right.
15     A. Which they -- and I don't know that
16 they had full disclosure. It is my
17 understanding they did not have full
18 disclosure, but if they wanted to do that,
19 they had no right to reduce my fee.
20     Q. Well, who had no right to reduce your
21 fee?
22     A. The clients and the other attorneys who
23 were going to make additional money on it. If
24 they wanted to give away their money, that is
25 on them, but they should have been able to

152

1 collect the full amount. The 150 plaintiffs
2 that I knew about, should have been able to
3 collect their full amount. If they wanted to
4 go ahead and give some money to these other
5 people, donate it, give it to them for some
6 reason because they were Marines or whatever
7 they were, that's on them, but not to reduce
8 my fee.
9     Q. Okay. When you say they and them, are
10 you talking Fay and Perles? Are you talking
11 about the clients?
12     A. No. No. I'm talking about the
13 clients.
14     Q. Okay.
15     A. And I don't think the clients were
16 adequately informed.
17     Q. Why not?
18     A. From what I understand.
19     Q. Why do you say that?
20     A. Because Fay and Perles did not have a
21 reduction. They had an increase in what they
22 were getting. The information provided to the
23 clients was incorrect. Even if arguendo and
24 you said that if they had in mind, and I
25 don't believe that's true, that it was true

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

153

1  that they were going to get a reduction when
2  they sent that letter and I believe, again,
3  that they did know what they were going to do,
4  certainly when they got the fees from the
5  others, they should have gone back and said,
6  hey, wait a minute. We were wrong. We really
7  got -- made more money. Not less money. Do
8  you still want to do this?
9      Q. You're not personally involved in any
10 recovery efforts with respect to the 650 5th
11 Avenue property, are you?
12     A. Say that again.
13     Q. You're not personally involved in
14 efforts to enforce a judgment against 650
15 Fifth Avenue?
16     A. Just I have an expectancy, but I'm not
17 the collection counsel.
18     Q. Is that Strook?
19     A. What?
20     Q. Is that Strook that's the collection
21 counsel?
22     MR. BUCKLEY: For which clients?
23     A. It's Bonner and Strook.
24     Q. Okay. So it's Strook with respect to
25 --

154

1      A. Bonner, Strook and DLA Piper and Howser
2  and all these other people.
3      Q. For their respective clients?
4      A. Well, they are all working together.
5      Q. Okay.
6      A. They are all working together on this.
7      Q. What about are you familiar with
8  something that they refer to as the Clear
9  Stream II asset?
10     A. I've heard of Clear Stream II.
11     Q. And are you personally involved in any
12 efforts to enforce judgments against them?
13     A. Just as before. I assume they are all
14 in. I don't even know if Strook -- I assume
15 they are, and the others I assume they are all
16 involved. I really don't know. I assume
17 they are all involved. I don't know.
18     Q. Are you also a lawyer -- involved as a
19 lawyer in a case known as Ofisi?
20     A. Who?
21     Q. Ofisi, O-F-I-S-I?
22     A. Ofisi. My best friend. Never heard of
23 them.
24     Q. Is that a case with Gaby Marrone? You
25 heard of him?

155

1      A. Yeah.
2      Q. Is he involved in a case for a
3  plaintiff called Ofisi?
4      A. I really don't know.
5      Q. You're not familiar with that?
6      A. I know we're involved in the embassy
7  bombing cases. This is Steve. Ofisi? I
8  don't know who Ofisi is.
9      (Exhibit 53 marked for identification.)
10     Q. Showing you what's been marked Exhibit
11 53, which I will represent are excerpts. The
12 document I put together, which I pulled off of
13 Pacer, the first, oh, my goodness, 18 pages of
14 which are the list of plaintiffs and the last
15 page is the lawyers involved and do you
16 know whether you represent any --
17     A. I see a name that says Osongo. I may
18 be representing them. The answer maybe, yes,
19 as does Steve saying you want to know the
20 history. Gabby Marrone brought me in as
21 counsel and Bill Wheeler brought Steve Perles
22 in and actually they are more cases that Steve
23 and Tom had together, but somehow Tom
24 apparently had something over Steve and Steve
25 had to give up his cases to Tom, so Tom had

156

1  some cases. Tom has separate cases. Steve's
2  group and the Marrone group and Miller Group
3  had to get together. We're now all
4  co-counsel.
5      Q. Is that in this Ofisi case that I'm
6  asking you about?
7      A. I'm not sure the name Ofisi. The only
8  name it looks like that rings a bell is
9  Osongo, I think.
10     Q. Where is that on this list? What page
11 are you looking at?
12     A. Osongo. Edwin Osongo. I think that
13 means -- I wouldn't know. Interesting names
14 here.
15     Q. Is it Osongo?
16     A. I think so with an O.
17     Q. Okay. Let me ask you again because I'm
18 not sure of the answer anymore. Do you know
19 whether you're representing any of the
20 plaintiffs included in this case?
21     A. I may be representing all of them. I'm
22 not sure.
23     Q. You don't know?
24     A. I think so. I don't know. I don't
25 know.

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

157

1    Q. Do you have, to use Mr. Buckley's
2  phrase, a fee expectancy with respect to the
3  Ofisi case?
4    **A. If I'm representing him, of course I**
5  **have a fee expectancy.**
6    MR. BUCKLEY: He wants to know. We
7  doesn't want you to guess. He wants you to
8  answer whether you know you have a fee
9  expectancy in the Ofisi case, Exhibit 53.
10  **A. Well, again, if I represent him, I have**
11 **a -- I don't know that I represent him.**
12    MR. BUCKLEY: Okay. If I was --
13    MR. HERVEY: Okay.
14 BY MR. HERVEY:
15   Q. If I was the king of England, I'd be the
16 king of England, but that is not the question.
17 Do you know whether you have a fee expectancy
18 in --
19   **A. I don't know.**
20   Q. Okay. Fair. Do you know whether --
21    MR. HERVEY: What's that phrase about
22 the king of England.
23    (Off the record.)
24   Q. So, do you have any understanding as to
25 whether the plaintiffs in this action are

---

158

1  seeking to recover against the Clear Stream II
2  asset for their plaintiffs?
3    **A. I don't know about that.**
4    Q. You don't know?
5    **A. The same assets, the Clear Stream II**
6  **assets?**
7    Q. Correct.
8    **A. I don't know. Steve would probably**
9  **know.**
10   Q. Okay. Well, I just want to know what
11 you know.
12   **A. I don't know.**
13   Q. Did Strook, to your knowledge, commence
14 an action in California to recover money from
15 Visa International?
16   **A. Yes.**
17   Q. On behalf -- tell me about that. What
18 were they doing?
19   **A. I'm not really sure, but I know Tom Fay**
20 **was in that. He had some plaintiffs, as well,**
21 **and Strook was involved with it.**
22   Q. Okay.
23   **A. Small amount. I don't remember exactly**
24 **what it was, and Tom also brought an action in**
25 **-- in, um, Canada that nobody had. It was all**

---

159

1    **Tom Fay for some -- I don't know if they were**
2  **Marines or whatever. I don't know what they**
3  **are were.**
4    Q. Was the California action against Visa
5  International, did that involve the Levin
6  action?
7    **A. I'm sorry. What?**
8    Q. Let me try that again. So the action
9  in California --
10   **A. Yeah.**
11   Q -- involving Visa International, was
12 that in the Levin case, if you know?
13    MR. BUCKLEY: Objection.
14   Q. Do you know what case it was in?
15    MR. BUCKLEY: Objection. He said he
16 didn't know anything about the case.
17    MR. HERVEY: No. No.
18    MR. BUCKLEY: And now you're asking him
19 details about a case he doesn't know about.
20   **A. I don't know much about it. I know**
21 **there was a recovery, I believe.**
22   Q. And who recovered?
23   **A. I believe Kahana, Kirschenbaum,**
24 **Greenbaum. My recollection is that there -- I**
25 **believe there was a recovery. I don't think**

---

160

1    **it was very much and Tom Fay recovered and**
2  **Strook recovered.**
3    Q. Do you know on whose behalf Tom Fay
4  recovered?
5    **A. No.**
6    Q. Do you know if it was on behalf of the
7  Peterson or any of the Marine plaintiffs?
8    **A. I do not know.**
9    Q. Okay.
10   **A. And as I say, there was another case in**
11 **Canada that was solely Mr. Fay found some**
12 **assets that he collected on it.**
13   Q. All right.
14   **A. It wasn't very much.**
15   Q. All right. Give me a minute. Let's
16 take a break. I want to see if I need to get
17 into some of this other stuff.
18    THE VIDEOGRAPHER: We are going
19 off the record. The time is 3:18.
20    (Recess taken.)
21    THE VIDEOGRAPHER: We are back on
22 the record. The time is 3:32 p.m.
23 BY MR. HERVEY:
24   Q. Mr. Rothenberg, I don't have anymore
25 questions. Thank you for your patience.

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

161

1    **A. Thank you.**
2    Q. Appreciate it. I think Mr. Altemus has
3    some questions.
4    **A. Thank you for your professionalism and**
5    **letting me take breaks when I had to and you**
6    **doing what you had to do. You did a good job.**
7    Q. Thank you very much. I'll let Mr.
8    Altemus ask questions.
9         CROSS-EXAMINATION
10   BY MR. ALTEMUS:
11   Q. All right. Good afternoon, Mr.
12   Rothenberg.
13   **A. Good afternoon.**
14   Q. Famous last words, but I think I only
15   have a few questions.
16   **A. I'm sorry. What?**
17   Q. I said, famous last words, but I think
18   I only have a few questions for you.
19   **A. Okay. Please, I have to ask you to**
20   **keep your voice up.**
21   Q. I will. I will.
22      (Exhibit 54 marked for identification.)
23   Q. As you look at that, Mr. Rothenberg,
24   for purposes of the record, I've handed you
25   what is Exhibit Number 54 and just want to ask

162

1    you if recognize the document.
2    **A. Interesting. Interesting.**
3    Q. Let me know when you're done. Do you
4    recognize this, sir?
5    **A. Yes. Very, very different. Go ahead.**
6    Q. Okay. Well, if you could turn to page
7    two and I'll ask, is that your signature on
8    the second page?
9    **A. Appears to be my signature, yes.**
10   Q. And I'll represent to you this is one
11   -- I didn't pull this particular retainer
12   agreement of the 101 families for any reason.
13   Just --
14   **A. Sure.**
15   Q -- if I could turn your attention to the
16   first page, sir, to the second paragraph. If
17   you need to take a look at it again, please do
18   so. Otherwise, I'll ask you a question.
19   **A. Yes.**
20   Q. Okay. Is my understanding correct that
21   the client was agreeing to pay the attorneys a
22   one-third fee?
23   **A. Well, this is a very unusual agreement.**
24   **I've never seen anything like this.**
25   Q. Okay, but is my reading correct where

163

1    it says, I agree to pay attorneys a fee, which
2    we compute as follows: And it goes onto say
3    one-third of the recovery?
4    **A. No. It's more than one-third. I have**
5    **never seen anything like this, and a fee -- a**
6    **fee equal to the expenses.**
7    Q. Okay.
8    **A. And the fee equal to the expenses,**
9    **which may take this out. When we do a case,**
10   **we have to segregate the fees. It is like an**
11   **interest free loan to the clients and we can't**
12   **deduct it until it can be three, four, five in**
13   **this case, ten years. You can't deduct the**
14   **expenses until you collect from them because**
15   **then when you get it -- but here it is saying,**
16   **33 percent of the gross fee -- of the gross**
17   **fee recovery, plus an amount equal to very,**
18   **very -- I don't have any other -- all right.**
19   **Go ahead.**
20   Q. All right.
21   **A. This past IRS thing, but I'm sure I**
22   **segregated it. It is first thing they ask you**
23   **in an audit, did you segregate your fees and**
24   **we do that.**
25   Q. Fair enough. Once we get past the

164

1    formula for the fee, the agreement goes on to
2    say, does it not, that this fee is contingent
3    upon collection and to the extent of
4    collection only. Did I read that correctly?
5    **A. Yes.**
6    Q. And the next sentence says, the
7    percentage of attorney's fees above described
8    will be distributed to each of the attorneys
9    in an equal share. Did I read that correctly?
10   **A. Yes, sir. Yes, sir.**
11   Q. And is my understanding correct that
12   based on this agreement, you would have
13   received one-third of the attorney's fees
14   because there were three attorneys
15   listed at the top of the agreement; is that
16   correct?
17   **A. Yes, sir.**
18   Q. Thank you, Mr. Rothenberg, with that
19   exhibit. Can I hand you back what was marked
20   Exhibit 49?
21   **A. I'm sorry. What is this? This is**
22   **something from my office.**
23      MR. BUCKLEY: Is that the Judy Young
24   letter?
25      MR. HERVEY: It is.

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

165

1    **A.  Please remember that it was my idea to**
2   **bring an action against Iran on behalf of the**
3   **victims and family members with her help.**
4       MR. BUCKLEY:  Allen, just wait until
5   Mr. Altemus asks you a question.
6    **A.  Go ahead.**
7       MR. BUCKLEY:  Go ahead, Tim.  Ask the
8   question.
9    Q.  Mr. Rothenberg, I wanted to focus your
10  attention to that specific paragraph.
11   **A.  Sure.**
12   Q.  If we turn to -- you see -- you go on
13  to say in that sentence that you -- it was
14  your idea to bring the action for a two-fold
15  purpose, right?  It seemed like -- it says the
16  first purpose was to strike a blow against
17  international state sponsored terrorism by
18  hurting Iran in a way that would do the most
19  damage in the pocketbook.  Did I read
20  that correctly?
21   **A.  Yes.**
22   Q.  And then the second is to get a
23  monetary recovery for the victims of Iran's
24  state sponsorship of terrorism.  Did I read
25  that correct?

166

1    **A.  Yes, you did.**
2    Q.  And there's no distinction in there in
3   terms of victims.  You just said that
4   generally, correct?
5       MR. BUCKLEY:  Objection.
6       MR. ALTEMUS:  Basis?
7       MR. BUCKLEY:  Are you suggesting in
8   here that when he refers to victims, he's
9   referring to some clients that he's not even
10  aware of that Mr. Perles and Mr. Fay had
11  signed up without his knowledge or follow on
12  attorneys it brought on without his knowledge?
13      MR. ALTEMUS:  Can you read my
14  question back?
15      (Last question read back.)
16   Q.  Go ahead, Mr. Rothenberg.
17   **A.  What is the question?**
18      MR. ALTEMUS:  Read it again.
19      (Last question read back.)
20   **A.  No, it's just like when we had a car**
21  **accident because the insurance company, we**
22  **represent, you know, the victims, our clients**
23  **and it makes it easier for others, as well,**
24  **when we get a good decision.**
25   Q.  Okay.  If I could turn your attention

167

1   to the second page.
2    **A.  Second page.  Yes, sir.**
3    Q.  The last paragraph begins with, you
4   have.
5    **A.  I'm sorry.  Which paragraph?**
6    Q.  The last paragraph.
7    **A.  On the second page?**
8    Q.  On the second page.
9    **A.  I have kept -- I have been kept**
10  **informed of the public filings.**
11   Q.  The next one.
12   **A.  What?**
13   Q.  I think there is a paragraph underneath
14  that where it says, you have pointed out.
15   **A.  You have pointed out --**
16      MR. BUCKLEY:  Allen, just wait for a
17  question.
18      THE WITNESS:  No.  No.  I was just
19  reading.  I'm sorry.  Go ahead.  I apologize.
20   Q.  Well, you indicate in that paragraph,
21  did you not, and I'll read you the words, that
22  you believed everyone should share in the
23  recovery of assets, correct?
24      MR. BUCKLEY:  Objection.  You're asking
25  him to interpret a document.

168

1       MR. ALTEMUS:  That he wrote.
2       MR. BUCKLEY:  Okay, but you're ignoring
3   the first sentence.
4       MR. ALTEMUS:  He can say, no.  My
5   understanding of objections is form,
6   foundation.  Give me the opportunity to
7   rephrase it, but otherwise you're testifying.
8       MR. BUCKLEY:  I don't know how valuable
9   his interpretation of the document is going to
10  be when you --
11      MR. ALTEMUS:  You're testifying.
12  You're testifying.
13      MR. BUCKLEY:  -- when you are honing in
14  on one sentence and not the prior sentence.
15      MR. ALTEMUS:  Object to form or
16  foundation.
17      MR. BUCKLEY:  Form and foundation.
18      MR. ALTEMUS:  Thank you.  It is stuff
19  in between I have an issue with.
20  BY MR. ALTEMUS:
21   Q.  I'll do it this way, Mr. Rothenberg.
22   **A.  Yes, sir.**
23   Q.  You wrote this letter, correct?  Mr.
24  Rothenberg, did you write this letter?
25   **A.  It has my signature on it.**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

169

1    Q. All right. Did you write, sir, I'm
2 disappointed that agreements have not been
3 reached so that everyone can share in the
4 recovery of assets. Did I read that
5 correctly?
6        MR. BUCKLEY: Objection.
7    **A. Yes, sir, referring to those words, we**
8 **were disputing it.**
9    Q. I'm sorry?
10   **A. Yes. Referring to those judgment**
11 **holders who were in a dispute here.**
12   Q. Where does it say that, sir? Anywhere
13 in the letter, please.
14   **A. You asked me what my interpretation is.**
15 **That is my interpretation. It doesn't say it**
16 **explicitly, but that is what I'm referring to.**
17   Q. No. I asked if I read that correctly?
18   **A. If you what?**
19   Q. Did I read that correctly? That was my
20 question.
21   **A. Read it again.**
22   Q. I'm disappointed that agreements have
23 not been reached so that everyone can share in
24 the recovery of assets, but is not my decision
25 now, correct?

170

1    **A. Right.**
2        MR. BUCKLEY: Objection. You can
3 answer.
4        THE WITNESS: What?
5        MR. BUCKLEY: You can answer.
6    **A. Yeah. I'm referring -- my reference is**
7 **to those that are fighting each other. There**
8 **were groups -- as I said, the Howser**
9 **plaintiffs, DLA Piper, the Rubin plaintiffs,**
10 **the Levin plaintiffs, Peterson plaintiffs, the**
11 **Kahanas, Kirschenbaum, Greenbaum, Beer and**
12 **they had not yet agreed to a sharing**
13 **agreement. I'm not talking about others who**
14 **weren't in there who were not fighting.**
15   Q. All right. Mr. Rothenberg, if you
16 could do me a favor then. Can you show me in
17 this letter where you refer to those cases?
18   **A. Where I refer to what?**
19   Q. The cases that you just listed.
20   **A. Yes.**
21   Q. Can you show me where you refer to them
22 in this letter?
23   **A. No. You asked me what my**
24 **interpretation was and that's what I'm**
25 **referring to.**

171

1    Q. I did not ask that.
2    **A. No, I did not specify.**
3    Q. Okay.
4        (Exhibit 55 marked for identification.)
5    Q. Mr. Rothenberg, for the record as you
6 look at that, I've handed you what's been
7 marked Exhibit 55 and let me know when you are
8 done. When you're finished reviewing it.
9    **A. What is this? Was this an executed**
10 **agreement?**
11       MR. BUCKLEY: Look at the last page.
12       THE WITNESS: I looked at it. There's
13 no signatures.
14   Q. Well, my question, if you're finished,
15 Mr. Rothenberg, do you recognize that
16 document?
17   **A. Not really.**
18   Q. If you look at the very top, it seems
19 to be dated -- there is a fax line. I mean,
20 at the very, very top above agreement where it
21 says May 20, 2008, 12:17 p.m. It says
22 from Allen Rothenberg, which suggests to me
23 that it's something that you had sent. Can we
24 agree on that?
25   **A. It doesn't look like something that I**

172

1 would have written.
2    Q. Okay.
3    **A. It doesn't look like something I would**
4 **have written.**
5    Q. Do you remember --
6    **A. Maybe I'm just not familiar with this.**
7    Q. Fair enough. Let me ask you more
8 generally and that's referring to the specific
9 document because I recognize you say you don't
10 recognize it and you perhaps may not have
11 drafted it. More generally, do
12 you ever remember proposing to Fay and
13 Rothenberg that they, along with you, retain
14 Strook and Strook --
15   **A. Yes.**
16   Q. I'm sorry.
17   **A. Go ahead. Finish the question.**
18   Q. But you do remember suggesting or
19 saying to Perles that they retained Strook and
20 Strook and Levan, as well as Sessun Lavin. Is
21 that how you pronounce it?
22   **A. Who?**
23       MR. BUCKLEY: Moshe Sessun.
24   **A. Moshe Sessun. Yes, I proposed -- once**
25 **I wanted to get a number of collection agents.**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

44 (173 to 176)

173

1  I did not want to get Cook exclusively at that
2  point. I wanted to get Strook and Cook and a
3  lot of others and whatever they would have
4  found, that's what they would be found, yes.
5      Q.  And do you remember proposing at the
6  time that the cases for which they would try
7  to collect on would be Peterson, Greenbaum,
8  Kirschenbaum, Beer and Acosta?
9      A.  What?  Repeat.  Most probably, yes.
10     Q.  I'm reading off the list.
11     A.  Because at that time, Peterson.  It
12  would have been Kirschenbaum, Greenbaum.  Yes,
13  that makes sense.
14     Q.  Okay, and can we agree that if this
15  agreement had been entered into and the
16  flushing counsel retained and if an
17  asset of Iran was collected on, that the
18  attorney's fees in Peterson would have been
19  lessened by the fees paid in under Greenbaum,
20  Kirschenbaum, Beer and Acosta?
21     MR. BUCKLEY:  Objection.  Calls for
22  hypothetical.
23     Q.  Can we agree on that?
24     A.  Well, the fact that they, um, that they
25  worked together would have -- would have --

174

1  that they brought something to the table.
2  That they wouldn't fight for anything.  They
3  brought something to the table, which are
4  their cases.
5      Q.  I'm sorry.  Are you done?
6      A.  Yes.
7      Q.  Now, and I appreciate that.  In other
8  words, I think what you're saying to me is
9  what they would have earned the fee.
10     A.  What?
11     Q.  The other attorneys and so, therefore
12  --
13     A.  No.  I think that bringing them
14  together would have strengthened the position
15  and that nobody would be fighting anybody --
16     Q.  I'm with you.
17     A  -- on this.
18     Q.  But we can agree --
19     A.  Because if it was not Cook, somebody
20  had to be paid a counsel fee, whether it was
21  Beirut Marines, whether it was Kahana,
22  Kirschenbaum, Greenbaum or Beer, they
23  would all have to pay a ten percent or
24  whatever the agreed number was, but again, I
25  don't -- I don't recognize this agreement.

175

1      Q.  No, and I appreciate that, but then I
2  asked you do remember making the proposal and
3  I believe you said you did.
4      A.  I didn't.  I never got to make a
5  specific proposal because in the meeting that
6  Steven and Tom and Barry Leibowitz and I had,
7  there was some kind of dispute between
8  Mr. Perles and Mr. Leibowitz and the thing
9  broke up.  So we really never got to that
10  stage.  We really never got to that stage and
11  I'm not familiar with this agreement or this
12  proposed agreement.
13     Q.  Fair enough.  I was asking you more
14  about your recollection.  Independent of this
15  document, I was asking about whether you had
16  ever proposed -- I understand it may not have
17  gone far.
18     A.  I wanted to get them together, yes.  I
19  wanted to get them together.
20     Q.  And "them" is who?  I'm sorry?
21     A.  I'm sorry.  What?
22     Q.  You just said "them" together.  Who is
23  "them"?
24     A.  I wanted to get Peterson attorneys and
25  the Strook attorneys together.

176

1      Q.  For purposes of --
2      A.  Allowing Strook to go out and look for
3  assets and allowing Cook or whoever else there
4  was to go out and look for assets and maybe
5  get three or four other attorneys, collection
6  guys.
7      Q.  And for which cases would they be
8  trying to collect on --
9      MR. BUCKLEY:  Objection.
10     Q  -- under your proposal?
11     A.  Well, it never got to that proposal.  I
12  guess what is stated here.
13     Q.  I just want to be clear.
14     A.  I understand what you're saying
15     Q.  You were trying to get them together
16  and I think you mentioned attorneys.
17     A.  Right.
18     Q.  Getting together for what cases to
19  collect on is my question?
20     A.  To collect for cases, yes.
21     Q.  Which ones?  Which cases?
22     A.  Peterson and the Acosta, Kirschenbaum,
23  Greenbaum and Beer case, I guess.
24     Q  And the time period we're talking about
25  was in 2008?

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

---

177

1    **A. Right. That's what it says here, so I**
2    **don't know, but I would have to assume so.**
3    (Exhibit 56 marked for identification.)
4    Q. Okay.
5    **A. I read the first one. Can we continue**
6    **with it?**
7    Q. Oh, I'm sorry.
8    **A. What?**
9    Q. Please review it.
10    **A. The whole thing. Yes, sir.**
11    Q. First of all, this document I handed to
12    you and, again, it's been marked as 56. I'll
13    represent this was produced I believe in this
14    arbitration by your attorney. Do you
15    recognize that or is it fair to say this is an
16    e-mail exchange between yourself and Mr. Fay?
17    **A. It appears as though that's what it is.**
18    Q. Okay, and is it also fair to say it
19    appears on August 6th of 2010, that you sent
20    to Mr. Fay what I'll call a settlement
21    proposal that you had previously sent to Jaime
22    Bernard, I believe; is that correct?
23    **A. Are you referring to the prior letter**
24    **that you showed me?**
25    Q. No. I'm referring to the exhibit.

---

178

1    **A. The agreement? Proposed agreement?**
2    Q. Barry Leibowitz. Excuse me. No.
3    **A. What?**
4    Q. Strike all that. Let me rephrase it,
5    Mr. Rothenberg.
6    Is it fair to say that this e-mail you
7    sent to Mr. Fay on August 6th of 2010,
8    included a settlement proposal amongst or
9    sharing, however you want to term it, but an
10    agreement to be reached between the cases of
11    Peterson, Bulos, Valor, Arnold, Spencer, Bonk.
12    **A. I don't think we got that far. I don't**
13    **think we got that far.**
14    Q. All right. I'll ask it a different
15    way.
16    **A. This is in response to Mr. Fay**
17    **threatening me and having Miss Young and the**
18    **other lady send me letters. So I think I**
19    **tried to bring -- I tried to bring it**
20    **together, which was my intention originally.**
21    Q. Okay. So, I'll ask the question a
22    different way or --
23    **A. Multiple collection counsel running**
24    **around trying to find assets and going after**
25    **it.**

---

179

1    Q. My question is, is it fair to say that
2    looks like on August 6th of 2010, you at least
3    made a proposal. I'm not suggesting it was
4    necessarily entered into, but you made
5    a proposal to include cases?
6    **A. I don't know. It looks like it by this**
7    **that there was some kind of proposal. I don't**
8    **know if it is this protested agreement. I**
9    **don't know what -- it's --**
10    Q. But it was an e-mail that you sent from
11    -- you said to Mr. Fay on August 6, 2010,
12    correct?
13    **A. Obviously it's an e-mail that I sent to**
14    **ThomasFay@AOL.com, but other than that, I**
15    **don't recall writing it. I don't recall. I**
16    **don't recall it, but it's there. It looks**
17    **like it came from my office. So what is**
18    **it?**
19    Q. You have no reason to doubt as you sit
20    here today that it was, in fact, sent, do you?
21    **A. No. I'm not doubting it. Just telling**
22    **you that I'm not --**
23    Q. Okay. Thank you. Mr. Rothenberg, I
24    believe you said earlier as a paraphrase, but
25    that you don't believe that the clients had

---

180

1    the right to give away your fee, something to
2    that effect, correct?
3    **A. Correct.**
4    Q. Okay, and I presume you're referring to
5    the sharing agreement they entered into with
6    their fellow Marines in 2012, correct?
7    **A. Correct. I don't think that they had**
8    **full information.**
9    Q. Okay.
10    **A. As to what they were doing.**
11    Q. Okay.
12    **A. But they were taking a reduction and**
13    **Mr. Perles and Mr. Fay were increasing their**
14    **fee.**
15    Q. Mr. Rothenberg, as of 2012 when the
16    sharing agreement was entered into, had there
17    been any collection on behalf of the clients?
18    **A. I don't think so.**
19    Q. And we discussed before that the fees
20    were contingent on -- the fees is contingent
21    upon collection and to the extent of
22    collection only, correct?
23    **A. Yes.**
24    Q. Okay. So can we agree that at the
25    time, no contingency fee had been earned in

---

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

181

1  2012 at the time the sharing agreement was
2  entered into?
3      MR. BUCKLEY:  Objection.
4      MR. ALTEMUS:  What's the grounds for
5  that?
6      MR. BUCKLEY:  Calls for legal
7  conclusion.
8      MR. ALTEMUS:  It is an allegation in
9  your case.
10 BY MR. ALTEMUS:
11     Q.  Can we agree that the fees had not been
12 --
13     **A.  I'm not sure of the timeline.**
14     Q.  I'm trying to explain.  That is why I
15 tried to set it up.
16         So in 2012 my understanding is what
17 you're alleging is the clients had no right to
18 give away your fee when they entered to the
19 sharing agreement?
20     **A.  Was that 2012?**
21     Q.  Correct, and can we agree that as of
22 2012, no fee had been earned at that point?
23     MR. BUCKLEY:  Objection.
24     Q.  You could say yes or no.
25     **A.  I can't say yes or no.  I didn't even**

182

1  know.
2      Q.  Okay.  What information do you need?
3      **A.  When were fees earned?  When were fees**
4  **not earned?  I don't know when the money was**
5  **paid or collected or whatever.  I'm not sure.**
6      Q.  Okay.  All right.  Would you agree with
7  me that if the money -- I can get the
8  documents to set the factual foundation if
9  you'd like me to, but if the fees had not
10 been collected in 2012 -- excuse me.  If there
11 had not been a collection --if there had not
12 been a collection on behalf of the client in
13 2012, can we agree that no fee had been earned
14 when the sharing agreement was signed?
15     MR. BUCKLEY:  Objection.  Calls for a
16 legal conclusion.
17     Q.  Can we agree?
18     **A.  It's not that simple.  You are asking**
19 **me, I believe, that to say that if there was**
20 **no money collected, the fees had not been**
21 **earned.  I don't think that that's so.  I**
22 **think had -- had the representation**
23 **stopped, all the efforts for all the years you**
24 **would have been entitled to substantial**
25 **compensation, irrespective of what it says on**

183

1  the contingent fee agreement.
2      Q.  As of 2012, were you expecting the
3  clients to pay you a fee?
4      **A.  Yes, I expected the clients to pay me a**
5  **fee.**
6      Q.  Were you expecting --
7      **A.  When money was collected.**
8      Q.  Okay.  So in 2012 --
9      **A.  But if I were discharged, I would have**
10 **expected them to pay my pro rata based on the**
11 **work that I had done prior thereto and the**
12 **same thing Mr. Perles and Mr. Fay would have**
13 **been entitled to it.**
14     Q.  Fair enough.  So we agree in the
15 calendar year of 2012, you were not expecting
16 your clients to pay you a fee?
17     MR. BUCKLEY:  Objection.
18     Q.  Can we agree on that?
19     MR. BUCKLEY:  No.  That's the exact
20 opposite of what he just said.
21     Q.  No.  The calendar year getting paid in
22 2012, were you expecting to be paid in 2012 by
23 your clients?
24     MR. BUCKLEY:  Objection.
25     **A.  I would expect the clients to pay when**

184

1  **they got the money, and I don't know when my**
2  **-- I'm shaky on the timeline.  I'm very shaky**
3  **on the timeline.  I don't know.**
4      Q.  At the beginning of your deposition --
5      **A.  I don't want to guess.  I just can't --**
6      Q.  I respect that.  I'm sorry.  Mr.
7  Rothenberg, I believe at the beginning of your
8  deposition, at least as I understand it, when
9  you entered into this venture with Fay and
10 Perles, the division of labor would be that
11 you would be focused on the lobbying; is that
12 correct?
13     **A.  I would be -- well, it wasn't that**
14 **simple.  Remember, we were starting a major**
15 **project and initially was going to bring the**
16 **clients, lobbying, whatever else had to be**
17 **done and there was constant -- until the**
18 **disputes rose, there was constant**
19 **communication and constant things that we had**
20 **to do.  There were a lot of things that we had**
21 **to.  It wasn't defined, especially as to Mr.**
22 **Perles.  I was working, you know, mostly with**
23 **Mr. Fay.**
24     Q.  And --
25     **A.  Mr. Fay was trying to get Mr. Perles**

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

185

1  disbarred. It was crazy and Mr. Perles called
2  me everyday about Mr. Fay, so the biggest
3  thing, two things. One was trying to get
4  where we wanted to be with the lobbyists and
5  legislation and getting collection. Once
6  we realized we had to get collection counsel,
7  getting collection counsel the best we could.
8  That was my function.
9      Q. Appreciate that.
10     A. Whatever had to be done.
11     Q. I should have limited -- what I should
12  have said was, of the division of labor,
13  lobbying of other things sort fell under your
14  camp, correct?
15     A. Well, not all lobbying, but working a
16  lot. I wasn't supposed to be do all the
17  lobbying or gathering all the lobbying. Fay
18  went out and got lobbyists initially. When I
19  put together the dream team, I got two of the
20  big firms and they added another small firm to
21  which I was able to put in there.
22     Q. Okay.
23     A. So I didn't have exclusivity. We
24  didn't have exclusivity under anything and Fay
25  consulted with me, you know, many times on

186

1  moves and what they are going to do, et
2  cetera, irrespective of the fact that he took
3  the responsibility of the litigation and the
4  litigation, the depositions and I was to get
5  the estate attorneys, which was a big job --
6      Q. Thank you, Mr. Rothenberg.
7      A -- all over the country.
8      Q. I'm trying to wrap up here.
9      A. I'm sorry. I'm falling asleep on you,
10  but go ahead.
11     Q. I very much appreciate it. The whole
12  case is fascinating, but, Mr. Rothenberg, let
13  me ask you in 2012.
14     A. Yes, sir.
15     Q. How involved were you --
16     A. Again, you are asking me a specific
17  year, and I'm not sure what, where, when and
18  --
19        MR. BUCKLEY: Just wait until he asks
20  the whole question.
21     Q. And you could tell me that.
22     A. Whenever you mention a year, you're
23  throwing me off.
24     Q. So in 2012, to the extent you can
25  remember, how involved were you in lobbying

187

1  for a particular statute that has since been
2  known as 8772?
3      A. I don't remember what you're referring
4  to. The lobbying that was done afterwards, at
5  some point, that -- that Fay got a guy in his
6  building to do it I think in the -- to get on
7  that lobbying, the major lobbying that we
8  needed to get the original legislation I was
9  involved with. The lobbying afterwards, I
10  think I did refer. I did mention a couple
11  of guys to him, but I'm not sure. My memory
12  is foggy for that.
13     Q. I appreciate that. During this time
14  period, I won't narrow it down to a specific
15  year, but, like, during the collection
16  efforts, during that time period.
17     A. Yes.
18     Q. My understanding is your role would
19  have been to get the dream team or to find
20  lobbyists who could work on behalf of your
21  clients; is that correct?
22     A. Right.
23     Q. Now --
24     A. And also they included cases that
25  Perles and Fay had.

188

1      Q. Right.
2      A. Which were included, which I expected
3  no compensation for. I think there were --
4  there were other bombing cases that they had
5  and -- and I agreed to that. If that would
6  benefit those cases, fine. I had no
7  interests in those cases. Benefit them and
8  benefit their clients, it was fine, so I
9  worked on that, as well.
10     Q. Were you aware of what the lobbyists,
11  the subject matters that they were trying to
12  convince congress to agree to?
13     A. At what time?
14     Q. This is the 2012, during the
15  collection.
16     A. The collection? I'm a little vague,
17  but I think I did recommend a couple of
18  lobbyists to them.
19     Q. Did you have any conversation --
20     A. I think I did recommend a couple of
21  lobbyists to them --
22     Q. And as the --
23     A -- for that.
24     Q. Did you ever discuss with those
25  lobbyists the specific work they were doing?

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

189

1    A.  No.  Well, I don't know.  I don't know
2  what would be lobbying for legislation and may
3  have put them in touch with Mr. Fay.
4    Q.  Well, do you expect to testify at trial
5  as to any recollection regarding the
6  lobbyists?
7    A.  What?
8    Q.  Do you expect to testify at trial
9  regarding any discussions that you may
10  have had with these lobbyists during the
11  collection efforts in 2012 about what they
12  were lobbying for?
13    A.  I don't know.
14    MR. BUCKLEY:  You're asking him now
15  what he remembers.
16    MR. ALTEMUS:  That's right.
17    MR. BUCKLEY:  He gives you what he
18  remembers.
19    MR. ALTEMUS:  That's right.
20    MR. BUCKLEY:  If I stick something in
21  front of him and he remembers something else,
22  then that doesn't mean if he says no now he
23  can't.
24  BY MR. ALTEMUS:
25    Q.  Well, I would ask -- do you remember

190

1  anything specific with Gibson, Dunn and
2  Crutcher talking to them about any specific
3  issues?
4    A.  Yes, yes, yes.
5    Q.  And what were those issues?
6    A.  The main thing was getting them on
7  board to work together, to work for low
8  contingency fee agreement and not only do it,
9  do it on a contingency fee, which they had
10  never done before and working together with
11  McGuireWoods and I bringing in more.  All
12  three of them put together.  I had the same
13  vision with the collection counsel.  We were
14  so successful with the Gibson, Dunn and
15  McGuireWoods and Amatae, that I wanted to
16  replicate that and they went ahead and the
17  Cook thing and the whole thing exploded.
18    Q.  Thank you.  What was the scope of the
19  work for which you hired Gibson, Dunn and for
20  which Gibson, Dunn, and Crutcher were hired
21  along with McGuireWoods?
22    A.  What?  What was what?
23    Q.  What was the scope of work for which
24  you retained Gibson, Dunn and Crutcher and
25  McGuireWoods?

191

1    A.  To work on legislation.  Prepare
2  legislation and see the various senators and
3  congressman.
4    Q.  Do you recollect what that legislation
5  was?
6    A.  It was legislation, which we put the
7  different countries -- terrorist countries on
8  the list and facilitating whatever their
9  documents -- I'm a little sleepy now.  The
10  documents that anything we needed to make it
11  easier for collect the money.
12    Q.  Okay.  You told me before and I'm going
13  to switch real quick.  I think I got two more
14  small subjects.  I think you said, Mr.
15  Rothenberg, once the collection stage began,
16  you built a wall; is that correct?  Or how
17  did you phrase it?  Correct me.
18    A.  I don't remember.
19    Q.  Were you involved in the litigation of
20  trying to collect on behalf on the clients?
21    A.  No.
22    Q.  Okay.
23    A.  That was Fay initially and then he gave
24  it over to Cook was doing it and then after
25  Cook, brought in Vogel and after Vogel, it was

192

1  Vogel because that was the guy that Cook hired
2  and then apparently there was a falling out
3  between Cook and Vogel because I think Cook
4  hadn't been paying him and then another guy
5  that was then hired called Bonner and I was
6  not involved with Mr. Bonner, no.
7    Q.  So whatever decisions that were made on
8  behalf of the clients at that stage, you
9  weren't involved in those decisions, correct?
10    A.  What decisions?
11    Q.  At that stage.  When their --
12    A.  What decisions?
13    Q.  Any decisions that would have been made
14  as part of collection litigation, can we agree
15  you were not part of making those decisions?
16    A.  I would think so.  I'm not sure.
17    Q.  You think you were involved?
18    A.  I'm not sure because I know there was a
19  point where Tom Fay contacted me saying this
20  $250 million and we let it go and leave
21  Citibank out of it, and leave this outfit out
22  $250 million, so we could proceed ahead.  So
23  I do remember that.  Where -- I don't remember
24  the chronology, but I do remember him calling
25  me and asking me about this thing.  I don't

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

49 (193 to 196)

193

1  want to do.  I don't want to do it and we
2  agreed to do it, if I remember correctly.
3      Q.  Okay.  Well, do you recall telling Ms.
4  Young in your letter to her that you were not
5  involved in the collection stage?
6      A.  At that point I don't think I was
7  involved.  They built that wall around me so I
8  didn't know specifically what was going on
9  with Strook and what was -- I had no
10 idea that Strook was knocking out Perles --
11 was knocking out Peterson.  I did not know
12 that.
13     Q.  All right.  And did that continue --
14     A.  I never knew that until Tom Fay sent me
15 an e-mail, until Tom Fay told me about it.  I
16 did not know that.
17     Q.  And you kept that wall up throughout
18 the collection litigation, correct?
19     A.  I would say for even to this day, I
20 don't know what's going on with 650 Fifth
21 Avenue.  I don't know what's going on with
22 Clear Stream II.  I don't know what's going on
23 with any other assets.  I don't know.
24     Q.  You mentioned before the --
25     A.  Plus also I understand there's bringing

194

1  -- bringing the, um, the Marines into the
2  terrorist victim fund.  Not involved in that
3  and I wasn't involved in getting lobbyists to
4  get legislation to allow the victims who
5  recovered in the Clear Stream assets to now
6  go into the -- to now go into the -- into the
7  fund.  I know that originally there had to be
8  a choice between getting 650 Fifth Avenue and
9  getting, I guess, it's Clear Stream and
10 getting any other assets or going into -- or
11 going into the fund and I was not involved in
12 that legislation.  I did not know about that
13 legislation.  I wasn't told about that
14 legislation until I, you know, became well
15 known.
16     Q.  Okay.  Well, Mr. Rothenberg, you
17 mentioned earlier that or you referenced, and
18 I believe took issue with, a representation
19 that Fay and Perles made to the clients about
20 how the Fay and Perles fee -- how Fay and
21 Perles would get less of a fee if the sharing
22 agreement was entered into.  Do you remember
23 that?
24     A.  Not the sharing agreement.  Not the
25 sharing agreement.

195

1      Q.  Okay.
2      A.  The -- what they said follow on
3  attorneys.
4      Q.  Okay.
5      A.  Who they allowed in if they paid them a
6  referring fee.
7      Q.  Did you --
8      A.  Not the attorneys from -- from Heisman,
9  from DLA Piper, from Rubin, from Levin and
10 from Strook.  Not those attorneys.  I'm
11 talking about the follow on attorneys.
12     Q.  I appreciate it.
13     A.  What was the mantra that you said?  The
14 Marines.  Share with other Marines, whatever
15 it is, that's what I was referring to.
16     Q.  Fair enough.  Can we agree that Fay and
17 Perles never told the clients that the clients
18 would pay less in attorney's fees if they
19 entered into the agreement?
20         MR. BUCKLEY:  Objection.
21     Q.  Can we agree on that?
22     A.  Let me --
23         MR. BUCKLEY:  You're asking him about
24 his recollection of something he didn't
25 participate in?

196

1          MR. ALTEMUS:  No.  I'm asking him
2  about his testimony.
3      Q.  You testified earlier, all right, about
4  a statement Fay and Perles made to the clients
5  and I'm asking --
6      A.  Yes.
7      Q  -- based on that testimony, can we
8  agree that Fay and Perles did not tell the
9  clients that clients would pay less if they
10 entered into the agreement?  Can we agree on
11 that?
12         MR. BUCKLEY:  Objection.
13 Argumentative.
14     MR. ALTEMUS:  It is a question.
15     Q.  Can we agree?
16         MR. BUCKLEY:  Same objection.
17     A.  That Perles and Fay never told the
18 clients that they were going to get more
19 money, yeah, they didn't tell the clients
20 that.
21     Q.  No.  My question is, did Perles and Fay
22 ever tell the clients that their attorney's
23 fee would be decreased?  The client's
24 attorney's fee would decrease?
25     A.  I believe that they did.  They said

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

197

1  they would be getting less, as well as
2  the clients getting less. I believe so, yes.
3  That's my recollection from what I've seen
4  here.
5      Q. We just talked before, Mr. Rothenberg,
6  about how your fee contingent, correct, on the
7  recovery of your clients?
8      A. Yes, sir.
9      Q. You're alleging in this case that you
10 have suffered damages in excess of 20 million
11 dollars. So presumably your clients have
12 suffered damages, correct?
13     MR. BUCKLEY: Objection. Calls for
14 legal conclusion. Argumentative.
15     MR. HERVEY: That's the allegation in
16 the case.
17     A. What?
18     Q. We agree I think, right, that your fee
19 is contingent on your client's recovery,
20 correct?
21     A. Yes, it is.
22     Q. Okay.
23     A. That is correct.
24     Q. And you're saying, and I'll approach it
25 this way. My understanding of your

198

1  allegations in this case is not that you
2  weren't paid a fee for the clients
3  that you represented, but you weren't paid
4  enough; is that correct?
5      MR. BUCKLEY: Objection.
6      A. Yes.
7      MR. ALTEMUS: What is the basis of
8  the objection?
9      MR. BUCKLEY: Well, certainly all
10 of the attorneys in this case made a lot of
11 money. Mr. Rothenberg is not alleging that he
12 wasn't paid enough. He is alleging that his
13 recovery was harmed by what Fay and Perles did
14 in brokering the following agreement.
15     MR. ALTEMUS: Can you please read
16 my question back?
17     THE WITNESS: Can we take a break?
18     THE VIDEOGRAPHER: We are going
19 off the record. The time is 4:16.
20     (Recess taken.)
21     THE VIDEOGRAPHER: We are back on
22 the record. The time is 4:22 p.m.
23 BY MR. ALTEMUS:
24     Q. Let me try to approach it this
25 way, Mr. Rothenberg.

199

1      A. Sure. I try to answer to the best of
2  my ability. Go ahead.
3      Q. I could have asked a better question
4  maybe. My understanding is that one of your
5  allegations in this case is that it's not that
6  you weren't paid legal fees, your attorney's
7  fees, it's that you weren't paid the proper
8  amount.
9      A. Yes.
10     Q. Okay. It is my understanding, from
11 your earlier testimony, that you don't believe
12 that the clients were properly informed before
13 they were asked to enter into the sharing
14 agreement; is that correct?
15     A. It's not only that.
16     Q. Okay.
17     A. Should I -- let me expound. My
18 contention is this. That when I wanted to
19 bring the -- all the contending parties
20 together, Rubin, Levine, Strook, all
21 these guys, certainly Strook, they would work
22 together and by working together, it would be
23 a benefit to the client. They would have more
24 powerful. They could find different assets.
25 Go here. This one would sue this. That was a

200

1  benefit and what Perles and Fay did by getting
2  the clients to reduce their amount, is just
3  like if you had, I don't know. A tornado or
4  something, getting them to reduce their
5  amount for others, for other victims, there
6  was no benefit to them. It was no benefit.
7  They knew there was no benefit and also never
8  revealing to them that they were -- that they
9  were going to make -- make additional money,
10 but even if they did do that, even arguendo
11 that they did do that and explained it
12 to them, they had no right to reduce my fee.
13 My fee was based on -- look, they stole 50
14 clients and I got nothing out of it and then
15 they added all of these other clients that I
16 had no knowledge of. No interest in and they
17 added to reduce it. In addition to that, they
18 told the clients one thing, but really the
19 result was something else and they didn't even
20 have the courtesy to go back and say, listen,
21 you know, you did a good thing. You reduced
22 it, fine. You got your friends. You let them
23 in, but by the way, we didn't lose anything on
24 it, so even if they had told me, if they want
25 to give away -- if my clients in Zaprexa, in

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

201

1  Paraguay, in Camp Lejeune, if they want to
2  give away their money, let them give away
3  their money, but they can't say, Mr.
4  Rothenberg, you know, you have to reduce your
5  fee. They can't do that.
6      Q. Thank you, Mr. Rothenberg. Have you
7  told your clients this?
8      A. What clients?
9      Q. Your clients for which you received the
10 attorney's fees.
11     A. I don't understand what you're saying.
12     Q. All right. So --
13     A. Have I told my clients what?
14     Q. Everything that you just said or
15 anything you just said.
16     A. I never communicated with these
17 clients. That was the deal. I haven't
18 reached the deal. I haven't reached the deal.
19 My --my contention is that Perles and Fay
20 unjustly enriched themselves and what they
21 have to do is pay me mine and if they want to
22 go to the clients that they -- that they
23 misinformed and want to make good with the
24 clients, that is another issue altogether.
25     Q. Do you not believe, sir, that the rules

202

1  of professional conduct require you to advise
2  your clients?
3      A. As to what?
4      MR. BUCKLEY: Objection.
5      Q. Let me finish the question. As to
6  everything you just said?
7      A. No.
8      Q. It does not, sir?
9      A. I don't know. I don't believe so.
10     Q. Do you believe you still owe your
11 clients a fiduciary duty as we sit here today?
12     MR. BUCKLEY: Objection. Mr. Altemus,
13 he is not here to analyze issues for you on
14 the spot.
15     MR. ALTEMUS: It goes to an issue as to
16 whether there is indeed -- whether the
17 allegation that there was a covenant in good
18 faith and fair dealing as described by Mr.
19 Rothenberg is consistent with his actions and
20 that's why I'm asking.
21     MR. BUCKLEY: So if you want to make an
22 argument to Judge Crane, go ahead.
23     MR. ALTEMUS: I want to ask him the
24 question.
25     A. I even said that even if they had made

203

1  full disclosure, full disclosure to the client
2  and said Mr. And Mrs. Client, you're going to
3  get a reduction, but I'm going to make more
4  money and they told them that and still got
5  the consent, the clients didn't have the right
6  reduce my fee.
7      Q. I will ask it this way then. When is
8  the last time -- and not suggesting it should
9  have been at any point.
10     When is the last time you communicated
11 with any of your clients independent of the
12 two letters we saw today?
13     A. I wasn't permitted to do that. That
14 was our agreement. I wasn't to talk to these
15 clients. The Kirschenbaum, Greenbaum, Beer,
16 and Kahana, a small group of clients, of
17 course I spoke to him.
18     Q. As you sit here today, you can't recall
19 if ever I guess whether you spoke to your
20 clients?
21     A. I was cut off from it. Once they
22 filed, I was cut off from getting new clients.
23 Cut off from getting new clients and no
24 communication. They started a website. It
25 was going to be one voice and that's it. I

204

1  couldn't interfere with that relationship.
2  They established that relationship. I was
3  never to interfere with that relationship.
4  I've held that until today. I tried to get
5  back to Mrs. Young and the other one who tried
6  to discharge me or say horrible allegations,
7  those two, yes. Other than that, no.
8      Q. As you sit here today, do you have a
9  believe you still have an attorney/client
10 relationship with any of the plaintiffs or any
11 of the clients in Peterson?
12     MR. BUCKLEY: Objection. Calls for
13 legal conclusion.
14     Q. Do you?
15     A. Make that conclusion.
16     Q. You don't know?
17     A. No. I think that I still have -- I
18 represent them, but the bulk of this is
19 carried by Perles and Fay in communication.
20     Q. Okay. You still represent them?
21     A. We agreed to that.
22     Q. But as you sit here today, you believe
23 you still represent them, correct?
24     A. Yes.
25     Q. And I'm asking about your theory of the

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

52 (205 to 208)

205

1 case, Mr. Rothenberg.
2      MR. BUCKLEY: I'll answer those
3 questions.
4      MR. HERVEY: Let him ask his question.
5      MR. BUCKLEY: Go ahead.
6      MR. ALTEMUS: I get to ask him factual
7 predicate, do I not?
8      MR. BUCKLEY: Ask him the question.
9 BY MR. ALEMUS:
10 Q. Mr. Rothenberg, you said earlier that the
11 clients had no right to give away your fee,
12 right? And based on that contention, what
13 should Fay and Perles have done when the
14 clients indicated they wanted to enter into
15 the sharing agreement?
16 **A. No. The clients -- the clients didn't.**
17 **It was Perles and Fay that forced it on them.**
18 Q. Do you know whether --
19 **A. The factual basis is incorrect. Perles**
20 **and Fay forced it on the clients. That is one**
21 **of things he said, you better do this. It's**
22 **going to stop everything and you got to get**
23 **into this thing and you gotta agree to it.**
24 Q. Have you seen --
25 **A. They didn't reach out to Tom Fay and**

206

1 **Perles and say, hey, we want to take a cut.**
2 **Bring other people in. Perles and Fay reached**
3 **out to them.**
4 Q. And that's why I'm asking. Have you
5 advised your clients that they were forced
6 into the sharing agreement?
7 **A. Have I advised them?**
8 Q. Yes.
9 **A. They read it or somebody read it. They**
10 **agreed to it.**
11 Q. No. The forced part.
12 **A. Pardon me?**
13 Q. You are alleging that they were forced
14 into an agreement. Hold on, Mr. Rothenberg,
15 with respect. You're allegedly that they were
16 forced into an agreement.
17 **A. Yes.**
18 Q. Had you advised them that?
19 **A. Advised them that --**
20 Q. Have you advised them that?
21 **A. No, I didn't advise them that. I**
22 **didn't advise them that.**
23 Q. Thank you very much.
24 **A. They made that decision.**
25      MR. BUCKLEY: All done? Geoff,

207

1 anymore?
2      MR. HERVEY: No.
3      THE VIDEOGRAPHER: This marks the
4 end of the deposition. We are going off the
5 record. The time is 4:29 p.m.
6      (Time noted 4:29 p.m.)

208

1      C E R T I F I C A T E
2
3      I, TRACY COOK, a Certified Court
4 Reporter, Registered Professional Reporter and
5 Notary Public for and within the State of New
6 Jersey, do hereby certify:
7      That the witness whose examination is
8 hereinbefore set forth was duly sworn and that
9 such examination is a true record of the
10 testimony given by that witness.
11      I further certify that I am not related
12 to any of the parties to this action by blood
13 or by marriage and that I am in no way
14 interested in the outcome of this
15 matter.
16      IN WITNESS WHEREOF, I have hereunto set
17 my hand this 3rd day of October, 2023.
18
19      *Tracy Cook*
20      TRACY COOK, CSR/CCR, RPR
21
22
23
24
25

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

53 (209 to 212)

209

```
1       CERTIFICATE OF TRANSCRIBER
2
3       I, Cynthia Bauerle, do hereby certify
4   that this transcript was prepared from the
5   digital audio recording of the foregoing
6   proceeding; that said transcript is a true and
7   accurate record of the proceedings to the best
8   of my knowledge, skills, and ability; and that
9   I am neither counsel for, related to, nor
10  employed by any of the parties to the case and
11  have no interest, financial or otherwise, in
12  its outcome.
13
14
15   Cynthia Bauerle
16  _____
17  CYNTHIA BAUERLE, CSR
18  10/9/23
19
20
21
22
23
24
25
```

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                54

| A |
|---|

**a3b**
52:25, 53:1
**abided**
63:22, 63:24
**ability**
7:19, 7:24,
8:4, 43:9,
43:11, 101:7,
199:2, 209:8
**able**
29:5, 61:18,
76:2, 77:21,
109:5, 109:7,
151:25, 152:2,
185:21
**above**
164:7, 171:20
**above-entitled**
1:17
**abramoff**
18:14, 19:6,
28:19
**absent**
27:2
**absolute**
110:13
**absolutely**
20:12, 67:14,
95:11, 101:19,
109:25
**ac**
46:7
**accident**
166:21
**according**
80:8, 142:22
**account**
34:7, 38:11,
96:20, 139:11
**accurate**
209:7
**accused**
123:7
**acosta**
43:23, 43:24,
43:25, 104:15,

104:16, 104:24,
107:6, 107:12,
107:15, 107:16,
108:9, 108:10,
108:11, 110:19,
112:4, 115:19,
137:25, 138:22,
140:4, 173:8,
173:20, 176:22
**acquitted**
107:20
**act**
47:22
**action**
42:17, 42:21,
46:25, 48:21,
51:11, 51:19,
51:25, 60:19,
60:20, 79:17,
116:2, 117:6,
127:8, 130:6,
157:25, 158:14,
158:24, 159:4,
159:6, 159:8,
165:2, 165:14,
208:12
**actions**
135:21, 135:25,
202:19
**actively**
42:23, 42:25
**actress**
145:20
**acts**
105:12
**actual**
141:22
**actually**
22:9, 24:24,
29:22, 35:22,
42:4, 49:13,
60:23, 63:21,
72:14, 80:12,
87:16, 93:22,
106:16, 110:9,
111:3, 114:20,
134:2, 138:12,
155:22

**ad**
21:3, 21:7,
21:8, 21:10,
21:16, 21:24
**adam**
57:19, 112:24
**added**
185:20, 200:15,
200:17
**addition**
200:17
**additional**
60:21, 62:25,
63:5, 64:6,
64:8, 67:6,
70:17, 70:18,
151:23, 200:9
**address**
13:6, 102:9
**adds**
111:20
**adequately**
152:16
**administration**
41:13, 41:15
**admitted**
10:4
**ads**
20:22, 21:24,
21:25, 22:17,
22:20, 23:3
**advertisements**
20:21, 21:1
**advise**
202:1, 206:21,
206:22
**advised**
10:16, 206:5,
206:7, 206:18,
206:19, 206:20
**advocate**
125:10
**af**
127:7
**affirm**
5:2
**affirmed**
6:11

**after**
14:18, 22:6,
23:19, 23:22,
24:15, 25:5,
27:20, 28:19,
34:15, 35:6,
35:14, 38:8,
39:8, 45:17,
60:18, 63:22,
65:3, 66:20,
66:21, 67:24,
68:10, 70:19,
96:13, 102:1,
107:18, 108:3,
110:12, 111:17,
117:4, 117:5,
117:15, 117:17,
117:19, 117:23,
118:1, 120:25,
121:1, 125:4,
125:9, 125:10,
126:17, 129:8,
130:8, 139:22,
140:20, 178:24,
191:24, 191:25
**afternoon**
15:9, 161:11,
161:13
**afterwards**
25:1, 27:23,
76:7, 99:23,
128:2, 128:3,
187:4, 187:9
**again**
32:11, 51:18,
125:11, 127:17,
146:18, 148:16,
150:17, 153:2,
153:12, 156:17,
157:10, 159:8,
162:17, 166:18,
169:21, 174:24,
177:12, 186:16
**against**
33:6, 34:8,
42:18, 42:21,
77:23, 91:9,
105:5, 117:3,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                55

117:8, 118:5,
118:15, 127:8,
127:13, 135:21,
153:14, 154:12,
158:1, 159:4,
165:2, 165:16
**agents**
62:14, 172:25
**ago**
56:19, 67:1
**agree**
72:6, 75:2,
86:17, 88:15,
163:1, 171:24,
173:14, 173:23,
174:18, 180:24,
181:11, 181:21,
182:6, 182:13,
182:17, 183:14,
183:18, 188:12,
192:14, 195:16,
195:21, 196:8,
196:10, 196:15,
197:18, 205:23
**agreed**
20:17, 51:5,
60:25, 64:8,
75:10, 80:14,
80:15, 93:4,
170:12, 174:24,
188:5, 193:2,
204:21, 206:10
**agreeing**
162:21
**agreement**
4:12, 4:17,
4:24, 11:3,
11:16, 11:18,
13:20, 14:1,
14:16, 16:20,
16:24, 28:22,
28:25, 29:6,
29:7, 47:10,
64:19, 67:5,
67:20, 81:17,
86:25, 87:17,
110:4, 110:15,
111:20, 112:2,

112:9, 125:12,
132:10, 133:25,
134:4, 134:5,
134:21, 134:25,
135:5, 135:22,
136:1, 138:6,
142:17, 143:7,
148:17, 150:8,
150:9, 151:10,
162:12, 162:23,
164:1, 164:12,
164:15, 170:13,
171:10, 171:20,
173:15, 174:25,
175:11, 175:12,
178:1, 178:10,
179:8, 180:5,
180:16, 181:1,
181:19, 182:14,
183:1, 190:8,
194:22, 194:24,
194:25, 195:19,
196:10, 198:14,
199:14, 203:14,
205:15, 206:6,
206:14, 206:16
**agreements**
10:25, 67:23,
124:13, 169:2,
169:22
**ahead**
19:3, 19:17,
23:25, 28:12,
29:12, 30:3,
30:6, 33:23,
39:17, 41:22,
53:21, 59:19,
61:14, 62:4,
71:25, 73:10,
84:16, 84:18,
85:12, 88:23,
91:15, 117:12,
128:8, 131:17,
133:20, 142:18,
147:20, 148:9,
148:11, 151:8,
152:4, 162:5,
163:19, 165:6,

165:7, 166:16,
167:19, 172:17,
186:10, 190:16,
192:22, 199:2,
202:22, 205:5
**al**
5:6
**alcohol**
7:23
**alemus**
205:9
**alexander**
15:7
**allegation**
181:8, 197:15,
202:17
**allegations**
198:1, 199:5,
204:6
**allegedly**
206:15
**alleging**
181:17, 197:9,
198:11, 198:12,
206:13
**allen**
1:5, 1:6, 1:15,
2:2, 2:9, 4:4,
5:5, 5:24, 9:2,
9:3, 9:6,
111:11, 136:24,
140:18, 142:19,
165:4, 167:16,
171:22
**allow**
194:4
**allowed**
75:1, 195:5
**allowing**
176:2, 176:3
**almost**
32:7, 106:10
**along**
68:10, 68:20,
172:13, 190:21
**already**
95:8
**also**
3:7, 6:2, 6:4,

22:15, 32:23,
72:1, 79:12,
127:5, 154:18,
158:24, 177:18,
187:24, 193:25,
200:7
**altemus**
3:3, 4:6, 5:20,
161:2, 161:8,
161:10, 165:5,
166:6, 166:13,
166:18, 168:1,
168:4, 168:11,
168:15, 168:18,
168:20, 181:4,
181:8, 181:10,
189:16, 189:19,
189:24, 196:1,
196:14, 198:7,
198:15, 198:23,
202:12, 202:15,
202:23, 205:6
**altogether**
78:17, 82:13,
201:24
**always**
12:9, 124:25
**amatae**
30:4, 30:6,
31:23, 31:24,
32:6, 190:15
**amazing**
118:9
**ambiguous**
150:12
**amendment**
110:23, 111:19,
112:1, 112:7
**among**
14:2, 143:15,
149:16, 151:4,
151:5
**amongst**
178:8
**amount**
36:16, 57:19,
109:17, 152:1,
152:3, 158:23,

163:17, 199:8,
200:2, 200:5
**amounts**
96:20
**analysis**
129:25
**analyze**
202:13
**anderson**
69:2, 135:24,
136:13
**animosity**
29:20
**ann**
96:16, 96:17
**another**
33:3, 40:13,
44:2, 50:25,
57:20, 61:4,
61:5, 66:12,
77:9, 77:10,
91:16, 106:7,
116:7, 127:17,
135:19, 160:10,
185:20, 192:4,
201:24
**answer**
7:24, 11:6,
11:7, 11:9,
13:24, 43:7,
44:21, 48:1,
48:15, 48:17,
48:24, 69:22,
70:1, 100:9,
117:13, 144:22,
144:23, 149:11,
151:9, 155:18,
156:18, 157:8,
170:3, 170:5,
199:1, 205:2
**answered**
19:4, 100:8,
136:23
**answering**
101:6
**answers**
135:11
**any**
7:18, 7:19,

7:25, 8:2, 8:11,
13:16, 14:7,
17:2, 21:25,
22:17, 22:20,
26:17, 29:13,
39:18, 39:22,
40:4, 40:20,
49:3, 52:24,
52:25, 53:1,
69:6, 83:7,
83:17, 83:19,
83:24, 84:3,
86:15, 87:1,
87:4, 87:14,
90:20, 93:5,
93:24, 94:1,
95:7, 104:4,
104:11, 112:18,
114:13, 117:5,
133:15, 136:10,
142:5, 143:4,
144:25, 148:12,
153:9, 154:11,
155:16, 156:19,
157:24, 160:7,
162:12, 163:18,
180:17, 188:19,
189:5, 189:9,
190:2, 192:13,
193:23, 194:10,
203:9, 203:11,
204:10, 208:12,
209:10
**anybody**
28:16, 29:16,
55:13, 56:11,
113:1, 114:11,
145:5, 174:15
**anymore**
61:2, 61:3,
61:16, 64:17,
65:7, 87:15,
89:10, 106:5,
156:18, 160:24,
207:1
**anyone**
129:4
**anything**
11:12, 23:22,

24:4, 26:12,
52:19, 70:4,
70:12, 70:20,
71:15, 78:10,
81:19, 83:21,
83:23, 86:25,
89:2, 89:3,
89:4, 89:5,
92:10, 95:1,
97:7, 97:13,
110:3, 119:18,
119:24, 121:3,
130:22, 131:1,
159:16, 162:24,
163:5, 174:2,
185:24, 190:1,
191:10, 200:23,
201:15
**anyway**
31:17, 107:24
**anywhere**
10:8, 10:11,
169:12
**apologize**
19:2, 167:19
**apparently**
18:21, 23:13,
23:17, 23:20,
29:3, 32:20,
34:6, 36:3,
40:9, 45:15,
45:22, 46:17,
47:8, 53:9,
70:21, 72:3,
77:4, 77:6,
91:8, 119:3,
127:19, 143:19,
155:24, 192:2
**appeal**
48:20, 50:4,
50:17
**appears**
27:18, 162:9,
177:17, 177:19
**appreciate**
101:5, 161:2,
174:7, 175:1,
185:9, 186:11,

187:13, 195:12
**approach**
197:24, 198:24
**approached**
14:20, 14:21
**appropriations**
33:15
**approval**
76:16
**approximately**
1:25, 33:20
**arabs**
107:2
**arbitration**
1:1, 5:7, 5:22,
8:17, 8:19,
8:20, 8:22,
15:22, 59:25,
62:22, 67:3,
85:10, 132:13,
135:17, 139:6,
177:14
**area**
15:5
**aren't**
67:22, 128:25
**argue**
49:5
**arguendo**
152:23, 200:10
**argument**
202:22
**argumentative**
196:13, 197:14
**arguments**
29:1
**arising**
105:7, 105:10
**arlen**
30:12
**arnold**
178:11
**around**
8:8, 16:19,
18:20, 25:19,
27:18, 27:25,
36:9, 40:2,
119:23, 178:24,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                              57

193:7
**arrangement**
79:11, 135:20
**arrangements**
12:19
**aside**
102:11, 131:15,
132:20
**asked**
48:7, 48:14,
75:11, 84:15,
88:15, 89:23,
97:4, 100:6,
103:13, 136:23,
140:19, 169:14,
169:17, 170:23,
175:2, 199:3,
199:13
**asking**
25:14, 75:11,
76:5, 92:11,
92:12, 92:15,
94:21, 96:2,
114:16, 115:13,
129:15, 129:18,
135:9, 142:16,
147:11, 147:25,
156:6, 159:18,
167:24, 175:13,
175:15, 182:18,
186:16, 189:14,
192:25, 195:23,
196:1, 196:5,
202:20, 204:25,
206:4
**asks**
165:5, 186:19
**asleep**
186:9
**assassin**
107:17
**asserted**
127:22
**asset**
40:3, 102:14,
102:25, 103:6,
117:5, 117:9,
118:15, 120:14,

120:19, 129:7,
138:2, 138:24,
154:9, 158:2,
173:17
**assets**
34:25, 35:11,
36:3, 42:22,
46:23, 117:4,
117:15, 117:18,
117:23, 124:15,
124:24, 125:15,
125:18, 125:20,
125:23, 126:5,
126:17, 126:20,
126:22, 128:7,
128:8, 128:11,
129:5, 143:18,
143:19, 158:5,
158:6, 160:12,
167:23, 169:4,
169:24, 176:3,
176:4, 178:24,
193:23, 194:5,
194:10, 199:24
**assist**
79:18, 80:15
**assistant**
50:24
**assistants**
22:7
**associates**
31:3
**assume**
8:24, 43:3,
89:20, 154:13,
154:14, 154:15,
154:16, 177:2
**assumed**
73:5
**assuming**
91:11
**assumption**
53:18, 76:6,
103:9
**assumptions**
91:13, 91:14
**attached**
33:14, 101:21,

101:22, 132:12,
137:13
**attachment**
132:3, 132:5,
132:7, 132:8
**attack**
106:19
**attacked**
122:10
**attacking**
54:9
**attacks**
43:20
**attempt**
53:7
**attempted**
148:20
**attend**
104:6
**attending**
104:5
**attention**
124:10, 162:15,
165:10, 166:25
**attorney**
2:9, 6:23,
10:1, 10:15,
11:4, 11:10,
11:17, 16:20,
16:21, 30:7,
30:10, 33:3,
44:13, 44:14,
69:23, 72:18,
140:23, 141:22,
142:2, 142:10,
142:13, 177:14,
204:9
**attorney's**
164:7, 164:13,
173:18, 195:18,
196:22, 196:24,
199:6, 201:10
**attorneys**
2:2, 2:15, 3:1,
68:20, 72:1,
136:15, 136:18,
137:2, 139:7,
142:18, 151:22,

162:21, 163:1,
164:8, 164:14,
166:12, 174:11,
175:24, 175:25,
176:5, 176:16,
186:5, 195:3,
195:8, 195:10,
195:11, 198:10
**attributable**
86:10
**audio**
209:5
**audit**
163:23
**august**
48:4, 177:19,
178:7, 179:2,
179:11
**avenue**
2:11, 2:19,
118:2, 146:13,
146:14, 148:15,
149:12, 153:11,
153:15, 193:21,
194:8
**aware**
26:3, 37:23,
43:8, 78:20,
90:20, 90:22,
102:24, 103:6,
103:24, 140:12,
146:11, 146:16,
146:21, 166:10,
188:10
**away**
42:9, 77:13,
146:7, 148:21,
151:13, 151:24,
180:1, 181:18,
200:25, 201:2,
205:11
**awful**
143:22

| B |
| --- |

**b-e-e-r**
104:17
**baby**
118:11

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    58

| | | | |
|---|---|---|---|
| **back** | 119:9, 142:21, | 166:21, 172:9, | 8:12, 12:24, |
| 15:16, 47:16, | 164:12, 183:10, | 173:11, 174:19, | 15:24, 15:25, |
| 47:18, 51:22, | 196:7, 200:13, | 175:5, 192:1, | 16:2, 20:15, |
| 54:23, 61:18, | 205:12 | 192:3, 192:18 | 20:17, 25:17, |
| 98:16, 102:17, | **basically** | **been** | 25:19, 27:2, |
| 118:18, 118:22, | 94:22, 131:12 | 6:11, 12:10, | 27:19, 29:4, |
| 123:25, 124:5, | **basis** | 15:24, 16:2, | 52:19, 54:17, |
| 133:6, 153:5, | 31:18, 31:19, | 26:25, 27:24, | 55:13, 60:23, |
| 160:21, 164:19, | 74:3, 126:14, | 27:25, 33:7, | 64:23, 66:19, |
| 166:14, 166:15, | 166:6, 198:7, | 43:4, 50:1, | 76:8, 94:25, |
| 166:19, 198:16, | 205:19 | 66:19, 95:14, | 121:7, 131:21, |
| 198:21, 200:20, | **bauerle** | 103:1, 104:22, | 137:15, 139:23, |
| 204:5 | 209:3, 209:17 | 104:23, 110:24, | 140:20, 140:21, |
| **bad** | **bear** | 113:14, 116:8, | 141:6, 143:5, |
| 53:24, 118:9, | 95:20 | 124:13, 124:25, | 146:23, 146:25, |
| 150:4 | **became** | 125:1, 144:11, | 148:2, 149:18, |
| **baltimore** | 102:23, 103:6, | 146:8, 149:1, | 154:13, 180:19, |
| 59:14 | 194:14 | 149:13, 151:25, | 190:10, 191:12, |
| **bank** | **because** | 152:2, 155:10, | 193:24, 197:5, |
| 38:12, 38:13, | 14:20, 18:23, | 167:9, 169:2, | 199:12 |
| 38:19, 38:20, | 24:1, 25:16, | 169:23, 171:6, | **began** |
| 38:21, 38:23, | 29:3, 31:13, | 173:12, 173:15, | 60:19, 191:15 |
| 39:10, 102:20, | 35:25, 36:6, | 173:18, 177:12, | **beginning** |
| 102:21 | 36:11, 40:2, | 180:17, 180:25, | 54:24, 184:4, |
| **banking** | 43:16, 46:4, | 181:11, 181:22, | 184:7 |
| 39:23 | 50:15, 52:12, | 182:10, 182:11, | **begins** |
| **bar** | 52:14, 52:20, | 182:12, 182:13, | 5:3, 167:3 |
| 78:25, 79:1 | 52:22, 53:11, | 182:20, 182:24, | **behalf** |
| **barracks** | 53:19, 53:22, | 183:13, 187:1, | 2:2, 2:9, 2:15, |
| 13:22, 15:3, | 56:7, 62:15, | 187:19, 192:4, | 3:1, 5:21, 5:24, |
| 79:16, 105:8 | 64:15, 65:5, | 192:13, 203:9 | 6:2, 8:20, 8:23, |
| **barry** | 65:6, 66:9, | **beer** | 17:22, 61:9, |
| 44:13, 52:15, | 73:1, 74:4, | 43:23, 44:1, | 119:13, 158:17, |
| 106:2, 106:13, | 74:10, 74:25, | 52:9, 104:15, | 160:3, 160:6, |
| 106:15, 110:17, | 76:22, 77:20, | 104:16, 104:17, | 165:2, 180:6, |
| 112:11, 112:23, | 78:24, 81:12, | 104:18, 104:19, | 182:12, 187:20, |
| 114:24, 116:10, | 82:3, 84:9, | 104:24, 106:21, | 191:20, 192:8 |
| 116:13, 116:14, | 88:24, 90:7, | 110:19, 112:4, | **behind** |
| 119:25, 120:6, | 93:7, 93:13, | 115:1, 120:5, | 145:3 |
| 129:1, 129:2, | 96:3, 96:23, | 128:10, 128:11, | **behold** |
| 129:3, 130:19, | 100:23, 113:23, | 137:25, 138:22, | 18:11 |
| 139:18, 139:21, | 119:2, 119:20, | 140:5, 170:11, | **being** |
| 140:21, 175:6, | 120:11, 123:18, | 173:8, 173:20, | 45:5, 45:24, |
| 178:2 | 125:25, 126:8, | 174:22, 176:23, | 65:11, 77:21, |
| **bartender** | 130:18, 130:25, | 203:15 | 118:21, 124:16, |
| 62:8, 62:9, | 144:5, 152:6, | **beer's** | 129:25 |
| 79:1 | 152:20, 156:17, | 43:20 | **beirut** |
| **based** | 163:14, 164:14, | **before** | 15:14, 32:22, |
| 72:7, 76:6, | | 1:18, 6:21, | |

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

59

60:21, 64:6,
67:6, 67:8,
105:8, 150:22,
174:21
**believe**
9:14, 13:14,
13:16, 38:9,
42:15, 75:4,
75:6, 142:5,
152:25, 153:2,
159:21, 159:23,
159:25, 175:3,
177:13, 177:22,
179:24, 179:25,
182:19, 184:7,
194:18, 196:25,
197:2, 199:11,
201:25, 202:9,
202:10, 204:9,
204:22
**believed**
167:22
**bell**
156:8
**benefit**
188:6, 188:7,
188:8, 199:23,
200:1, 200:6,
200:7
**berbert**
2:17
**berlin**
106:7
**bernard**
109:16, 116:3,
116:9, 177:22
**best**
21:5, 30:13,
68:1, 100:22,
101:7, 104:10,
109:22, 154:22,
185:7, 199:1,
209:7
**bethesda**
2:20
**better**
53:13, 77:19,
199:3, 205:21

**between**
9:5, 11:3,
23:14, 79:11,
83:16, 110:15,
168:19, 175:7,
177:16, 178:10,
192:3, 194:8
**big**
14:24, 20:4,
21:10, 23:13,
24:23, 36:18,
36:19, 63:11,
79:25, 80:17,
126:4, 185:20,
186:5
**bigger**
15:2
**biggest**
185:2
**bill**
12:15, 33:9,
33:13, 33:15,
33:16, 38:8,
39:8, 155:21
**bit**
8:9, 49:22,
58:7
**bizarre**
37:15
**blacking**
30:19
**blah**
18:18, 37:1,
37:2
**bland**
69:1
**blinking**
15:13
**blood**
208:12
**blow**
165:16
**board**
190:7
**boat**
117:21, 126:23,
126:24, 127:1,
127:14, 127:19,

127:20, 128:1,
129:5
**boeing**
35:6, 127:8
**bologna**
80:15
**bombing**
13:22, 15:15,
21:2, 26:6,
32:22, 43:18,
66:18, 105:8,
116:23, 150:23,
155:7, 188:4
**bonk**
38:16, 65:24,
66:1, 66:13,
178:11
**bonner**
116:22, 117:1,
153:23, 154:1,
192:5, 192:6
**bonus**
24:6
**borrow**
31:3
**both**
9:12, 24:9,
55:19, 90:10,
120:12, 129:8,
150:17
**bothered**
37:5, 71:2
**bottom**
111:2, 124:10
**boulevard**
3:4
**brag**
36:24
**brandon**
26:21, 26:22
**breached**
37:9, 148:16
**break**
7:13, 7:15,
47:11, 47:12,
98:10, 133:2,
133:22, 160:16,
198:17

**breaking**
122:7
**breaks**
161:5
**bregman**
2:17, 29:17,
29:18, 29:19,
29:24
**briefs**
49:6
**bring**
17:13, 17:15,
19:13, 165:2,
165:14, 178:19,
184:15, 199:19,
206:2
**bringing**
14:6, 174:13,
190:11, 193:25,
194:1
**broke**
44:14, 175:9
**brokering**
198:14
**brother**
81:23
**brother-in-law**
77:10, 77:13
**brought**
17:20, 23:5,
24:1, 34:21,
35:18, 44:11,
50:15, 64:23,
78:14, 79:20,
84:9, 84:13,
99:8, 99:15,
127:8, 155:20,
155:21, 158:24,
166:12, 174:1,
174:3, 191:25
**brown**
69:3, 135:25
**buchakjian**
85:11
**buckley's**
157:1
**build**
120:1, 120:3

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                          60

**building**
1:22, 18:10,
106:9, 117:22,
117:25, 187:6
**built**
36:9, 119:23,
119:24, 191:16,
193:7
**bulk**
204:18
**bulos**
178:11
**burwell**
6:7
**bush**
33:8, 33:13
**busy**
57:15
**butler**
106:6

---
**C**
---

**calendar**
183:15, 183:21
**california**
54:20, 158:14,
159:4, 159:9
**call**
18:16, 18:18,
45:1, 54:18,
68:12, 70:23,
74:10, 74:17,
77:13, 77:18,
94:8, 102:14,
106:20, 106:25,
109:2, 120:4,
122:12, 177:20
**called**
6:11, 15:8,
18:11, 32:4,
32:5, 45:11,
102:24, 108:19,
146:9, 155:3,
185:1, 192:5
**calling**
65:8, 68:20,
74:8, 92:9,
192:24

**calls**
34:2, 57:21,
57:22, 88:25,
89:17, 89:18,
92:8, 173:21,
181:6, 182:15,
197:13, 204:12
**camans**
28:21, 29:15
**came**
28:20, 43:16,
68:9, 84:8,
92:13, 99:23,
179:17
**camp**
94:7, 95:2,
95:3, 95:14,
185:14, 201:1
**can't**
21:18, 22:12,
22:13, 23:11,
26:2, 31:7,
34:8, 40:15,
53:19, 59:13,
65:6, 76:12,
76:14, 77:7,
100:2, 101:8,
116:4, 163:11,
163:13, 181:25,
184:5, 189:23,
201:3, 201:5,
203:18
**canada**
158:25, 160:11
**cannot**
102:9
**car**
166:20
**care**
11:22, 19:25,
32:24, 52:15,
52:16
**cari**
41:8
**carlos**
43:23, 107:25,
108:2
**carmella**
56:4, 56:6

**carolina**
63:8
**carried**
204:19
**carryover**
9:16
**casas**
3:7, 5:11
**case**
5:8, 9:19,
11:21, 12:10,
15:3, 19:13,
19:19, 21:2,
26:6, 27:13,
36:2, 50:25,
52:7, 52:8,
56:12, 57:9,
58:11, 61:4,
61:5, 65:20,
65:21, 67:24,
72:19, 75:14,
78:4, 79:16,
81:24, 82:1,
82:2, 83:13,
96:25, 106:12,
106:17, 107:14,
108:7, 108:12,
121:15, 139:19,
139:20, 142:24,
148:14, 148:15,
154:19, 154:24,
155:2, 156:5,
156:20, 157:3,
157:9, 159:12,
159:14, 159:16,
159:19, 160:10,
163:9, 163:13,
176:23, 181:9,
186:12, 197:9,
197:16, 198:1,
198:10, 199:5,
205:1, 209:10
**ccr**
208:20
**celebrate**
65:13
**certain**
79:18

**certainly**
96:9, 115:22,
153:4, 198:9,
199:21
**certificate**
209:1
**certified**
1:19, 208:3
**certify**
208:6, 208:11,
209:3
**cetera**
186:2
**challenges**
43:9, 43:12
**chance**
133:15
**change**
100:20
**charge**
70:22
**charity**
39:2, 39:6,
75:16
**charles**
40:11
**chart**
4:21, 139:5,
141:13, 141:14,
141:20
**chasing**
43:24, 108:3
**cheaply**
37:11
**chiefly**
116:1
**children**
9:9
**chinese**
36:9, 119:23,
120:1, 120:3
**choice**
194:8
**chronology**
20:18, 64:10,
64:11, 65:2,
67:15, 80:14,
192:24

chrysler
106:9
chuck
109:14
circuit
48:21
citibank
39:12, 39:13,
102:19, 192:21
citizens
33:6
civilly
34:5
claimant
1:16, 5:25, 6:3
claimants
1:8, 9:2
claiming
9:18
clarity
45:8
clear
38:9, 39:11,
42:18, 42:21,
52:25, 102:13,
102:14, 102:18,
102:19, 102:21,
102:25, 110:22,
117:4, 117:9,
118:2, 118:5,
118:6, 118:7,
118:8, 118:15,
120:13, 120:18,
121:2, 138:1,
138:24, 139:9,
140:25, 142:2,
143:18, 149:21,
150:21, 154:8,
154:10, 158:1,
158:5, 176:13,
193:22, 194:5,
194:9
cleveland
107:4
client
11:4, 11:10,
11:20, 12:3,
37:6, 66:5,

66:6, 69:23,
81:21, 107:25,
111:3, 113:10,
162:21, 182:12,
199:23, 203:1,
203:2, 204:9
client's
196:23, 197:19
close
90:11
closure
101:15
co-counsel
17:12, 43:4,
44:13, 75:17,
105:25, 139:15,
139:16, 140:22,
156:4
cobert
54:19
coherent
8:10
colbert
144:15
collect
32:17, 34:19,
36:23, 42:13,
62:18, 108:24,
109:4, 128:8,
152:1, 152:3,
163:14, 173:7,
176:8, 176:19,
176:20, 191:11,
191:20
collected
125:16, 160:12,
173:17, 182:5,
182:10, 182:20,
183:7
collecting
26:11, 128:22
collection
36:12, 36:13,
46:13, 46:15,
46:25, 62:14,
84:8, 84:10,
84:12, 103:16,
108:21, 112:1,

114:9, 116:23,
120:13, 124:17,
126:9, 126:16,
127:13, 128:15,
128:21, 130:6,
153:17, 153:20,
164:3, 164:4,
172:25, 176:5,
178:23, 180:17,
180:21, 180:22,
182:11, 182:12,
185:5, 185:6,
185:7, 187:15,
188:15, 188:16,
189:11, 190:13,
191:15, 192:14,
193:5, 193:18
collections
35:16
colleen
23:6, 23:12,
55:13, 57:1,
57:6
columbia
10:6
com
179:14
comadon
99:1, 99:3
come
15:9, 72:15,
74:24, 74:25,
75:9, 80:15,
83:24
comes
97:1
commence
158:13
commencing
1:24
commercial
10:18
commission
49:20
committed
29:22, 57:23
committee
15:9

communicate
14:14, 120:8,
120:16, 145:14,
146:7
communicated
116:10, 116:12,
116:14, 120:6,
201:16, 203:10
communicating
51:2, 58:22,
143:11
communication
61:12, 61:15,
115:23, 184:19,
203:24, 204:19
communications
69:24
companies
35:6, 117:19
company
97:14, 166:21
compensation
182:25, 188:3
complain
121:15
complaint
24:21, 25:9,
25:10, 25:20,
27:12, 28:2,
68:8
comprehensive
1:1, 5:7
compute
163:2
concerned
19:5, 19:8
concluded
23:19
concluding
53:20
conclusion
72:16, 181:7,
182:16, 197:14,
204:13, 204:15
condition
8:3
conduct
39:18, 39:22,

202:1
**conducted**
26:5, 37:24
**confirm**
131:3
**conflict**
42:11
**congress**
188:12
**congressman**
30:17, 191:3
**connection**
79:15, 113:20,
114:8, 117:6,
144:19
**consent**
96:19, 203:5
**consequence**
143:24
**consider**
51:14, 52:10
**considered**
24:5, 52:3,
144:19
**consisted**
14:6
**consistent**
27:16, 139:9,
202:19
**constant**
32:8, 58:5,
184:17, 184:18,
184:19
**consult**
39:3
**consulted**
49:18, 185:25
**contact**
143:5
**contacted**
34:22, 35:23,
121:3, 192:19
**contacting**
143:9
**contending**
199:19
**contention**
199:18, 201:19,

**contingency**
12:6, 12:7,
12:12, 12:18,
30:23, 30:24,
31:2, 31:4,
31:18, 31:19,
31:25, 180:25,
190:8, 190:9
**contingent**
11:18, 67:19,
67:23, 164:2,
180:20, 183:1,
197:6, 197:19
**continue**
177:5, 193:13
**continued**
63:4
**continuing**
133:16
**contract**
10:16, 10:17,
59:9
**contractors**
59:6
**control**
40:3
**conversation**
188:19
**conversations**
40:4
**convince**
30:22, 188:12
**convinced**
14:3, 14:19,
31:22, 98:7
**cook**
1:18, 6:7,
34:21, 35:4,
35:18, 35:23,
36:1, 36:5,
36:15, 37:18,
38:21, 40:6,
44:7, 44:10,
44:16, 44:17,
48:4, 52:21,
52:22, 84:9,
84:13, 84:23,

109:3, 116:25,
173:1, 173:2,
174:19, 176:3,
190:17, 191:24,
191:25, 192:1,
192:3, 208:3,
208:20
**cop**
43:24, 108:1,
108:2
**copea**
49:19
**corner**
111:5, 111:7,
141:11
**corp**
13:22, 99:3
**corporation**
133:24
**correct**
10:1, 42:14,
65:18, 67:9,
67:14, 80:3,
80:5, 81:5,
98:2, 105:8,
127:6, 138:24,
139:13, 143:1,
144:6, 158:7,
162:20, 162:25,
164:11, 164:16,
165:25, 166:4,
167:23, 168:23,
169:25, 177:22,
179:12, 180:2,
180:3, 180:6,
180:7, 180:22,
181:21, 184:12,
185:14, 187:21,
191:16, 191:17,
192:9, 193:18,
197:6, 197:12,
197:20, 197:23,
198:4, 199:14,
204:23
**correction**
112:1
**correctly**
164:4, 164:9,

165:20, 169:5,
169:17, 169:19,
193:2
**correspond**
67:21
**costs**
11:20, 11:22
**could**
15:12, 21:17,
25:13, 31:12,
36:23, 36:24,
36:25, 37:12,
37:13, 44:4,
60:10, 64:22,
75:9, 75:16,
99:17, 103:1,
108:13, 109:4,
131:15, 143:1,
144:7, 144:8,
151:12, 162:6,
162:15, 166:25,
170:16, 181:24,
185:7, 186:21,
187:20, 192:22,
199:3, 199:24
**couldn't**
29:10, 75:9,
78:9, 84:12,
123:20, 204:1
**counsel**
4:9, 5:15,
5:18, 36:12,
36:13, 44:12,
83:4, 84:13,
85:16, 124:18,
126:9, 126:16,
128:15, 153:17,
153:21, 155:21,
173:16, 174:20,
178:23, 185:6,
185:7, 190:13,
209:9
**count**
55:9
**countries**
191:7
**country**
186:7

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    63

| | | | |
|---|---|---|---|
| **couple**<br>8:9, 28:21,<br>99:9, 107:11,<br>146:1, 187:10,<br>188:17, 188:20<br>**course**<br>50:7, 62:19,<br>73:25, 74:1,<br>99:14, 113:11,<br>114:10, 115:1,<br>139:14, 139:21,<br>140:12, 157:4,<br>203:17<br>**court**<br>1:19, 6:6,<br>10:12, 10:14,<br>33:11, 49:8,<br>49:16, 50:5,<br>50:25, 105:16,<br>105:19, 208:3<br>**courtesy**<br>200:20<br>**courts**<br>10:9<br>**cousin**<br>43:21, 43:22<br>**covenant**<br>202:17<br>**cover**<br>4:13, 13:8,<br>27:11<br>**crane**<br>202:22<br>**crazy**<br>37:13, 46:16,<br>97:12, 123:8,<br>185:1<br>**cream**<br>137:4<br>**created**<br>21:7<br>**credit**<br>82:9, 82:12,<br>82:16, 82:20<br>**creditors**<br>135:20<br>**cross**<br>4:3 | **cross-examination**<br>161:9<br>**crutcher**<br>30:15, 32:4,<br>32:6, 50:14,<br>50:19, 190:2,<br>190:20, 190:24<br>**csr**<br>208:20, 209:17<br>**current**<br>100:12<br>**cut**<br>73:14, 99:17,<br>122:13, 203:21,<br>203:22, 203:23,<br>206:1<br>**cycle**<br>107:1<br>**cynthia**<br>209:3, 209:17<br><br>    **D**<br><br>**damage**<br>70:23, 94:8,<br>94:19, 165:19<br>**damages**<br>34:17, 197:10,<br>197:12<br>**dan**<br>59:22, 88:3,<br>88:4, 88:5,<br>88:17, 88:20,<br>90:23, 91:3,<br>91:5, 92:1, 92:3<br>**date**<br>5:9, 25:15,<br>25:18, 61:17,<br>65:8, 65:9,<br>65:10, 65:11,<br>65:12, 65:16,<br>67:16, 90:8,<br>90:9<br>**dated**<br>83:11, 95:23,<br>171:19<br>**david**<br>35:18, 35:23,<br>106:6 | **davis**<br>69:2, 135:24,<br>136:13<br>**day**<br>25:17, 34:2,<br>39:8, 46:22,<br>147:10, 193:19,<br>208:17<br>**days**<br>88:11<br>**deal**<br>36:17, 36:18,<br>36:19, 36:20,<br>36:21, 36:22,<br>63:11, 79:25,<br>80:17, 82:16,<br>97:11, 201:17,<br>201:18<br>**dealing**<br>35:7, 82:13,<br>91:18, 202:18<br>**dealt**<br>117:20<br>**december**<br>84:19, 84:22<br>**decide**<br>75:14, 75:20<br>**decided**<br>15:17, 23:22,<br>44:15, 57:24,<br>98:8, 143:21,<br>151:13<br>**decision**<br>49:25, 124:15,<br>166:24, 169:24,<br>206:24<br>**decisions**<br>192:7, 192:9,<br>192:10, 192:12,<br>192:13, 192:15<br>**decrease**<br>196:24<br>**decreased**<br>196:23<br>**deduct**<br>163:12, 163:13<br>**defend**<br>34:7, 77:23 | **defense**<br>33:15, 72:20<br>**defined**<br>81:14, 184:21<br>**definitively**<br>76:12, 76:14<br>**delaney**<br>23:6, 25:22,<br>25:25, 55:13,<br>56:10, 59:9,<br>65:13, 68:4<br>**delegate**<br>57:18<br>**demand**<br>4:11, 8:17,<br>8:19, 8:23,<br>15:21, 16:8,<br>59:25, 62:21,<br>64:2, 64:11,<br>67:2, 132:12,<br>135:16<br>**dematerialized**<br>41:1, 41:3<br>**democratic**<br>30:12<br>**depends**<br>139:17, 147:14<br>**depos**<br>5:12, 6:8<br>**deposed**<br>38:22, 81:21,<br>129:25<br>**deposition**<br>5:4, 5:13,<br>6:20, 37:23,<br>38:6, 39:16,<br>48:4, 48:6,<br>74:16, 81:22,<br>147:17, 184:4,<br>184:8, 207:4<br>**depositions**<br>6:24, 70:23,<br>186:4<br>**described**<br>164:7, 202:18<br>**description**<br>4:10<br>**desire**<br>124:22 |

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    64

details
159:19
develop
74:13
dictatorships
118:10
died
109:15
difference
9:5, 78:6
different
18:7, 54:10,
54:12, 54:14,
54:16, 107:14,
114:12, 162:5,
178:14, 178:22,
191:7, 199:24
digital
209:5
dilute
71:25
diluted
71:23
direct
4:3, 6:14
directed
32:7
directive
68:7
directors
38:25
disagree
86:16, 86:18
disappointed
124:13, 169:2,
169:22
disbar
23:15, 34:4
disbarred
31:1, 97:3,
185:1
discharge
204:6
discharged
183:9
disclosed
46:23
disclosure
151:16, 151:18,

203:1
discovered
59:18, 59:20
discuss
188:24
discussed
180:19
discussions
189:9
dismiss
122:12
dispute
169:11, 175:7
disputes
184:18
disputing
169:8
distinction
166:2
distributed
164:8
distribution
83:8, 139:8,
140:24, 150:22
district
10:5, 42:14,
42:17, 42:20,
51:12, 51:20,
105:16, 105:19,
117:7, 130:7
diversion
96:23
division
184:10, 185:12
divvy
54:1
dla
45:20, 46:18,
46:19, 54:19,
134:15, 144:15,
154:1, 170:9,
195:9
doc
118:10, 118:11
document
112:6, 132:17,
132:24, 135:10,
137:13, 137:14,

137:20, 148:1,
155:12, 162:1,
167:25, 168:9,
171:16, 172:9,
175:15, 177:11
documents
111:3, 182:8,
191:9, 191:10
doing
17:21, 36:17,
44:23, 56:7,
58:24, 61:8,
71:4, 76:8,
76:15, 94:10,
130:19, 130:23,
130:24, 133:9,
158:18, 161:6,
180:10, 188:25,
191:24
dollar
33:5
dollars
35:4, 35:5,
39:2, 62:12,
62:18, 197:11
donate
75:12, 75:13,
152:5
donatelli
31:7, 32:10
donation
75:11
done
14:8, 17:1,
23:23, 24:6,
28:23, 37:11,
40:18, 45:5,
57:24, 61:24,
61:25, 62:16,
63:25, 65:10,
68:4, 84:4,
84:6, 89:10,
92:10, 92:23,
112:23, 118:21,
162:3, 171:8,
174:5, 183:11,
184:17, 185:10,
187:4, 190:10,

205:13, 206:25
door
22:15
double-sided
16:11
doubt
179:19
doubting
179:21
down
24:19, 49:22,
60:12, 63:8,
63:10, 63:12,
63:20, 63:21,
65:13, 71:23,
82:8, 82:19,
83:5, 95:4,
96:4, 100:24,
187:14
draft
28:8, 137:12
drafted
172:11
drafting
28:1
drank
95:15
draw
124:9
dream
32:4, 185:19,
187:19
dreamed
83:2, 83:3,
83:4
dressed
108:1, 108:2
drive
1:22, 5:13
dropped
106:10, 110:24
drugs
7:23
duly
208:8
dumped
109:6
dunn
30:15, 30:16,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    65

30:23, 31:17,
32:4, 32:5,
50:14, 50:19,
190:1, 190:14,
190:19, 190:20,
190:24
**during**
24:18, 51:11,
51:19, 56:24,
57:6, 187:13,
187:15, 187:16,
188:14, 189:10
**durshire**
145:15
**duties**
14:6
**duty**
37:9, 128:14,
202:11

**E**
**e-mail**
4:20, 4:25,
44:22, 137:11,
177:16, 178:6,
179:10, 179:13,
193:15
**each**
16:20, 33:24,
46:18, 53:12,
53:14, 53:22,
54:4, 54:9,
105:5, 122:19,
122:22, 143:20,
143:24, 144:4,
150:24, 164:8,
170:7
**earlier**
18:15, 78:4,
79:6, 79:9,
80:22, 88:11,
104:14, 108:6,
109:1, 131:24,
141:9, 142:21,
146:22, 179:24,
194:17, 196:3,
199:11, 205:10
**early**
25:6

**earned**
174:9, 180:25,
181:22, 182:3,
182:4, 182:13,
182:21
**easier**
32:17, 39:5,
166:23, 191:11
**east**
26:5, 26:19
**easy**
25:16
**edwin**
156:12
**effect**
143:6, 180:2
**effort**
14:25, 67:7
**efforts**
153:10, 153:14,
154:12, 182:23,
187:16, 189:11
**ego**
80:1
**either**
22:23, 23:2,
24:8, 25:1,
25:24, 50:8,
72:1, 72:24,
120:8, 123:20
**ellie**
43:20, 106:21
**else**
10:8, 10:11,
11:12, 15:1,
28:16, 28:18,
29:16, 36:4,
39:10, 43:20,
43:22, 49:13,
54:1, 55:14,
56:11, 57:8,
57:10, 63:17,
66:8, 84:15,
106:13, 119:11,
129:4, 134:15,
176:3, 184:16,
189:21, 200:19
**emails**
103:2

**embassy**
155:6
**employed**
209:10
**employee**
59:10, 59:11
**employees**
59:4, 59:8
**end**
61:2, 61:24,
86:7, 147:10,
207:4
**ended**
23:8, 137:25,
140:3
**enforce**
118:15, 153:14,
154:12
**enforcement**
34:18, 37:21,
42:12, 42:21,
48:21, 51:11,
51:19, 52:13,
52:25, 108:21,
112:19, 113:20,
114:9, 116:1,
117:3, 117:8,
118:5
**engage**
19:15
**engaged**
26:24, 109:1,
109:3, 112:19,
116:20
**engagement**
20:16, 112:8
**england**
157:15, 157:16,
157:22
**enough**
14:24, 22:11,
55:20, 66:2,
70:2, 94:25,
110:6, 120:22,
126:4, 130:1,
138:19, 163:25,
172:7, 175:13,
183:14, 195:16,

**embassy** (cont.)
198:4, 198:12
**enriched**
201:20
**enrique**
3:7, 5:11
**enter**
199:13, 205:14
**entered**
68:15, 143:15,
173:15, 179:4,
180:5, 180:16,
181:2, 181:18,
184:9, 194:22,
195:19, 196:10
**entities**
9:12, 9:18
**entitled**
16:21, 24:3,
85:2, 182:24,
183:13
**entitlement**
23:18
**equal**
163:6, 163:8,
163:17, 164:9
**escrow**
96:20
**especially**
123:1, 184:21
**esq**
1:5, 1:10,
1:11, 1:16, 2:2,
2:4, 2:9, 2:10,
2:18, 3:3, 9:3
**established**
142:21, 204:2
**establishes**
11:10
**estate**
186:5
**estimate**
58:9, 115:17
**estimated**
62:15
**et**
5:6, 186:1
**even**
38:9, 40:1,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                66

41:19, 53:8,
59:14, 62:13,
64:24, 102:6,
104:3, 104:12,
120:24, 122:5,
127:20, 136:10,
152:23, 154:14,
166:9, 181:25,
193:19, 200:10,
200:19, 200:24,
202:25
**event**
11:23
**events**
33:18
**eventually**
143:14
**ever**
6:20, 10:19,
41:12, 61:23,
65:3, 98:21,
98:25, 99:4,
102:6, 120:16,
134:6, 134:21,
134:24, 137:14,
144:25, 145:5,
145:14, 146:4,
172:12, 175:16,
188:24, 196:22,
203:19
**every**
35:8, 99:15,
101:6
**everybody**
36:4, 45:16,
45:20, 46:22,
46:23, 54:22,
75:8, 119:10,
123:2
**everyday**
57:21, 185:2
**everyone**
55:21, 124:14,
124:23, 125:3,
167:22, 169:3,
169:23
**everything**
9:14, 15:1,

49:17, 54:1,
68:5, 76:20,
98:6, 135:11,
201:14, 202:6,
205:22
**exact**
183:19
**exactly**
53:8, 66:11,
82:10, 158:23
**examination**
6:14, 208:7,
208:9
**examined**
6:13
**excellent**
24:3
**except**
17:5
**excerpts**
4:22, 155:11
**excess**
197:10
**exchange**
177:16
**exclusively**
173:1
**exclusivity**
36:14, 44:8,
44:9, 185:23,
185:24
**excuse**
132:7, 178:2,
182:10
**executed**
171:9
**executive**
3:4
**exhibit**
4:10, 8:14,
8:16, 8:18,
12:21, 12:23,
13:8, 15:23,
27:8, 27:9,
60:1, 67:2,
78:5, 78:7,
79:9, 80:18,
83:10, 84:1,

85:13, 85:14,
86:6, 86:7,
86:22, 88:8,
89:13, 90:4,
90:12, 91:23,
92:25, 95:21,
95:22, 100:17,
100:19, 101:10,
101:21, 101:23,
109:20, 109:23,
110:23, 124:3,
124:4, 131:2,
131:24, 132:12,
132:13, 132:17,
133:1, 133:23,
135:16, 136:8,
137:9, 137:10,
139:3, 139:4,
141:6, 141:8,
146:22, 146:23,
155:9, 155:10,
157:9, 161:22,
161:25, 164:19,
164:20, 171:4,
171:7, 177:3,
177:25
**exhibits**
86:1, 121:21,
122:3
**existence**
9:13, 9:14,
102:24
**expect**
129:5, 129:7,
183:25, 189:4,
189:8
**expectancy**
153:16, 157:2,
157:5, 157:9,
157:17
**expected**
183:4, 183:10,
188:2
**expecting**
183:2, 183:6,
183:15, 183:22
**expenses**
163:6, 163:8,

163:14
**experience**
49:21
**expert**
85:9, 85:17,
141:7, 141:9
**expertise**
15:5
**explain**
181:14
**explained**
200:11
**explicitly**
169:16
**exploded**
190:17
**expose**
18:23
**expound**
199:17
**extended**
65:8, 65:9
**extensive**
18:1, 49:20
**extent**
17:6, 69:23,
80:11, 144:10,
164:3, 180:21,
186:24
**extracting**
69:18
**extrapolate**
86:12
**extrapolates**
143:2

---
**F**
---
**faced**
106:5
**facilitating**
191:8
**fact**
26:4, 29:2,
32:19, 34:15,
36:12, 50:17,
50:23, 61:19,
73:19, 73:21,
78:1, 90:22,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

67

97:24, 130:9,
138:21, 173:24,
179:20, 186:2
**facts**
26:5, 76:6
**factual**
182:8, 205:6,
205:19
**failing**
126:21
**fain**
69:2
**fair**
19:25, 24:2,
34:14, 55:12,
66:2, 68:12,
70:2, 86:19,
94:25, 96:1,
99:13, 104:13,
110:6, 120:22,
130:1, 138:19,
157:20, 163:25,
172:7, 175:13,
177:15, 177:18,
178:6, 179:1,
183:14, 195:16,
202:18
**faith**
89:20, 202:18
**falling**
186:9, 192:2
**false**
76:10
**familiar**
7:1, 26:9,
26:23, 34:15,
34:19, 35:21,
40:13, 40:23,
41:19, 44:5,
46:8, 47:5,
47:23, 48:2,
48:15, 85:21,
102:13, 102:15,
132:9, 132:14,
132:16, 132:19,
132:21, 132:23,
154:7, 155:5,
172:6, 175:11

**families**
71:20, 82:6,
82:7, 82:9,
82:21, 86:12,
143:2, 148:23,
149:16, 151:4,
162:12
**family**
86:14, 107:4,
165:3
**famous**
161:14, 161:17
**fan**
109:10
**far**
17:23, 17:25,
20:11, 21:16,
37:4, 40:21,
42:9, 42:12,
53:16, 66:3,
67:22, 175:17,
178:12, 178:13
**farm**
15:8
**fascinating**
186:12
**faster**
61:7
**father-in-law**
21:5
**favor**
140:25, 170:16
**fax**
13:8, 13:9,
13:12, 13:14,
171:19
**fay's**
55:25
**federal**
10:9
**fee**
11:13, 11:15,
11:18, 11:21,
12:3, 12:18,
30:23, 30:24,
31:2, 31:4,
31:25, 39:6,
62:19, 67:23,

69:18, 75:12,
75:13, 92:13,
97:25, 113:19,
114:8, 114:15,
138:14, 138:21,
139:25, 151:19,
151:21, 152:8,
157:2, 157:5,
157:8, 157:17,
162:22, 163:1,
163:5, 163:6,
163:8, 163:16,
163:17, 164:1,
164:2, 174:9,
174:20, 180:1,
180:14, 180:25,
181:18, 181:22,
182:13, 183:1,
183:3, 183:5,
183:16, 190:8,
190:9, 194:20,
194:21, 195:6,
196:23, 196:24,
197:6, 197:18,
198:2, 200:12,
200:13, 201:5,
203:6, 205:11
**feeling**
133:11
**fees**
16:21, 67:19,
78:6, 79:15,
85:3, 93:23,
94:2, 139:8,
140:4, 140:23,
140:24, 141:22,
142:2, 142:10,
142:13, 153:4,
163:10, 163:23,
164:7, 164:13,
173:18, 173:19,
180:19, 180:20,
181:11, 182:3,
182:9, 182:20,
195:18, 199:6,
199:7, 201:10
**fein**
135:25, 136:13

**fell**
185:13
**fellow**
15:6, 59:13,
180:6
**few**
7:3, 18:16,
54:20, 58:21,
87:15, 133:10,
133:12, 161:15,
161:18
**fidelis**
148:5
**fiduciary**
202:11
**field**
46:22
**fielding**
57:21, 57:22
**fifth**
146:13, 146:14,
148:15, 149:12,
153:15, 193:20,
194:8
**fight**
44:12, 46:18,
53:12, 53:24,
79:4, 88:4,
92:6, 174:2
**fighting**
143:18, 143:20,
143:24, 144:4,
144:5, 170:7,
170:14, 174:15
**figuratively**
33:25, 54:7,
54:9
**figure**
30:11, 37:4,
37:12, 37:13
**figured**
32:25, 62:7,
62:11, 91:10
**figuring**
109:4
**file**
46:4, 53:10,
75:18

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    68

| | | | |
|---|---|---|---|
| **filed** | **126:5, 188:6,** | **floor** | **formed** |
| 8:18, 8:19, | 188:8, 200:22 | 2:5, 2:11 | 9:10 |
| 8:23, 24:19, | **finest** | **fluegel** | **former** |
| 24:21, 24:22, | 77:22 | 122:1, 131:8, | 30:17, 44:13 |
| 24:23, 25:7, | **finish** | 131:18 | **formula** |
| 25:8, 25:17, | 22:25, 61:12, | **flushing** | 164:1 |
| 25:20, 27:13, | 116:22, 120:12, | 173:16 | **forth** |
| 27:14, 27:19, | 140:7, 172:17, | **focus** | 102:17, 208:8 |
| 27:23, 45:22, | 202:5 | 28:13, 58:6, | **fortunately** |
| 45:24, 61:1, | **finished** | 165:9 | 57:17 |
| 64:15, 65:11, | 171:8, 171:14 | **focused** | **fortune** |
| 65:15, 65:17, | **firing** | 184:11 | 1:10 |
| 66:8, 66:12, | 123:8 | **foggy** | **forty-seven** |
| 66:19, 67:11, | **firm** | 187:12 | 100:21 |
| 67:25, 68:10, | 1:5, 1:7, 1:11, | **folkenflik** | **forward** |
| 83:13, 97:18, | 2:16, 5:6, 5:19, | 48:7, 48:9 | 33:8 |
| 117:7, 119:5, | 6:19, 9:3, 9:4, | **follow** | **found** |
| 203:22 | 9:6, 9:7, 9:8, | 68:12, 68:19, | 18:11, 21:4, |
| **filing** | 41:20, 41:23, | 68:20, 71:3, | 22:7, 25:4, |
| 24:15, 46:2, | 42:3, 45:9, | 90:20, 135:22, | 30:8, 52:18, |
| 60:18, 61:9, | 47:1, 55:2, | 136:14, 150:8, | 61:5, 62:1, |
| 61:25, 65:12, | 57:14, 58:15, | 166:11, 195:2, | 65:20, 72:1, |
| 67:17, 121:10 | 58:16, 59:2, | 195:11 | 81:22, 84:11, |
| **filings** | 59:3, 61:4, | **following** | 117:1, 118:1, |
| 167:10 | 75:19, 77:22, | 18:19, 83:18, | 125:15, 125:18, |
| **final** | 114:7, 130:5, | 83:20, 198:14 | 126:5, 126:23, |
| 90:1 | 130:15, 140:13, | **follows** | 127:1, 127:8, |
| **finally** | 185:20 | 6:13, 163:2 | 130:12, 160:11, |
| 15:17, 24:22, | **firm's** | **foolishly** | 173:4 |
| 24:23, 31:17, | 91:1 | 93:8 | **foundation** |
| 33:16, 65:9, | **firms** | **forced** | 168:6, 168:16, |
| 77:24, 78:9, | 97:4, 185:20 | 205:17, 205:20, | 168:17, 182:8 |
| 78:10, 97:7 | **first** | 206:5, 206:11, | **founded** |
| **financial** | 13:8, 18:4, | 206:13, 206:16 | 106:22 |
| 40:3, 209:11 | 25:9, 35:24, | **foregoing** | **four** |
| **find** | 46:24, 64:24, | 209:5 | 29:8, 60:10, |
| 19:12, 24:25, | 82:3, 82:4, | **foreign** | 60:11, 104:14, |
| 25:18, 28:10, | 96:8, 96:15, | 47:22 | 104:20, 108:18, |
| 34:10, 57:7, | 96:22, 102:23, | **forgery** | 112:9, 115:3, |
| 58:11, 106:12, | 103:6, 106:4, | 110:13 | 115:4, 163:12, |
| 126:20, 126:22, | 155:13, 162:16, | **forget** | 176:5 |
| 129:6, 178:24, | 163:22, 165:16, | 48:12, 65:23, | **fourth** |
| 187:19, 199:24 | 168:3, 177:5, | 66:1, 109:14 | 110:6, 110:8, |
| **finds** | 177:11 | **form** | 110:10 |
| 128:7, 128:11 | **five** | 149:7, 168:5, | **fox** |
| **fine** | 49:15, 163:12 | 168:15, 168:17 | 1:22, 2:3, |
| 13:6, 33:1, | **flipped** | **formalized** | 5:24, 77:22 |
| 50:2, 75:13, | 141:15 | 20:15 | **frank** |
| | | | 31:6, 32:10 |

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    69

frankel
107:24
frankly
130:25
free
163:11
freshly
37:7
friend
18:6, 43:19,
55:25, 106:19,
106:20, 107:6,
154:22
friends
200:22
frightened
106:10
front
80:19, 80:21,
133:23, 145:22,
189:21
fsia
47:19, 48:15
full
21:11, 144:10,
151:16, 151:17,
152:1, 152:3,
180:8, 203:1
function
185:8
fund
194:2, 194:7,
194:11
fundamentals
41:6
funeral
49:16
further
208:11

G

g-e-m
104:2
ga
113:2
gab
114:13
gabby
155:20

gabk
104:24, 108:19,
112:18, 119:13,
119:22, 120:9,
120:16, 121:16,
127:1, 128:19,
138:12, 139:11,
140:7, 143:15
gaby
154:24
gaddafi
38:24, 39:6
game
70:15
garbage
81:20
gaskell
59:18, 59:21,
59:22, 61:6,
61:7, 61:8,
61:9, 88:3,
88:4, 88:5,
88:17, 88:20,
90:23, 91:3,
91:5, 92:1,
92:3, 92:5,
97:6, 97:17,
98:1
gather
16:25
gathered
14:9
gathering
24:16, 185:17
gave
8:25, 18:9,
35:8, 35:13,
36:2, 37:6,
40:9, 68:17,
69:9, 71:2,
106:22, 145:19,
191:23
gee
55:3, 56:18,
90:17, 96:18,
121:6
geez
33:19

gellner
55:15, 55:16,
55:17, 56:11
gem
103:25, 104:2,
104:3, 104:11
general
11:19, 98:21
generally
11:17, 166:4,
172:8, 172:11
gentlemen
38:22
geoff
94:20, 110:23,
133:19, 135:9,
137:4, 148:9,
206:25
geoffrey
2:18, 5:17,
6:18, 103:21
george
15:7, 33:8
georgetown
33:5
get-go
148:18
getting
13:4, 13:5,
64:24, 70:3,
71:18, 88:25,
90:25, 101:10,
101:16, 101:17,
107:2, 109:22,
152:22, 176:18,
183:21, 185:5,
185:7, 190:6,
194:3, 194:8,
194:9, 194:10,
197:1, 197:2,
200:1, 200:4,
203:22, 203:23
gibson
30:15, 30:16,
30:22, 31:17,
32:3, 32:5,
50:14, 50:19,
190:1, 190:14,

190:19, 190:20,
190:24
gilday
2:17
girl
50:16, 77:7
give
24:5, 31:12,
31:15, 35:24,
37:3, 39:1,
68:24, 75:15,
87:21, 88:16,
91:11, 94:20,
115:6, 115:16,
151:13, 151:24,
152:4, 152:5,
155:25, 160:15,
168:6, 180:1,
181:18, 200:25,
201:2, 205:11
given
45:16, 208:10
gives
189:17
giving
97:7, 127:24
glanced
85:23
glen
77:15, 77:17,
77:18, 77:23
go
14:10, 16:13,
19:3, 19:17,
22:6, 28:12,
29:12, 30:3,
33:8, 33:11,
33:23, 35:5,
35:14, 36:11,
39:17, 41:22,
52:17, 53:21,
58:19, 59:19,
61:14, 63:11,
63:12, 63:13,
71:25, 73:10,
76:17, 78:19,
78:21, 78:23,
79:3, 83:2,

84:12, 84:16,
84:18, 85:12,
88:23, 91:15,
107:1, 117:12,
125:3, 125:9,
125:10, 125:17,
125:18, 127:11,
128:8, 131:17,
133:20, 142:18,
147:20, 148:9,
148:11, 151:8,
152:4, 162:5,
163:19, 165:6,
165:7, 165:12,
166:16, 167:19,
172:17, 176:2,
176:4, 186:10,
192:20, 194:6,
199:2, 199:25,
200:20, 201:22,
202:22, 205:5
**god**
77:21
**goes**
16:22, 60:22,
107:25, 163:2,
164:1, 202:15
**gold**
22:7
**goldman**
36:24
**gone**
23:20, 95:12,
95:16, 126:24,
153:5, 175:17
**good**
6:16, 6:17,
8:11, 23:23,
30:7, 50:1,
50:18, 89:20,
161:6, 161:11,
161:13, 166:24,
200:21, 201:23,
202:17
**goodness**
155:13
**gotta**
205:23

**gotten**
84:21, 144:9
**grabbing**
97:13
**gravitas**
49:15
**great**
15:15, 43:25,
106:7
**greenbaum**
36:2, 43:16,
43:22, 44:1,
52:9, 104:15,
104:16, 104:24,
106:17, 110:24,
111:20, 112:4,
112:7, 114:25,
120:5, 127:10,
128:10, 128:11,
137:24, 138:22,
139:20, 140:4,
159:24, 170:11,
173:7, 173:12,
173:19, 174:22,
176:23, 203:15
**grey**
99:1, 99:3
**gross**
139:14, 163:16
**ground**
26:18
**grounds**
181:4
**group**
1:10, 3:2,
5:21, 22:10,
22:12, 41:6,
46:24, 69:11,
69:15, 120:9,
125:25, 126:2,
156:2, 203:16
**groups**
54:11, 54:12,
54:14, 54:16,
143:16, 170:8
**guard**
107:16
**guess**
9:1, 14:14,

61:9, 66:14,
86:14, 94:18,
110:21, 110:25,
111:22, 114:2,
115:14, 118:7,
121:2, 121:9,
135:6, 135:8,
135:12, 138:9,
139:21, 139:24,
157:7, 176:12,
176:23, 184:5,
194:9, 203:19
**guy**
29:2, 31:8,
36:17, 43:25,
46:21, 49:1,
59:18, 77:9,
77:10, 81:18,
90:24, 91:2,
91:4, 98:9,
107:4, 116:7,
187:5, 192:1,
192:4
**guys**
22:13, 28:21,
29:7, 31:1,
32:2, 32:18,
33:23, 50:8,
53:24, 63:20,
69:6, 70:20,
70:21, 93:23,
94:3, 94:9,
97:12, 100:7,
118:9, 129:11,
176:6, 187:11,
199:21

### H

**habish**
45:18, 45:19,
45:20
**habowitch**
54:18
**hague**
15:7
**haiti**
118:11
**half**
21:11, 21:13

**hamas**
26:9
**hand**
60:7, 90:12,
164:19, 208:17
**handed**
85:14, 132:18,
132:19, 132:24,
161:24, 171:6,
177:11
**handle**
14:11, 17:3,
17:4
**handled**
124:16
**handling**
88:21, 92:1,
92:4
**hang**
37:16, 99:16
**happen**
44:15, 118:25
**happened**
24:18, 25:21,
33:1, 38:7,
53:8, 68:14,
80:12, 84:14,
88:25, 90:25,
91:6, 94:5,
104:5, 106:8,
109:9, 150:25
**happens**
109:21
**happy**
7:15, 150:18
**hard**
34:13, 48:12,
100:22, 101:1
**harmed**
135:22, 198:13
**harry**
2:10, 6:1, 9:1,
71:16, 72:20,
139:19
**harry's**
106:17, 106:18,
113:9
**harvey**
15:6

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    71

| | | | |
|---|---|---|---|
| **haskell** | **helpful** | 133:8, 135:13, | 120:10, 126:3, |
| 45:18 | 31:13 | 135:14, 137:1, | 127:12, 131:24, |
| **hatzalah** | **helping** | 138:16, 138:19, | 206:14 |
| 43:21, 106:22 | 17:2 | 138:20, 139:13, | **holders** |
| **head** | **here** | 147:8, 147:13, | 169:11 |
| 18:8, 22:9, | 5:3, 5:21, 6:2, | 147:18, 147:22, | **holding** |
| 22:10, 43:21 | 8:24, 36:23, | 148:3, 149:2, | 135:20 |
| **hear** | 47:18, 55:7, | 149:6, 149:14, | **honaman** |
| 7:10, 22:14, | 60:6, 60:18, | 149:21, 149:25, | 63:15, 63:16 |
| 55:23, 74:24, | 62:20, 64:14, | 150:4, 150:10, | **honing** |
| 75:7, 101:1, | 71:3, 76:1, | 150:13, 150:14, | 168:13 |
| 101:8, 144:25, | 78:15, 82:14, | 157:13, 157:14, | **hooked** |
| 145:5, 145:10 | 83:6, 86:2, | 157:21, 159:17, | 42:3 |
| **heard** | 86:25, 87:6, | 160:23, 164:25, | **hope** |
| 18:10, 27:3, | 88:19, 93:17, | 197:15, 205:4, | 126:19 |
| 30:4, 41:14, | 94:21, 95:18, | 207:2 | **hoped** |
| 63:7, 71:12, | 101:4, 103:5, | **hey** | 126:19 |
| 74:22, 78:25, | 107:23, 113:16, | 23:23, 38:24, | **horrible** |
| 94:6, 95:1, | 113:18, 120:9, | 153:6, 206:1 | 49:17, 204:6 |
| 98:25, 118:8, | 129:11, 129:12, | **hiding** | **hour** |
| 134:8, 145:7, | 129:25, 140:2, | 39:7 | 12:16 |
| 154:10, 154:22, | 142:21, 148:4, | **high** | **hours** |
| 154:25 | 148:25, 156:14, | 28:22, 28:25 | 133:10, 133:13 |
| **hearing** | 163:15, 166:8, | **higher** | **houston** |
| 47:9, 103:15, | 169:11, 176:12, | 36:16, 37:10 | 50:17, 50:18 |
| 103:21, 103:22, | 177:1, 179:20, | **himself** | **however** |
| 103:24, 104:5, | 186:8, 197:4, | 29:23, 74:14 | 178:9 |
| 104:6, 104:8, | 199:25, 202:11, | **hip** | **howser** |
| 104:11 | 202:13, 203:18, | 8:7 | 134:9, 134:12, |
| **heart** | 204:8, 204:22 | **hire** | 134:14, 138:8, |
| 122:7 | **hereby** | 36:11, 98:9 | 144:12, 144:16, |
| **heartbreaking** | 208:6, 209:3 | **hired** | 154:1, 170:8 |
| 123:3 | **hereinbefore** | 22:4, 28:21, | **huh** |
| **heck** | 208:8 | 37:9, 49:11, | 69:14, 77:16, |
| 18:21, 23:11, | **hereunto** | 50:10, 50:13, | 93:11 |
| 73:4 | 208:16 | 88:2, 190:19, | **hunting** |
| **heisman** | **hervey** | 190:20, 192:1, | 34:25 |
| 195:8 | 2:18, 4:5, | 192:5 | **hurting** |
| **held** | 5:17, 6:4, 6:15, | **hiring** | 165:18 |
| 1:21, 204:4 | 6:18, 9:24, | 33:23 | **hussein** |
| **hell** | 65:25, 66:2, | **history** | 33:6 |
| 87:24, 97:8, | 70:2, 84:21, | 155:20 | **hypothetical** |
| 136:14 | 84:24, 85:1, | **hold** | 129:11, 129:17, |
| **help** | 98:12, 98:18, | 39:15, 44:19, | 173:22 |
| 14:13, 15:20, | 103:22, 115:16, | 61:12, 95:6, | **hypotheticals** |
| 17:6, 19:11, | 120:22, 129:13, | 95:13, 103:14, | 129:22 |
| 32:23, 32:25, | 129:16, 129:20, | 107:8, 109:19, | **I** |
| 165:3 | 130:1, 130:3, | 112:15, 113:4, | **ice** |
| | | | 137:4 |

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    72

**idea**
23:24, 27:4,
44:7, 44:25,
45:3, 93:21,
97:19, 97:22,
98:6, 115:6,
165:1, 165:14,
193:10
**identification**
8:14, 12:21,
27:8, 85:13,
95:21, 100:17,
100:19, 109:20,
124:3, 131:2,
137:9, 139:3,
155:9, 161:22,
171:4, 177:3
**identify**
5:15, 40:15,
44:4, 56:12
**ignoring**
168:2
**ii**
154:9, 154:10,
158:1, 158:5,
193:22
**immunities**
47:22
**immunity**
127:21, 127:22
**important**
144:3
**impression**
47:7
**improper**
46:2, 149:3,
149:5, 149:6
**improperly**
45:22, 45:24
**inactively**
43:1
**incidentally**
107:21
**include**
66:8, 90:2,
135:24, 137:12,
179:5
**included**
65:21, 89:24,

136:8, 156:20,
178:8, 187:24,
188:2
**incorrect**
142:6, 152:23,
205:19
**incorrectly**
119:5
**increase**
152:21
**increasing**
180:13
**incredible**
109:17
**indeed**
202:16
**independent**
69:25, 72:11,
72:12, 126:10,
126:12, 126:15,
128:17, 130:18,
130:20, 175:14,
203:11
**independently**
70:10
**indians**
18:22, 18:24
**indicate**
167:20
**indicated**
12:6, 64:5,
205:14
**individual**
126:5, 142:23
**ineffective**
29:9
**infighting**
54:10
**influence**
7:22
**information**
40:10, 45:16,
152:22, 180:8,
182:2
**informed**
130:14, 152:16,
167:10, 199:12
**initial**
13:19, 32:20

**initially**
50:15, 184:15,
185:18, 191:23
**injured**
43:19
**injury**
10:22, 10:24,
20:22, 57:14,
57:16
**inn**
99:9
**inordinate**
57:19
**insisted**
49:14
**instead**
97:2, 143:20
**instructing**
69:22, 149:11
**insurance**
97:14, 166:21
**intent**
29:3
**intention**
178:20
**interest**
32:21, 32:24,
129:2, 163:11,
200:16, 209:11
**interested**
208:14
**interesting**
33:2, 35:2,
147:5, 147:6,
147:12, 147:16,
147:23, 148:1,
156:13, 162:2
**interests**
188:7
**interfere**
7:18, 7:23,
8:4, 204:1,
204:3
**international**
158:15, 159:5,
159:11, 165:17
**internet**
22:5, 58:19

**interplayed**
39:13
**interpret**
167:25
**interpretation**
94:1, 168:9,
169:14, 169:15,
170:24
**interrupt**
19:1, 32:11,
95:20
**interrupting**
29:11, 34:12
**intervene**
46:25, 130:6
**introduced**
30:9, 30:15,
31:23
**invest**
14:25
**investigation**
26:4, 26:18,
27:3, 107:22
**investigator**
26:25
**invited**
63:9
**inviting**
63:15
**involve**
159:5
**involved**
34:25, 40:2,
49:3, 51:1,
52:12, 52:14,
56:23, 79:3,
84:9, 90:25,
97:11, 116:1,
118:12, 153:9,
153:13, 154:11,
154:16, 154:17,
154:18, 155:2,
155:6, 155:15,
158:21, 186:15,
186:25, 187:9,
191:19, 192:6,
192:9, 192:17,
193:5, 193:7,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    73

194:2, 194:3,
194:11
**involvement**
121:16
**involving**
146:12, 148:15,
159:11
**iran**
35:7, 38:8,
53:24, 105:5,
105:13, 117:3,
117:20, 125:4,
125:10, 127:20,
127:21, 135:21,
165:2, 165:18,
173:17
**iran's**
165:23
**iranian**
117:15, 117:18,
117:23, 125:20,
125:23
**iraq**
33:3, 33:8
**irrelevant**
30:3
**irrespective**
182:25, 186:2
**irs**
163:21
**irving**
107:24
**island**
46:21
**isolated**
36:6, 36:8
**issue**
39:1, 68:6,
168:19, 194:18,
201:24, 202:15
**issues**
190:3, 190:5,
202:13
**it'll**
39:4
**italian**
38:12, 38:13,
38:19, 38:20,

38:21, 38:22,
39:9, 42:3,
102:20
**italy**
37:24, 52:18
**itself**
28:4

**J**

**jack**
18:14, 18:17,
19:6, 28:15,
28:19, 55:15,
55:16, 55:17,
57:2, 57:7,
59:9, 59:11,
68:4
**jail**
97:13
**jaime**
109:16, 116:3,
116:9, 177:21
**jams**
1:1, 1:3, 5:7
**jay**
77:15, 77:17
**jersey**
1:21, 1:23,
5:14, 6:12,
30:8, 30:9,
208:6
**jewish**
49:19
**jews**
107:3
**jim**
116:22
**job**
17:18, 17:19,
24:3, 24:6,
28:9, 29:6,
29:10, 48:13,
49:2, 50:3,
50:9, 50:10,
51:5, 52:22,
58:25, 59:16,
91:1, 161:6,
186:5

**john**
15:7
**join**
79:17
**joined**
79:19
**joint**
34:6, 148:7
**judge**
202:22
**judgements**
20:7, 35:1
**judgment**
33:5, 34:16,
34:17, 34:19,
42:13, 62:17,
105:16, 105:18,
108:24, 144:10,
153:14, 169:10
**judgments**
35:11, 105:4,
105:7, 117:3,
135:20, 154:12
**judy**
22:7, 55:18,
58:20, 91:10,
121:23, 122:1,
123:1, 123:22,
123:25, 124:5,
131:11, 164:23
**jump**
129:10
**jumping**
62:4
**june**
103:15, 135:18
**justice**
148:7
**justification**
145:8

**K**

**kagy**
96:11, 96:12,
96:14, 96:18,
101:15
**kahana**
14:22, 43:16,

52:8, 106:5,
107:5, 107:11,
107:19, 107:20,
108:7, 108:12,
109:10, 120:5,
127:9, 128:9,
128:10, 159:23,
174:21, 203:16
**kahanas**
170:11
**kaplan**
30:10, 77:8,
96:11, 96:13,
101:11, 101:12,
101:13
**keep**
7:8, 29:11,
32:9, 34:12,
107:1, 129:18,
130:14, 133:18,
133:22, 161:20
**keith**
98:21, 98:24
**kelly**
99:6
**kept**
44:20, 61:17,
167:9, 193:17
**kickback**
74:9
**kickbacks**
74:7
**kicked**
66:9
**killed**
29:23, 43:17,
106:18, 107:18
**killing**
33:24, 47:7,
53:14, 53:22,
54:4
**kim**
112:23
**kind**
13:9, 20:17,
22:11, 29:1,
55:20, 75:4,
175:7, 179:7

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    74

king
157:15, 157:16,
157:22
kirk
116:5, 116:6,
116:9, 137:11
kirschenbaum
43:18, 43:23,
44:1, 52:9,
104:15, 104:16,
104:24, 106:19,
110:19, 112:4,
114:24, 120:5,
125:19, 127:9,
128:9, 128:10,
137:25, 138:7,
138:23, 139:19,
140:5, 159:23,
170:11, 173:8,
173:12, 173:20,
174:22, 176:22,
203:15
knew
15:4, 24:4,
26:12, 36:5,
37:8, 43:13,
43:15, 52:19,
56:9, 73:25,
74:2, 76:8,
76:15, 83:7,
84:7, 116:16,
116:25, 120:24,
120:25, 152:2,
193:14, 200:7
knock
44:24, 45:2,
45:3, 53:7,
119:1, 119:6,
119:8, 119:10,
119:12, 121:10
knocked
45:25, 53:3,
53:5, 53:6,
144:7, 144:8,
144:9
knocking
193:10, 193:11
knowing
135:21

knowledge
38:5, 68:1,
69:25, 94:23,
101:7, 158:13,
166:11, 166:12,
200:16, 209:8
known
114:23, 154:19,
187:2, 194:15
knows
133:20
kremen
46:19

                L

labor
184:10, 185:12
lady
43:17, 96:12,
178:18
landlord
63:16
laspata
56:1, 56:2,
56:8, 71:20,
78:15, 81:15,
81:17, 81:23,
82:1, 82:3
laspata's
56:3, 91:9
last
27:12, 66:17,
111:1, 111:11,
111:13, 111:15,
112:8, 124:12,
155:14, 161:14,
161:17, 166:15,
166:19, 167:3,
167:6, 171:11,
203:8, 203:10
later
24:17, 52:17,
64:4, 73:17,
84:14, 84:23,
108:14, 108:17,
117:1, 117:2
latitude
94:21

lavin
172:20
law
1:5, 1:7, 1:10,
1:11, 2:16, 3:2,
5:6, 5:19, 5:21,
6:19, 9:3, 9:4,
9:5, 9:7, 9:8,
41:20, 41:23,
42:3, 45:9,
66:7, 66:10
lawrenceville
1:23, 5:14
laws
39:19, 39:23
lawsuit
23:13, 34:8
lawsuits
66:16
lawyer
10:18, 10:20,
10:22, 10:24,
12:12, 23:12,
35:16, 56:5,
56:8, 72:21,
73:1, 77:19,
88:1, 105:23,
106:7, 111:4,
128:22, 154:18,
154:19
lawyers
55:1, 71:13,
71:18, 74:7,
115:25, 116:12,
116:20, 118:13,
155:15
layout
11:19
learned
38:5, 76:7,
94:10
learning
63:18
least
88:17, 97:5,
142:22, 179:2,
184:8
leatherneck
21:6, 21:9,

21:11, 21:24
leave
19:9, 145:2,
192:20, 192:21
leaview
116:20
left
88:5, 92:7
legal
181:6, 182:16,
197:14, 199:6,
204:13
legislation
14:8, 17:3,
32:15, 144:20,
185:5, 187:8,
189:2, 191:1,
191:2, 191:4,
191:6, 194:4,
194:12, 194:13,
194:14
lehman
15:7
leibowitz
44:13, 52:15,
106:1, 106:2,
106:13, 106:15,
116:10, 116:13,
119:25, 120:6,
130:20, 139:18,
139:21, 175:6,
175:8, 178:2
lejeune
94:7, 95:2,
95:3, 95:14,
201:1
lenny
30:10
lenox
1:22, 5:13
less
72:5, 73:13,
73:20, 75:21,
76:3, 142:25,
153:7, 194:21,
195:18, 196:9,
197:1, 197:2
lessened
173:19

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    75

| | | | |
|---|---|---|---|
| **let's**<br>53:23, 58:9,<br>85:12, 90:10,<br>109:2, 120:23,<br>127:9, 131:24,<br>133:18, 160:15<br>**letter**<br>4:15, 4:16,<br>4:18, 4:19,<br>13:17, 22:12,<br>44:21, 44:23,<br>55:21, 73:13,<br>73:16, 79:22,<br>81:3, 81:9,<br>83:10, 84:1,<br>86:22, 88:11,<br>90:1, 92:25,<br>93:25, 95:23,<br>95:24, 97:23,<br>101:16, 101:17,<br>102:2, 102:7,<br>103:2, 118:24,<br>121:22, 121:25,<br>122:1, 122:24,<br>123:4, 123:5,<br>123:9, 123:15,<br>123:17, 124:5,<br>131:8, 131:9,<br>131:17, 131:18,<br>132:1, 132:8,<br>146:16, 153:2,<br>164:24, 168:23,<br>168:24, 169:13,<br>170:17, 170:22,<br>177:23, 193:4<br>**letterhead**<br>55:7, 55:10<br>**letters**<br>103:3, 107:2,<br>122:18, 122:21,<br>178:18, 203:12<br>**letting**<br>145:8, 161:5<br>**levan**<br>45:9, 45:13,<br>172:20<br>**levied**<br>125:16 | **levin**<br>31:7, 134:12,<br>134:15, 144:13,<br>159:5, 159:12,<br>170:10, 195:9<br>**levine**<br>30:17, 138:9,<br>199:20<br>**levy**<br>35:21, 41:10,<br>41:11<br>**lewin**<br>49:20<br>**liability**<br>34:16, 57:16<br>**libby**<br>114:22<br>**libyans**<br>38:24<br>**life**<br>18:7, 30:2<br>**limited**<br>185:11<br>**line**<br>171:19<br>**list**<br>32:18, 32:19,<br>55:24, 62:3,<br>78:11, 90:14,<br>91:8, 91:9,<br>101:21, 101:22,<br>101:24, 155:14,<br>156:10, 173:10,<br>191:8<br>**listed**<br>9:2, 81:14,<br>81:15, 164:15,<br>170:19<br>**listen**<br>147:9, 200:20<br>**listing**<br>78:16<br>**lists**<br>86:9<br>**literally**<br>33:25, 54:6<br>**litigate**<br>19:19 | **litigation**<br>1:12, 14:11,<br>17:4, 17:9,<br>17:23, 51:15,<br>133:24, 186:3,<br>186:4, 191:19,<br>192:14, 193:18<br>**little**<br>7:9, 8:8,<br>49:22, 58:7,<br>67:13, 104:14,<br>118:3, 188:16,<br>191:9<br>**llc**<br>2:17<br>**llp**<br>1:7, 1:22, 9:5,<br>9:7<br>**lo**<br>18:11<br>**loan**<br>163:11<br>**lobbying**<br>14:7, 17:2,<br>17:25, 19:25,<br>20:2, 20:5,<br>28:15, 32:13,<br>97:4, 184:11,<br>184:16, 185:13,<br>185:15, 185:17,<br>186:25, 187:4,<br>187:7, 187:9,<br>189:2, 189:12<br>**lobbyist**<br>18:5, 18:10,<br>18:12, 19:6,<br>30:8, 30:14<br>**lobbyists**<br>18:3, 30:7,<br>57:23, 77:5,<br>185:4, 185:18,<br>187:20, 188:10,<br>188:18, 188:21,<br>188:25, 189:6,<br>189:10, 194:3<br>**locate**<br>19:11, 19:24,<br>55:14 | **long**<br>7:15, 12:10,<br>33:17, 56:19,<br>62:10, 79:2,<br>110:4, 128:3<br>**long-time**<br>59:11<br>**longer**<br>64:5<br>**look**<br>12:25, 13:7,<br>14:24, 15:21,<br>22:12, 39:4,<br>53:23, 59:25,<br>60:10, 64:1,<br>65:2, 65:7,<br>66:24, 67:19,<br>78:3, 78:7,<br>80:16, 85:8,<br>85:24, 85:25,<br>86:5, 86:7,<br>90:10, 91:10,<br>95:25, 97:8,<br>109:23, 111:1,<br>111:10, 122:6,<br>122:8, 134:23,<br>135:17, 141:8,<br>141:10, 161:23,<br>162:17, 171:6,<br>171:11, 171:18,<br>171:25, 172:3,<br>176:2, 176:4,<br>200:13<br>**looked**<br>8:25, 67:1,<br>73:2, 79:6,<br>79:9, 141:5,<br>141:9, 171:12<br>**looking**<br>22:18, 35:10,<br>86:3, 86:4,<br>142:14, 156:11<br>**looks**<br>27:13, 122:23,<br>134:5, 135:6,<br>156:8, 179:2,<br>179:6, 179:16<br>**lose**<br>200:23 |

lost
11:21, 25:20,
46:3, 106:11,
107:5
lot
47:8, 57:18,
58:16, 75:15,
75:19, 83:7,
99:24, 102:16,
108:13, 121:1,
143:22, 173:3,
184:20, 185:16,
198:10
louisiana
66:6
loved
51:6
low
190:7
lower
37:4, 111:5,
111:7
luncheon
63:9
luxembourg
39:19, 39:23,
40:1, 42:4, 42:6
lynn
49:19, 145:14

**M**

maclean
137:11
made
37:5, 49:24,
72:15, 73:9,
73:21, 73:24,
76:3, 76:4,
76:10, 78:10,
81:16, 83:9,
101:13, 119:7,
153:7, 179:3,
179:4, 192:7,
192:13, 194:19,
196:4, 198:10,
202:25, 206:24
magazine
21:7, 21:9,

21:24
main
68:8, 80:6,
132:2, 190:6
major
184:14, 187:7
majority
7:2
make
14:8, 32:17,
39:4, 71:10,
72:3, 72:5,
73:13, 73:20,
75:8, 75:23,
76:3, 76:24,
82:12, 82:15,
91:12, 91:14,
91:19, 98:8,
110:22, 122:9,
129:16, 143:3,
150:17, 151:23,
175:4, 191:10,
200:9, 201:23,
202:21, 203:3,
204:15
makes
166:23, 173:13
making
18:8, 103:9,
175:2, 192:15
malicious
29:3
malpractice
57:17
man
103:25
manner
121:11
mantra
145:1, 195:13
many
21:16, 33:20,
44:10, 55:1,
55:4, 55:6,
64:22, 75:15,
78:13, 90:17,
107:6, 114:23,
115:2, 115:5,

115:6, 115:20,
115:21, 115:22,
185:25
marie
96:16, 96:17
marilou
122:1, 131:8
marine
13:22, 21:2,
21:5, 79:16,
87:24, 88:1,
99:3, 145:1,
146:17, 148:5,
148:23, 151:4,
160:7
marine's
57:9
marines
14:4, 15:3,
15:14, 15:15,
37:3, 37:4,
37:11, 44:24,
45:3, 57:21,
95:5, 98:5,
99:6, 99:8,
119:2, 119:8,
145:2, 146:19,
149:16, 151:2,
151:5, 152:6,
159:2, 174:21,
180:6, 194:1,
195:14
mark
27:6, 85:12,
100:14, 103:25,
104:2, 109:19,
137:8
markazi
38:18, 102:22
marked
8:14, 8:16,
12:21, 12:23,
27:8, 60:1,
78:4, 85:13,
88:7, 95:21,
100:17, 100:18,
109:20, 121:20,
124:3, 131:2,

131:23, 132:25,
137:9, 139:3,
146:22, 155:9,
155:10, 161:22,
164:19, 171:4,
171:7, 177:3,
177:12
market
2:5
marks
207:3
marriage
208:13
marrone
154:24, 155:20,
156:2
martin
104:3
maryland
2:20, 3:5
mass
28:11
matt
50:21, 50:23
matter
1:17, 5:5,
8:20, 13:22,
29:2, 32:19,
36:12, 48:4,
49:9, 50:23,
51:3, 77:25,
107:14, 139:6,
146:13, 149:22,
208:15
matters
10:16, 10:17,
12:7, 57:12,
124:16, 188:11
maybe
26:1, 26:23,
27:23, 31:6,
56:21, 57:7,
58:21, 82:2,
91:12, 99:9,
99:23, 143:19,
144:15, 145:11,
155:18, 172:6,
176:4, 199:4

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

77

mayor
14:22, 107:5,
107:11
mcgill
50:21, 50:23
mcguire
30:16, 31:5
mcguirewoods
31:6, 31:18,
32:6, 190:11,
190:15, 190:21,
190:25
mean
11:14, 25:12,
26:11, 33:20,
36:8, 45:23,
48:2, 54:5,
63:1, 66:4,
68:14, 69:8,
72:12, 76:21,
83:23, 86:15,
92:21, 102:15,
113:8, 115:1,
126:16, 135:8,
138:18, 171:19,
189:22
means
63:3, 156:13
meant
92:17
meantime
31:5
meckley
116:5, 116:6,
116:9
med
106:25
media
5:4
mediator
85:16
medical
8:2, 57:17
medicines
7:18
meet
24:24
meeting
23:20, 24:8,

24:10, 25:2,
25:5, 25:22,
52:20, 55:18,
95:2, 95:3,
95:10, 175:5
meetings
14:18, 15:16,
18:16, 32:8,
52:17, 99:22
mel
30:16
member
26:9, 41:14
members
49:15, 165:3
memory
97:23, 187:11
mental
8:3
mention
87:5, 135:23,
186:22, 187:10
mentioned
23:5, 24:7,
107:11, 176:16,
193:24, 194:17
met
22:8, 24:20,
30:16, 30:17,
99:10, 99:19,
100:11
meta
106:25
michael
29:18, 29:19,
29:24
middle
13:10, 26:5,
26:18
might
19:9, 40:17,
70:4
military
32:8
miller
156:2
million
33:5, 39:1,

192:20, 192:22,
197:10
mind
11:2, 88:20,
91:25, 144:24,
152:24
mindful
31:14, 95:17
mine
18:6, 82:2,
90:16, 107:6,
151:11, 201:21
minute
27:19, 31:10,
31:11, 51:22,
67:1, 98:11,
107:9, 113:22,
131:4, 153:6,
160:15
misinformed
201:23
miss
178:17
mistake
101:13
modified
33:13
modis
76:19
monetary
165:23
money
29:4, 30:11,
31:3, 32:17,
34:7, 37:1,
38:10, 39:7,
39:14, 62:13,
62:16, 71:10,
71:19, 72:3,
72:5, 72:7,
72:15, 73:20,
73:21, 75:15,
76:3, 76:22,
79:3, 83:6,
97:10, 97:15,
98:9, 102:20,
118:10, 128:22,
138:11, 140:3,

151:13, 151:23,
151:24, 152:4,
153:7, 158:14,
182:4, 182:7,
182:20, 183:7,
184:1, 191:11,
196:19, 198:11,
200:9, 201:2,
201:3, 203:4
monitor
5:10
month
84:23
months
28:24, 33:22
mooney
40:12, 40:17
more
21:19, 36:13,
58:7, 61:1,
61:18, 63:14,
63:19, 63:24,
64:20, 64:21,
65:10, 70:24,
72:3, 72:7,
72:15, 73:21,
78:1, 81:13,
83:3, 98:9,
109:18, 116:10,
116:12, 128:5,
133:10, 133:12,
136:14, 142:24,
153:7, 155:22,
163:4, 172:7,
172:11, 175:13,
190:11, 191:13,
196:18, 199:23,
203:3
morning
1:25, 6:16,
6:17, 88:8
moshe
172:23, 172:24
most
11:17, 165:18,
173:9
mostly
10:20, 10:22,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    78

| | | | |
|---|---|---|---|
| 12:7, 184:22 | 39:12, 40:13, | 187:8, 191:10 | 92:15, 93:5, |
| **mother** | 40:22, 41:14, | **needs** | 93:19, 93:21, |
| 22:8 | 41:19, 44:2, | 109:19 | 93:22, 93:24, |
| **motto** | 44:4, 44:16, | **negotiate** | 94:1, 108:22, |
| 97:15, 145:1 | 50:13, 55:25, | 29:7, 31:1, | 117:7, 130:7, |
| **move** | 59:14, 59:15, | 97:3 | 203:22, 203:23, |
| 46:24 | 67:23, 74:17, | **negotiating** | 208:5 |
| **moved** | 77:8, 85:12, | 31:5 | **next** |
| 130:5 | 87:21, 87:24, | **negotiation** | 27:7, 110:11, |
| **moves** | 96:12, 96:14, | 30:3 | 140:17, 164:6, |
| 186:1 | 96:15, 98:25, | **neighbor** | 167:11 |
| **movies** | 101:13, 108:5, | 21:4, 106:17 | **nice** |
| 18:8 | 109:14, 109:15, | **neither** | 63:13, 95:9, |
| **much** | 116:4, 137:18, | 31:20, 209:9 | 144:11 |
| 37:10, 56:9, | 155:17, 156:7, | **net** | **nobody** |
| 62:11, 73:16, | 156:8 | 16:21, 140:13 | 63:25, 75:9, |
| 76:24, 79:2, | **named** | **never** | 158:25, 174:15 |
| 79:3, 97:10, | 43:4, 91:2, | 17:4, 36:4, | **nobody's** |
| 109:17, 138:11, | 103:25 | 36:6, 37:12, | 50:10 |
| 139:1, 140:3, | **names** | 37:13, 61:3, | **none** |
| 141:3, 142:1, | 31:13, 31:15, | 61:4, 72:2, | 50:8 |
| 159:20, 160:1, | 68:21, 68:25, | 73:2, 83:2, | **notary** |
| 160:14, 161:7, | 99:10, 99:24, | 83:3, 83:4, | 1:20, 6:12, |
| 186:11, 206:23 | 100:2, 102:9, | 83:7, 95:14, | 208:5 |
| **multiple** | 134:8, 134:11, | 104:8, 140:9, | **noted** |
| 40:10, 178:23 | 136:11, 136:20, | 140:11, 144:24, | 207:6 |
| **murder** | 138:9, 156:13 | 146:3, 146:25, | **notes** |
| 29:22 | **narrow** | 147:3, 147:5, | 1:16 |
| **murphy** | 187:14 | 148:1, 154:22, | **nothing** |
| 69:2 | **nasir** | 162:24, 163:5, | 15:4, 27:10, |
| **murray** | 107:18, 108:4 | 175:4, 175:9, | 32:22, 33:4, |
| 30:4, 30:5, | **nat** | 175:10, 176:11, | 42:6, 43:13, |
| 31:23, 31:24, | 49:20 | 190:10, 193:14, | 87:11, 98:5, |
| 32:6 | **national** | 195:17, 196:17, | 130:25, 149:4, |
| **must** | 49:19 | 200:7, 201:16, | 200:14 |
| 42:2, 111:24 | **necessarily** | 204:3 | **notice** |
| **myself** | 13:3, 125:8, | **new** | 36:3, 36:4 |
| 32:1, 36:7, | 179:4 | 1:2, 1:21, | **november** |
| 36:9 | **necessary** | 1:23, 2:12, 5:7, | 81:3, 83:11, |
| **N** | 17:7 | 5:8, 5:14, 6:12, | 86:24, 90:15, |
| **nail** | **need** | 10:6, 10:9, | 95:23, 102:2 |
| 82:8, 82:19 | 7:12, 49:22, | 18:19, 18:23, | **number** |
| **name** | 62:14, 129:12, | 30:8, 30:9, | 5:4, 5:8, 8:16, |
| 18:13, 23:11, | 133:14, 133:21, | 42:14, 42:17, | 12:23, 13:9, |
| 26:22, 27:4, | 133:22, 160:16, | 42:20, 45:10, | 13:12, 13:14, |
| 29:13, 30:19, | 162:17, 182:2 | 51:12, 51:20, | 15:16, 18:5, |
| 34:9, 38:12, | **needed** | 83:24, 87:1, | 18:12, 27:9, |
| | 30:6, 32:14, | 87:17, 92:12, | 51:24, 78:5, |

79:9, 88:8,
90:12, 91:23,
100:20, 131:24,
133:1, 133:23,
141:6, 161:25,
172:25, 174:24
**numbered**
86:1, 111:8
**numbers**
73:2, 111:2
**numerous**
14:18
**nuts**
37:5

---
O
---

**o'brien**
69:2, 135:25
**o-f-i-s-i**
154:21
**object**
73:14, 149:3,
168:15
**objecting**
129:21, 129:23,
147:24, 149:10
**objection**
11:5, 13:23,
47:2, 47:25,
48:23, 49:10,
50:6, 51:4,
51:17, 65:23,
68:11, 69:21,
71:8, 84:2,
103:18, 105:22,
115:13, 117:10,
120:20, 125:2,
125:6, 129:16,
136:9, 136:17,
136:21, 138:15,
138:16, 142:7,
142:12, 144:1,
144:21, 145:4,
147:7, 148:24,
149:7, 149:17,
149:19, 150:12,
151:8, 159:13,
159:15, 166:5,

167:24, 169:6,
170:2, 173:21,
176:9, 181:3,
181:23, 182:15,
183:17, 183:24,
195:20, 196:12,
196:16, 197:13,
198:5, 198:8,
202:4, 202:12,
204:12
**objections**
149:8, 168:5
**objects**
11:7
**obtained**
26:8, 34:16,
34:17, 105:4
**obviously**
26:11, 63:18,
76:14, 78:14,
102:8, 124:19,
179:13
**occur**
33:18, 61:11
**occurred**
15:19, 94:13,
94:17, 94:18
**october**
27:14, 65:15,
83:14, 208:17
**ofac**
39:25, 40:5,
46:22
**offer**
148:25
**office**
13:13, 13:15,
15:10, 18:9,
20:14, 20:19,
20:21, 40:3,
50:18, 55:17,
56:16, 106:9,
108:1, 164:22,
179:17
**officers**
38:23
**offices**
1:21

**ofisi**
154:19, 154:21,
154:22, 155:3,
155:7, 155:8,
156:5, 156:7,
157:3, 157:9
**oh**
9:8, 23:1,
28:17, 30:17,
33:19, 38:20,
39:11, 55:3,
61:6, 77:19,
78:12, 84:15,
121:6, 155:13,
177:7
**oj**
36:24, 36:25
**old**
101:4, 109:21
**olsen**
49:12, 49:14,
49:24, 50:2,
50:13, 50:16
**once**
17:20, 21:19,
60:25, 64:15,
94:9, 163:25,
172:24, 185:5,
191:15, 203:21
**one**
5:4, 6:5, 9:20,
9:22, 9:23,
15:21, 16:8,
16:15, 16:16,
18:5, 18:12,
22:6, 22:7,
27:7, 29:2,
29:19, 30:13,
30:22, 31:2,
31:20, 31:21,
33:1, 35:14,
36:14, 37:16,
43:19, 44:2,
49:25, 50:19,
51:6, 51:8,
51:9, 51:10,
53:12, 55:18,
57:20, 58:22,

59:13, 60:3,
60:5, 60:6,
66:5, 66:12,
69:11, 80:22,
80:23, 80:24,
82:2, 90:12,
90:14, 96:17,
101:12, 101:14,
102:11, 109:9,
109:11, 111:17,
121:2, 121:21,
122:3, 123:1,
123:10, 125:25,
127:17, 128:4,
128:6, 131:11,
143:4, 143:8,
145:18, 162:10,
167:11, 168:14,
177:5, 185:3,
199:4, 199:25,
200:18, 203:25,
204:5, 205:20
**one-third**
16:21, 23:18,
82:18, 162:22,
163:3, 163:4,
164:13
**ones**
44:5, 63:16,
97:5, 109:5,
127:23, 143:9,
151:12, 176:21
**only**
25:8, 25:12,
45:15, 49:24,
58:20, 67:15,
70:17, 75:1,
96:8, 96:21,
115:18, 116:16,
120:11, 143:9,
151:1, 156:7,
161:14, 161:18,
164:4, 180:22,
190:8, 199:15
**opened**
22:15, 123:2
**operandi**
76:19

operation
32:8
opinions
147:15, 148:25,
149:12
opportunity
91:15, 168:6
opposite
183:20
oral
16:19, 16:23,
67:5, 79:14,
86:25
orally
64:7
order
46:6, 79:18
original
84:5, 187:8
originally
36:1, 109:3,
178:20, 194:7
originate
94:4
osongo
155:17, 156:9,
156:12, 156:15
other
8:9, 10:12,
14:22, 16:12,
21:23, 21:25,
24:17, 27:11,
28:21, 29:14,
31:21, 32:2,
32:21, 33:25,
35:6, 35:25,
36:11, 43:2,
43:14, 46:18,
49:25, 50:8,
50:25, 53:12,
53:14, 53:23,
54:5, 54:10,
56:10, 57:11,
58:18, 58:23,
58:24, 59:1,
61:21, 63:15,
66:15, 68:9,
68:16, 68:19,

70:6, 70:20,
71:2, 71:11,
71:14, 71:18,
74:7, 75:1,
75:10, 76:25,
77:3, 78:19,
82:1, 93:23,
94:3, 101:12,
105:12, 106:15,
107:21, 109:5,
119:21, 122:19,
122:22, 126:1,
128:4, 128:6,
142:18, 143:16,
143:19, 143:21,
143:25, 144:4,
145:9, 148:23,
149:8, 150:24,
151:12, 151:22,
152:4, 154:2,
160:17, 163:18,
170:7, 174:7,
174:11, 176:5,
178:18, 179:14,
185:13, 188:4,
193:23, 194:10,
195:14, 200:5,
200:15, 204:5,
204:7, 206:2
others
31:6, 44:10,
50:14, 53:10,
54:20, 56:13,
56:14, 59:12,
68:25, 72:6,
119:1, 119:6,
151:3, 153:5,
154:15, 166:23,
170:13, 173:3,
200:5
otherwise
96:4, 100:24,
162:18, 168:7,
209:11
ourselves
53:25
out
15:20, 18:11,

21:4, 22:11,
24:25, 25:4,
30:20, 34:7,
34:11, 34:23,
37:12, 37:13,
44:20, 44:24,
45:2, 45:3,
45:16, 45:25,
52:11, 52:18,
53:3, 53:5,
53:6, 53:7,
55:20, 61:5,
62:1, 66:9,
70:24, 71:4,
72:1, 72:5,
72:17, 76:17,
76:23, 82:6,
82:22, 82:23,
83:2, 83:9,
84:11, 89:24,
90:5, 90:16,
92:19, 92:20,
92:21, 94:9,
95:18, 97:5,
97:16, 99:18,
105:7, 105:10,
108:4, 117:1,
118:1, 119:2,
119:8, 119:10,
119:12, 121:10,
122:13, 123:5,
130:12, 138:12,
138:14, 138:18,
139:25, 142:2,
144:8, 144:9,
163:9, 167:14,
167:15, 176:2,
176:4, 185:18,
192:2, 192:21,
193:10, 193:11,
200:14, 205:25,
206:3
outcome
208:14, 209:12
outfit
192:21
outfits
33:2

outraged
53:4
outside
107:25
over
8:25, 18:15,
33:17, 34:11,
38:21, 41:21,
55:19, 120:9,
143:18, 144:5,
146:5, 155:24,
186:7, 191:24
owe
202:10
owed
29:4
own
21:8, 78:25,
94:9, 94:11
owned
38:24

_____

P

pa
5:6
pacer
155:13
page
4:10, 4:13,
13:8, 13:10,
15:22, 16:12,
21:11, 21:12,
23:9, 27:12,
86:2, 110:7,
110:8, 110:11,
112:13, 124:10,
141:10, 141:12,
141:17, 155:15,
156:10, 162:6,
162:8, 162:16,
167:1, 167:2,
167:7, 167:8,
171:11
pages
86:6, 111:1,
111:11, 111:13,
111:15, 112:8,
155:13

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    81

**paid**
12:3, 21:21,
23:12, 23:19,
23:25, 24:2,
48:25, 49:1,
59:3, 77:24,
77:25, 78:1,
86:20, 99:14,
114:14, 139:15,
139:25, 173:19,
174:20, 182:5,
183:21, 183:22,
195:5, 198:2,
198:3, 198:12,
199:6, 199:7
**panicked**
28:20
**papa**
118:10
**paragraph**
15:21, 16:8,
16:15, 16:16,
60:9, 60:10,
60:16, 64:2,
64:19, 66:25,
67:2, 88:12,
88:14, 88:19,
89:23, 90:2,
91:22, 92:12,
96:8, 96:22,
124:12, 135:15,
136:1, 162:16,
165:10, 167:3,
167:5, 167:6,
167:13, 167:20
**paraguay**
201:1
**paraphrase**
179:24
**pardon**
54:15, 77:2,
79:7, 81:1,
122:20, 125:22,
206:12
**part**
20:4, 53:18,
59:1, 72:20,
77:24, 77:25,

86:13, 88:17,
97:25, 147:16,
192:14, 192:15,
206:11
**participate**
26:17, 28:1,
42:16, 42:19,
42:23, 42:25,
43:1, 48:20,
50:4, 195:25
**particular**
162:11, 187:1
**parties**
40:10, 64:7,
67:4, 199:19,
208:12, 209:10
**partners**
9:10, 109:9,
109:11
**partnership**
1:12, 9:11,
106:11
**party's**
67:5
**pass**
17:2
**passage**
144:19
**passed**
14:8, 33:16,
38:8, 39:9
**past**
141:15, 163:21,
163:25
**patience**
160:25
**pay**
23:16, 29:1,
31:3, 68:15,
69:7, 69:12,
69:19, 70:7,
73:14, 74:11,
74:19, 76:23,
77:5, 77:6,
77:9, 83:6,
90:21, 95:5,
97:16, 162:21,
163:1, 174:23,

183:3, 183:4,
183:10, 183:16,
183:25, 195:18,
196:9, 201:21
**paying**
95:9, 97:25,
192:4
**payment**
79:15
**peace**
14:23, 59:10,
119:7
**pending**
7:16
**pennsylvania**
2:6, 10:5,
10:10, 66:6
**people**
47:8, 50:11,
56:24, 57:18,
58:23, 58:24,
59:1, 65:7,
65:19, 68:16,
71:3, 81:25,
82:14, 83:5,
89:1, 92:9,
94:11, 95:4,
99:25, 113:2,
137:12, 145:9,
152:5, 154:2,
206:2
**percent**
20:10, 28:22,
29:8, 29:9,
37:14, 90:19,
97:5, 163:16,
174:23
**percentage**
11:24, 11:25,
12:1, 58:10,
138:7, 164:7
**perform**
129:24
**perhaps**
51:9, 172:10
**period**
27:18, 33:17,
34:11, 57:13,

57:25, 176:24,
187:14, 187:16
**periodical**
21:6
**perles**
1:11, 2:16,
3:8, 5:18, 5:19,
6:5, 6:19,
13:21, 14:3,
14:17, 20:6,
20:13, 22:22,
23:10, 23:14,
23:15, 23:21,
24:1, 24:8,
24:11, 25:23,
25:24, 30:25,
44:11, 44:12,
49:1, 60:19,
61:10, 62:24,
64:4, 69:18,
70:8, 71:14,
75:12, 79:12,
81:12, 82:16,
83:25, 88:15,
91:7, 94:25,
96:19, 96:24,
97:1, 101:14,
106:4, 129:4,
132:1, 143:8,
148:4, 152:10,
152:20, 155:21,
166:10, 172:19,
175:8, 180:13,
183:12, 184:10,
184:22, 184:25,
185:1, 187:25,
193:10, 194:19,
194:20, 194:21,
195:17, 196:4,
196:8, 196:17,
196:21, 198:13,
200:1, 201:19,
204:19, 205:13,
205:17, 205:19,
206:1, 206:2
**perlesfsia**
1:12
**permission**
127:24

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                  82

permitted
203:13
person
146:3
personal
10:22, 10:23,
20:22, 57:14,
57:16, 94:23,
102:10, 114:19
personally
34:25, 58:12,
58:17, 58:18,
112:22, 112:25,
113:12, 153:9,
153:13, 154:11
personnel
85:6
peter
2:4, 5:23,
9:25, 70:4,
70:6, 70:8,
71:12, 149:2,
149:25
peter's
8:25
peterson
24:21, 24:22,
25:10, 25:11,
25:20, 27:13,
34:16, 34:18,
40:5, 51:3,
51:25, 52:8,
53:6, 53:7,
54:17, 60:19,
60:20, 62:25,
65:21, 67:24,
75:2, 75:10,
83:13, 116:19,
118:14, 119:13,
119:20, 120:9,
120:17, 121:15,
125:17, 126:25,
127:5, 127:7,
127:11, 128:7,
128:19, 130:6,
130:21, 130:23,
130:24, 138:2,
140:25, 142:24,

143:15, 144:6,
144:9, 148:14,
160:7, 170:10,
173:7, 173:11,
173:18, 175:24,
176:22, 178:11,
193:11, 204:11
peterson's
43:9
philadelphia
2:6, 13:15,
20:15
phone
114:18, 146:5
phrase
157:2, 157:21,
191:17
physical
8:3, 110:6,
110:11
physically
58:19
pick
81:20
picked
71:16
picking
114:17
pie
91:16, 141:19
piece
91:16
pile
126:4
piper
45:20, 46:18,
46:19, 54:19,
134:15, 144:15,
154:1, 170:9,
195:9
place
5:13, 53:15
plaintiff
5:25, 6:2,
64:24, 66:18,
120:9, 138:2,
145:19, 155:3
plaintiffs
14:7, 17:1,

17:9, 17:13,
17:16, 17:22,
19:12, 19:15,
19:24, 21:2,
22:3, 22:6,
22:18, 24:16,
28:10, 28:14,
51:14, 51:24,
52:6, 56:12,
57:8, 58:11,
60:22, 61:19,
61:20, 61:22,
62:25, 63:14,
64:6, 64:8,
65:19, 66:13,
67:6, 67:8,
70:18, 70:19,
75:2, 85:4,
86:9, 90:16,
90:23, 97:20,
100:16, 105:24,
115:7, 116:19,
118:14, 119:13,
119:14, 120:10,
121:13, 121:14,
126:1, 126:2,
127:1, 127:6,
127:7, 135:24,
137:5, 138:23,
141:1, 142:24,
143:4, 143:16,
145:1, 146:17,
148:13, 150:23,
152:1, 155:14,
156:20, 157:25,
158:2, 158:20,
160:7, 170:9,
170:10, 204:10
planet
5:12, 6:8
platform
60:20, 62:24,
63:17
play
68:15, 69:7,
69:19, 70:7,
90:21
please
5:15, 7:6,

7:13, 13:1,
78:8, 96:3,
100:3, 100:5,
100:25, 109:24,
114:5, 149:2,
149:25, 161:19,
162:17, 165:1,
169:13, 177:9,
198:15
plus
163:17, 193:25
pocketbook
165:19
point
22:5, 47:10,
51:3, 82:8,
82:19, 86:6,
146:10, 173:2,
181:22, 187:5,
192:19, 193:6,
203:9
pointed
72:17, 83:9,
167:14, 167:15
policeman
107:17
political
30:11
polled
56:21
poor
36:25, 71:11
position
45:21, 54:11,
174:14
possibility
148:14
possible
35:8, 99:7,
134:25
post
18:20, 108:1
potential
56:12, 143:24,
146:11, 146:15
powerful
41:14, 199:24
practice
10:5, 10:23

prayer
15:10
predicate
205:7
prepare
191:1
prepared
209:4
present
3:7
preserved
149:9
president
49:19
presumably
197:11
presume
180:4
previously
121:20, 133:1,
177:21
price
37:10, 37:13
primarily
14:6
principals
57:1, 57:4
print
21:25
prior
168:14, 177:23,
183:11
priority
46:3, 54:13,
119:2, 119:9,
144:6
privilege
97:1
privy
130:21
pro
183:10
probably
44:1, 46:7,
52:18, 85:23,
90:11, 93:8,
104:23, 112:23,
123:23, 133:17,

158:8, 173:9
problem
18:22, 62:16,
129:9
proceed
97:11, 192:22
proceeded
34:18, 42:13,
105:15, 105:18,
108:21
proceeding
209:6
proceedings
1:17, 209:7
produced
111:4, 177:13
products
57:16
professional
1:20, 202:1,
208:4
professionalism
161:4
professor
33:4
project
184:15
pronounce
85:11, 172:21
pronounced
104:18
proper
199:7
properly
46:4, 53:10,
53:11, 199:12
property
153:11
proposal
175:2, 175:5,
176:10, 176:11,
177:21, 178:8,
179:3, 179:5,
179:7
proposed
172:24, 175:12,
175:16, 178:1
proposing
172:12, 173:5

proprietorship
9:9
protested
179:8
provide
148:7
provided
60:21, 85:15,
139:5, 152:22
providence
46:21
proximity
90:11
public
1:20, 6:12,
103:15, 103:21,
167:10, 208:5
publications
21:25
publicity
14:20, 14:21
pull
162:11
pulled
155:12
pulls
93:14
punish
75:20, 75:21
punished
75:18
purpose
11:2, 95:10,
165:15, 165:16
purposes
72:19, 161:24,
176:1
pursuant
16:19
pursue
64:9, 112:19,
116:23
pursuit
120:18
pushing
61:18
put
12:18, 29:5,

32:3, 38:11,
39:9, 39:10,
80:19, 80:21,
92:24, 93:6,
93:17, 98:5,
98:6, 102:20,
120:21, 131:15,
133:23, 148:5,
155:12, 185:19,
185:21, 189:3,
190:12, 191:6
putting
97:12
px
99:6

**Q**

qsf
140:25, 142:3
quarter
21:12, 21:13
question
7:5, 7:16,
16:6, 19:4,
22:25, 33:9,
35:2, 44:22,
61:13, 71:11,
84:17, 86:9,
95:13, 96:21,
100:1, 100:3,
100:5, 101:6,
114:12, 120:12,
132:2, 136:24,
137:21, 140:7,
140:18, 142:20,
147:21, 148:10,
149:8, 150:16,
150:19, 157:16,
162:18, 165:5,
165:8, 166:14,
166:15, 166:17,
166:19, 167:17,
169:20, 171:14,
172:17, 176:19,
178:21, 179:1,
186:20, 196:14,
196:21, 198:16,
199:3, 202:5,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                      84

202:24, 205:4,
205:8
**questioned**
103:25
**questions**
7:20, 7:25,
8:5, 8:6, 8:12,
48:8, 55:5,
96:7, 110:1,
114:16, 129:18,
129:22, 129:23,
135:10, 160:25,
161:3, 161:8,
161:15, 161:18,
205:3
**quick**
191:13
**quickly**
78:14
**quietly**
60:13, 100:23
**quite**
87:14

**R**

**radio**
22:20, 23:3,
36:17, 36:19,
36:20, 36:21
**raise**
30:11
**ran**
21:8, 21:10,
30:18, 32:10,
122:11
**rata**
183:10
**rather**
53:24, 71:24,
91:7
**reach**
14:16, 79:7,
81:1, 123:5,
205:25
**reached**
124:14, 169:3,
169:23, 178:10,
201:18, 206:2

**read**
8:24, 60:12,
60:15, 88:22,
92:21, 96:2,
96:9, 100:22,
101:3, 101:11,
110:2, 110:4,
132:23, 135:18,
164:4, 164:9,
165:19, 165:24,
166:13, 166:15,
166:18, 166:19,
167:21, 169:4,
169:17, 169:19,
169:21, 177:5,
198:15, 206:9
**reading**
89:13, 162:25,
167:19, 173:10
**real**
191:13
**realized**
185:6
**really**
15:4, 15:11,
15:12, 17:5,
18:17, 23:21,
30:2, 30:6,
32:7, 37:5,
38:25, 47:23,
48:16, 50:18,
81:17, 85:21,
85:24, 92:14,
96:7, 96:10,
96:21, 99:20,
102:8, 103:1,
116:10, 117:14,
118:9, 118:12,
134:19, 146:2,
149:1, 153:6,
154:16, 155:4,
158:19, 171:17,
175:9, 175:10,
200:18
**reason**
13:16, 13:18,
80:6, 86:16,
86:17, 142:5,

146:6, 146:8,
146:9, 152:6,
162:12, 179:19
**reasons**
131:21
**recall**
20:13, 21:17,
21:18, 26:2,
28:9, 29:13,
40:21, 56:21,
99:10, 99:12,
99:19, 99:20,
100:12, 114:11,
137:14, 140:1,
140:13, 140:15,
179:15, 179:16,
193:3, 203:18
**receive**
13:17
**received**
139:7, 140:23,
142:1, 164:13,
201:9
**recent**
128:5
**recently**
25:6, 116:6,
116:7
**recess**
47:15, 98:15,
133:5, 160:20,
198:20
**recognize**
134:1, 135:1,
135:4, 135:11,
136:10, 136:19,
137:18, 137:20,
162:1, 162:4,
171:15, 172:9,
172:10, 174:25,
177:15
**recollect**
191:4
**recollection**
16:23, 27:17,
100:13, 102:10,
104:4, 104:10,
114:19, 139:10,

142:15, 159:24,
175:14, 189:5,
195:24, 197:3
**recommend**
22:13, 188:17,
188:20
**recommended**
49:13, 49:18
**recommending**
55:22
**record**
11:8, 47:14,
47:17, 47:18,
96:6, 98:14,
98:17, 108:15,
133:4, 133:7,
157:23, 160:19,
160:22, 161:24,
171:5, 198:19,
198:22, 207:5,
208:9, 209:7
**recording**
209:5
**recover**
158:1, 158:14
**recovered**
37:8, 159:22,
160:1, 160:2,
160:4, 194:5
**recoveries**
9:18, 125:5,
144:20, 146:18,
150:24
**recovery**
9:20, 9:22,
11:25, 12:1,
64:9, 73:7,
124:15, 124:23,
125:7, 138:1,
138:23, 153:10,
159:21, 159:25,
163:3, 163:17,
165:23, 167:23,
169:4, 169:24,
197:7, 197:19,
198:13
**recross**
4:3

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    85

**recruit**
60:21, 62:25,
63:5, 63:21,
64:5, 64:17,
67:7, 83:3
**recruited**
66:17, 70:18,
140:9, 140:11
**recruiting**
61:22, 61:23
**red**
99:9
**redirect**
4:3
**reduce**
75:20, 151:19,
151:20, 152:7,
200:2, 200:4,
200:12, 200:17,
201:4, 203:6
**reduced**
200:21
**reducing**
29:8
**reduction**
152:21, 153:1,
180:12, 203:3
**ref**
1:3
**refer**
17:9, 17:10,
17:13, 154:8,
170:17, 170:18,
170:21, 187:10
**reference**
170:6
**referenced**
194:17
**referral**
68:17, 69:9,
70:25, 71:4,
71:7, 71:14,
74:12, 83:4
**referrals**
72:8, 74:6,
75:19, 76:17
**referred**
51:15, 65:20,

91:25, 92:2,
97:24, 106:16,
108:6
**referring**
26:7, 73:11,
88:6, 88:20,
89:11, 141:18,
166:9, 169:7,
169:10, 169:16,
170:6, 170:25,
172:8, 177:23,
177:25, 180:4,
187:3, 195:6,
195:15
**refers**
166:8
**reflect**
13:3, 13:19,
14:1
**reflects**
139:7
**regarding**
13:21, 79:14,
87:17, 103:16,
112:9, 189:5,
189:9
**registered**
1:19, 208:4
**regulatory**
41:5
**related**
26:6, 40:5,
57:9, 85:4,
96:8, 144:20,
208:11, 209:9
**relates**
110:18
**relations**
15:8
**relationship**
11:11, 13:3,
27:5, 84:5,
204:1, 204:2,
204:3, 204:10
**relative**
26:12, 107:5
**reliance**
64:19, 66:25,

67:3
**relied**
64:18
**relvas**
69:13, 69:15,
69:16, 74:18
**remember**
13:4, 13:5,
15:19, 18:13,
20:20, 20:24,
20:25, 21:3,
21:12, 21:14,
25:14, 25:15,
26:14, 44:2,
48:3, 48:10,
50:21, 52:23,
55:2, 55:6,
56:17, 59:15,
81:6, 84:19,
85:20, 95:24,
96:2, 97:17,
99:24, 100:2,
100:16, 101:10,
101:16, 101:17,
101:19, 102:23,
103:5, 103:11,
103:12, 103:14,
112:21, 113:16,
113:18, 113:22,
114:17, 115:22,
115:25, 129:2,
139:1, 143:1,
146:6, 158:23,
165:1, 172:5,
172:12, 172:18,
173:5, 175:2,
184:14, 186:25,
187:3, 189:25,
191:18, 192:23,
192:24, 193:2,
194:22
**remembers**
189:15, 189:18,
189:21
**removing**
96:19
**renew**
84:11

**repeat**
7:3, 173:9
**rephrase**
144:24, 168:7,
178:4
**replaced**
8:7
**replicate**
190:16
**report**
4:14, 85:9,
85:17, 86:16,
141:7, 141:9,
142:21, 142:22
**reportedly**
96:24
**reporter**
1:19, 1:20,
6:7, 49:23,
208:4
**represent**
5:16, 6:19,
8:17, 27:10,
43:14, 44:16,
44:17, 85:15,
88:10, 112:8,
126:8, 128:19,
139:4, 144:14,
155:11, 155:16,
157:10, 157:11,
162:10, 166:22,
177:13, 204:18,
204:20, 204:23
**representation**
13:21, 14:4,
182:22, 194:18
**represented**
18:24, 97:21,
112:18, 113:2,
120:10, 120:18,
121:14, 121:15,
125:25, 126:1,
127:5, 134:14,
142:23, 198:3
**representing**
5:12, 6:8,
103:20, 105:23,
155:18, 156:19,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    86

156:21, 157:4
**republic**
18:9
**request**
64:7, 67:4,
79:17, 79:18,
79:19
**requested**
71:6
**require**
129:23, 202:1
**requisite**
17:2, 32:15
**research**
39:18, 39:22
**respect**
85:3, 95:5,
95:9, 97:25,
108:18, 128:1,
135:22, 140:24,
153:10, 153:24,
157:2, 184:6,
206:15
**respective**
154:3
**respectively**
124:17
**respond**
7:19, 7:25, 8:5
**respondent**
2:15, 5:18
**respondent's**
64:7, 67:3,
85:16
**respondents**
1:13, 3:1,
5:22, 6:5,
135:19, 135:23
**responding**
131:9
**response**
131:16, 178:16
**responsibilities**
83:25, 84:3
**responsibility**
186:3
**responsible**
11:20, 105:13

**rest**
14:23, 59:10,
78:20
**restricted**
115:23
**result**
138:21, 140:4,
200:19
**retain**
172:13
**retained**
4:9, 172:19,
173:16, 190:24
**retainer**
4:23, 10:24,
11:3, 11:16,
162:11
**retired**
116:8
**return**
69:18
**revealing**
69:23, 200:8
**review**
28:8, 177:9
**reviewing**
171:8
**rhode**
46:21
**richard**
46:19
**rid**
52:21, 106:12
**ridiculous**
44:9, 53:25,
78:2
**ridiculously**
28:22, 28:25
**right-hand**
111:5, 111:7,
141:11
**rights**
86:20
**rings**
156:8
**road**
15:17
**robin**
99:9

**rockville**
3:5
**role**
17:8, 187:18
**room**
6:4
**rose**
184:18
**ross**
43:19, 106:20,
114:23, 139:19
**ross's**
113:10
**rothenberg**
1:5, 1:6, 1:7,
1:15, 2:2, 2:9,
2:10, 4:4, 5:1,
5:5, 5:6, 5:25,
6:1, 6:16, 7:17,
8:18, 9:3, 9:4,
9:6, 9:8, 10:2,
12:16, 12:22,
19:1, 27:17,
39:19, 60:11,
67:6, 76:1,
78:8, 79:7,
85:19, 91:8,
91:11, 95:22,
98:19, 100:20,
100:21, 107:8,
129:24, 130:5,
133:10, 135:23,
137:24, 141:23,
147:11, 147:23,
150:15, 160:24,
161:12, 161:23,
164:18, 165:9,
166:16, 168:21,
168:24, 170:15,
171:5, 171:15,
171:22, 172:13,
178:5, 179:23,
180:15, 184:7,
186:6, 186:12,
191:15, 194:16,
197:5, 198:11,
198:25, 201:4,
201:6, 202:19,

205:1, 205:10,
206:14
**rothschild**
1:22, 2:3,
5:24, 77:23
**rpr**
208:20
**rubin**
45:17, 46:20,
54:18, 138:8,
144:13, 170:9,
195:9, 199:20
**rules**
7:1, 201:25
**run**
20:22, 21:1,
21:16, 21:23,
21:24, 22:17,
22:23, 23:2,
102:18
**running**
32:9, 45:21,
178:23

———— **S** ————

**s**
2:1
**saddam**
33:6
**said**
14:24, 15:11,
15:15, 16:25,
17:8, 27:1,
27:2, 27:3,
30:13, 31:25,
37:2, 37:3,
38:23, 39:2,
39:4, 40:6,
40:19, 54:16,
54:17, 55:19,
58:17, 61:1,
61:6, 61:7,
61:24, 62:4,
64:18, 65:7,
69:7, 69:10,
69:11, 73:19,
73:20, 74:14,
74:16, 74:21,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    87

77:19, 78:12,
78:24, 87:18,
90:18, 92:9,
97:6, 97:8,
97:24, 98:2,
108:2, 109:1,
114:18, 123:21,
124:7, 126:22,
131:21, 142:7,
152:24, 153:5,
159:15, 161:17,
166:3, 170:8,
175:3, 175:22,
179:11, 179:24,
183:20, 185:12,
191:14, 195:2,
195:13, 196:25,
201:14, 201:15,
202:6, 202:25,
203:2, 205:10,
205:21, 209:6
**sailed**
117:21
**same**
27:1, 30:24,
31:24, 36:22,
37:12, 48:17,
48:18, 48:25,
49:8, 77:4,
91:8, 101:22,
107:12, 107:15,
122:9, 122:23,
128:20, 129:3,
131:10, 131:11,
131:16, 132:11,
144:11, 144:12,
144:13, 158:5,
183:12, 190:12,
196:16
**sandwich**
137:5
**satisfy**
35:1, 35:11
**save**
108:14
**saved**
30:2, 107:3
**savvy**
22:5

**saw**
26:11, 26:12,
71:17, 72:4,
78:11, 102:6,
134:19, 134:21,
134:24, 146:25,
147:3, 147:5,
203:12
**say**
11:16, 22:13,
22:14, 34:13,
51:18, 54:4,
55:24, 58:9,
60:18, 62:20,
63:8, 70:3,
71:3, 71:13,
72:14, 76:2,
76:12, 76:14,
79:21, 79:25,
80:1, 80:13,
83:5, 86:24,
89:14, 92:25,
93:4, 93:10,
93:12, 107:1,
113:4, 120:23,
122:17, 122:25,
123:9, 124:12,
125:11, 127:9,
145:5, 147:19,
152:9, 152:19,
153:12, 160:10,
163:2, 164:2,
165:13, 168:4,
169:12, 169:15,
172:9, 177:15,
177:18, 178:6,
179:1, 181:24,
181:25, 182:19,
193:19, 200:20,
201:3, 204:6,
206:1
**saying**
22:12, 42:2,
44:23, 55:21,
62:21, 67:21,
73:13, 83:16,
101:2, 126:11,
127:22, 155:19,

163:15, 172:19,
174:8, 176:14,
192:19, 197:24,
201:11
**says**
11:18, 13:2,
13:9, 15:14,
16:9, 18:19,
31:3, 64:4,
66:25, 135:18,
137:4, 141:10,
141:22, 142:4,
147:14, 148:4,
155:17, 163:1,
164:6, 165:15,
167:14, 171:21,
177:1, 182:25,
189:22
**sbarro**
43:17, 106:19
**schtick**
93:13
**schultz**
15:7
**schwartz**
2:17
**scope**
190:18, 190:23
**screaming**
103:3
**sean**
41:16, 41:18
**second**
37:16, 48:21,
87:22, 124:10,
127:12, 162:8,
162:16, 165:22,
167:1, 167:2,
167:7, 167:8
**seconds**
15:13, 15:14
**secretary**
41:12
**secure**
20:6
**security**
39:19, 41:1,
41:3

**see**
13:2, 13:9,
15:20, 35:22,
60:11, 62:3,
64:22, 65:1,
65:2, 68:25,
69:1, 73:16,
78:15, 99:17,
111:5, 122:12,
131:4, 136:1,
136:3, 141:15,
141:23, 141:24,
155:17, 160:16,
165:12, 191:2
**seeing**
137:14
**seeking**
64:9, 117:2,
117:8, 120:13,
158:1
**seemed**
165:15
**seems**
171:18
**seen**
12:23, 14:20,
85:19, 134:6,
146:23, 148:1,
162:24, 163:5,
197:3, 205:24
**segregate**
163:10, 163:23
**segregated**
163:22
**seize**
118:14
**seized**
127:19
**selm**
30:8, 30:9,
30:13, 30:14
**semiretired**
116:8
**senate**
30:18
**senators**
191:2
**send**
22:11, 55:20,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    88

81:11, 178:18
**sends**
75:17
**sense**
75:8, 143:3,
173:13
**sent**
13:6, 73:12,
102:1, 102:8,
153:2, 171:23,
177:19, 177:21,
178:7, 179:10,
179:13, 179:20,
193:14
**sentence**
164:6, 165:13,
168:3, 168:14
**separate**
43:14, 108:12,
148:5, 156:1
**september**
1:24, 5:9,
27:20
**service**
15:10, 85:6
**servicemen**
33:7
**sessun**
110:17, 172:20,
172:23, 172:24
**set**
102:11, 132:20,
181:15, 182:8,
208:8, 208:16
**setting**
61:17
**settle**
96:25
**settled**
23:25, 77:24
**settlement**
133:24, 134:4,
146:12, 146:15,
148:25, 149:13,
177:20, 178:8
**seven**
29:8, 37:14,
64:19, 66:25,

102:1
**shake**
83:5
**shaky**
118:3, 184:2
**share**
53:11, 78:1,
80:13, 85:3,
124:14, 124:23,
125:5, 125:7,
128:12, 128:13,
129:9, 146:18,
164:9, 167:22,
169:3, 169:23,
195:14
**shared**
138:23, 149:1,
149:13, 150:23
**sharing**
47:10, 53:13,
53:15, 125:12,
128:9, 134:5,
135:4, 135:19,
138:1, 138:5,
138:6, 142:16,
143:5, 143:14,
144:18, 148:14,
148:23, 149:15,
149:19, 149:24,
150:21, 151:4,
170:12, 178:9,
180:5, 180:16,
181:1, 181:19,
182:14, 194:21,
194:24, 194:25,
199:13, 205:15,
206:6
**sheet**
13:9, 71:17
**shelly**
29:15
**shocking**
59:18
**shoots**
108:4, 108:5
**shorthand**
104:22
**shot**
43:24, 107:17,

107:24
**should**
35:14, 39:3,
80:13, 86:20,
90:19, 91:10,
92:15, 97:14,
121:11, 123:3,
125:3, 125:9,
148:22, 151:25,
152:2, 153:5,
167:22, 185:11,
199:17, 203:8,
205:13
**shouldn't**
62:8, 91:12
**show**
8:15, 32:10,
88:7, 121:20,
131:23, 135:15,
141:5, 146:21,
170:16, 170:21
**showed**
177:24
**showing**
12:22, 20:20,
27:9, 95:22,
100:18, 122:3,
124:4, 132:25,
137:10, 139:4,
155:10
**shown**
73:17
**shows**
91:3
**side**
30:13
**sign**
78:10, 95:11,
98:3, 116:16
**signature**
110:9, 110:10,
110:14, 112:12,
162:7, 162:9,
168:25
**signature-7dmpd**
208:18
**signature-k9lvk**
209:15

**signatures**
171:13
**signed**
22:10, 22:15,
33:13, 37:7,
44:8, 55:19,
55:23, 56:7,
81:6, 81:23,
82:1, 82:3,
88:17, 93:2,
93:9, 95:8,
97:6, 97:7,
98:9, 131:17,
135:19, 166:11,
182:14
**signing**
63:13, 91:6,
92:4, 94:11,
95:4, 95:7
**similar**
21:1, 122:18,
122:22
**simple**
182:18, 184:14
**since**
27:1, 32:1,
43:3, 187:1
**sir**
7:21, 8:13,
10:3, 10:7,
12:2, 16:18,
17:19, 19:10,
32:12, 33:16,
35:17, 35:20,
51:13, 51:23,
60:2, 64:3,
65:17, 66:23,
78:6, 79:8,
80:20, 85:5,
98:20, 100:3,
102:5, 103:14,
105:2, 110:2,
110:11, 124:8,
141:16, 141:24,
162:4, 162:16,
164:10, 164:17,
167:2, 168:22,
169:1, 169:7,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    89

169:12, 177:10,
186:14, 197:8,
201:25, 202:8
**sister**
56:3, 71:21,
81:22, 91:9
**sit**
179:19, 202:11,
203:18, 204:8,
204:22
**sitting**
76:1, 103:5,
113:16, 113:18,
140:2
**situation**
68:16
**six**
9:9, 64:2,
88:11
**skills**
209:8
**skip**
7:2, 26:21,
26:22, 32:20
**sleepy**
191:9
**slightly**
40:23
**slippery**
82:13
**slow**
49:22
**small**
36:16, 36:18,
138:7, 158:23,
185:20, 191:14,
203:16
**smaller**
35:24, 109:4
**smith**
98:22, 98:24
**sole**
9:8
**solely**
160:11
**some**
9:16, 14:13,
17:6, 24:17,

26:4, 29:2,
31:6, 32:21,
35:3, 35:9,
35:13, 36:3,
37:20, 43:1,
47:10, 48:7,
68:25, 71:1,
94:20, 96:7,
99:11, 99:17,
110:1, 111:2,
117:22, 118:9,
121:13, 121:14,
125:15, 125:18,
128:7, 129:24,
138:8, 138:9,
143:19, 146:5,
146:9, 152:4,
152:5, 156:1,
158:20, 159:1,
160:11, 160:17,
161:3, 166:9,
175:7, 179:7,
187:5
**somebody**
23:5, 23:15,
49:13, 63:17,
75:17, 106:12,
112:24, 134:15,
174:19, 206:9
**somehow**
155:23
**someone**
78:25
**something**
15:1, 15:2,
15:12, 20:7,
37:2, 38:12,
43:5, 46:8,
66:8, 72:10,
75:21, 81:14,
88:14, 113:12,
113:14, 116:17,
117:22, 123:6,
129:8, 143:3,
144:18, 154:8,
155:24, 164:22,
171:23, 171:25,
172:3, 174:1,

174:3, 180:1,
189:20, 189:21,
195:24, 200:4,
200:19
**sometimes**
101:8
**somewhere**
39:10
**son**
14:23, 43:19,
72:17, 72:19
**sorry**
19:3, 25:21,
28:13, 29:11,
34:11, 39:17,
42:19, 54:7,
57:10, 60:14,
86:3, 86:4,
95:19, 104:7,
111:6, 120:15,
132:6, 159:7,
161:16, 164:21,
167:5, 167:19,
169:9, 172:16,
174:5, 175:20,
175:21, 177:7,
184:6, 186:9
**sort**
129:24, 185:13
**sound**
86:10
**sounded**
74:23
**source**
69:25
**south**
63:8
**souther**
42:20
**southern**
42:14, 42:17,
51:12, 51:20,
117:7, 130:7
**sovereign**
47:22
**speak**
98:21, 100:25,
101:9, 113:9

**speaking**
149:7
**spearheaded**
47:1
**spebring**
18:15
**specific**
26:14, 28:10,
44:21, 110:3,
165:10, 172:8,
175:5, 186:16,
187:14, 188:25,
190:1, 190:2
**specifically**
25:15, 44:22,
117:25, 193:8
**specifies**
11:13, 11:14
**specify**
20:17, 171:2
**spector**
30:12
**spelled**
104:17
**spencer**
178:11
**spending**
58:10
**spent**
57:19
**split**
14:5, 92:13
**spoke**
18:14, 58:21,
99:22, 112:25,
145:20, 145:21,
146:4, 203:17,
203:19
**spoken**
99:11, 100:11,
146:1, 146:2
**spokesperson**
145:23, 145:25
**sponsored**
165:17
**sponsorship**
165:24
**spot**
202:14

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                    90

st
90:15
stage
175:10, 191:15,
192:8, 192:11,
193:5
stanebloom
96:18
star
22:8
start
8:12, 39:13,
41:21
started
56:6, 64:24,
94:10, 97:14,
203:24
starting
184:14
state
1:21, 5:16,
6:12, 10:12,
30:14, 66:10,
165:17, 165:24,
208:5
stated
96:24, 124:24,
176:12
statement
73:9, 73:12,
73:23, 74:3,
76:2, 76:10,
93:18, 126:14,
196:4
states
10:14, 127:18,
127:22
statute
187:1
stay
146:7
stayed
42:9, 49:21,
52:11, 130:18,
130:20, 148:20
steal
62:11, 78:18,
79:2, 81:13

stealing
62:10, 79:1,
97:9, 97:10
steinbaum
96:19
stenographic
1:16
steve
3:8, 6:19,
14:12, 15:17,
17:5, 19:21,
25:1, 29:3,
29:4, 29:20,
30:13, 31:23,
32:20, 33:10,
33:24, 34:3,
34:4, 34:7,
36:5, 37:8,
40:6, 45:22,
51:1, 51:8,
57:22, 63:7,
63:23, 68:15,
69:9, 69:10,
74:6, 74:14,
77:18, 78:10,
79:20, 81:12,
88:4, 92:6,
93:13, 97:12,
97:13, 97:14,
98:3, 114:24,
115:18, 155:7,
155:19, 155:21,
155:22, 155:24,
158:8
steve's
30:2, 51:5,
94:6, 94:14,
94:24, 156:1
steven
1:11, 2:15,
5:18, 6:5,
14:21, 30:8,
30:9, 30:14,
51:9, 77:11,
175:6
steven's
94:14
stick
189:20

still
9:12, 9:16,
28:24, 61:22,
61:23, 75:22,
84:16, 118:2,
132:21, 137:5,
153:8, 202:10,
203:4, 204:9,
204:17, 204:20,
204:23
stinebower
41:8
stole
200:13
stood
145:18
stop
62:6, 67:16,
133:14, 133:22,
149:3, 205:22
stopped
64:22, 65:1,
65:5, 67:7,
67:16, 68:4,
68:5, 182:23
stopping
33:24
stories
108:13, 108:16
story
18:25, 33:2,
107:21
stream
38:10, 39:11,
42:18, 42:21,
52:25, 102:13,
102:14, 102:18,
102:20, 102:21,
102:25, 117:4,
117:9, 118:2,
118:5, 118:6,
118:7, 118:8,
118:15, 120:14,
120:18, 121:2,
138:1, 138:24,
139:9, 140:25,
142:2, 143:18,
149:21, 150:21,

154:9, 154:10,
158:1, 158:5,
193:22, 194:5,
194:9
street
2:5
strengthened
174:14
stricken
88:19, 91:23
strict
93:25
strike
66:16, 88:12,
92:21, 165:16,
178:4
stripped
127:21, 143:22
strook
43:14, 44:6,
44:9, 44:11,
44:15, 45:1,
45:2, 45:5,
45:7, 45:8,
45:9, 45:11,
45:12, 45:13,
45:15, 46:4,
47:1, 47:7,
52:12, 52:14,
52:15, 53:10,
54:17, 109:2,
109:3, 109:7,
109:11, 110:16,
112:9, 112:19,
113:19, 114:7,
114:14, 115:25,
116:12, 117:17,
117:19, 117:20,
119:1, 119:8,
119:12, 121:1,
125:15, 126:23,
127:25, 128:11,
128:24, 129:6,
130:5, 130:15,
130:22, 130:23,
130:24, 139:22,
139:23, 139:25,
140:19, 140:20,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

91

144:7, 153:18,
153:20, 153:23,
153:24, 154:1,
154:14, 158:13,
158:21, 160:2,
172:14, 172:19,
172:20, 173:2,
175:25, 176:2,
193:9, 193:10,
195:10, 199:20,
199:21
**struck**
89:24, 92:19,
92:20
**stuart**
41:10, 41:11
**stuff**
52:24, 52:25,
53:2, 133:19,
147:8, 160:17,
168:18
**stupid**
76:16
**subject**
188:11
**subjects**
191:14
**submitted**
85:10
**subsequently**
39:5, 50:24
**substantial**
182:24
**substantially**
22:16
**successful**
67:7, 190:14
**sudden**
77:11, 84:8,
91:2, 98:8
**sue**
34:5, 35:3,
39:11, 97:2,
127:24, 199:25
**sued**
77:7, 77:9,
77:21, 127:23
**suffer**
75:17

**suffered**
197:10, 197:12
**suffering**
8:2
**suggesting**
146:17, 166:7,
172:18, 179:3,
203:8
**suggestion**
33:12
**suggestions**
35:3, 35:9,
35:13
**suggests**
171:22
**suing**
23:8, 101:14
**suit**
77:12
**suite**
2:19
**sunday**
28:20
**supposed**
17:11, 17:12,
20:5, 42:7,
52:16, 66:7,
70:21, 84:24,
119:24, 146:6,
148:17, 185:16
**supreme**
10:12, 10:14,
33:11, 49:8,
49:15, 50:5,
50:25
**sure**
7:4, 7:8, 14:9,
14:12, 16:7,
17:5, 18:14,
21:15, 24:16,
26:16, 28:17,
35:8, 37:19,
37:22, 50:23,
53:8, 54:25,
56:13, 57:4,
58:8, 62:23,
67:20, 75:23,
82:12, 82:15,

87:23, 88:9,
91:19, 94:6,
98:12, 102:22,
111:23, 112:20,
113:3, 113:4,
113:8, 113:9,
113:24, 114:1,
114:6, 114:17,
114:19, 116:3,
122:9, 123:23,
139:20, 156:7,
156:18, 156:22,
158:19, 162:14,
163:21, 165:11,
181:13, 182:5,
186:17, 187:11,
192:16, 192:18,
199:1
**surfaced**
59:23
**surprised**
68:2
**surprising**
36:15
**suspect**
140:21
**sweet**
81:17
**swidler**
106:7
**switch**
102:4, 191:13
**sworn**
6:9, 208:8

---
**T**
---

**t-r-i-a**
48:18
**table**
174:1, 174:3
**take**
7:12, 7:15,
9:23, 11:22,
14:19, 15:21,
19:25, 35:25,
47:11, 47:12,
52:16, 59:25,
60:10, 61:3,

64:8, 64:20,
64:21, 65:7,
67:5, 69:10,
69:12, 70:17,
70:21, 70:22,
71:3, 75:21,
76:22, 78:3,
78:7, 87:1,
87:4, 87:15,
89:10, 92:15,
92:22, 93:5,
93:18, 93:21,
93:22, 93:24,
94:1, 97:15,
98:10, 109:23,
133:2, 134:23,
135:17, 160:16,
161:5, 162:17,
163:9, 198:17,
206:1
**taken**
1:18, 6:20,
6:23, 47:15,
48:4, 48:6,
65:3, 71:1,
87:14, 98:15,
133:5, 160:20,
198:20
**takes**
108:4, 110:4
**taking**
5:13, 7:18,
61:2, 61:16,
94:19, 145:8,
180:12
**talk**
63:23, 96:6,
99:4, 122:13,
122:16, 123:4,
123:11, 123:20,
123:21, 148:17,
203:14
**talked**
36:14, 42:8,
55:12, 58:20,
79:13, 104:13,
114:20, 114:22,
114:24, 133:19,

146:13, 148:12,
148:19, 197:5
**talking**
18:21, 39:15,
44:25, 45:1,
57:25, 58:2,
58:18, 68:18,
73:15, 76:25,
77:20, 79:11,
80:24, 82:6,
89:16, 105:1,
108:7, 115:3,
115:24, 121:22,
121:25, 122:9,
123:22, 127:14,
149:20, 149:23,
150:7, 150:8,
151:1, 151:2,
152:10, 152:12,
170:13, 176:24,
190:2, 195:11
**talks**
114:23
**tangentially**
10:19, 56:23
**tat**
51:14
**taylor**
69:2, 135:25,
136:13
**team**
32:5, 72:20,
72:21, 185:19,
187:19
**ted**
49:12, 49:14,
49:24, 50:2
**television**
22:17, 23:2,
36:18, 36:20,
36:22
**tell**
7:6, 7:13,
22:22, 25:8,
25:13, 25:16,
30:5, 37:7,
53:19, 57:20,
108:13, 108:16,

112:17, 114:13,
122:6, 130:22,
130:23, 130:24,
130:25, 131:5,
150:1, 150:5,
150:10, 158:17,
186:21, 196:8,
196:19, 196:22
**teller**
28:11
**telling**
34:3, 55:22,
63:22, 114:18,
119:15, 179:21,
193:3
**ten**
15:13, 34:2,
163:13, 174:23
**term**
178:9
**terms**
16:23, 17:21,
27:1, 166:3
**terrible**
34:3, 44:17,
44:18
**terrorism**
105:12, 165:17,
165:24
**terrorist**
32:19, 191:7,
194:2
**test**
35:24
**tested**
36:20
**testified**
6:13, 95:1,
196:3
**testify**
94:22, 189:4,
189:8
**testifying**
168:7, 168:11,
168:12
**testimony**
65:4, 75:24,
79:5, 88:18,

91:20, 91:22,
94:7, 94:15,
94:19, 94:24,
196:2, 196:7,
199:11, 208:10
**th**
2:5, 2:11,
83:11, 90:15,
118:1
**thank**
7:12, 9:24,
10:4, 10:13,
19:8, 19:10,
77:11, 77:21,
84:25, 101:9,
105:3, 111:19,
129:20, 139:13,
150:13, 160:25,
161:1, 161:4,
161:7, 164:18,
168:18, 179:23,
186:6, 190:18,
201:6, 206:23
**thanks**
31:16
**theirs**
75:22
**themselves**
5:16, 31:20,
54:11, 201:20
**theory**
204:25
**therefore**
174:11
**thereto**
183:11
**thing**
18:4, 23:19,
23:23, 24:23,
31:24, 35:8,
36:22, 37:12,
44:14, 49:1,
49:8, 53:13,
57:24, 58:20,
60:25, 62:16,
64:15, 67:13,
67:14, 67:15,
77:4, 80:7,

82:1, 90:8,
90:9, 96:9,
97:11, 98:4,
98:6, 122:9,
123:8, 125:3,
129:3, 131:10,
142:14, 144:11,
144:12, 144:13,
144:14, 163:21,
163:22, 175:8,
177:10, 183:12,
185:3, 190:6,
190:17, 192:25,
200:18, 200:21,
205:23
**things**
8:9, 9:16,
24:18, 34:3,
37:6, 57:18,
102:17, 121:1,
146:3, 184:19,
184:20, 185:3,
185:13, 205:21
**thinks**
147:11
**third**
21:13, 23:24,
71:23, 91:11,
99:14
**thomas**
1:10
**thomasfay@aol**
179:14
**thornton**
41:16, 41:18
**thought**
23:17, 61:20,
62:12, 83:1,
84:10, 90:7,
100:6, 108:2,
137:1, 151:11
**thousand**
89:8
**threatening**
178:17
**three**
9:17, 14:5,
15:13, 17:14,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                               93

26:1, 28:24,
32:3, 64:23,
110:18, 163:12,
164:14, 176:5,
190:12
**through**
21:4, 30:7,
88:12, 147:10
**throughout**
193:17
**throwing**
186:23
**tidy**
131:25
**tim**
3:3, 5:20,
165:7
**time**
5:10, 14:25,
19:9, 24:15,
25:15, 25:19,
27:18, 27:25,
30:24, 31:14,
33:17, 34:11,
47:14, 47:17,
52:21, 55:2,
56:19, 56:24,
57:6, 57:13,
57:19, 57:25,
58:10, 58:16,
66:10, 66:17,
73:23, 76:4,
76:10, 80:8,
83:16, 90:24,
95:17, 98:14,
98:17, 99:15,
110:4, 124:22,
128:20, 133:4,
133:7, 160:19,
160:22, 173:6,
173:11, 176:24,
180:25, 181:1,
187:13, 187:16,
188:13, 198:19,
198:22, 203:8,
203:10, 207:5,
207:6
**timeframe**
120:21

**timeline**
181:13, 184:2,
184:3
**times**
18:19, 18:23,
21:16, 34:2,
75:15, 99:9,
107:12, 146:1,
185:25
**tired**
109:22
**today**
5:11, 6:7,
7:20, 12:8,
40:15, 55:5,
63:19, 68:9,
74:14, 74:15,
76:1, 94:6,
94:16, 95:1,
103:5, 108:17,
113:16, 113:18,
132:16, 140:2,
179:20, 202:11,
203:12, 203:18,
204:4, 204:8,
204:22
**today's**
5:9
**together**
17:11, 20:1,
31:22, 32:2,
32:3, 46:17,
47:9, 53:23,
98:7, 109:18,
112:11, 126:20,
126:21, 143:21,
154:4, 154:6,
155:12, 155:23,
156:3, 173:25,
174:14, 175:18,
175:19, 175:22,
175:25, 176:15,
176:18, 178:20,
185:19, 190:7,
190:10, 190:12,
199:20, 199:22
**told**
20:25, 24:13,

25:2, 25:25,
26:1, 26:13,
36:4, 36:6,
39:5, 43:13,
52:23, 53:3,
64:16, 65:5,
65:6, 67:16,
70:4, 70:5,
70:6, 70:9,
70:19, 72:2,
72:4, 72:23,
89:4, 89:6,
103:10, 113:1,
113:11, 113:23,
123:10, 123:13,
123:18, 123:19,
191:12, 193:15,
194:13, 195:17,
196:17, 200:18,
200:24, 201:7,
201:13, 203:4
**tom**
15:16, 18:15,
19:18, 20:9,
25:1, 26:10,
26:13, 26:20,
26:23, 28:7,
28:20, 31:23,
32:21, 33:11,
33:24, 34:3,
34:4, 35:4,
37:14, 39:2,
39:5, 45:22,
47:6, 49:14,
51:9, 52:15,
53:3, 53:9,
57:21, 61:1,
61:17, 62:15,
65:6, 68:15,
69:10, 70:22,
73:12, 74:6,
79:20, 81:14,
84:10, 89:7,
97:12, 98:2,
103:2, 103:9,
118:24, 119:5,
121:3, 121:23,
122:10, 122:17,

122:25, 123:7,
123:9, 123:10,
123:15, 123:16,
123:20, 145:11,
145:12, 155:23,
155:25, 156:1,
158:19, 158:24,
159:1, 160:1,
160:3, 175:6,
192:19, 193:14,
193:15, 205:25
**tom's**
77:12, 119:17
**tomorrow**
133:16, 133:17
**ton**
126:20
**took**
14:21, 19:7,
21:4, 23:9,
34:7, 38:10,
52:15, 61:4,
70:24, 71:14,
90:5, 93:23,
94:3, 186:2,
194:18
**top**
86:1, 164:15,
171:18, 171:20
**topics**
102:4
**tops**
86:5
**tornado**
200:3
**torturing**
33:6, 33:7
**total**
115:2
**totally**
14:11, 17:4,
57:23
**touch**
189:3
**towers**
54:19, 144:15
**track**
107:23

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

94

tracy
1:18, 6:7,
208:3, 208:20
transcriber
209:1
transcript
209:4, 209:6
treasurer
41:12
tremendous
59:16
trenton
30:10
tria
48:18
trial
10:20, 20:10,
189:4, 189:8
tried
23:14, 39:9,
44:6, 81:20,
117:20, 119:1,
119:6, 119:8,
119:10, 119:12,
121:9, 122:11,
122:12, 123:4,
127:17, 178:19,
181:15, 204:4,
204:5
trillion
35:4, 35:5
trillions
62:12
trip
80:1
true
73:23, 76:4,
76:9, 152:25,
208:9, 209:6
truthfully
101:8
try
44:21, 56:11,
58:6, 81:13,
96:3, 99:17,
100:23, 101:3,
101:9, 110:2,
122:11, 130:14,

147:10, 150:17,
159:8, 173:6,
198:24, 199:1
trying
30:19, 30:25,
31:1, 34:4,
34:10, 38:11,
44:24, 45:2,
45:21, 52:22,
54:11, 56:20,
57:7, 57:22,
58:11, 59:13,
60:12, 82:5,
83:24, 95:18,
97:2, 97:3,
117:21, 118:14,
127:2, 127:3,
128:1, 176:8,
176:15, 178:24,
181:14, 184:25,
185:3, 186:8,
188:11, 191:20
turn
162:6, 162:15,
165:12, 166:25
turns
72:5
two
9:18, 15:22,
28:23, 32:2,
37:5, 66:15,
89:8, 98:10,
111:1, 111:11,
111:13, 111:15,
112:8, 121:21,
122:4, 141:11,
141:12, 141:17,
162:7, 185:3,
185:19, 191:13,
203:12, 204:7
two-fold
165:14
two-thirds
61:19, 62:11,
71:21, 71:24,
73:6, 78:11,
78:13, 82:7,
90:18

type
46:10, 46:12

**U**

ubae
38:14, 38:16
uh-huh
13:11, 27:15,
79:10, 124:6,
124:11, 124:21
ultimately
62:1
um
18:5, 29:20,
35:2, 36:3,
43:25, 70:22,
106:21, 109:15,
122:11, 123:8,
134:18, 158:25,
173:24, 194:1
unbeknownst
24:25, 63:7
unbelievable
72:9, 107:4,
108:16
unclear
138:17
under
7:22, 66:10,
82:16, 173:19,
176:10, 185:13,
185:24
undermining
103:3, 123:7
underneath
167:13
understand
7:5, 7:6, 7:19,
7:24, 8:4, 8:6,
18:24, 22:9,
70:14, 75:24,
79:24, 83:8,
91:6, 91:19,
92:5, 92:18,
94:5, 104:25,
105:4, 118:13,
122:21, 127:12,
143:17, 150:1,

150:2, 150:3,
150:5, 150:11,
150:24, 152:18,
175:16, 176:14,
184:8, 193:25,
201:11
understanding
46:1, 46:3,
69:17, 69:20,
70:16, 71:19,
72:11, 72:13,
74:13, 78:17,
79:13, 79:14,
83:17, 94:12,
94:16, 94:24,
116:19, 118:4,
118:6, 122:18,
130:4, 136:7,
137:23, 138:4,
143:23, 144:17,
150:20, 151:17,
157:24, 162:20,
164:11, 168:5,
181:16, 187:18,
197:25, 199:4,
199:10
understands
150:11
undertake
14:4, 15:18
unfortunately
43:18
united
10:14, 43:21,
106:22, 127:18,
127:22
universe
129:12
unjustly
201:20
unless
75:9, 121:22
unlikely
92:6
until
15:17, 24:25,
46:15, 53:3,
71:16, 73:16,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

95

83:8, 94:14,
118:23, 121:3,
128:2, 130:8,
132:19, 134:22,
163:12, 163:14,
165:4, 184:17,
186:19, 193:14,
193:15, 194:14,
204:4
**unusual**
162:23
**upper**
141:11
**use**
104:25, 157:1
**using**
60:19, 104:22,
104:23

---
**V**
---

**vague**
188:16
**vaguely**
26:22
**valor**
69:1, 87:25,
178:11
**valuable**
168:8
**various**
137:11, 149:16,
150:22, 191:2
**vast**
7:2
**venture**
148:7, 184:9
**versa**
81:25
**version**
88:10
**versus**
5:6
**vetoed**
33:9, 33:10
**vice**
49:19
**victim**
36:25, 194:2

**victims**
116:23, 148:8,
150:23, 165:3,
165:23, 166:3,
166:8, 166:22,
194:4, 200:5
**video**
5:10, 5:12,
26:8, 26:14
**videographer**
3:7, 5:3, 5:11,
6:6, 47:13,
47:16, 98:13,
98:16, 133:3,
133:6, 160:18,
160:21, 198:18,
198:21, 207:3
**videotaped**
5:4
**vilret-avocats**
41:24, 42:1
**visa**
158:15, 159:4,
159:11
**vise**
81:25
**vision**
36:13, 190:13
**visited**
20:14, 20:21
**visiting**
84:7
**vogel**
38:1, 48:25,
52:16, 52:17,
52:20, 52:23,
103:25, 109:18,
116:22, 116:25,
191:25, 192:1,
192:3
**voice**
5:15, 7:8,
51:6, 51:8,
51:10, 143:9,
161:20, 203:25
**volunteered**
148:3
**volunteering**
147:8

**voted**
106:11

---
**W**
---

**wait**
16:13, 27:19,
31:10, 60:5,
100:1, 100:3,
100:5, 113:22,
136:23, 140:17,
153:6, 165:4,
167:16, 186:19
**walk**
8:8
**wall**
36:9, 40:2,
119:23, 120:1,
120:3, 191:16,
193:7, 193:17
**want**
18:17, 19:9,
22:14, 31:24,
32:1, 44:7,
55:23, 60:3,
60:9, 61:6,
70:8, 71:1,
72:23, 74:25,
75:15, 75:23,
76:23, 77:5,
77:6, 77:9,
85:8, 86:7,
91:19, 106:5,
110:5, 124:9,
129:17, 131:3,
153:8, 155:19,
157:7, 158:10,
160:16, 161:25,
173:1, 176:13,
178:9, 184:5,
193:1, 200:24,
201:1, 201:21,
201:23, 202:21,
202:23, 206:1
**wanted**
9:21, 31:21,
33:8, 33:11,
35:22, 35:23,
39:1, 44:9,

49:24, 50:2,
71:25, 75:13,
80:16, 88:16,
95:6, 107:22,
131:14, 137:7,
151:18, 151:24,
152:3, 165:9,
172:25, 173:2,
175:18, 175:19,
175:24, 185:4,
190:15, 199:18,
205:14
**wants**
80:1, 157:6,
157:7
**washington**
18:6, 18:12,
24:14, 24:19,
24:24, 25:3,
25:22, 32:9,
32:10
**water**
95:15
**way**
14:13, 25:8,
25:12, 42:2,
43:2, 121:10,
123:5, 140:3,
142:2, 165:18,
168:21, 178:15,
178:22, 197:25,
198:25, 200:23,
203:7, 208:13
**ways**
14:5
**we'll**
7:2, 9:23,
34:24, 37:18,
47:12, 62:19,
133:22
**we're**
35:3, 35:6,
35:7, 39:11,
47:13, 61:25,
63:12, 64:15,
71:4, 73:20,
77:20, 82:6,
92:23, 122:9,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                    96

127:24, 129:13,
155:6, 156:3,
176:24
**we've**
93:4, 102:24,
104:22, 104:23
**weak**
75:4
**website**
51:10, 203:24
**wednesday**
1:23
**week**
18:15
**welcome**
96:9
**went**
15:5, 15:10,
15:15, 17:23,
23:24, 24:15,
24:19, 24:24,
30:6, 32:3,
37:21, 38:21,
46:16, 49:16,
53:15, 55:19,
59:14, 61:23,
63:8, 63:20,
63:21, 65:13,
70:24, 79:20,
81:20, 81:25,
94:7, 94:9,
96:12, 104:8,
104:11, 129:8,
138:7, 138:8,
138:9, 138:12,
143:6, 146:16,
185:18, 190:16
**weren't**
29:1, 49:2,
49:3, 76:15,
92:11, 115:4,
170:14, 192:9,
198:2, 198:3,
199:6, 199:7
**west**
2:19
**whatever**
14:9, 17:1,

17:6, 17:7,
19:21, 46:7,
53:1, 61:25,
65:13, 65:16,
72:1, 73:6,
74:10, 84:4,
84:6, 86:6,
102:22, 125:13,
126:21, 145:2,
148:13, 152:6,
159:2, 173:3,
174:24, 182:5,
184:16, 185:10,
191:8, 192:7,
195:14
**whatsoever**
13:18
**wheeler**
155:21
**whenever**
65:16, 186:22
**whereby**
16:20
**whereof**
208:16
**whether**
20:25, 73:22,
76:2, 76:9,
89:17, 92:15,
101:20, 113:1,
114:11, 132:11,
137:24, 140:20,
144:18, 144:24,
155:16, 156:19,
157:8, 157:17,
157:20, 157:25,
174:20, 174:21,
175:15, 202:16,
203:19, 205:18
**whiz**
96:18, 121:6
**whoever**
38:10, 63:15,
176:3
**whole**
22:10, 44:14,
96:9, 98:4,
98:5, 107:21,

123:7, 144:9,
177:10, 186:11,
186:20, 190:17
**wife**
9:10, 106:18,
115:19
**wife's**
49:16
**willing**
78:18
**win**
11:23
**wisconsin**
2:19
**within**
28:23, 208:5
**without**
15:13, 70:3,
70:13, 98:4,
166:11, 166:12
**witness**
4:3, 6:8, 6:11,
69:22, 85:9,
85:17, 94:22,
111:12, 111:14,
130:2, 136:25,
141:7, 141:10,
147:25, 149:11,
167:18, 170:4,
171:12, 198:17,
208:7, 208:10,
208:16
**wiz**
55:3, 56:18
**woman**
22:4, 23:10,
34:9
**woods**
30:16, 31:5
**word**
19:12
**words**
161:14, 161:17,
167:21, 169:7,
174:8
**work**
10:15, 12:7,
17:21, 18:1,

18:2, 20:1,
20:8, 31:4,
31:21, 31:22,
31:25, 34:18,
34:23, 36:21,
37:21, 40:17,
40:20, 46:11,
46:12, 109:17,
113:20, 114:9,
143:21, 143:22,
183:11, 187:20,
188:25, 190:7,
190:19, 190:23,
191:1, 199:21
**worked**
15:6, 23:16,
26:23, 34:9,
91:5, 96:13,
173:25, 188:9
**working**
23:10, 32:2,
55:14, 56:11,
56:15, 57:8,
57:12, 62:9,
84:5, 90:23,
128:24, 129:1,
154:4, 154:6,
184:22, 185:15,
190:10, 199:22
**world**
123:6
**worried**
81:12
**worth**
24:4
**wouldn't**
50:1, 74:19,
81:24, 93:9,
98:3, 122:13,
122:16, 123:4,
125:17, 125:21,
125:24, 144:11,
156:13, 174:2
**wound**
23:25
**wrap**
186:8
**write**
49:5, 60:12,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

97

79:21, 79:23,
96:4, 100:24,
123:3, 168:24,
169:1
**writer**
50:18
**writing**
12:19, 179:15
**written**
10:24, 11:3,
172:1, 172:4
**wrong**
64:14, 64:15,
79:22, 80:8,
80:10, 80:11,
80:14, 149:16,
153:6
**wrote**
81:10, 103:2,
121:23, 122:2,
122:25, 123:9,
123:15, 123:16,
123:25, 124:18,
131:18, 168:1,
168:23

---

**Y**

**yeah**
9:22, 15:24,
16:2, 18:17,
23:9, 27:24,
29:15, 29:25,
35:15, 48:17,
48:19, 51:21,
55:11, 59:23,
60:8, 60:17,
63:10, 69:4,
72:25, 75:25,
84:6, 84:16,
86:23, 87:9,
88:24, 89:15,
89:25, 90:18,
91:21, 91:24,
96:1, 96:17,
100:10, 101:11,
104:21, 107:10,
107:13, 108:20,
109:12, 110:21,

111:24, 112:20,
113:3, 114:10,
116:3, 122:23,
122:24, 123:24,
126:13, 127:4,
131:20, 131:22,
133:15, 134:14,
145:13, 145:24,
155:1, 159:10,
170:6, 196:19
**year**
15:20, 183:15,
183:21, 186:17,
186:22, 187:15
**years**
12:11, 33:20,
58:2, 58:5,
87:15, 101:4,
102:1, 107:6,
114:23, 163:13,
182:23
**yetti**
112:23
**york**
1:2, 2:12, 5:8,
10:6, 10:10,
18:19, 18:23,
42:14, 42:17,
42:20, 45:10,
51:12, 51:20,
108:22, 117:8,
130:7
**young**
22:7, 22:8,
31:3, 55:18,
58:21, 59:13,
91:10, 121:23,
122:1, 123:22,
123:25, 124:5,
131:12, 164:23,
178:17, 193:4,
204:5
**yourself**
36:8, 60:13,
96:3, 100:23,
110:2, 114:14,
177:16

---

**Z**

**zaprexa**
200:25

**zero**
28:9, 28:13,
58:14, 58:17
**zeroed**
28:11
**zill**
71:22
**zillions**
62:18
**zisserman**
57:20
**zuckerman**
15:6

---

**$**

**$175,000.00**
24:2
**$250**
192:20, 192:22
**$250,000.00**
39:7
**$59,947,508.00**
141:23
**$7,923,503.82**
139:8

---

**0**

**0/9/23**
209:18
**0100**
2:13
**06**
47:17
**07**
84:22, 95:23
**08**
171:21
**08648**
1:23

---

**1**

**1**
47:17, 98:14
**10**
133:1, 133:24
**100**
4:16, 20:10,
90:19

**101**
62:5, 71:19,
78:16, 82:6,
82:20, 85:4,
86:12, 90:9,
90:16, 143:2,
151:11, 162:12
**10123**
2:12
**109**
4:17
**11**
1:25, 5:10,
15:24, 16:3,
27:20, 106:8,
134:8
**12**
4:12, 47:14,
171:21
**124**
4:18
**131**
4:19
**137**
4:20
**139**
4:21
**1425036110**
1:3, 5:8
**150**
62:4, 71:20,
78:16, 82:6,
82:22, 82:23,
151:11, 152:1
**155**
4:22, 90:17
**16**
46:7, 52:25,
53:1, 198:19
**161**
4:6, 4:23
**1610**
46:6
**17**
171:21
**171**
4:24
**177**
4:25

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023

98

**18**
97:5, 155:13,
160:19
**19**
131:24, 132:17
**19103**
2:6
**1999**
16:5

---
**2**
---

**2**
133:4, 133:7
**20**
1:24, 2:5, 5:9,
84:22, 95:23,
115:9, 171:21,
197:10
**2000**
2:5, 12:13,
16:3, 16:19,
25:6, 54:24,
55:6, 57:12,
79:14
**2001**
12:13, 16:1,
27:14, 27:19,
27:21, 54:24,
55:6, 57:12,
58:9, 65:15,
83:14
**2007**
81:4, 83:11,
84:22, 86:24,
87:18, 95:23,
102:2, 120:23
**2008**
103:15, 171:21,
176:25
**2010**
120:23, 177:19,
178:7, 179:2,
179:11
**2011**
124:20, 124:23
**2012**
73:12, 73:24,
76:3, 76:11,

135:19, 180:6,
180:15, 181:1,
181:16, 181:20,
181:22, 182:10,
182:13, 183:2,
183:8, 183:15,
183:22, 186:13,
186:24, 188:14,
189:11
**2017**
48:5, 84:20,
111:9
**2019**
111:4, 111:10,
111:16, 111:18,
112:15
**2020**
111:4, 111:10,
111:14, 111:18
**2023**
1:24, 5:9,
208:17
**207**
90:9
**20814**
2:20
**20852**
3:5
**21**
28:22, 37:14,
90:15
**212**
2:13
**215**
2:7
**2150**
2:7
**22**
198:22
**23**
1:24, 5:9
**24**
47:14, 78:5,
78:7, 80:18,
83:11, 84:1,
86:22, 90:4,
92:25
**25**
135:15, 136:2

**250**
39:1
**27**
4:13, 81:3,
83:11, 90:15
**2707**
2:21
**29**
207:5, 207:6
**299**
2:7

---
**3**
---

**3**
160:19, 160:22
**300**
33:5
**301**
2:21
**32**
133:4, 160:22
**33**
163:16
**3rd**
208:17

---
**4**
---

**4**
198:19, 198:22,
207:5, 207:6
**4.3**
86:7
**40**
88:8, 90:13,
91:23
**42**
4:11, 8:14,
8:16, 8:18,
15:23, 60:1,
67:2, 132:13,
135:16
**43**
4:12, 12:21,
12:23, 13:8,
79:9
**44**
2:11, 4:13,
27:8, 27:9

**45**
1:25, 4:14,
5:10, 85:13,
85:14, 141:6,
141:8
**450**
2:11
**46**
4:15, 95:21,
95:22
**47**
4:16, 100:17,
100:19, 101:10,
101:21
**48**
4:17, 109:20,
109:23
**49**
4:18, 124:3,
124:4, 164:20
**498**
27:12

---
**5**
---

**50**
4:19, 62:7,
78:19, 115:9,
131:2, 151:11,
200:13
**500**
143:2
**51**
4:20, 98:14,
133:7, 137:9,
137:10
**52**
4:21, 12:11,
139:3, 139:4
**53**
4:22, 155:9,
155:11, 157:9
**54**
4:23, 161:22,
161:25
**55**
4:24, 78:16,
171:4, 171:7
**558**
86:9, 142:23,

Transcript of Allen Rothenberg, Esquire
Conducted on September 20, 2023                                99

143:4, 148:13
**56**
4:25, 177:3,
177:12
**563**
2:13
**5th**
153:10

**6**

**6205**
3:4
**650**
143:20, 146:12,
146:14, 148:15,
149:12, 153:10,
153:14, 193:20,
194:8
**655**
118:1
**656**
2:21
**6th**
177:19, 178:7,
179:2

**7**

**7315**
2:19
**7th**
2:11

**8**

**800**
2:19
**83**
101:4
**85**
4:14
**8713**
150:9
**8772**
187:2

**9**

**95**
4:15
**997**
1:22, 5:13