# Exhibit 13

**ARBITRATION PROCEEDING BEFORE JAMS**

| | | |
|---|---|---|
| ALLEN L. ROTHENBERG, Esq., *et al.* | * | |
| Claimants | * | |
| | * | JAMS Ref. No.: 1425036110 |
| v. | * | Hon. Stephen Crane, Arbitrator |
| THOMAS FORTUNE FAY, Esq., *et al.* | * | |
| Respondents | * | |

## MOTION TO RECONSIDER INTERIM AWARD

Respondents Steven R. Perles and Perles Law Firm, P.C. (hereinafter referred to collectively as the "Perles Respondents"), by and through undersigned counsel, hereby move for reconsideration of the Interim Award issued April 10, 2025. In support of their request for reconsideration, the Perles Respondents state as follows.

### I.    ARGUMENT

**A. The Interim Award fails to address that Claimants' requested relief falls outside the scope of the Arbitration Agreement.**

In opposition to Claimants' request for sanctions, the Perles Respondents pointed out that the relief requested in the Claimants' Motion was outside the scope of the Arbitration Agreement. Claimants did not contest this in their reply. Nor did the Interim Award address the fact that <u>the scope of the Arbitration is limited by the language of the Arbitration Agreement</u>. Instead, the Interim Award quoted language from the Demand for Arbitration, which is not the same as the Arbitration Agreement and which exceeds the scope of that Agreement. The Claimants' allegations, however, cannot expand the scope of this Arbitration as it was agreed to by the Parties. The Respondents would not have, and did not, consent to open-ended jurisdiction in this Arbitration for all future complaints by Rothenberg about his fees. Respondents certainly would not have submitted themselves to claims by Rothenberg that would impose financial penalties on

them for communicating with the clients about ethical misconduct, or that would require them to

indemnify Rothenberg for such misconduct.

The controlling portion of the Arbitration Agreement reads:

"The Fee Dispute is over whether Rothenberg is entitled to compensation from Fay
and Perles caused by and/or related to sharing agreements between the plaintiffs
and/or their attorneys in the Beirut Marine Cases (the 'Beirut Marine Plaintiffs')
and Marine victim and family plaintiffs (not represented by Rothenberg) and/or
their attorneys in other actions against the Islamic Republic of Iran (collectively,
with the Beirut Marine Plaintiffs, the 'Marine Plaintiffs')."

Arbitration Agreement, Recital A. Furthermore, Section II.A. of the Arbitration Agreement

specifically limits the scope of this Arbitration. It reads, in pertinent part:

"The Parties stipulate and agree to submit the Fee Dispute . . . to neutral, binding
arbitration at JAMS . . .. Unless otherwise agreed in a writing signed by all of the
Parties, the Fee Dispute and any disputes arising out of this Agreement shall be the
only claims arbitrated under this Agreement."

Even taken at face value, the Arbitrator's inference that "Respondents are cloaking themselves in

the Rules of Professional Conduct to steal the Claimant's fees" is facially not part of the Fee

Dispute over whether Rothenberg is "entitled to compensation from Fay and Perles caused by

and/or related to sharing agreements between the plaintiffs and/or their attorneys in the Beirut

Marine Cases" (emphasis added).[1]

The Arbitrator asserts, without further explanation, that Respondents' communications

with their clients "undermine" his ability to provide declaratory relief in the event he finds

Respondents improperly diluted Rothenberg's fees in future distributions subject to a sharing

agreement. Interim Award at 14-15. Assuming *arguendo* that the sanction was properly imposed,

the Interim Award should at the very least be modified to limit the indemnification of Rothenberg

to the "delta" to his fee caused by the existence of a sharing agreement. The USVSST payments,

---

[1] The Perles Respondents contend that this inference is contrary to evidence and exceeds the authority granted the
Arbitrator by Rule 29.

to which the Interim Award explicitly applies, <u>are not even subject to a sharing agreement</u>. *See* Declaration of Steve Perles attached hereto as Exhibit A, ¶ 15. A sanction for "undermining" the Arbitrator's jurisdiction over a demand for declaratory relief should not <u>exceed the value of the demanded relief by, as here, orders of magnitude</u>.

As to the dispute over the allocation of fees <u>already paid</u> to Respondents in Clearstream I, the Arbitrator does not even attempt to explain how the client's termination of Rothenberg would affect his ability to order <u>Respondents</u> to disgorge money to Rothenberg, nor can Respondents imagine such explanation. As such, the Interim Award must be reconsidered.

### B. The Interim Award's inference that Fay and Perles are attempting to "steal the Claimant's fees derived from the plaintiffs he represents in the <u>Peterson</u> Action" is contrary to evidence.

Contrary to the Arbitrator's "inference," the Perles Respondents never had any intention of receiving any additional fees as a result of the clients' dispute with Rothenberg. When the Perles Respondents learned that certain <u>Peterson</u> plaintiffs had terminated Rothenberg, and that Rothenberg viewed himself as still entitled to fees from those clients, they understood that this dispute between Rothenberg and the clients would likely be resolved by a court of competent jurisdiction, and that there was a likelihood that court would find that Rothenberg's impermissible conduct merited some diminution in his future entitlement to fees. *See* Exhibit A, ¶ 8-14.

The Perles Respondents immediately concluded that they wanted nothing to do with whatever fees ended up not going to Rothenberg. *Id*. Instead, the Perles Respondents proposed that any fees that would otherwise have been paid to Rothenberg would be placed into a segregated account and used to defray future *client* expenses (not attorney fees) related to future collection efforts, for the benefit of all of the plaintiffs. *Id*. The <u>Peterson</u> plaintiffs have already spent millions in expenses on experts and witnesses, and this money would help ease that burden during future

3

collection efforts. *Id*. The Perles Respondents then consulted ethics counsel regarding the establishment of such an account, and ethics counsel advised that such a disposition of fees that otherwise would have gone to Rothenberg was ethically appropriate. *Id*; *See also* Letter from Jack Marshall attached hereto as **Exhibit B**.[2] Thus, even if Rothenberg's recovery was reduced, the Respondents' recovery would not be increased.

Moreover, Respondents have taken appropriate measures to ensure that Rothenberg receives every cent of the fees he is entitled to under the law. At Respondents' request, with regards to the USVSST catch-up payments, Epiq has agreed to release any fees due to Rothenberg from clients that do not dispute his representation, and in the case of disputes, to escrow funds equal to Rothenberg's full claimed fee pending resolution of that dispute by a court of competent jurisdiction. If Respondents intended to steal Rothenberg's fees, they would not have recommended these measures. Given that Respondents clearly did not intend to "steal" fees from Rothenberg, the sanctions imposed under the Interim Award must be reconsidered.

### C. The Arbitrator never enjoined Respondents from communicating with their and Rothenberg's mutual clients.

The Interim Award states that in Order No. 8, "[t]he Arbitrator also enjoined the Respondents from communicating any adverse information about the Claimant to any of the <u>Peterson</u> plaintiffs or their counsel until the Final Award is issued in this arbitration." Interim Award at 5. Yet there is no language in Order No. 8 that states, or even implies, that the Respondents cannot communicate adverse information about the Claimant to any of the <u>Peterson</u> plaintiffs, whom the Respondents also represent. Order No. 7 similarly lacks any such prohibition. Even if there was such a prohibition, Claimants have not offered any evidence that the Perles

---

[2] Exhibit B is, among other things, Jack Marshall's attempt to memorialize his conversation with counsel for Perles Respondents on February 17, 2025, when Perles Respondents inquired about the ethical implications of their suggestion that any money not paid to Rothenberg be segregated and used to defray future expenses for the plaintiffs.

Respondents have communicated any adverse information about the Claimant to any of the <u>Peterson</u> plaintiffs nor encouraged anyone else to do so. Nor does any such evidence exist, as the Perles Respondents have not communicated with the <u>Peterson</u> plaintiffs about Rothenberg since the April 16, 2024 letter. Exhibit A, ¶ 4.

### D. The Perles Respondents violated no order and no negative inference can be drawn that would support an award of sanctions.

Even if the Arbitrator had ordered Respondents not to communicate with the clients, the Arbitrator acknowledges that there is no evidence in the record that the Perles Respondents carried out any "clandestine communications in violation of [Order No. 7]" besides the fact that the April 16, 2024 letter "was sent on Fay and Perles letterhead." Interim Award at 15-17.[3] Both Order No. 7 (May 15, 2024) and Order No. 8 (December 7, 2024) were issued <u>after</u> the April 16, 2024 letter, so Perles' participation in drafting the letter cannot possibly have violated either Order.

Instead, the Arbitrator merely notes that Mr. Perles "never disclaims knowing that [Ms. Fay's subsequent] communications were occurring or even instigating or encouraging them." To be clear, Mr. Perles did not know these communications were occurring, and did not instigate or encourage them. Exhibit A, ¶ 5-6. Based on the advice of ethics counsel, Mr. Perles co-authored the April 16, 2024 letter. *Id.*, 2-3. Subsequently, the Perles Respondents have not communicated with Rothenberg's current or former clients about him in any manner. *Id.,* ¶ 4. Thus, the Perles Respondents have not violated Order No. 7 or 8, and sanctions against the Perles Respondents are not supportable.

---

[3] The naked assertion that "[Fay's] follow-up communications clearly were made on behalf of Fay & Perles" is conclusory, made entirely without explanation or evidence, and contrary to the evidence presented by the Perles Respondents with this Motion.

Rule 29 authorizes "appropriate sanctions for the failure of a Party to comply with . . . any order of the Arbitrator." It does not authorize sanctions for failing to "disclaim knowledge" of another party's alleged failure to comply with an order. Since the Perles Respondents did not violate Order No. 7, 8 or any other order, and did not instigate or encourage Ms. Fay's communications with the <u>Peterson</u> plaintiffs, the Perles Respondents cannot be sanctioned. In other words, the Arbitrator cannot infer the predicate fact authorizing negative inferences under Rule 29 solely on the basis of an inference itself authorized under Rule 29. To do so would be circular and arbitrary.

### E. Even assuming Rule 29 applies, the Interim Award exceeds the authority granted under Rule 29.

The sanctions available under Rule 29 must be "appropriate" and may include:

(1)    assessment of Arbitration fees and Arbitrator compensation and expenses;

(2)    assessment of any other costs occasioned by the actionable conduct, including

> (a) reasonable attorneys' fees;
>
> (b) exclusion of certain evidence;
>
> (c) drawing adverse inferences,
>
> (d) or, <u>in extreme cases</u>, determining an issue or issues submitted to
>
> Arbitration adversely to the Party that has failed to comply.

Numerals and emphasis added. Assuming, *arguendo,* that both Respondents violated an order, Rule 29 does not authorize the Arbitrator to award "payment to the Claimant of any shortfall in attorneys' fees from the <u>Peterson</u> plaintiffs" due to his "discharge of representation."

If, for example, Client A refuses to consent to Epiq paying Rothenberg fees from their award, and Rothenberg asserts an attorney's lien that is denied in whole or in part by a court of competent jurisdiction due to his conflicts of interest, under the Interim Award, Respondents must

indemnify Rothenberg for what a court order denied him <u>due to his own misconduct</u>. If Client A has refused the payment of fees without reason then Rothenberg is paid his full fee out of the escrow maintained by Epiq. *See* Section B *supra*. Assuming the ethicist consulted by Respondents is correct, and that Rothenberg is found to not be entitled to fees from *any* of the Peterson clients (*See* Exhibit B), the Interim Award could require Respondents to indemnify Rothenberg for tens of millions of dollars in fees that a federal court disqualifies him from receiving.

Before going any further, it must be noted that such an arrangement is not "appropriate" within the meaning of Rule 29 as a sanction for what is, at worst, the Fay Respondents' failure to notify Rothenberg of her communications with the clients (even though Ms. Fay apparently did encourage the clients to notify Rothenberg). The sanctions merit reconsideration for at least three reasons: (1) their vast disproportion, (2) their entry without any opportunity for hearing or discovery, and (3) their adjacency to Respondents' ethical obligations to inform the clients of Rothenberg's conflicts of interest—a subject matter that the Arbitrator notes is beyond his jurisdiction (Interim Award at 13).

Additionally, this improvised, multi-million dollar indemnification obligation fits into none of Rule 29's enumerated forms of sanction: this arrangement is clearly not an "assessment of Arbitration fees and Arbitrator compensation and expenses," nor "reasonable attorney's fees," nor "exclusion of certain evidence." Nor is it a determination of "issue or issues submitted to Arbitration adversely to the Party that has failed to comply." The issue of whether Respondents individually or collectively acted appropriately in notifying the clients of Rothenberg's conflicts of interest and advising them of their rights has not "been submitted to Arbitration." As discussed in Section A, *infra*, this question is well outside the scope of the Arbitration Agreement and has no bearing on whether the Arbitrator can in, accordance with Mr. Rothenberg's "dilution" theory,

redistribute amongst the attorneys those fees <u>already paid</u>. This question has not been subject to discovery or hearing. Moreover, the Arbitrator denied Claimants' request to amend their Demand for Arbitration. Interim Award at 24.

Plainly, the sanction is punitive rather than arising out of a determination on the merits of a matter submitted to the Arbitrator under the Arbitration Agreement. Finally, even if the ordered indemnity scheme did fall within the final prong of Rule 29, the Interim Award does not address how Respondents' *inferred* misconduct (failing to inform Rothenberg) meets the "extreme" standard required by Rule 29.

### F. The Interim Award should not have granted this extraordinary relief without holding an evidentiary hearing, particularly given that no monetary damage has been suffered.

It appears that the Arbitrator's decision to impose the extraordinary sanctions described in the Interim Award is based on the incorrect assumption that the Respondents are seeking to enrich themselves at Rothenberg's expense. That is not the case. Subject to client consent and the ethical rules, Respondents <u>will not accept</u> additional attorneys' fees, and will propose that the money will be paid to defray costs.

Claimants may scoff at this clarification and suggest that it is an after-the-fact explanation created to avoid sanctions, but Respondents' communication with Jack Marshall **before** Rothenberg ever filed a motion for sanctions evidences their consistent commitment to not enriching themselves by vindicating the clients' rights to competent and zealous counsel. *See* Exhibit B. Such skepticism also highlights the error in awarding these sanctions without an evidentiary hearing and before any monetary harm has been suffered. If the Arbitrator had convened a hearing, the Perles Respondents could have made clear that they never had any intention to accept additional fees in the event Claimants' fees are reduced. Similarly, if the

Claimants' new claim for tortious interference was litigated later in an appropriate forum, there would be no need for the Arbitrator to speculate about Respondents' intentions or the existence of any monetary damages.

At this moment, Claimants have suffered <u>no damages</u> as a result of the decision by many <u>Peterson</u> plaintiffs to terminate Rothenberg. The Arbitrator's response to the Claimants' request for sanctions should have been limited to those sanctions appropriate to remedy any harm actually suffered. Claimants have not even disclosed to the Arbitrator how many clients have terminated Rothenberg, information which would help the Arbitrator understand the scope of the ordered sanction which is at present open-ended. As such, the Interim Award should not have been entered without an evidentiary hearing.

Moreover, had the Arbitrator held a hearing before entering extraordinary sanctions against Respondents, he would have learned of Rothenberg's recent litigation and lobbying activities which could cost the Beirut Marines hundreds of millions of dollars. *See infra*, Section G.

On May 28, 2024, Rothenberg sent a letter to his *Peterson* clients, stating that he was "shocked" by the letter of April 16, 2024, and that he was "working on a detailed response" that will "surprise[e] the clients by what [he] ha[s] to share." To the best of the Perles Respondents' knowledge, over the intervening year Rothenberg offered no explanation for his conduct to the clients. Instead, it appears that the Arbitrator's recent Orders have emboldened Rothenberg to ramp up his aggressive efforts to benefit his other clients at the expense of the Beirut Marines clients. It would not surprise the Perles Respondents if Rothenberg distributed the Interim Award to the clients as evidence that the Arbitrator approves of his conduct; his counsel has intimated that he would do so if Respondents did not help him burnish his reputation among the clients.

### G. The Arbitrator mistakenly concludes that Rothenberg's misconduct predates the Arbitration Agreement.

In what seems to constitute doubt regarding the sincerity of Respondents' concerns about Rothenberg's misconduct, the Arbitrator mistakenly states that "[t]he Respondents remained silent for seven years and only found the urgency to notify the Peterson plaintiffs of the Claimant's alleged ethical violations in the midst of this arbitration." Interim Award at 14. This is simply not supported by the record. In fact, it was not until September 20, 2023, when Rothenberg revealed under oath that he had "no idea [his other clients] were knocking out Peterson [from the Clearsteam I enforcement action]" because he had essentially terminated himself from both representations ("even to this day, I don't know what's going on with 650 Fifth Avenue . . . with Clearstream II … with any other assets."). Rothenberg Deposition at 193-94. That same testimony revealed that Rothenberg viewed the clients as having impermissibly "given away" his fees. Id. at 151-52.

At this very moment, Rothenberg is organizing lobbying efforts to advocate for legislation with the practical effect of halving potential USVSST payments to the Beirut Marines, potentially costing them hundreds of millions of dollars, in favor of other clients that Rothenberg represents in other, unrelated matters.

In an echo of his original Clearstream I conflict—Rothenberg currently has hundreds of new clients in other, unrelated matters pursuing the same Iranian assets that the Peterson Plaintiffs are pursuing in Clearstream II, potentially resulting in a massive dilution of the Beirut Marines' share, or outright loss of priority. This new litigation is ongoing and post-dates the arbitration agreement.

Earlier this year, Rothenberg's collection counsel, Strook, successfully renegotiated an offset provision in the settlement agreement in 650 Fifth Avenue in a manner that will potentially cost the Beirut Marines tens of millions of dollars while favoring parties that Rothenberg

represents in other, unrelated actions against Iran. The Perles Respondents alluded to this recent and ongoing misconduct in their Opposition to Rothenberg's Motion.

### H. The Arbitrator disclaims jurisdiction over violations of ethical rules yet alleges them without evidence in a "two wrongs make a right" defense of Rothenberg's misconduct.

In the Interim Award, the Arbitrator notes that "whether any of the parties violated the Rules of Professional Conduct is an issue not before the Arbitrator and is, in fact, beyond the jurisdiction of the Arbitrator." Then, in footnote 3, the Arbitrator raises *sua sponte* that the Respondents have a "conflict in representing the Follow-On Plaintiffs who are competing with the Peterson plaintiffs to execute judgments against the same assets (Clearstream I and 650 Fifth Avenue)." Yet Respondents were assiduous in their efforts to ensure that all clients consented to the enforcement and collection actions for the benefit of all. Both the Peterson plaintiffs and the Follow-On plaintiffs consented to this via the consent forms attached to the February 10, 2012 letter to the clients (*See* Arbitration Exhibits 18 and 68) and the CDAs signed by the clients at the time distributions were made (Arbitration Exhibit 69). In contrast, the clients did not consent to and were not even informed of Rothenberg's unilateral decision to shield himself from work on any enforcement efforts via a "Chinese wall," to pursue extra fees without attempting to vindicate the clients' related rights, or any of the other recent misconduct enumerated in Section F (including advocating for legislation which reduces the Peterson plaintiffs' recovery from the USVSST and hiring counsel who negotiated provisions into the 650 Fifth Avenue settlement antagonistic to the Peterson plaintiffs) which has the potential to cost them hundreds of millions of dollars collectively.[4]

---

[4] To the extent that the conclusions regarding conflicts expressed in footnote 3 contributed to the fact and amount of sanctions, Respondents also point out that such conflicts are not within the scope of the Arbitration Agreement.

I. **Rather than clarifying the Parties' rights, the Interim Award has caused further confusion amongst the Parties and will result in additional disputes that further consumes the Arbitrator's time.**

The Arbitrator complains, not without justification, that this is "the fourth time the Arbitrator is addressing the same issue in this arbitration in the span of less than 12 months." Interim Award at 10-11. It is undoubtedly irksome to be sidetracked by a matter "outside the scope" of this Arbitration. Interim Award at 16. However, Respondents respectfully request that the Arbitrator consider the possibility, however contrary to his initial intuition, that they are acting in good faith. Before sending the April 16, 2024 letter, Respondents, faced with an ethics opinion *requiring* that they inform the clients of Rothenberg's misconduct (*See* Exhibit B), deliberated at length.[5] In those deliberations, Respondents contemplated the likely possibility that adhering to this obligation would require them to defend at great expense a meritless but protracted and expensive tortious interference claim by a demonstrably litigious Rothenberg.[6] Respondents concluded that they were without discretion.

On the basis of information heretofore not available to the Arbitrator, the Perles Respondents infer, without any possibility of personal enrichment, that Rothenberg is afraid of being called to account for his years of abusing the <u>Peterson</u> plaintiffs. They infer that Rothenberg is using this Arbitration as an effort to avoid not only facing the financial consequences of his misconduct, but a public adjudication of his brewing dispute with the clients in a court of competent jurisdiction. They infer that the Arbitrator is facing a glut of ethics-related filings because Rothenberg prefers this forum to one in which his clients would be actual parties. The Perles Respondents are proud of, and would happily discuss in a public forum, their track record

---

[5] Hence the delay from September 20, 2023 to April 16, 2024.
[6] They, however, failed to imagine the arbitrator would take jurisdiction over such a claim, let alone grant it as *a sanction*, without hearing or discovery.

of service for the Beirut Marines. In contrast, Rothenberg has demonstrated a powerful aversion to scrutiny of his own such record, at the expense of the Arbitrator's time and energy.

Indeed, Claimants' counsel has already transmitted a copy of the Interim Award to Epiq as an attachment to an email seeking access to a spreadsheet containing payment information related to matters from which Rothenberg has been terminated and is adverse to the Peterson plaintiffs, and related to matters in which Rothenberg was never counsel. The Order does not require this of Epiq and will require further clarification. Rothenberg will no doubt next demand that Epiq release any escrowed funds pertaining even to clients that instruct Epiq to not pay Rothenberg. As the Interim Award does not order Epiq to make payments from clients to Rothenberg, Epiq will likely refuse Rothenberg's demands. The Parties will then again have to darken the Arbitrator's doors seeking clarification.

Respondents are likewise exhausted of obligatorily vindicating the rights of their clients before a tribunal that disclaims jurisdiction over those rights but is willing to financially penalize Respondents for asserting them. The obvious solution to both the Arbitrator's and the Respondents' agita is to vacate the Interim Award's prejudgment of this question and allow a court of competent jurisdiction to evaluate the merits of the clients' dispute with Rothenberg. The Arbitrator can then focus on his deliberations over the matters presented in the Arbitration that closed on January 24, 2025.

## II.    CONCLUSION

For all the reasons stated herein, the Arbitrator should reconsider its Interim Award.

Respectfully submitted,

BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC

By:    /s/ Stephen J. Whelan
    Douglas M. Bregman, Esq.
    Stephen J. Whelan, Esq.
    7315 Wisconsin Avenue, Suite 800 West
    Bethesda, Maryland 20814
    (301) 656-2707 – telephone
    dbregman@bregmanlaw.com
    swhelan@bregmanlaw.com
    *Counsel for Respondents Steven R. Perles and*
        *Perles Law Firm, P.C.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing paper was served by JAMS Access

and email on all counsel of record in this matter on April 24, 2025.

By:    /s/ Stephen J. Whelan
    Stephen J. Whelan

**ARBITRATION PROCEEDING BEFORE JAMS**

| | |
|---|---|
| ALLEN L. ROTHENBERG, ESQ., *et al.*, | |
| Claimants, | |
| vs. | JAMS Ref. No. 1425036110 |
| THOMAS FORTUNE FAY, *et al.*, | Hon. Stephen Crane, Arbitrator |
| Respondents. | |

## <u>DECLARATION OF STEVEN R. PERLES</u>

1.      My name is Steven R. Perles.  I have personal knowledge of and am competent to testify as to the matters set forth herein.  I am providing this written testimony under oath and under the penalty of perjury.

2.      I co-authored the April 16, 2024 letter to those clients I represented along with Ms. Fay and Mr. Rothenberg upon the advice of ethics counsel, Jack Marshall.

3.      Mr. Marshall advised that I was obligated to disclose the existence of Mr. Rothenberg's violations of the Rules of Professional Conduct to our joint clients.

4.      Subsequent to my co-authoring the April 16, 2024 letter, neither I nor my law firm have had any further communications with the aforementioned joint clients regarding Mr. Rothenberg or the contents of the April 16, 2024 letter.

5.      Additionally, I was not aware that Ms. Fay was contacting clients directly to ask about Mr. Rothenberg. I did learn after the fact that Fay Law Group had carried out Zoom information sessions in response to client's requests for additional information immediately following the April 16, 2024 letter. In response to this information I sought and received confirmation from Ms. Fay that those meetings were carried out in accordance with the ethical advice we had received from Jack Marshall.

1

6.     I did not "instigate or encourage" Ms. Fay or her law firm to contact clients directly to ask about Mr. Rothenberg.

7.     I do not "disclaim" her decision to contact the clients insofar as she reasonably believed she was required to do so under the ethical rules, particularly in the absence of any order enjoining her from communicating about this subject with our clients.

8.     When I learned that certain clients fired Mr. Rothenberg in response to the April 16, 2024 letter, I considered what would happen to fees that would have been paid to Mr. Rothenberg but for his violations of the Rules of Professional Conduct and subsequent termination.

9.     I immediately concluded that I would not allow my fee to be increased by Mr. Rothenberg's fee being decreased or eliminated as a result of his disputes with the clients regarding his conflicts of interest.

10.    Instead, I proposed that any fees that would otherwise have been paid to Mr. Rothenberg would be placed into a segregated account and used to defray future *client* expenses (not my fees) related to future collection efforts, for the benefit of all of the plaintiffs.

11.    I proposed this to ethics counsel via my own counsel on February 17, 2025, which was well before Claimants filed their motion for sanctions.

12.    The Peterson plaintiffs have already spent millions in expenses on experts and witnesses, and this money would help ease that ongoing burden.

13.    This proposal was disclosed to ethics counsel, who advised that such a disposition of fees that otherwise would have gone to Mr. Rothenberg was ethically appropriate.

14.    I absolutely reject the idea that I co-authored the April 16, 2024 letter in order to steal fees from Mr. Rothenberg.

15.     There are no sharing agreements in place affecting the distribution of VSST Lump Sum Catch Up Payments to the Beirut Marines.

I hereby affirm under the penalty of perjury and upon personal knowledge that the contents of the foregoing are true.

Date: 4.24.25

Steven R. Perles

3



**ProEthics Ltd.**
2707 Westminster Place
Alexandria, VA 22305
703-548-5229

April 24, 2025                                              Via Email

Geoffrey T. Hervey, Esquire.
Stephen J. Whelan, Esquire
BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC
Suite 800 West
7315 Wisconsin Avenue
Bethesda, Maryland 20814

Dear Geoffrey :

You have inquired regarding my analysis and recommendations during our February, 2025 conversations focusing on the ethical and practical implications of Attorney Rothenberg's statement in an arbitration proceeding, under oath.

You and I initially discussed this issue almost a year earlier, after I reviewed the relevant transcript.

My records indicate that the last and most inclusive discussion was 80 minutes, or an hour and 20 minutes in duration, which comports with my recollection (and my invoice covering the month of February, 2025.). You had previously informed me of Mr. Rothenberg's statement in early 2024, and I had advised you that Mr. Rothenberg's co-counsel (Mr. Perles and Ms. Fay) had no alternative but to inform the clients immediately of what Attorney Rothenberg had said. I based this conclusion (which I subsequently confirmed with the D.C. Bar ethics office) on the requirements of D.C. Rule of Professional Conduct 1.4, requiring lawyers to "keep a client reasonably informed" regarding the course of the representation as well as permitting "the client to make informed decisions regarding the representation." I was (and am) adamant and certain that a co-counsel revealing a crippling and disqualifying conflict of interest regarding his loyalty and personal interests is the epitome of the kind of development a client must be informed of at the earliest opportunity. For Mr. Rothenberg's co-counsel to fail to so inform their mutual clients of this would have itself constituted a serious breach of professional conduct standards.

1

In the 2024 consult on this incident, I had also noted that if Mr. Rothenberg, as a result of this disclosure, were to be either disqualified or fired by the clients, co-counsel would be on sound ethical grounds to maintain that he should not receive a fee from future collections in the matter. This is because Mr. Rothenberg's conflict of interest, which was made explicit and undeniable by his own statements, rendered the retainers signed by his clients unenforceable due to the document's misrepresentation of the attorney's fitness to advance their interests competently, zealously and without obstacles to his independent judgment on their behalf.

In the February 2025, much lengthier phone discussion with you, I reiterated the points above, adding that in addition to informing clients of Mr. Rothenberg's conflict, co-counsel must explain, first, that Mr. Rothenberg had revealed a conflict of interest, and, second, that it was the clients' decision and choice whether to terminate Mr. Rothenberg's representation. This was the necessary course, I said, despite my conclusion that Mr. Rothenberg had in effect rendered himself incapable of continuing as an attorney in the case because the nature of his conflict of interest made it 1) unwaivable by the clients and 2) such a material fact of his representation that even if it were waivable, the absence of any acknowledgment of it in the retainers rendered those retainers invalid regarding Mr. Rothenberg's participation in the case. In short, he had been retained under false pretenses, and every client must be able to assume that all of their attorneys know and will abide by the ethical requirements of their profession as enumerated by their licensing jurisdictions. In this instance, that necessary presumption was proven, subsequent to the signing of the retainers, false regarding Allen Rothenberg.

I pointed out that there is no direct authority for dealing with these facts, because it is, thankfully, rare (if not unprecedented) for an attorney to declare such a crippling conflict, under oath, in an official proceeding. Mr. Rothenberg also, in the same session, revealed that he had not advised his clients against agreeing to a course he believed (or said he believed) was against their interests, but I explained that his conflict was so unconscionable that it made that failure of competence, diligence and zeal (and violations of D.C. Rules of Professional Conduct 1.3, 1.4 and 2.1) both superfluous and unsurprising.

You asked me, in this regard, to consider the propriety of Fay and Perles dedicating the portion of the fee that would have been Mr. Rothenberg's (had he not misrepresented his interests adverse to those of his clients) to be used to offset future expenses of eventual collection efforts. While I explained that no rules or legal ethics opinions required such a course, it would avoid the claim that Fay and Perles were seeking to enrich themselves by disqualifying co-counsel Rothenberg. Moreover, using the amount to reduce expenses would directly benefit their clients in the interests of justice, which I regard as the epitome of professionalism, or ethical conduct above the minimum required by the Rules.

2

I believe that the foregoing accurately reflects the substance our conversation as well as my analysis.

Sincerely

*Jack Marshall*

Jack Marshall
Proethics