# Exhibit 15

JAMS COMPREHENSIVE ARBITRATION
NEW YORK, NEW YORK
------------------------------------------

ALLEN L. ROTHENBERG, ESQ., THE LAW
FIRM OF ALLEN L. ROTHENBERG, and THE
ROTHENBERG LAW FIRM LLP,

        Claimants,

        and                     JAMS Ref. No.
                                   1425036110

THOMAS FORTUNE FAY, ESQ., THE FAY LAW
GROUP, P.A., STEVEN R. PERLES, ESQ.,
PERLES LAW FIRM, P.C., and FAY and
PERLES FSIA LITIGATION PARTNERSHIP, Respondents.

------------------------------------------

## FINAL AWARD

The undersigned Arbitrator, having been designated pursuant to Section II, paragraph D of an Arbitration Agreement dated December 4, 2017, among the Claimants Allen L. Rothenberg, Esq., The Law Firm of Allen L. Rothenberg, and The Rothenberg Law Firm LLP, the Respondents Thomas Fortune Fay, Esq., The Fay Law Group, P.C., Steven R. Perles, Esq., Perles Law Firm, P.C., and Fay and Perles FSIA Litigation Partnership, and non-party Anthony LaSpada, Esq., and having read the submissions and heard the proofs and allegations of the Claimants and the Respondents, does hereby find and AWARD as follows: **Background**

Sometime in the year 2000, the Claimant Allen L. Rothenberg, Esq. (together with the other Claimants, hereinafter referred to as the Claimant), and the Respondents orally agreed to act as

cocounsel on behalf of victims of terrorism. Pursuant to that oral agreement, each attorney was entitled to one-third of the net attorneys' fees recovered in any case they pursued as co-counsel. This oral agreement was memorialized in a February 6, 2001, letter agreement "concerning cases on which we plan to act as co-counsel on behalf of victims of terrorism," and was signed by the Claimant and the Respondents [Exh 26]. The February 6, 2001, letter agreement provided that it would also "govern any future cases we file jointly on behalf of victims of terrorism, unless the agreement is modified in writing at a later date. . . ." [Exh 26]. The representation included litigation contemplated on behalf of the Estate of Rabbi Meir Kahane and others against the Islamic Republic of Iran for a terrorist attack at the Marriott Hotel resulting in the death of Rabbi Kahane and the wounding of others. The Respondents later declined to pursue any litigation on behalf of Rabbi Kahane. The Claimant then partnered with Barry Leibowitz, Esq., and on November 13, 2001, filed <u>Acosta v Islamic Republic of Iran et al.</u>, No. 01-2353 (DDC).[1]

Sometime after entering into the February 6, 2001, letter agreement, the Claimant and the Respondents agreed to pursue

---

[1]  Acosta was also wounded in the attack at the Marriott Hotel. This action was brought on behalf of several plaintiffs, including the Estate of Rabbi Kahane.

litigation against the Islamic Republic of Iran on behalf of the survivors, surviving family members or representatives of deceased Marines killed in the October 23, 1983, attack on the Marine Barracks in Beirut.[2]  It was agreed that the Claimant would use his efforts to locate the Marines wounded and families of those killed in the Marine Barracks bombing; the Claimant was to open estates for those families that needed estate representation for deceased Marines or family members.[3]  Respondent Fay's role was that of trial counsel and Respondent Perles was to lobby Congress and craft remedies.  The Claimant's efforts between March and October of 2001, resulted in his securing retainer agreements for representation of what was later determined to be 101 Beirut Marine families.[4]  The Contingent Retainer Agreements for what was later determined to be these 101 families were signed by the Claimant and the Respondents and provided a 33 1/3% contingency fee to be

---

[2]  The parties dispute whether the Claimant or Respondent Perles was the originating attorney for these claims. Resolution of this factual dispute is not necessary for the purposes of this FINAL AWARD.

[3] The Arbitrator takes judicial notice of an archived New York Times article and a Wikipedia page that refer to lists publicly available of the names of the victims of the Marine Barracks bombing.

[4]  According to the Claimant this amounts to 558 of the approximately 811 plaintiffs named in the action commenced against the Islamic Republic of Iran, Peterson et al. v Islamic Republic of Iran et al., No. 01-02094 (DDC)(hereinafter the Peterson Action).

distributed to each of the attorneys in an equal share, "contingent upon collection and to the extent of collection only" [Exh 67].

In March 2001, the Claimant became aware that certain victims of the Marine Barracks bombing, or their surviving family members, had been referred to the Respondents by Anthony LaSpada, Esq.[5] The Claimant spoke to Respondent Fay as to how the attorneys' fees for those cases would be divided. On March 14, 2001, the Claimant sent Respondent Fay a letter agreement memorializing their conversation; the letter agreement had signature lines for both Respondents Fay and Perles [Exh 27]. In this March 14, 2001, letter agreement, the Claimant set forth that, for the 31 cases referred by Mr. LaSpada, the attorneys' fees would be divided as follows: 20 2/3% to the

Claimant, 23% to each Fay and Perles, and 33 1/3% to Mr. LaSpada. Respondents Fay and Perles never signed this letter agreement. On April 24, 2001, the Respondents sent the Claimant a "Memorandum" on the "Marine Barracks Attack - October 23, 1983," the subject of which was, *inter alia*, "Agreement of Counsel on Fees" [Exh 71]. In the Memorandum, the Respondents indicated that they were "unable to agree to payment to [Claimant] of any amounts from cases referred by [LaSpada]" because the plaintiffs in those cases objected to the Claimant receiving any attorneys' fees on their

---

[5]  Mr. LaSpada's sister was a friend of Respondent Fay [TR 11/2/23 p202].

4

cases.[6]  The Respondents stated they could proceed only "on the basis of the original agreement providing for division of the fees realized into three equal parts as to all cases referred by your office" [Exh 71].

In a June 6, 2001, letter to the Claimant, the Respondents "reaffirmed" the "fee sharing letter agreement within the context of the Beirut Marine Corps Barracks Bombing" [Exh 43].[7]  They agreed that the Claimant and the Respondents would share equal thirds of the net fees earned in the Marine Barracks bombing litigation "brought on behalf of each claimant you have referred to our offices, as evidenced by the submission . . . of an executed original retainer agreement" [Exh 43].[8]  The Claimant acknowledged

---

[6]  The Claimant does not assert any claim for fees in this arbitration for the plaintiffs referred by Mr. LaSpada [Affirmation dated October 20, 2023, of Claimant Rothenberg (hereinafter referred to as "Affirmation of Claimant Allen Rothenberg"), pp9-10, ¶47].

[7]  Respondent Perles sent the June 6, 2001, letter on behalf of himself and Respondent Fay.  Respondent Perles wrote, *inter alia*, "At our request, you have joined us in this action in order to assist with certain client management matters including the referral of specific cases and the opening of estates for the decedent in each case you have referred" [Exh 43].  At Claimant's request, Respondent Fay countersigned this letter on July 1, 2001, indicating his agreement thereto [Id.].

[8] The "original agreement" entered into on February 6, 2001, called for the parties to each receive a one-third attorneys fee for cases "file[d] jointly on behalf of victims of terrorism" [Exh 26].  It did not contain the

receipt of the Memorandum and agreed to abide by the "original cocounsel agreement of February 6, 2001" [Exh 72].

Shortly before the complaint was filed in the <u>Peterson</u> Action on September 10, 2001, in Federal District Court for the District of Columbia,[9] the Claimant was told to stop referring plaintiffs for the Marine Barracks bombing litigation [TR 10/30/23 p101; Affirmation of Claimant Rothenberg, p8, ¶40]; the Claimant assumed that the Respondents would stop recruiting plaintiffs as well [TR 10/30/23 p101; Affirmation of Allen Rothenberg, p8, ¶40].[10]  The Claimant did not recruit any additional plaintiffs thereafter [TR 10/30/23 pp101-102].  Unbeknownst to the Claimant, the Respondents did not in fact stop recruiting plaintiffs, a fact he would later learn.

After several days of trial in the <u>Peterson</u> Action, a judgment was entered in favor of the plaintiffs on May 30, 2003, on all issues of liability [see <u>Peterson v Islamic Republic of Iran</u>, 264

---

[9]    <u>Peterson et al. v Islamic Republic of Iran et al.</u>, No. 01-02094 (DDC).

[10]    The Respondents dispute this assertion.  Respondent Fay did not testify at the arbitration hearing.  His daughter, Caragh Fay Owens, an attorney with the firm who was involved in the <u>Peterson</u> Action as a law clerk and later as an attorney, testified that she did not know if her father told the Claimant

---

limiting language of "brought on behalf of each claimant you have referred to our offices" {Exh 43}.

to stop referring clients or if he told the Claimant to "pump the
brakes" [TR 11/6/23 p320].  In his Affirmation, Respondent Perles
stated that the Claimant was told "we" had "small shops" and
could not handle more cases and plaintiffs, but never told the
Claimant that they would stop looking [Affirmation dated October
23, 2023, of Respondent Perles (hereinafter "Affirmation of
Respondent Perles") pp14-15, ¶60].  He testified that the "we"
referred to in his Affirmation was an institutional "we" and that
he never had a conversation with the Claimant like that [TR
12/7/23 p840].  Nevertheless, Respondent Perles testified that
Respondent Fay "had to draw a line in the sand somewhere and say
we have to stop taking in new clients while we file <u>Peterson</u>.
Logically, if you're going to get a case on trial you have to
stop" [TR 12/7/23 pp840-841].
F Supp 2d 46 (DDC 2003)].  Damages attorneys were retained, and on

June 13, 2003, the Claimant and Respondents entered into an

agreement to pay the damages attorneys a contingency fee of 3% of

the total gross recovery of compensatory damages, to be paid out

of each of their 33 1/3% share of attorneys' fees [Exh 73].  On

September 7, 2007, the Peterson plaintiffs were awarded damages in

the sum of $2,656,944,877.00.  The judgment included the specific

dollar amount awarded to each <u>Peterson</u> plaintiff.

     During the pendency of the <u>Peterson</u> Action, additional cases

stemming from the Marine Barracks bombing were filed by other

attorneys, including the damages attorneys, and the Respondent Fay

as co-counsel, by Respondent Fay alone, or by Respondents Fay and

Perles.  These cases included <u>Valore et al v Islamic Republic of</u>

<u>Iran</u>, No. 03-1959 (DDC),[11] <u>Estate of Bland et al v Islamic Republic</u>

<u>of Iran</u>, No. 05-2124 (DDC), <u>Murphy et al v Islamic Republic of</u>

<u>Iran</u>, No. 06-596 (DDC), <u>Arnold et al v Islamic Republic of Iran</u>,

No. 06-0516 (DDC), <u>Anderson et al v Islamic Republic of Iran</u>, No.

08-535 (DDC), <u>Taylor et al v Islamic Republic of Iran</u>, No. 10-844
(DDC), <u>O'Brien et al v Islamic Republic of Iran</u>, No. 06-690 (DDC),
<u>Brown et al v Islamic Republic of Iran</u>, No. 08-531 (DDC), and

---

[11]    Respondent Fay entered into a fee sharing agreement dated May 24, 2007, with Dan Gaskill, Patrick Donahue, and Joseph Drennan, counsel for the <u>Valore</u> plaintiffs [Exh 3].   Under this agreement, Respondent Fay received a 25% fee in <u>Valore</u> [<u>Id.</u>].
<u>Spencer et al v Islamic Republic of Iran</u>, No. 12-0042 (DDC).[12]

Respondent Fay also filed <u>Fain et al v Islamic Republic of Iran</u>,
No. 10-628(DDC).  On July 23, 2007, the Respondents filed <u>Davis et
al v Islamic Republic of Iran</u>, No. 07-1302 (DDC).  These actions
are referred to as the Follow-On Cases because they essentially
followed the path forged in the <u>Peterson</u> Action in order to obtain
liability judgments.[13]  The attorneys in these cases who were not
part of the <u>Peterson</u> Action are referred to as the Follow-On
Attorneys.[14]

---

[12]    The plaintiffs in these actions were represented either by Drennan, Gaskill, and Donahue, or Heideman, Nudelman & Kalik, P.C. (hereinafter HNK), or John Karr.  Fay was listed as cocounsel in <u>Valore</u>, <u>Arnold</u>, <u>Taylor</u>, and <u>Anderson</u>, and he was promised one-third of the attorneys' fees earned in <u>Murphy</u>. Respondent Perles was unaware that Respondent Fay negotiated these fees for himself, referred to by Respondent Perles as a "kick-back deal" [Exh 41 p15].  On February 15, 2012, the Respondents entered into an Agreement whereby any fees promised to Respondent Fay as co-counsel would be split with Respondent Perles, as well as any fees earned in the <u>Fain</u> case [Exh 20].

Caragh Fay Owens, Esq. referred to this as the "magic contract" [TR 11/9/23 pp420-421].

[13]    The Follow-On Cases are further delineated as either Direct Follow-On Cases or Indirect Follow-On Cases. The Direct Follow-On Cases are those that originated from publicity of the Peterson Action and were directly signed up by the Respondents. The Indirect Follow-On Cases are those cases that Respondents did not originate from publicity; they were brought by other attorneys, some of whom were damages attorneys. The Indirect Follow-On Cases used the work done in the Peterson Action; the Respondents performed no work in these cases but were paid an attorneys' fee.

[14]    Despite having entered into the "magic contract" with Respondent Fay to share fees from the Follow-On Cases, Respondent Perles was dissatisfied with the percentage of attorneys' fees the Follow-On Attorneys were to receive for the work performed in The Claimant became aware that the Respondents continued to recruit additional Marine Barracks bombing plaintiffs prior to the entry of the damages award in the Peterson Action. A dispute arose among the Claimant and the Respondents as to Claimant's entitlement to one-third of the attorneys' fees in the Peterson Action attributable to all plaintiffs in that action, not just the plaintiffs recruited by the Claimant. In a letter dated September 20, 2007, Respondent Fay wrote the Claimant regarding the

---

the Follow-On Cases. In June 2017, Respondent Perles wrote Special Master Kathleen Massey regarding his dispute with the allocation of attorneys' fees to Drennan, Gaskill, and Donahue, and to HNK [Exh 42]. He asserted that the fees were "excessive" because the work in the Follow-On Cases involved "merely repackaging the pleadings and arguments that were perfected in Peterson" [Exh 41 p10]. The Special Master rejected Respondent Perles' complaint and sided with the Follow-On Attorneys [Respondent Perles Response to Demand p10, ¶36]. Undeterred, Respondent Perles filed an action in New York State Supreme Court in 2019 against Drennan, Gaskill and Donahue to recover damages under theories of unjust enrichment and quantum meruit, and the doctrine of common fund, based upon the defendants' collection of attorneys' fees in the Follow-On Cases without having performed any work or contributed to any costs in the eight-year long collection effort in Peterson [Exh 38 p4 ¶¶4, 5]. In his

complaint in that action, Respondent Perles referred to the
Follow On Cases as "mere cookie-cutter copies of Peterson" [Exh
38, p15].  He pointed out that the Follow-On plaintiffs were only
able to recover damages as a result of the Marines Cooperation
Agreement and the 87/13 Agreement  [Exh 38 pp35-36, ¶137].
Ironically, Respondent Perles also argued that the fact that the
Peterson plaintiffs agreed to share the recovery by virtue of the
Marines Cooperation Agreement and the 87/13 Agreement, "did not
mean that the attorney fees that otherwise would have been paid
to Plaintiffs were suddenly reallocated to Defendants or to any
other attorneys who did minimal work" [Exh 38, p36 ¶139].
Respondent Perles ultimately discontinued this action on May 7,
2020, after reaching a confidential settlement with Drennan,
Gaskill and Donahue [Exh 39].
Claimant's request to be paid 18% of the net fee to Respondents

for cases with retainers naming only Respondent Fay and Respondent

Perles [Exh 46].  Respondent Fay unequivocally denied that request

and reiterated that the Claimant would be paid one-third of the

net fees from cases for which there were retainers bearing the

Claimant's name and the Respondents' names [Exh 46].[9]

     The parties continued to discuss and confer regarding the

division of fees.  On November 11, 2007, the Claimant wrote a

letter to the Respondents to "memorialize and confirm that to which

we have agreed . . . regarding our firms' division of fees" in the

Peterson Action [Exh 40].  The letter sets forth an agreement that

each firm is to receive one-third of the net attorneys' fees

achieved "from all claims on behalf of the 101 servicemen or their

_____

[9] Attached to the letter was a list of "Allen Rothenberg
Clients" which constituted the clients for which there were
retainer agreements bearing the Claimant's name and the
Respondents' names [Exh 46].

estates" as named in the attached list [Exh 40]. Further, each firm was to receive "one-third of the net attorneys' fee resulting from damages awarded in this matter at any time to any of the listed servicemen's family members or those family members' estates" [Exh 40]. The letter contained a paragraph recognizing that the publicity of the <u>Peterson</u> Action brought about inquiries regarding potential representation from other victims or families of victims of the Marine Barracks bombing tragedy [Exh 40]. The Claimant proposed that, if any of the attorneys were asked to bring a claim on behalf of any such victim, the attorneys would provide each other with the opportunity to handle the matter jointly [Exh 40]. Respondent Perles struck that paragraph from the letter and both he and Respondent Fay signed their respective names on November 27, 2007, underneath the "Agreed and Accepted" lines for their signatures [Exh 40].

The Claimant sent another letter on November 27, 2007, without the stricken paragraph, to "memorialize and confirm that to which we have agreed . . . regarding our firms' division of fees in the" <u>Peterson</u> Action [Exh 24]. The letter expressly stated that it superseded any prior agreements between the firms regarding this matter [Exh 24]. The November 27, 2007, letter also provides, in pertinent part:

> We agree that, as co-counsel, each of our respective firms is to receive one-third of the net attorneys' fee achieved in this matter

11

> from all claims on behalf of the 101
> servicemen or their estates as named in the
> attached list compiled by Tom and his staff.
> Each of our three firms is also to receive
> one-third of the net attorneys' fee resulting
> from damages awarded in this matter at any
> time to any of the listed servicemen's family
> members or those family member's estates [Exh
> 24].

The letter is signed by the Claimant and the Respondents as "Agreed and Accepted" [Exh 24].[10]

After judgment was entered in the <u>Peterson</u> Action, efforts to collect on the judgment began and resulted in the seizure of assets known as Clearstream I.[17] The <u>Peterson</u> plaintiffs filed a turnover proceeding in the United States District Court for the Southern District of New York on June 8, 2010, <u>Peterson v Islamic Republic of Iran</u>, No. 10-4518. By this time the Claimant, through Barry Liebowitz, Esq., also had obtained judgments against the Islamic Republic of Iran in the <u>Acosta</u> case as well as cases involving plaintiffs <u>Greenbaum</u>, <u>Beer</u>, and <u>Kirschenbaum</u> (hereinafter, all four cases referred to as the GABK cases). Each of these cases stemmed from terrorist attacks sponsored by the Islamic Republic of Iran but unrelated to the Marine Barracks bombing. The Claimant and Barry Liebowitz, Esq., retained the firm of Stroock Stroock and

---

[10] The Claimant refers to this document as the "Co-Counsel Agreement."

---

[17]    The Clearstream I asset was identified in June 2008, in response to a subpoena served by David Cook, Esq., on the United States Department of Treasury Office of Foreign Asset Control (hereinafter OFAC).  Cook had served a subpoena on OFAC in Greenbaum on February 27, 2008 [Exh 88], and he served a separate subpoena on OFAC on March 10, 2008, in the Peterson Action [Exh 89].  When the Clearstream I asset was identified in response to the subpoenas in both Greenbaum and Peterson, neither Cook nor Respondent Perles, who also was informed of the identification of the asset, disclosed this information to the Claimant. [Affirmation of Claimant Rothenberg, p25 ¶136; TR 11/2/23 p180; TR 12/7/23 p884].  Judge Lamberth issued a Protective Order, of which the Arbitrator takes judicial notice, regarding the disclosure of the Clearstream I asset.  Respondent Perles assumed the Claimant received the Protective Order and if the Claimant did not sign it, then Respondent Perles could not speak to him about the asset [TR 12/7/23 pp884, 909-910].  Respondent Perles testified that he did not instruct Cook or Leibowitz to withhold the discovery of the Clearstream I asset from the Claimant [TR 12/7/23 pp907-908].

Lavan (hereinafter Stroock) to pursue collection on the judgments in GABK.

On August 4, 2010, Stroock sought to intervene in the Peterson turnover proceeding in New York on behalf of the Greenbaum and Acosta cases [Exhs 59, 60].[18]  The Respondents contacted the Claimant[19] because of the potential threat the intervention in the Peterson enforcement action posed with respect to the ability of the Peterson plaintiffs to collect their judgment.[20]  The Claimant wrote an email on July 27, 2010, the subject of which was a "Joint Collection Efforts Proposal" [Exh 56].[21]  The Claimant proposed that the attorneys representing the Peterson, Boulos, Valore,

<u>Arnold</u>, <u>Spencer</u> and <u>Bonk</u> plaintiffs, all of whom had outstanding

judgments

---

[18] Citibank, which held the Clearstream I asset, also filed an interpleader complaint in that proceeding for a determination on the competing claims to the Clearstream I asset.

[19] The Claimant was in communication with Stroock and the Respondents at this time [TR 10/30/23 p112]. According to the Claimant, Respondent Fay emailed him about the intervention motion [TR 10/30/23 pp116-117, 120]. The Respondents accused the Claimant of revealing the existence of the Clearstram I asset to Stroock. The Claimant vehemently denies this accusation because the existence of the Clearstream I asset was never disclosed to him [TR 10/30/23 p111].

[20] The <u>Greenbaum</u> and <u>Acosta</u> plaintiffs had secured judgements against the Islamic Republic of Iran in August 2006, prior to the entry of the judgment in the <u>Peterson</u> Action in September 2007 [Exh 10].

[21] This email does not contain any information as to whom it was sent [Exh 56]. Moreover, the Claimant could not explain the timing of this email as it pre-dated Stroock's motion to intervene in the <u>Peterson</u> turnover proceeding [TR 10/30/23 pp124125].

against the Islamic Republic of Iran stemming from the Marine

Barracks bombing, as well as the attorneys representing the GABK

plaintiffs, work together to obtain turnover of the Clearstream I

asset, with a view towards sharing the funds proportionately among

all plaintiffs [Exh 56]. The Claimant forwarded that email to

Respondent Fay on August 6, 2010 [Exh 56].[22] Nearly two years

later on June 1, 2012, the attorneys representing the various

intervenors and the <u>Peterson</u> plaintiffs entered into a Litigation

and Cooperation Settlement Agreement (referred to as the 87/13

14

Agreement)[23] [Exh 10, 87/13 Agreement].[24]  This agreement provided that the Peterson plaintiffs would receive 87% of the distribution from the Clearstream I asset and the intervening plaintiffs would receive 13% of the distribution from the Clearstream I asset [Exh

---

[22] It was at or around this time that the Claimant erected a "Chinese Wall" to avoid any conflict of interest between the GABK cases and the Peterson Action [TR 10/30/23 pp110-112, 117].  The Claimant testified that he had a "Chinese Wall" with Stroock and "arguably" with the Respondents (as all communication stopped, according to the Claimant, with Stroock and the Respondents) [TR 10/30/23 p112; but see the discussion *infra* in Decision, 2. Disputed Assertions, ii. Communication/The "Chinese Wall"].

[23] The full list of plaintiffs included in the 87/13 Agreement were Peterson, Greenbaum, Acosta, Rubin, Heiser, Levin, Valore, Kirschenbaum, Beer, Murphy, and Bland [Exh 10, 87/13 Agreement].

[24] The Claimant claims to have been aware "very generally" of the discussions leading to execution of the 87/13 Agreement in June 2012 [Affirmation of Claimant Rothenberg p28, ¶147].  While the Claimant was aware of this agreement, he is not a signatory to it.  Stroock signed it on behalf of the GABK plaintiffs, and the Respondents signed it on behalf of the Peterson plaintiffs [Exh 10, 87/13 Agreement].
10, 87/13 Agreement].[25]

The efforts to enforce the judgment in the Peterson Action and seize the Clearstream I asset took several years and included lobbying Congress for the passage of legislation codified as 22 U.S.C. §8772[26] that would allow the Peterson plaintiffs to execute on the Clearstream I asset,[27] obtaining an Executive Order from then-President Obama on February 6, 2012, freezing all Iranian assets in the United States, and litigating up to the United States

15

Supreme Court.   It is undisputed that Respondent Perles was instrumental in clearing all of these hurdles.

_____

25 It is undisputed that the Claimant received attorneys' fees from the plaintiffs that he represented in the Peterson Action, the recipients of a portion of the 87% share of the Clearstream I asset under this 87/13 Agreement, as well as from the GABK plaintiffs, the recipients of the 13% share of the Clearstream I asset under this 87/13 Agreement.  Another point of irony in this arbitration is that this 87/13 Agreement had the effect of diluting the Respondents' attorneys' fees in the Peterson Action.  However, the Respondents were aware of the 87/13 Agreement and signed off on it.

26 This was signed into law on August 10, 2012.

27 The Claimant claims to have gathered a "dream team" of lobbyists though the Respondents dispute this assertion.  The Claimant and the Respondents retained lobbyists whose fees were paid in the Peterson Action as a client expense [TR 11/13/23 p600; Exh 14 Kamins Agreement dated 6/9/04; Exh 28 McGuire Woods Agreement dated 7/1/07; Exh 74 Amitay Agreement dated 7/1/07; Exh 75 Gibson Dunn Agreement dated 7/1/07, Exh 86 Cochran Agreement dated 2/17/12].  The Kamins, McGuire Woods and Amitay Agreements are signed by the Claimant and Respondents, the Gibson Dunn Agreement contains no signatures, and the Cochran Agreement is signed by the Respondents.  Kamins later renegotiated his fee in 2015 such that his fee was to be based upon the recovery in the Davis and Bonk Actions as well as the Peterson Action [Exh 16].

While the lobbying activities were pending, the Respondents determined that they needed all plaintiffs in the Peterson Action as well as the plaintiffs in the Follow-On Cases to agree to share in the Clearstream I asset.  The Respondents deemed this necessary in order to assure the passage of 22 U.S.C. §8772.[11]  On February

_____

11 Respondent Perles stated that from his meetings with representatives of Congress, Congress was not going to pass

16

21, 2012, the Respondents as well as the attorneys for the <u>Valore</u>, <u>Murphy</u>, <u>Bland</u>, <u>Davis</u>, <u>Taylor</u>,[12] <u>Brown</u>, and <u>Fain</u> plaintiffs entered into the Marines Cooperation Agreement [Exh 19].[13][14]  Under this agreement, the plaintiffs in the <u>Peterson</u> Action, and the plaintiffs in the Follow-On Cases recited therein, agreed not to contest the claims to recovery in the turnover proceeding and, further, that they would share *pro rata* in the recovery of the Clearstream I asset based upon the amount of judgment for each plaintiff [Exh 19].[15]  The effect of this sharing agreement resulted in each plaintiff in the <u>Peterson</u> Action, including those represented by the Claimant, recovering less from the Clearstream

I asset than they would have otherwise recovered without the Marines Cooperation Agreement.  The Claimant was not told about this agreement, and it was never shared with him.

_____

§8772 without all plaintiffs being in solidarity with one another [Affirmation of Steven Perles, pp31-32 ¶¶146, 149].
[12] <u>Taylor</u> included the cases of <u>O'Brien</u> and <u>Anderson</u> [Exh 19].
[13]  The Respondents wrote the <u>Peterson</u> plaintiffs on February
[14] , 2012, seeking their consent to enter into the Marines Cooperation Agreement [Exh 18].  The Respondents entered into the Marines Cooperation Agreement just 11 days later.

[15]  At the time the agreement was entered into, however, the only cases with judgments besides the <u>Peterson</u> Action were the <u>Valore</u>, <u>Murphy</u>, and <u>Bland</u> cases [Exh 19].

17

Prior to entering into this agreement, Respondent Perles sent an email to Respondent Fay dated January 11, 2012, regarding an issue raised by inviting the Valore consolidated judgment holders to share in the Clearstream I asset [Exh 13].  Respondent Perles wrote, in pertinent part:

> Inviting the VALORE consolidated judgment holders to share in the PETERSON asset raises the issue of fee dilution for every PETERSON contractor whose fees are predicated on PETERSON gross recovery. * * *
>
> Does the sharing agreement that you circulated yesterday take into account that all of the parties listed above[16] could sue Fay and Perles for fee dilution if PETERSON redistributes *their fee income* to the VALORE consolidated judgment holders (*who owe fee income to Fay & Perles*)?
>
> * * *
>
> If such an outcome exists in NY law, isn't it likely that NY law would invest a right to the contractors listed above for fee dilution, when Fay & Perles have effectively foregone the contractors' fee income in favor of spreading the PETERSON asset among the VALORE

_____

[16]  The email listed 8 "contractors," including damages attorneys, lobbyists, and enforcement counsel, all of whose fees were predicated on the gross recovery in the Peterson Action [Exh 13].  Noticeably absent from this list is the Claimant, whose fees were also predicated on the gross recovery in the Peterson Action.

> (consolidated judgment) creditors?
> The fact that Fay & Perles recover
> fees when the VALORE (consolidated
> judgment) creditors do is not a fact
> that the NY courts will overlook
> when they adjudicate any lawsuits
> filed against Fay & Perles by the
> contractors. [Exh 13].

The Respondents proceeded to resolve the fee dilution for the "contractors" named in the email.

Meanwhile, after granting summary judgment in the turnover proceeding in favor of the <u>Peterson</u> plaintiffs and directing Citibank to turn over the Clearstream I asset, the District Court, District Judge Katherine Forrest presiding, established the Qualified Settlement Fund (hereinafter QSF) on July 9, 2013.[17] The Claimant learned of the Marines Cooperation Agreement at the time of distribution of the Clearstream I asset from the QSF in or about June 2017. The Claimant raised with the Respondents the issue of his fee dilution by virtue of the Marines Cooperation Agreement.[18] The parties later entered into the December 4, 2017, Arbitration

---

[17] The late Judge Stanley Sporkin (Ret.) was appointed to serve as Trustee of the QSF. Ken Feinberg later took over as Trustee.

[18] Counsel for the Claimant and the Respondents stipulated on the record that the issues raised in this arbitration were raised by the Claimant at the time of the QSF distribution in or about June 2017  [TR 11/2/23 p239]. Counsel for Respondent Fay clarified that the Claimant raised the issue of fee dilution at

Agreement, to submit the fee dispute to binding arbitration with JAMS [Exh 42, Exh A].

## CLAIMS AND DEFENSES

The claims are set forth in a Demand for Arbitration dated September 14, 2021. The Claimant asserts claims to recover damages for breach of contract based on the implied covenant of good faith and fair dealing, for a declaratory judgment, and for recovery of damages under a theory of unjust enrichment. In the breach of contract claim, the Claimant asserts that the Respondents breached the implied covenant of good faith and fair dealing in the "Co-Counsel Agreement" when they entered into the February 21, 2012, Marines Cooperation Agreement, on behalf of the Peterson plaintiffs, with the Follow-On Plaintiffs [Exh 42, ¶39]. The Marines Cooperation Agreement diluted the Claimant's attorneys' fees while significantly increasing the Respondents' attorneys' fees [Id.]. The Claimant demands judgment on the breach of contract claim in excess of $20,000,000.00 and future damages for attorneys' fees from additional recoveries on behalf of the Peterson plaintiffs [Exh 42, ¶41].

In the second claim the Claimant seeks a declaration "setting

the time of distribution of the QSF [TR 11/6/23 p282; Exh 90, 91, 92].

forth his entitlement to future attorneys' fees under the CoCounsel Agreement sufficient to remedy the dilution and other damages caused by Respondents' improper actions" [Exh 42, ¶45]. In the third claim to recover damages under a theory of unjust enrichment, the Claimant asserts that the Respondents have been enriched at the Claimant's expense as a result of their actions, and that it would be against equity and good conscience for the Respondents to retain these benefits [Exh 42, ¶¶47-48]. The Claimant seeks an award in excess of $20,000,000.00 on this claim [Exh 42]. In each of the claims, the Claimant also requests an award of attorneys' fees and the costs of this arbitration [Exh 42].

Respondent Perles filed a Response to the Demand for Arbitration dated October 8, 2021. The Response includes affirmative defenses that the claims are barred by expiration of the time limit specified in the Arbitration Agreement or the statute of limitations or laches,[19] failure of consideration, failure to state a claim, breach of contract claim barred because the Claimant cannot establish who are the parties to the contract, breach of contract claim barred because Claimant cannot establish elements of the contract, failure to satisfy the elements of the

---

[19] The Respondents moved to dismiss the arbitration as barred by the statute of limitations. The motion was denied in Procedural Order No. 1 dated December 13, 2021.

claims, claims barred by Claimant receiving or requesting fees in excess of the reasonable amount permitted under the Rules of Professional Conduct, failure to perform, failure of a condition precedent, failure to provide any work or anything of value to the collection effort, fraud in the inducement, malfeasance, contributory negligence, claims barred by the doctrine of *in pari delicto*, unclean hands, failure to mitigate damages, justification, fraud, estoppel, and waiver. Respondent Perles filed a

Supplemental Response to the Demand for Arbitration dated January 20, 2022, asserting additional affirmative defenses that the Claimant's equitable claims are barred by his own conduct in connection with the GABK cases (unclean hands), and setoff in the amount of the fees that the Claimant received from the QSF pursuant to the 87/13 Agreement.

Respondent Fay filed a Response to the Demand dated October 8, 2021. Respondent Fay does not assert any affirmative defenses.


**THE HEARING AND PRE- AND POST-HEARING SUBMISSIONS**

The parties submitted affirmations in lieu of direct testimony in advance of the hearing as follows: Affirmation of Claimant Allen L. Rothenberg, Esq. dated October 20, 2023, Affirmation of Respondent Steven R. Perles, Esq. dated October 23, 2023, Affirmation of Caragh Fay Owens, Esq. dated October 23, 2023,

22

Affirmation of Respondents' witness Lynn Smith Derbyshire dated October 20, 2023, and Affirmation of Claimant's damages expert Jeffrey Buchakjian, CPA/CFF dated October 23, 2023, together with demonstratives prepared by Mr. Buchakjian. Hearings were held October 30, 2023, November 2, 6, 9, 13, 2023, December 4, 7, and 21, 2023, May 23, 2024, and September 25, 2024. The Claimant and the Respondents each made an opening statement on October 30, 2023. The Arbitrator heard testimony from the Claimant Alan L. Rothenberg, Esq., his expert Jeffrey Buchakjian, Respondent Steven R. Perles, Esq., Caragh Fay Owens, Esq., and Respondents' witness Lynn Smith Derbyshire.

The parties made closing summations on September 25, 2024. The Claimant and the Respondents each submitted separate PostHearing Briefs simultaneously exchanged on December 13, 2024, and separate Post-Hearing Reply Briefs simultaneously exchanged on January 24, 2025.[20]


**DECISION**

A.    Preliminary Matters

---

[20]    The JAMS Comprehensive Arbitration Rules and Procedures effective June 1, 2021, are applicable to this arbitration [see Procedural Order No. 2, p3 ¶6]. The parties stipulated on the record to waive the 30-day deadline set forth in JAMS Rule 24(a) for rendering this FINAL AWARD [TR 5/23/24 pp1166-1167, TR 9/25/24 p4].

1.    <u>Applicable Law</u>

The Arbitration Agreement does not contain a provision setting forth the law to be applied to the determination of the dispute. Procedural Order No. 1 provides, in pertinent part:

> The parties shall determine the law or laws that apply to determination of the "Fee Dispute" as the issue arises, if at all.  In the absence of agreement, the Arbitrator will decide which law should apply.[Procedural Order No. 1, p3 ¶6].

The parties have not advised the Arbitrator of any agreement reached as to the law applicable to the determination of the Fee Dispute.  In accordance with Procedural Order No. 1, the Arbitrator chooses the law of the State of New York to govern the determination of the Fee Dispute.

2.    <u>Disputed Assertions</u>

There are a number of disputed assertions in this arbitration, several worthy of addressing at the outset.

(i) Claimant's Contribution in <u>Peterson</u>

One of the disputes concerns the work the Claimant performed in the <u>Peterson</u> litigation.  The Respondents have denigrated the Claimant's participation in the <u>Peterson</u> litigation throughout the entirety of this arbitration, beginning with the Responses to the Demand, the Affirmations, the Post-Hearing Briefs, and during the arbitration hearing.  They have accused the Claimant of performing

24

absolutely no work that contributed to the success achieved in the Peterson Action.[21]   The Claimant testified that he was asked only to gather and sign up victims of the Marine Barracks bombing and their families for the litigation that became the Peterson Action. The Claimant was never asked to perform any damages work [TR 11/2/23 p261], yet he is criticized for not having done any such work.   Respondent Perles admitted that when the attorneys agreed to work together in 2001 on the Marine Barracks bombing case, all that Respondent Fay and Respondent Perles expected of the Claimant was to refer cases and open estates for decedents [TR 12/7/23 p831; Affirmation of Respondent Perles p10 ¶37].   The Respondents have perpetuated their narrative in the face of evidence that the Claimant signed up over 500 of the plaintiffs named in the Peterson complaint.   This is the work the Claimant was asked to perform, and this is the work he performed.   The Respondents did not present any compelling evidence of any work that the Claimant was required to perform in the Peterson Action that he either declined or failed to perform.

As stated *supra* in footnote 2, the Claimant and Respondent Perles each claim to have originated the idea of pursuing claims on behalf of the Marine Barracks bombing victims.   The Arbitrator

---

[21]   Though counsel for Respondent Fay admitted on the record that the Claimant "contributed in the case of Peterson versus

need not resolve this dispute.  It has no effect either way on the outcome of this arbitration.  Even assuming, without deciding, that

---

Iran" [TR11/6/23 p337], Respondent Fay refers to the Claimant's "almost complete lack of participation in the Peterson litigation. . . ." in the Response to the Demand for Arbitration [Respondent Fay's Response to Demand dated 10/8/21, p8].
the idea of the cases originated with Respondent Perles, as he testified, the Claimant's efforts in gathering the lion's share of the Peterson plaintiffs enabled the Respondents to file the complaint and pursue the litigation.  This is a significant contribution to the litigation that culminated in the recovery of damages for the Peterson plaintiffs.[22]  The Claimant's role should not be diminished particularly in light of the fact, as stated *supra*, that he performed the role he was tasked to perform.

    (ii) Communication/The "Chinese Wall"

---

[22]  The names of the victims of the Marine Barracks bombing was a public record.  Securing their retainers was delegated to Colleen Delaney, an employee hired by the Claimant for this task, and Jack Geldner of Claimant's office [Affirmation of Claimant Rothenberg p7, ¶¶32-33; TR 10/30/23 p85].  Delaney later sued the
Claimant and the Respondents for a percentage of the recovery in the Peterson Action [Exh 79].  The parties entered into a settlement agreement with Ms. Delaney on April 20, 2020; the entire settlement sum of $175,000 was paid by the Claimant [Exh 79].

26

Respondents also criticize the Claimant for his lack of communication with the Peterson plaintiffs. However, the Respondents have not refuted the Claimant's testimony that there was to be "one voice" with the Peterson clients, and that voice was to be the Respondent Fay and Respondent Perles [TR 10/30/23 p97; TR 11/2/23 p267]. This criticism of the Claimant appears hypocritical and unwarranted.

It is an undisputed fact that the Respondents did not tell the Claimant about the Marines Cooperation Agreement, and they entered into that agreement without his knowledge. The Respondents blame the "Chinese Wall" for their lack of communication with the Claimant. This "Chinese Wall" was erected by the Claimant after Stroock filed the motion to intervene on August 4, 2010. Respondent Perles testified that he had other cases with the Claimant that were unrelated to the Marine Barracks bombing, and he was in communication with the Claimant and his son, Harry Rothenberg, Esq., on these other matters [TR 9/25/24 p9]. Shortly after the Stroock intervention motion was filed in August 2010, Respondent Perles contacted Harry Rothenberg regarding what Respondent Perles considered to be a conflict of interest in the Claimant's representation of the GABK plaintiffs and the Peterson plaintiffs because the plaintiffs in the GABK and Peterson actions were pursuing the same asset [TR 9/25/24 p15]. Harry Rothenberg told Respondent Perles that he could not discuss the cases with

27

him because of the "Chinese Wall" [TR 9/25/24 p15]. Respondent Perles told Harry Rothenberg he would honor it [TR 9/25/24 p15]. When Respondent Perles later tried to discuss with Harry Rothenberg what was going on in Peterson with respect to the Clearstream I asset, Harry Rothenberg reminded him of the discussion they had regarding the "Chinese Wall" and the commitment Respondent Perles had given to honor it [TR 9/25/24 pp9-10, 16-17]. According to Respondent Perles, Harry Rothenberg made it very clear that he could not speak with him regarding any issues related to the Clearstream I asset because of the potential conflict [TR 9/25/24 pp9-10]. Perhaps the "Chinese Wall" is a good excuse for Respondent Perles not telling the Claimant about the Marines Cooperation Agreement, though he was never asked if the Marines Cooperation Agreement was the subject of any of the conversations he sought to have with Harry Rothenberg.[39]

Caragh Fay Owens, on the other hand, admitted that, during the period the Marines Cooperation Agreement was being discussed, she was in contact with Adam Zisserman of the Claimant's office and she did not provide him with the Marines Cooperation Agreement [TR 12/4/23 p738]. It is unclear why Ms. Fay did not mention the Marines Cooperation Agreement to Mr. Zisserman.

Despite all of the testimony about the "Chinese Wall," it is clear that the Claimant was not entirely cut off from what was

28

happening in the <u>Peterson</u> Action.  Indeed, the Claimant received

and read letters in October 2011 from <u>Peterson</u> plaintiffs Judith

---

[39]    As stated *supra*, Respondent Perles recognized that the
Marines Cooperation Agreement would result in a fee dilution for
the contractors whose fees were predicated on the <u>Peterson</u>
plaintiff's gross recovery [Exh 13]. He said exactly that in his
January 2012, email to Respondent Fay.  Although the Claimant's
fees also were predicated on the <u>Peterson</u> plaintiffs' gross
recovery, the Claimant was not mentioned in the email [Exh 13, TR
12/21/23 pp963-964].  Respondent Perles' testimony that the
Claimant was not mentioned because the effect of the agreement on
originating counsel "didn't even cross [his] mind," strains
credulity [TR 12/21/23 p964]. Respondent Perles also testified
that, because of the "Chinese Wall" and his discussions with
Harry Rothenberg about honoring it, he did not discuss with the
Claimant his concerns set forth in the January 2012, email [Exh
13] [TR 9/25/24 p21].  While the "Chinese Wall" may explain why
Respondent Perles did not discuss the email with the Claimant, it
does not explain why the Claimant was not mentioned in the email.
Young and Marilou Fluegel.  They were upset that the Claimant was

representing both the <u>Peterson</u> plaintiffs and the plaintiffs in

<u>Acosta</u> and <u>Greenbaum</u>, who were attempting to invalidate the

<u>Peterson</u> plaintiffs' attachment of the Clearstream I asset [Exh 1,

Exh 2].  The Claimant responded to those letters on October 12,

2011, and October 26, 2011, respectively [Exh 49, 50]. In his

letters, the Claimant stated, in pertinent part:

> I have been kept informed of the public
> filings by various collection counsel and am
> pleased for all of the terror victims and
> their families about the significant progress
> each counsel has made. * * * I have tried,
> through my contacts with others who represent
> victims of Iranian sponsored terrorism and
> their collection lawyers, to bring everyone
> under the same tent to recognize that we are

all on the same side and that Iran is the
enemy.

You have pointed out only the unfortunate
disagreements between various holders of
judgments against Iran.  I am disappointed
that agreements have not been reached so that
everyone can share in the recovery of assets,
but it is not my decision now, as all these
matters are being handled for all clients,
respectively, by collection counsel. * * * *
* *

Working together, collection counsel will be
able to collectively seek assets for the
benefits of the Marine families and other
victims of terror and to guarantee that
attacks on priorities will cease and have no
effect, rather than infighting among victims
over priorities and risking that some victims
recover while others do not.  I firmly believe
that all can collect if all come together.[Exh
49, Exh 50].

Given the Claimant's own statements in these letters that he was

in communication with collection counsel, it is unclear how the

Claimant's "Chinese Wall" worked and whether it was, in fact, a

plausible excuse for keeping him in the dark with respect to the

Marines Cooperation Agreement.[40]

    (iii)    Conflict of Interest

    Respondent Perles has maintained throughout this Arbitration

that the Claimant was engaged in a conflict of interest by

representing plaintiffs in both the GABK cases and the Peterson

Action[41] because the plaintiffs in all of those case were pursuing

recovery from the very same asset.[42]  Nevertheless, in his Post-

[40]

While the Claimant argues that the Respondents had no issue communicating with him when they needed him to contribute funds to settle actions filed by lobbyists or other attorneys, the Claimant ignores the fact that all of the contributions to settle the actions, two of which named the Claimant as either a respondent or defendant, occurred in 2018 or later.  The Claimant contributed $60,345 to settle the Cook Arbitration in which he was named as a respondent [Exh 77, Settlement Agreement dated 9/16/18], $850,740.18 to settle a lawsuit filed by damages attorney Jay Glenn against the Respondents, but not the Claimant [Exh 78, Settlement Agreement dated 10/15/18], 13.41% of a $675,000 "Contribution Agreement" entered into with Joel Rubin, a lobbyist retained by Cook [Exh 80, Contribution Agreement dated 5/15/18], and $175,000 to settle the lawsuit filed by Colleen Delaney against the Claimant and the Respondents [Exh 79, Settlement Agreement dated 4/20/20].

[41]

Respondent Perles's affirmative defense of unclean hands rests upon this fact [Supplemental Response of Perles to Demand for Arbitration, pp1-2].  He asserts that the Claimant's claim for equitable relief is barred by this conduct [Id. p3].

[42]

Counsel for Respondent Fay stipulated on the record that Respondent Fay had not raised in his pleading any issue regarding a conflict of interest with respect to the Claimant's Hearing Brief dated December 13, 2024, Respondent Perles concedes that whether a conflict of interest actually existed need not be resolved in this Arbitration [see Principal Closing Brief of Perles Respondents, p20].  The Arbitrator agrees.  Another matter that will not be resolved here is the assertion that the Claimant violated the Rules of Professional Conduct.  The Respondents have certainly made such allegations during the course of this arbitration.  Such arguments are beyond the jurisdiction of the Arbitrator [see Bidermann Indus. Licensing v Avmar N.V., 173 AD2d 401, 402 (1st Dept 1991)(application of the Code of Professional Responsibility cannot be left to determination of arbitrators);

31

see also <u>Merrill Lynch, Pierce, Fenner & Smith v Benjamin</u>, 1 AD3d 39,

44 (1ˢᵗ Dept 2003)].  They will not be addressed in this FINAL AWARD.

     (iv) The Necessity of the Marines Cooperation Agreement

     Finally, the Claimant emphasized throughout the arbitration hearing that, contrary to the Respondents' contention, there is no evidence that the Marines Cooperation Agreement was necessary for the passage of 22 USC §8772.  The Arbitrator agrees as a matter of fact with the Respondents that the passage of 22 USC §8772 would not have taken place without Congress being assured that all Marines would be compensated.  Without the passage of 22 USC §8772,

_____

representation of both the <u>Peterson</u> plaintiffs and the GABK plaintiffs [TR 11/6/23 pp357-358].
the Clearstream I asset would have been out of reach.


B.   Claims

     1.   <u>Breach of Contract - Covenant of Good Faith and Fair Dealing</u>

     Central to the controversy in this arbitration is the Claimant's first claim to recover damages for breach of contract based on Respondents' breach of the implied covenant of good faith and fair dealing.  This claim is predicated on what the Claimant refers to as the November 27, 2007, "Co-Counsel Agreement."  The

32

genesis of the "Co-Counsel Agreement" is not in dispute.   It started with an oral agreement between the Claimant and the Respondents that later was memorialized in a February 6, 2001 written co-counsel agreement.  That agreement was rather broad in scope as the parties agreed to act as co-counsel representing "victims of terrorism" and to share the attorneys' fees earned in those cases in an equal sum of one-third each.  On June 6, 2001, after the Claimant tried to negotiate a share of the attorneys' fees from the cases referred by LaSpada, and was denied that opportunity because those clients objected to the Claimant receiving a share of the attorneys' fees in their cases, the parties "reaffirmed" the February 6, 2001, letter agreement within the context of the Marine Barracks bombing litigation.

The Claimant again wrote to the Respondents on November 11, 2007, to clear up some confusion and disagreement as to the cases that he referred into the Peterson Action.  He also asked for an agreement from the Respondents to provide each of them with the opportunity to handle jointly any claims that any one of them was asked to bring on behalf of previously unrepresented victims of the Marine Barracks bombing in the future that were generated from the publicity from the Peterson Action.  This letter further provided that the attorneys would share equally in the attorneys' fees earned from any such cases.  While the Claimant and the Respondents signed this letter agreement, the Respondents crossed

33

out the paragraph referencing the obligation to provide one another with the right to handle jointly any claims that came their way in the future.

The final iteration of the letter agreement was signed on November 27, 2007, by the Claimant and on November 28, 2007, by the Respondents. This document is the same as the November 11, 2007, letter agreement, but it omits the paragraph to which the Respondents objected. It is this document on which the breach of contract claim based upon the covenant of good faith and fair dealing is predicated.

The Claimant contends that the Respondents breached the covenant of good faith and fair dealing when they entered into the Marines Cooperation Agreement because the sharing of the Clearstream I asset among the <u>Peterson</u> plaintiffs and the Follow-On Plaintiffs resulted in a reduction of the amount of damages recovered from this asset by the <u>Peterson</u> plaintiffs. This, in turn, resulted in a dilution of the amount of these fees which were tied to a percentage of the damages actually collected by each <u>Peterson</u> plaintiff. The Claimant further contends that the act was done in bad faith because the Marines Cooperation Agreement was never shared with him, and he was never told about it by any of the Respondents. In addition, the Respondents, who recognized the fee dilution the Marines Cooperation Agreement would cause to

the individuals whose compensation was tied to the <u>Peterson</u> plaintiffs' recovery, resolved the issue for all of them except the Claimant. Finally, the Claimant asserts that the Respondents stood to gain from the Marines Cooperation Agreement since they were to receive attorneys' fees from the <u>Peterson</u> plaintiffs as well as from the Follow-On Cases, whether they did any work in those cases or not.

The Respondents contend that the November 27, 2007, letter agreement is not a contract at all because it is not supported by consideration - the agreement did not impose any new responsibilities on any of the parties that were not already imposed by the earlier agreement to represent the Marine Barracks bombing victims and their families. Respondent Fay argues that the Claimant's attorneys' fees in the <u>Peterson</u> Action are solely governed by the Retainer Agreements he entered into with the <u>Peterson</u> plaintiffs that retained him, which provide for the recovery of attorneys' fees "contingent upon collection and to the extent of collection only."


(A) The November 27, 2007 "Co-Counsel Agreement"

The elements of a contract are an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound [<u>see</u>

35

Kasowitz Benson, Torres, & Friedman, LLP v Duane Reade, 98 AD3d 403, 404 (1ˢᵗ Dept 2012) *affd* 20 NY3d 1082 (2013)]. Without consideration there is no enforceable agreement [see Keller-Wala v Coello, 224 AD3d 892, 893 (2d Dept 2024)(citations omitted)]. Consideration "consists of either a benefit to the promisor or a detriment to the promisee" [Weiner v McGraw-Hill, Inc., 57 NY2d 458, 464 (1982) citing Holt v Feigenbaum 52 NY2d 291, 299 (1981)]. "It is enough that something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him" [Weiner v McGraw-Hill, Inc., supra, quoting Hamer v Sidway, 124 NY 538, 545 (1891); see Keller-Wala v Coello, supra at 894].

An agreement existed among the Claimant and the Respondents when the Claimant learned of new cases that were being filed as a result of publicity from the Peterson Action. The Claimant's request for a share of attorneys' fees from these cases was rejected by the Respondents. Rather than continue to pursue a share of these fees at that time, the Claimant agreed to stand down on this request, and he deleted it from the agreement when he resent it to the Respondents. The Claimant's elimination of the crossed-out paragraph from the November 27, 2007, letter, is a forbearance of his claimed right to attorneys' fees in the Direct

Follow-On Cases, and this forbearance is sufficient consideration to support a contract [see Lebedev v Blavatnik, 193 AD3d 175, 183 (1ˢᵗ Dept 2021); All Terrain Props. v Hoy, 265 AD2d 87, 94 (1ˢᵗ Dept 2000)].

Furthermore, the evidence established that the November 27, 2007, letter agreement resolved a disagreement over the plaintiffs referred by the Claimant to the Peterson Action and for whom the Claimant would receive credit. This disagreement stemmed from the fact that members of the same Marine family were referred by different attorneys or signed up with more than one attorney. Ms. Fay agreed that there was confusion over the list of clients the Claimant had referred to the Peterson Action [TR 11/6/23 p346]. She stated in her Affirmation that, "[b]y way of example: the estate of a Marine who died in the Beirut bombing might have been referred by Mr. Rothenerg, a sister of the Marine might have been referred by Mr. LaSpada, and a brother of that Marine might have signed up directly with F&P" [Affirmation of Caragh Fay Owens, Esq. p9, ¶68; TR 11/6/23 p347]. The November 27, 2007, letter agreement laid to rest that dispute, as well as the dispute over whether the Claimant would be entitled to fees from solatium claims. [23]    Thus, the November 27, 2007, letter agreement

--------

[23]  While Caragh Fay Owens admitted there was confusion over the list of clients the Claimant referred into the Peterson Action, she testified that the dispute regarding solatium

37

constitutes an accord and satisfaction of the disputes that it
resolved[24] [see Rose Inn of Ithaca, Inc. v Great Am. Inc. Co., 75
AD3d 737, 739 (3rd Dept) *lv app den* 15 NY3d 713 (2010); Sorrye v
Kennedy, 267 AD2d 587, 589 (3rd Dept 1999)]. It also constitutes
a modification of the parties' prior contract founded upon the
consideration of the Claimant's forbearance in pressing his request
for attorneys' fees generated from the Marine cases signed up as
a result of the publicity from the *Peterson* Action [see Lebedev v
Blavatnik, supra 193 AD3d at 183; All Terrain Prop v Hoy, supra
265 AD2d at 94]. Finally, lest there be any doubt that the November
27, 2007, Co-Counsel Agreement is a contract, it specifically
states that it supercedes the parties' prior Co-Counsel Agreement,
and it is signed by the Claimant and the Respondents, with the
Respondents' signatures each appearing under the words "Agreed and
Accepted."

(B) The Covenant of Good Faith and Fair Dealing

A claim to recover damages based upon a breach of a covenant
of good faith and fair dealing requires a contractual obligation
between the parties [see Parkmerced Invs., LLC v WeWork Cos. LLC,

_____

claims was resolved "way before 2007" [TR 11/6/23 pp346-
348]. However, Ms. Fay was not a party to the November 27,
2007, Co-Counsel
Agreement and, therefore, her testimony is insufficient to
refute the Claimant's testimony on this subject.

[24] The Claimant made this argument on the record during the
arbitration hearings [TR 12/7/23 p890].

217 AD3d 531, 532 (1st Dept 2023); <u>Duration Mun. Fund, LP v JP Morgan Sec., Inc.</u>, 77 AD3d 474 (1st Dept 2010) (citations omitted)]. The implied covenant of good faith and fair dealing embraces a pledge that no party to a contract "'shall do anything that will have the effect of destroying or injuring another party's right to receive the fruits of the contract'" [<u>Dalton v Education Testing Serv.</u>, 87 NY2d 384, 389 (1995) quoting <u>Kirke La Shelle Co. v Armstrong Co.</u>, 263 NY 79, 87 (1933); <u>see</u> <u>511 W. 232nd Owners Corp. v Jennifer Realty Co.</u>, 98 NY2d 144, 152 (2002)]. The covenant of "good faith and fair dealing ... is breached when a party acts in a manner that - although not expressly forbidden by any contractual provision - would deprive the other party of receiving the benefits under their agreement" [<u>Sorenson v Bridge Capital Corp.</u>, 52 AD3d 265, 267 (1st Dept 2008), *lv app dismissed* 12 NY3d 748 (2009)].

Claimant's claim of breach of the implied covenant of good faith and fair dealing rests exclusively upon the fact that Respondents entered into the Marines Cooperation Agreement, without his knowledge, which had the effect of diluting the attorneys' fees received from his clients in the <u>Peterson</u> Action. As stated *supra*, the weight of the evidence favors the Respondents' position. The agreement among the Beirut Marines to share in the Clearstream I asset, regardless of whether or not the plaintiffs had secured judgments in their cases, was necessary for the passage

of 22 USC §8772.[25]   Furthermore, the Marines Cooperation Agreement
was signed by the Respondents as representatives of their clients
[Exh 19]. It was entered into by the Respondents on behalf of their
clients, not themselves [Exh 19].   The clients are not parties to
the Co-Counsel Agreement.   They had the right to agree to share
the Clearstream I asset with other plaintiffs.   Nothing in the
Retainer Agreements with the Claimant precluded them from doing
so.   Since all of the Peterson plaintiffs participated in the
distribution of the QSF with all of the Marine families who were
part of the Marines
Cooperation Agreement, they implicitly agreed to the sharing of
the
Clearstream I asset and, as a result, to the dilution the
Claimant's attorneys' fees.   The Arbitrator, therefore, rejects
the Claimant's arguments that the Respondents engaged in any
wrongdoing by entering into the Marines Cooperation Agreement on
behalf of their clients.[26]

---

[25]  Respondents' witness Lynn Smith Derbyshire testified
that she was in many of the meetings on Capitol Hill during
the efforts to get §8772 passed [TR 5/23/24 pp1162-1163].
Ms. Derbyshire stated that "we would not have been able to
pass these laws if we didn't have the sharing agreement.
Because they wanted to make sure their constituent [sic]
was going to benefit, and we needed all constituents from
the [F]ollow-[O]n [C]ases" [TR 5/23/24 p1163].
[26]  It is worth noting again that the Claimant advocated for
the 87/13 Agreement which permitted sharing the Clearstream
I

In addition, the Respondents' failure to advise the Claimant
of the Marines Cooperation Agreement does not constitute a breach
of the parties' contract.  The Claimant and the Respondents did
not owe each other a fiduciary duty [see e.g. Marmelstein v
Kehillat

New Hempstead: The Rav Aron Jofen Community Synagogue, 45 AD3d 33,
36 (1st Dept 2007)(fiduciary relationship exists between two people
where one is under duty to act for or give advice for benefit of
another regarding matters within scope of relationship) affd 11
NY3d 15 (2008)].  As discussed supra, the Claimant's "Chinese Wall"
may have played a role in his lack of knowledge of this agreement.
The Claimant testified that, if any of the plaintiffs in the
Peterson Action with whom he had a Retainer Agreement had contacted
him, they would have been told to call the Respondents [TR 11/2/23
p156].[47]  When Respondent Perles tried to communicate with Harry
Rothenberg, Esq., he was reminded of the "Chinese Wall" and that
neither he nor the Claimant could communicate regarding the
Peterson Action [TR 9/25/24 pp9-10, 15-17, 21].

Finally, even if the Claimant had been aware of the Marines

---

asset between the victims of the Marine Barracks bombing and
victims of unrelated terrorism by the Islamic Republic of Iran.
The effect of this agreement was to dilute the attorneys' fees
for all of the attorneys involved, though the Claimant stood on
both sides of that transaction.  The Claimant believed that the
87/13 Agreement was "in the best interests of the clients" [Exh.
56; TR 10/30/23 pp127-129].

[47]
     Then again, the Claimant did respond to the October 2011,
letters sent to him by Judith Young and Marilou Fluegel, as
discussed *supra*.

Cooperation Agreement, it was the Claimant's own clients' decision,

not the Respondents' decision, to participate in that sharing, and

it was the clients' decision to participate that diluted the

Claimant's fees. Respondents' witness Lynn Smith Derbyshire very

forcefully testified that it did not matter to her whether the

attorneys were going to receive more or fewer fees as a result of

the Marines Cooperation Agreement [TR 5/23/24 pp1159-1161]. What

mattered to Ms. Derbyshire, who was part of the leadership team

for the Marine Barracks bombing victims in the <u>Peterson</u> Action,

was that they were not "leaving anybody behind" [TR 5/23/24

p1161].[27]

    Thus, the Arbitrator finds that the Claimant has failed to

establish that the Respondents breached the covenant of good faith

and fair dealing when they entered into the Marines Cooperation

Agreement, and that claim is denied.


    2.   <u>Unjust Enrichment</u>

    The Claimant contends that he is entitled to recover damages

under a theory of unjust enrichment on two grounds: first, as an

---

[27]  Ms. Derbyshire testified, "[w]ho cares whether the
attorneys made more or less money? Who cares? That's not
what it's about" [TR 5/23/24 p1163].

alternative to his breach of contract claim, and second, as a result of the Respondents' negotiating fees for themselves in the Indirect Follow-On Cases. The Claimant argues that this second branch of the claim for unjust enrichment does not fall within the scope of the November 27, 2007, Co-Counsel Agreement, and this claim is not barred by the existence of that contract.

The Respondents assert that this claim is barred if the Arbitrator finds that the November 27, 2007, Co-Counsel Agreement constitutes a valid contract. If no valid contract is found to exist, they assert, this claim still fails because the Respondents did not retain any benefit belonging to the Claimant, a necessary element of the claim.[28]

"The existence of a valid and enforceable written contract governing a particular subject matter" generally precludes recovery of damages under a theory of unjust enrichment for events arising out of the same subject matter [Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388 (1987); see Randall v Guido, 238 AD2d 164 (1st Dept 1997)]. The Claimant's claim for recovery of damages under a theory of unjust enrichment, pled as an alternative to the breach of contract claim, must be dismissed in

---

[28] During the course of the Arbitration hearings, the Claimant and Respondent Perles each submitted a Memorandum of Law on Unjust Enrichment. The Claimant's Memorandum is dated November 2, 2023, and Respondent Perles's Memorandum is dated November 9, 2023.

light of the finding, *supra*, that the November 27, 2007, Co-Counsel Agreement constitutes a valid contract.

In support of the argument that the unjust enrichment claim is viable with respect to the Indirect Follow-On Cases, the Claimant relies on the case of <u>Pauwels v Deloitte LLP</u>, 83 F 4th 171 (2d Cir 2023), for the proposition that recovery of damages under a theory of unjust enrichment is permissible even where a valid contact exists, but the scope of the contract does not cover the disagreement between the parties. According to the Claimant, it is not the existence of a contract but, rather, it is the scope of the contract that governs the viability of the claim for unjust enrichment.

In <u>Pauwels</u>, the plaintiff was retained by the defendants Bank of New York Mellon Corporation and its subsidiary Bank of New York Mellon (hereinafter BNYM), as an independent contractor to perform work on an investment valuation project [<u>Id.</u> at 177]. After working on several projects for BNYM, the plaintiff developed a model, aptly named the Pauwels Model, which was a custom-made valuation tool he used to evaluate and monitor BNYM's potential and existing energy-sector investments [<u>Ibid</u>]. Over the years, the plaintiff shared spreadsheets that he created using his Pauwels Model, with BNYM's employees and executives [<u>Ibid</u>].

BNYM then retained defendant Deloitte LLP to perform the work the plaintiff had been performing [<u>Ibid</u>]. BNYM shared the

44

plaintiff's spreadsheets with Deloitte who used those spreadsheets to reverse engineer the Pauwels Model [Ibid]. Deloitte utilized the Pauwels Model to perform its services for BNYM. The plaintiff sued BNYM and Deloitte, asserting causes of action for, *inter alia*, unjust enrichment. The plaintiff asserted that the defendants unjustly enriched themselves at the plaintiff's expense by using the Pauwels Model [Id. at 186]. That is, BNYM allowed Deloitte to use his model, without BNYM having paid the plaintiff for the model and without having to pay Deloitte for the time and expense of developing its own model [Ibid]. The plaintiff asserted further that Deloitte was enriched by duplicating his model which enabled Deloitte to perform the work that the plaintiff had previously performed for BNYM without further cost to the defendants [Ibid].

The defendants successfully moved in the United States District Court for the Southern District of New York to dismiss the complaint for failure to state a claim. The plaintiff appealed. BNYM argued that the unjust enrichment cause of action was precluded by the existence of a valid contract between it and the plaintiff [Id. at 187]. The plaintiff did not dispute the existence of a valid contract, but, he claimed, the contract did not contemplate the plaintiff selling his intellectual property to BNYM and, therefore, the contract did not cover this disagreement between the parties and thus did not preclude the cause of action for unjust enrichment [Ibid.]. In reversing the dismissal of the

45

complaint, in part, the Second Circuit noted that the plaintiff pleaded in the complaint that BNYM paid him for his advice and expertise, not his models, which was not contemplated by the contract [Id. at 188].  The Second Circuit ruled that, "because there was a bona fide dispute as to whether the contract governed the subject matter underlying Pauwel's claim for unjust enrichment . . . the existence of the contract did not preclude the unjust enrichment claim against BNYM at this motion to dismiss stage" [Ibid.].

        The Claimant's unjust enrichment claim predicated on the Indirect Follow-On Cases is not precluded by the existence of the November 27, 2007, Co-Counsel Agreement.  This branch of the Claimant's claim rests upon the undisputed fact that the Respondents negotiated fees for themselves in the Indirect Follow-On Cases to the exclusion of the Claimant, and without the Claimant's knowledge.  It is also undisputed that the Respondents did not perform any work on the Indirect Follow-On Cases.[29]  The Respondents' claimed entitlement to fees in the Indirect Follow-On Cases is based solely on the fact that the attorneys in these cases merely "repackaged" the Peterson pleadings and asked Judge

_____

[29]  Respondent Perles agreed with the statement that he did not do any work in the Follow-On Cases that wasn't already done in the Peterson Action [TR 12/7/23 pp855-856].

Lamberth to take judicial notice of the judgment entered in the

Peterson

Action.  That is, they used the "work product" of the Peterson

Action to obtain judgments in the Indirect Follow-on Cases, the

"mere cookie-cutter copies of Peterson" as described by Respondent

Perles in his lawsuit against Drennan Gaskill and Donahue [Exh

39].[30]  Respondent Perles believes he owns the "work product" [TR

12/21/23 p1015], and if that is the case then so does the

Claimant based upon his contributions to the Peterson Action.

The "work product" was the result of the Claimant's and

Respondents' efforts in bringing the Peterson Action to

fruition.[31]  It is the very same "work product" that was used by

the damages attorneys and the other attorneys that represented

plaintiffs in the Indirect Follow-On Cases.  The November 27,

2007, Co-Counsel Agreement had nothing to do with the use of the

Peterson work product and did not touch on it whatsoever.  The

---

[30]  Respondent Perles even went so far as to state that a
paralegal could have performed much of the work performed
by the Follow-On Attorneys [TR 12/7/23 pp920-921].
[31]  As mentioned in footnote 2, *supra*, the Arbitrator is not
persuaded that there is any relevance in determining
whether the idea for the Beirut Marines litigation
originated with the Claimant or Respondent Perles as it has
no bearing on the use of the Peterson Action "work product"
in the Indirect Follow-On Cases.  The "work product" from
the Peterson Action belonged to the Claimant and the
Respondents in equal one-thirds, regardless of which party
originated the idea of the litigation.

Claimant owns one-third of the <u>Peterson</u> Action work product and when the Respondents cashed in on the use of the work product, to the exclusion of the Claimant, they were unjustly enriched at the Claimant's expense to the extent of the Claimant's interest in the work product.  The Respondents admitted they did nothing more in the Indirect Follow-On Cases and they cannot criticize the Claimant for not doing any work in the Indirect Follow-On Cases either.

Furthermore, there is no excuse for the Respondents to have excluded the Claimant from the negotiation of these fees for themselves in the Indirect Follow-On Cases. The evidence establishes that when some of these fees were negotiated, the Claimant's "Chinese Wall" was not yet in place. Thus, the Respondents cannot hide behind this excuse in this circumstance. Finally, the fact that the Pauwels decision was decided on a motion to dismiss for failure to state a claim does not undermine the Arbitrator's conclusion. In fact, the posture of the Pauwels case as compared to this arbitration presents a distinction with a significant difference, but not for the reasons espoused by the Respondents. Here, unlike in the Pauwels case, the Arbitrator has had the benefit of the completion of 10 days of hearings, closing arguments, and the submission of exhibits and Post-Hearing Briefs. With the hearings complete and all of the evidence and exhibits fully submitted, it is pellucidly clear that the subject of the unjust enrichment claim falls outside of the scope of the parties' November 27, 2007, Co-Counsel Agreement. It is thus not precluded by the existence of that contract. Therefore, that branch of the Claimant's request for recovery of damages under a theory of unjust enrichment as a result of the Respondents' negotiating fees for themselves in the Indirect Follow-On Cases, is granted.

     3.   <u>Declaratory Judgment</u>

49

In his Demand for Arbitration, the Claimant seeks a judgment declaring his entitlement to future attorneys' fees pursuant to the November 27, 2007, Co-Counsel Agreement sufficient to remedy the dilution "and other damages caused by the Respondents' improper actions." In his Post-Hearing Briefs, the Claimant requests additional declaratory relief that: (1) the Respondents facilitate and not contest in any way the Claimant's claim to direct payment of his one-third *pro rata* share of legal fees from any future recovery by the same individual Peterson plaintiffs from whom Claimant received legal fees in Peterson v Islamic Republic of Iran, No. 10-4518 (SDNY), without those fees coming into Respondents' possession; (2) the Claimant is entitled to be paid 21.61% of any future legal fees payable to the Respondents, directly or indirectly, from any future recovery for the Indirect Follow-On Cases of Valore, Arnold, Spencer I, Murphy, Bland, Taylor, O'Brien, Anderson, Brown, Spencer II, and Ayers, without those fees coming into Respondents' possession; and (3) Respondents' obligations shall not be impacted in any way by, among other things, whether the Claimant is counsel of record in any related action or whether any of the Peterson plaintiffs have discharged him. The Claimant also requests the appointment of a Special Master to implement the Final Award, and that all legal fees payable to any of the parties arising from the Beirut Marine

50

plaintiffs future recoveries be paid to the Special Master to allocate consistent with the Final Award.[32]

The Respondents oppose the request for declaratory relief and argue that the "Co-Counsel Agreement" is not a contract and, in any event, it does not govern the payment of attorneys' fees. The Respondents further contend that, even if the Co-Counsel Agreement is found to be a contract, the covenant of good faith and fair dealing was not breached and thus, the request for declaratory relief in the Claimant's favor is without merit.

CPLR 3001 provides that a judgment may be rendered declaring "the rights and other legal relations of the parties to a justiciable controversy." "The primary purpose of a declaratory judgment is to stabilize an uncertain or disputed jural relationship with respect to present or prospective obligations" [see Chanos v MADAC, LLC, 74 AD3d 1007, 1008 (2d Dept 2010)].

As stated *supra*, although the November 27, 2007, Co-Counsel Agreement constitutes a valid contract, the Respondents did not breach the covenant of good faith and fair dealing by entering into the Marines Cooperation Agreement. As a result, the Claimant is not entitled to damages on the breach of contract claim. This dooms that branch of the Claimant's request as set forth in his

---

[32]   The request for declaratory relief in the Claimant's Demand for Arbitration is sufficiently broad to embrace these additional requests for declaratory relief as articulated in the Claimant's Post-Hearing Briefs.

Demand for Arbitration for a judgment declaring his entitlement to future attorneys' fees pursuant to the November 27, 2007, CoCounsel Agreement sufficient to remedy the dilution of his attorneys' fees.

Where a declaratory judgment claim is resolved on the merits against the Claimant, the proper course is to issue a declaration in favor of the Respondents [see Lanza v Wagner, 11 NY2d 317, 334, *appeal dismissed* 371 US 74, *cert den* 371 US 901 (1962); Siegel, NY Prac §440]. Thus, it will be DECLARED that the Claimant is not entitled to future attorneys' fees pursuant to the November 27, 2007, Co-Counsel Agreement sufficient to remedy any dilution of attorneys' fees resulting from the Peterson plaintiffs entering into the Marines Cooperation Agreement. This declaration is not intended to interfere with the Claimant's right to diminish or eliminate his dilution as to any current clients that have been Peterson plaintiffs by recovering his fees on the clients' future enforcement of their judgments.

That branch of the Claimant's request for a judgment declaring that the Respondents are directed to facilitate and not contest in any way the Claimant's claim to direct payment of his one-third *pro rata* share of legal fees from any future recovery by the same individual Peterson plaintiffs from whom Claimant received legal fees in Peterson v Islamic Republic of Iran, No. 10-4518 (SDNY), without those fees coming into Respondents' possession, is denied.

52

The denial of this branch of relief does not alter or affect the sanctions awarded in decretal paragraph 2 of the CORRECTED INTERIM AWARD dated the same date as this FINAL AWARD, *nunc pro tunc* to April 10, 2025. Moreover, the denial of this relief is not intended to interfere with the Claimant's right to diminish or eliminate his dilution as to any current clients that have been <u>Peterson</u> plaintiffs by recovering his fees on the clients' future enforcement of their judgments.

That branch of the Claimant's request for a judgment declaring that the Respondents pay to the Claimant 21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of the following Indirect Follow-On cases: <u>Valore</u>, <u>Arnold</u>, <u>Spencer I</u>, <u>Murphy</u>, <u>Bland</u>, <u>Taylor</u>, <u>O'Brien</u>, <u>Anderson</u>, <u>Brown</u>, <u>Spencer II</u> and <u>Ayers</u>, without the Claimant's 21.61% of those fees coming into Respondents' possession, is granted. As discussed *supra*, the Claimant established his entitlement to judgment on that branch of the unjust enrichment claim predicated upon the Respondents' negotiating fees for themselves in the Indirect Follow-On Cases, to the exclusion of the Claimant, based upon the use of the <u>Peterson</u> Action "work product" in those cases. Therefore, it will be DECLARED that the Respondents shall pay to the Claimant 21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of the following Indirect Follow-On cases:

Valore, Arnold, Spencer I, Murphy, Bland, Taylor, O'Brien, Anderson, Brown, Spencer II and Ayers, without the Claimant's 21.61% of those fees coming into Respondents' possession.

That branch of Claimant's request for a judgment declaring that the Respondents' obligations shall not be impacted in any way by, among other things, whether the Claimant is counsel of record in the Indirect Follow-On Cases or whether any of the Peterson plaintiffs have purportedly discharged the Claimant, is denied as unnecessary.

The Claimant's request for the appointment of a Special Master and for a directive that all legal fees payable to any of the parties arising from the Beirut Marine plaintiff's future recoveries be paid to the Special Master to allocate consistent with this FINAL AWARD, is denied as unnecessary.

C.  Respondent Perles's Affirmative Defenses

Respondent Perles asserts a number of affirmative defenses, all but one of which are without merit.  As stated *supra* in footnote 35, the first affirmative defense of the statute of limitations was the subject of a motion to dismiss brought by the Respondents which was denied on the merits in Procedural Order No. 1 dated December 13, 2021.  Therefore, that branch of the first affirmative defense asserting that the claims are barred by the statute of limitations is dismissed.  That branch of the first affirmative defense asserting that the claims are barred by laches

54

is denied and dismissed as abandoned. The second affirmative defense of the failure of consideration has been addressed *supra*; the Arbitrator found that the November 27, 2007, Co-Counsel Agreement is supported by consideration. Therefore, the second affirmative defense is without merit and is denied, and that affirmative defense is dismissed.

The third affirmative defenses of failure to state a claim is without merit insofar as it is asserted against the claim for breach of contract in view of the Arbitrator's finding that the Claimant established that the November 27, 2007, Co-Counsel Agreement was a valid and binding contract. However, Respondent Perles has established this affirmative defense with respect to that branch of the Claimant's claim to recover damages under a theory of unjust enrichment, pled as an alternative to the breach of contract claim. This branch of the unjust enrichment claim was dismissed in view of the finding that the November 27, 2007, CoCounsel Agreement constitutes a valid a contract thereby precluding recovery under a theory of unjust enrichment. Therefore, the third affirmative defense of failure to state a claim is granted to the extent indicated in the dismissal of the claim to recover damages under a theory of unjust enrichment, pled as an alternative to the breach of contract claim, and otherwise the third affirmative defense is denied and dismissed.

55

The fourth and fifth affirmative defenses of failure to establish the parties to the contract, and failure to establish the elements of the contract, are without merit in view of the Arbitrator's finding that the Claimant established that the November 27, 2007, Co-Counsel Agreement was a valid and binding contract. Therefore, the fourth and fifth affirmative defenses are denied, and these affirmative defenses are dismissed.

The seventh affirmative defense asserting that the fees requested are in excess of that permitted under the Rules of Professional Conduct is denied as beyond the jurisdiction of the Arbitrator. The eighth affirmative defense of failure to perform, and the tenth affirmative defense of failure to provide any work or anything of value to the collection effort, are denied because, as already discussed, the evidence established that the Claimant performed the tasks that he was required to perform under the parties' agreed-upon division of labor. The ninth and eleventh through fourteenth affirmative defenses of failure of a condition precedent, fraud in the inducement, malfeasance, contributory negligence, and the doctrine of *in pari delicto*, as well as the sixteenth through twentieth affirmative defenses of failure to mitigate damages, justification, fraud, estoppel, and waiver, are denied for lack of proof. Therefore, the seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth affirmative defenses are denied and dismissed.

56

Respondent Perles established his sixth affirmative defense of failure to satisfy the elements of the claims to the extent of the claim for damages for breach of contract based upon the covenant of good faith and fair dealing, because the Claimant failed to establish that the November 27, 2007, Co-Counsel Agreement was breached by the Respondents.  The sixth affirmative defense has also been established with respect to that branch of the claim to recover damages under a theory of unjust enrichment, pled as an alternative to the breach of contract claim, because the existence of the contract precludes that branch of the unjust enrichment claim.  Therefore, the sixth affirmative defense of failure to satisfy the elements of the claims is granted to the extent indicated in the dismissal of the claim to recover damages for breach of contract based upon the covenant of good faith and fair dealing, and the dismissal of that branch of the claim to recover damages under a theory of unjust enrichment, pled as an alternative to the breach of contract claim, and otherwise the sixth affirmative defense is denied and dismissed.

The remaining affirmative defenses of unclean hands and setoff are discussed separately.

(1) Unclean Hands

Respondent Perles asserts the affirmative defense of unclean hands as his fifteenth affirmative defense in the Response to the Demand for Arbitration dated October 8, 2021.  It is asserted again

in his Supplemental Response to the Demand for Arbitration dated January 20, 2022, as a bar to the Claimant's claim for equitable relief.

The doctrine of unclean hands is a defense to a party seeking equitable remedies. It applies "when the complaining party shows that the offending party is "guilty of immoral, unconscionable conduct and even then only when the 'conduct relied on is directly related to the subject in litigation and the party seeking to invoke the doctrine was injured by such conduct'" [Kopsidas v Krokos, 294 AD2d 406, 407 (2d Dept 2002), quoting National Distillers & Chem. Corp. v Seyopp Corp., 17 NY2d 12, 16 (1966)].

In his Response and Supplemental Response to the Demand, Respondent Perles argues that the Claimant's simultaneous representation of the GABK plaintiffs and the Peterson plaintiffs caused or contributed to the facts about which he now complains. In particular, Respondent Perles "believes" that the Claimant "may have" improperly provided the GABK plaintiffs with information regarding the Clearstream I asset when it was identified in response to the subpoena served by Cook on OFAC in both the Greenbaum and Peterson cases. As discussed in footnote 17, *supra*, the Claimant denied revealing any information about the Clearstream I asset to Stroock. In fact, the Claimant testified that he could not have revealed such information since the existence of the

Clearstream I asset was not disclosed to him by either Cook or
Respondent Perles, both of whom were advised of the existence of
the Clearstream I asset.  Respondent Perles has produced no
viable evidence to support his assertion,[33] and he has likewise
failed to submit any evidence or arguments to establish that the
Claimant engaged in any immoral or unconscionable conduct.
Therefore, the affirmative defense of unclean hands is denied,
and that affirmative defense is dismissed.

    (2) Set-Off

    Respondent Perles asserts an affirmative defense of set-off
on the basis of the 87/13 Agreement.  He argues that the Claimant
cannot be entitled to recovery against the Respondents in
connection with the Marines Cooperation Agreement while also being
entitled to the fees he received in connection with the GABK cases.
Respondent Perles argues that, if the Claimant is entitled to
recover damages in connection with the Marines Cooperation
Agreement, then Respondents are entitled to a set-off in the amount

---

[33]  Moreover, to the extent this affirmative defense is
predicated on the Claimant's purported conflict of interest
in representing both the GABK plaintiffs and the Peterson
plaintiffs, Respondent Perles conceded in his Post-Hearing
Brief that "[w]hether a conflict of interest actually
existed need not be resolved in this Arbitration"
[Principal Closing Brief of Perles Respondents dated
12/13/24 p20].

of the fees that the Claimant received from the QSF pursuant to the 87/13 Agreement.

The Claimant has not been awarded any damages on his claim predicated on the Marines Cooperation Agreement. Furthermore, Respondent Perles did not produce any expert witness or expert report, or otherwise provide the Arbitrator with a mechanism by which to calculate any set-off. Therefore, the affirmative defense of set-off is denied, and that affirmative defense is dismissed.

D.    Damages

The Claimant seeks damages on his claims for breach of contract and under the theory of unjust enrichment. Because the Claimant failed to establish a breach of contract, his request for damages on the breach of contract claim is denied. The Claimant has succeeded on his claim for the recovery of damages under the theory of unjust enrichment as a result of the Respondents' negotiating fees for themselves in the Indirect Follow-On Cases. The Claimant's expert, Jeffrey Buchakjian, CPA/CFF, submitted a detailed and thorough report dated October 23, 2023, and testified at the hearing. The report separately calculates the damages for that branch of the unjust enrichment claim for which the Arbitrator has ruled in the Claimant's favor. Mr. Buchakjian calculated the percentage of attorneys' fees received by each of the Claimant, Respondent Fay, Respondent Perles, and Mr. LaSpada on distributions

from the Clearstream I asset in the <u>Peterson</u> Action.  The Claimant
received 21.61% of those fees.  Mr. Buchakjian then calculated the
fees the Respondents received from the Clearstream I asset
attributable to the Indirect Follow-On Cases as $30,493,346.  After
applying the Claimant's 21.61% share to the $30,493,346, Mr.
Buchakjian arrived at the sum of $6,589,416.00 owed to the Claimant
as his portion of the fees paid in the Indirect Follow-On Cases
thus far.

Respondent Perles argues that Mr. Buchakjian's report is
"meaningless and defective."  However, Respondent Perles fails to
support this statement with any persuasive arguments or evidence.
He criticizes the damages expert for failing to take into account
the "over $7.9 million" in attorneys' fees the Claimant received
from the GABK case, and the fact that Respondents' attorneys' fees
were diluted by 13% as a result of the 87/13 Agreement.  However,
Respondent Perles presented no expert of his own, and he has not
otherwise provided the Arbitrator with any evidence upon which to
calculate a set-off, other than vague references to the attorneys'
fees Claimant recovered in the GABK case.  Therefore, the
Arbitrator awards the Claimant the sum of $6,589,416.00 as
calculated by the Claimant's expert on the Claimant's claim to
recover damages under a theory of unjust enrichment based upon the
Respondents' negotiation of fees for themselves in the Indirect

Follow-On Cases to the exclusion of the Claimant.[34]

E.    Pre-Judgment Interest

In his Post-Hearing Brief, the Claimant seeks an award of prejudgment interest.  The Claimant did not make this request in his Demand for Arbitration.  CPLR 5001(a) provides, in pertinent part, that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."

Respondent Perles opposes the Claimant's request for prejudgment interest because the Arbitration Agreement does not mention pre-judgment interest, and the Claimant did not include any such request in his Demand for Arbitration.  Further, Respondent Perles argues that the Arbitrator should not award pre-judgment interest as a matter of discretion where, as here, the Claimant was willfully ignorant of the facts and is responsible for the delay in seeking a remedy.

---

[34]    There is no merit to Respondent Perles's argument that Mr. Buchakjian's expert report is defective because it provides no mechanism for addressing future recoveries.  The Claimant is entitled to 21.61% of the attorneys' fees from the Indirect Follow-On Cases from past and future recoveries in those cases, as set forth in the expert report [Affirmation of Jeffrey Buchkajian, CPA/CFF, p6].

The Claimant's request for pre-judgment interest is denied. The Claimant did not make any such request in his Demand for Arbitration and his request for such an award in his Post-Hearing Briefs comes too late.

F.    Attorneys' Fees and Costs of the Arbitration

The Claimant seeks an award of attorneys' fees and costs incurred in this arbitration.[35]

JAMS Rule 24(g)[36] provides that the Arbitrator may allocate attorneys' fees and expenses if provided by the parties' agreement or allowed by applicable law. The "long standing 'American rule' precludes the prevailing party from recouping legal fees from the losing party 'except where authorized by statute, agreement, or court rule'" [Gotham Partners, L.P. v High River Ltd. Partnership, 76 AD3d 203, 204 (1st Dept 2010) *lv app denied* 17 NY3d 713 (2011) quoting US Underwriters Inc. Co. v City Club Hotel, LLC, 3 NY3d 592, 597 (2004); see CPLR 7513].

The Arbitration Agreement requires the Claimant to bear 50% of the expenses of the arbitration and is silent with respect to attorneys' fees [see Arbitration Agreement dated December 4, 2017, Section II. Agreement to Arbitrate ¶F]. Since there is no statute,

---

[35]   The Respondents did not request an award of attorneys' fees or costs in their Responses to the Demand for Arbitration.

[36]   See fn36, *supra*.

agreement or court rule authorizing an award of attorneys' fees in this arbitration, and the Arbitration Agreement requires the Claimant to bear 50% of the costs of the arbitration, the Claimant's request for an award of attorneys' fees and costs is denied, except for the costs awarded *infra* pursuant to the CORRECTED INTERIM AWARD as a sanction authorized by JAMS Rule 29.

A CORRECTED INTERIM AWARD was issued on the date of this FINAL AWARD, *nunc pro tunc* to April 10, 2025. It is incorporated verbatim as follows, except for the numbering of footnotes in the CORRECTED INTERIM AWARD:

**CORRECTED INTERIM AWARD**

The undersigned Arbitrator, having been designated pursuant to Section II, paragraph D of an Arbitration Agreement dated December 4, 2017, among the Claimants Allen L. Rothenberg, Esq., The Law Firm of Allen L. Rothenberg, and The Rothenberg Law Firm LLP, (hereinafter the Claimant), the Respondents Thomas Fortune Fay, Esq., The Fay Law Group, P.C., (hereinafter Respondent Fay), Steven R. Perles, Esq., Perles Law Firm, P.C., (hereinafter Respondent Perles), and Fay and Perles FSIA Litigation Partnership, and non-party Anthony LaSpada, Esq., and having read the submissions of the Claimant and the Respondents, does hereby find and AWARD as follows:

<u>**BACKGROUND**</u>

On April 16, 2024, the Respondents sent a letter to those <u>Peterson</u> plaintiffs who are the Claimant's clients accusing the Claimant of having violated the Rules of Professional Conduct. The letter was sent on "Fay & Perles" letterhead. The Respondents invited <u>the Peterson</u> plaintiffs to whom the letter was sent to "make changes to [their] legal team." Claimant's counsel was notified on April 18, 2024, that the letter was sent to the

64

Claimant's clients.    Shortly thereafter, the Claimant began
receiving communications from some of the <u>Peterson</u> plaintiffs, who
are the Claimant's clients, purporting to terminate his
representation in the <u>Peterson</u> Action.

In an email dated April 19, 2024, the Claimant requested a
conference with the Arbitrator and all parties.  A Zoom conference
was held on April 22, 2024, and the Claimant thereafter submitted
an email dated April 26, 2024, seeking various forms of relief.
The Respondents submitted letters opposing much of the requested
relief.

The Arbitrator issued Order No. 7 on May 15, 2024.  Order No.
7 provides, in pertinent part:

> **ORDERED** that that branch of the Claimant's
> April 26, 2024, email request for an Order
> directing the Perles Respondents and the Fay
> Respondents to facilitate, and not contest,
> Claimant's claim to direct payment of the
> Claimant's pro rata share of legal fees in the
> 650 Fifth Avenue Action on account of the same
> individual Peterson plaintiffs from whom the
> Claimant received legal fees in the <u>Peterson</u>
> <u>et al v Islamic Republic of Iran</u>, No. 104518
> (SDNY), [sic] without those fees coming into
> the Respondents' possession, is granted; and
> it is further * * *
>
> **ORDERED** that that branch of the Claimant's
> April 26, 2024, email request for an Order
> directing the Perles Respondents and the Fay
> Respondents to provide the Claimant with
> information regarding any communications or
> meetings the Respondents had with the Peterson
> Plaintiffs, who are the Claimant's clients,
> related to the Claimant, the letter dated
> April 16, 2024, or the subject of this
> arbitration, is granted; and it is further
>
> **ORDERED** that within 7 days of the date of this
> Order, the Fay Respondents shall provide the
> Claimant with a detailed written statement of
> all communications with the Peterson
> Plaintiffs, who are the Claimant's clients,
> regarding the Claimant, the April 16, 2024,
> letter, or the subject of this arbitration,
> including the Zoom sessions, and both the Fay
> Respondents and Perles Respondents shall
> continue to provide the  Claimant with the

65

same detailed information for any past, present and future communications with the Peterson Plaintiffs who are the Claimant's clients.

The Claimant thereafter received communication from an attorney claiming to represent one of the Peterson plaintiffs, who was the Claimant's client, who had purportedly discharged the Claimant and was threatening to bring a motion to disqualify the Claimant from representing any of the Peterson plaintiffs. On December 5, 2024, the Claimant submitted an email application for an order, *inter alia*, compelling the Respondents "to comply with Order No. 7 by disclosing all written and oral communications with . . . any other Peterson plaintiffs who are the Claimant's clients, or their attorneys, relating to the issues to be decided in this arbitration, to Fay and Perles's April 16, 2024, letter, or the allegation that the Claimant has engaged in an impermissible conflict of interest. . . ." The Respondents opposed the Claimant's email application in separate emails dated December 6, 2024.

In Order No. 8 dated December 9, 2024, the Arbitrator granted the Claimant's motion and the Respondents were given two calendar days to provide this information. In Order No. 9 dated December 18, 2024, the Arbitrator found that the Respondents complied with Order No. 7 and Order No. 8 by timely revealing the fact of communications though not revealing the content of communications on the basis of privilege. The Arbitrator denied additional relief requested by the Claimant in Order No. 9, for privilege logs and for the disclosure of any financial or incentive relationship between the Respondents and certain other law firms, as outside the scope of this arbitration.

The Respondents' compliance with Order No. 7 as recognized in Order No. 9, did not terminate the Respondents' ongoing obligations to comply with the directives contained in Order No. 7. Order No. 7 remains in full force and effect and neither of the Respondents has moved to vacate that Order.

## MOTION AND OPPOSITIONS

By motion dated March 17, 2025, the Claimant seeks the imposition of sanctions against the Respondents pursuant to JAMS Rule 29 for violation of Order No. 7 dated May 15, 2024. In the alternative, the Claimant seeks to amend the Demand for Arbitration pursuant to JAMS Rule 10. The Claimant also seeks an Order directing Respondents to (1) cease and desist from facilitating the termination or purported termination of the Claimant's representation of the Peterson plaintiffs; (2) comply with Order No. 7; (3) provide the Claimant with all written communications since April 16, 2024, or in the future with any Peterson plaintiff

or such plaintiff's representative that reference the Claimant in any way whatsoever; (4) facilitate, and not contest, the Claimant's claim to direct payment of his *pro rata* share of legal fees from funds paid by the USVSST on account of the same individual <u>Peterson</u> plaintiffs from whom the Claimant received legal fees in the <u>Peterson et al v Islamic Republic of Iran</u>, No. 10-4518 (SDNY) action; (5) escrow legal fees payable to them from funds paid by the USVSST on account of the Indirect Follow-On Plaintiffs in an amount sufficient to cover the Claimant's claimed damages which will be determined at a later date.  The Claimant also requests permission to share Order No. 7 and this **INTERIM AWARD** with anyone necessary to implement the relief in the context of the USVSST.

Respondent Fay and Respondent Perles oppose the motion in separate submissions each dated March 25, 2025.

The Claimant submitted an email Reply on March 26, 2025.

## DISCUSSION

In support of the motion, the Claimant contends that the Respondents have orchestrated and facilitated the purported termination of his representation of plaintiffs in the <u>Peterson</u> Action in an attempt to deprive him of his attorneys' fees in that action.  The Claimant further asserts that the Respondents' actions are not only a violation of Order No. 7, but they are a clear attempt at an end-run around the relief sought in this arbitration. The Claimant supports his motion with email communications from Caragh Fay Owens, Esq. to some of the <u>Peterson</u> plaintiffs.  In one of those email communications, Ms. Fay brings up "the Rothenberg issue," and asks the Claimant's client if she sent "anything" to the Claimant.  The Claimant's client asked no questions and simply responded that she had not sent anything to the Claimant. Nevertheless, Ms. Fay responded with an email advising the Claimant's client that she needs to let the Claimant know, by sending him an email, if the client no longer wishes the Claimant to represent her and her entire family.  The client expresses confusion and asks Ms. Fay what they should do.  Ms. Fay again reiterates that the Claimant's client should send the Claimant a letter if they no longer wish the Claimant to represent them.  Ms. Fay goes so far as to provide her cell phone number and to invite plaintiffs to call her, even during the weekend, if they have any questions.  The communications reveal that Ms. Fay is clearly setting up a competition between the Fay & Perles law firm and the Rothenberg law firm.

In opposition to the motion, Respondent Fay argues that the communications with the <u>Peterson</u> plaintiffs did not violate Order No. 7, and that all of the communications were mandated by the Rules of Professional Conduct for the District of Columbia. Respondent Fay's opposition papers take a deep dive down a rabbit hole of the Rules of Professional Conduct from which she somehow

concludes that the Claimant is prohibited from representing the Peterson plaintiffs and that, as a result, the request for sanctions is moot.  Tellingly, the opposition papers contain no denial of communications with the Peterson plaintiffs, and, in fact, contain an admission of "instigating" communications but without explanation as to whether all of these communications have been revealed to the Claimant as required by the continuing obligations imposed by Order No. 7.

Respondent Perles similarly misses the mark in his opposition to the motion by asserting that the Arbitrator lacks jurisdiction to grant the requested relief.  He then throws Respondent Fay under the bus by claiming that, while Respondent Perles sought advice from ethics counsel and the communications with the Peterson plaintiffs were determined to be necessary, Respondent Perles has not communicated with the clients[37] and thus cannot be sanctioned.

This is the fourth time the Arbitrator is addressing the same issue in this arbitration in the span of less than 12 months.[38] The email communications submitted by the Claimant in support of his motion reveal that the Respondents continue to communicate with the Peterson plaintiffs who are the Claimant's clients, about the Claimant's representation of those clients, without revealing all of those communications to the Claimant.  The scant emails that were forwarded to the Claimant, which appear to have been forwarded by accident, are only portions of communications with the Claimant's clients, not the entirety of the communications between Respondent Fay and those clients, despite the Respondents' continuing obligation to provide the entirety of these communications to the Claimant pursuant to Order No. 7.

Moreover, contrary to Respondent Fay's assertion, she is not simply inquiring as to whether the plaintiffs have made a decision on their legal representation.  Respondent Fay blatantly asks the Claimant's clients whether they have "sent a letter" to the Claimant.  She raises "the Rothenberg issue" with one Peterson plaintiff and asks if they sent anything to the Claimant; Respondent Fay attaches another copy of the April 16, 2024, letter "in case [they] didn't receive it."  Respondent Fay tells more than one Peterson plaintiff, in response to their confusion, that "if you do not wish for him to represent you, you need to let him know by sending him an email."  This is not simply "initiating contact" to determine if these plaintiffs consented to the Claimant "resuming his representation."  That phrase, as perplexing as it

---

[37]  He never disclaims knowing that these communications were occurring or even instigating or encouraging them.

[38]  The Arbitrator addressed this issue in Order No. 7, dated May 15, 2024, in Order No. 8, dated December 9, 2024, and in Order No. 9, dated December 18, 2024.

is, is nowhere found in any of the communications submitted to the Arbitrator. Respondent Fay is clearly coaxing these <u>Peterson</u> plaintiffs to terminate the Claimant's representation. She sets up a competition or false choice between the Claimant and the Respondents - an either/or proposition - that will undermine the relief sought in this arbitration.

Respondent Fay trots out a number of provisions of the Rules of Professional Conduct which she relies on as an excuse for her violation of Order No. 7. One of those rules is that informed consent requires an affirmative response by a client; consent may not be assumed from silence. Apparently Respondent Fay did not believe this Rule applied to the Respondents when they entered into the Marines Cooperation Agreement, a mere 10 days after sending consent forms to the more than 800 <u>Peterson</u> plaintiffs. Moreover, the Respondents wholly ignore the fact that they never told the Claimant about the Marines Cooperation Agreement and the Respondents certainly do not reveal what the ramifications might be of that concealment under the Rules of Professional Conduct.

Nevertheless, whether any of the parties violated the Rules of Professional Conduct is an issue not before the Arbitrator and is, in fact, beyond the jurisdiction of the Arbitrator [<u>see Bidermann Indus. Licensing v Avmar N.V.</u>, 173 AD2d 401, 402 (1ˢᵗ Dept 1991)(application of the Code of Professional Responsibility cannot be left to determination of arbitrators); <u>see also</u> <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v Benjamin</u>, 1 AD3d 39, 44 (1ˢᵗ Dept 2003)]. However, Order No. 7 has been in effect since May 15, 2024. The Respondents have not once come to the Arbitrator with a motion to vacate or modify Order No. 7 under the guise of their so-called ethical obligations.

Furthermore, the reasons provided by the Respondents for their actions are subterfuge. If the Rules of Professional Conduct imposed an obligation on the Respondents to speak to the clients about any alleged conflicts,[39] those obligations were imposed long ago. The Respondents chose to remain silent. The Claimant first raised an issue regarding the Marines Cooperation Agreement and the dilution of his fees when he learned of that Agreement in or about 2017. The Arbitration Agreement dated December 4, 2017, and signed by all parties to this arbitration, clearly spelled out the issue the Claimant was raising with respect to the sharing agreements. The Respondents remained silent for seven years and only found the urgency to notify the <u>Peterson</u> plaintiffs of the

---

[39]   And what about their own conflict in representing the Follow-On Plaintiffs who are competing with the <u>Peterson</u> plaintiffs to execute judgments against the same assets (Clearstream I and 650 Fifth Avenue).

Claimant's alleged ethical violations in the midst of this arbitration.

The Respondents' actions are nothing more than a thinly veiled attempt to oust the Claimant from representing the Peterson plaintiffs and to share his fees between them in a 50/50 split. Furthermore, the communications with the Peterson plaintiffs are a glaring attempt to undermine this Arbitrator's jurisdiction to determine the issues in this arbitration and to render academic the relief sought by the Claimant in his Demand for Arbitration, particularly his request for declaratory relief.

There is no merit to Respondent Fay's allegation that the Claimant no longer represents the Peterson plaintiffs and that the Claimant is only entitled to fees on the basis of *quantum meruit*. This is nowhere alleged in any of the arbitration pleadings. Indeed, Ms. Fay contradicts, for this arbitration, the conflict of interest she raises to justify the communication with the Claimant's clients in the letter of April 16, 2024. Ms. Fay's conflict of interest argument, raised more than seven years after the purported conflict came to light, is merely a smokescreen created after the fact to justify sending the letter of April 16, 2024.

In addition, although Respondent Perles attempts to lay all of the blame on Respondent Fay, he never disclaims Respondent Fay's communications or indicates that she was acting clandestinely without his knowledge or even his consent or support. The April 16, 2024, letter was sent on Fay & Perles letterhead and her follow-up communications clearly were made on behalf of Fay & Perles.

Finally, the Arbitrator rejects the assertion that this dispute falls outside the scope of this Arbitration. The Claimant submitted his "fee dispute" to arbitration seeking, *inter alia*, declaratory relief "setting forth his entitlement to future attorneys' fees from under the Co-Counsel Agreement sufficient to remedy. . . other damages caused by Respondents' improper actions" [Claimant's Demand for Arbitration dated September 14, 2021, p10, ¶45]. Any attempt to undermine the parties' Arbitration Agreement with respect to the disputes submitted to arbitration falls within the scope of the Arbitrator's jurisdiction. The dispute that is the subject of this **INTERIM AWARD** also falls within the Arbitrator's jurisdiction to protect the sanctity of the relief requested, including the issuance of a declaratory judgment that might otherwise be rendered academic if the Respondents were to succeed in dislodging the Claimant from representing all of the Peterson plaintiffs.

JAMS Rule 29 provides:

> The Arbitrator may order appropriate sanctions for the failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences, or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

That branch of the Claimant's motion which was for sanctions under JAMS Rule 29 is granted. The Arbitrator finds that the Respondents have flagrantly violated their continuing obligations imposed under Order No. 7 dated May 15, 2024. Their clandestine communications in violation of that Order are an attempt to undermine the jurisdiction of this Arbitrator to adjudicate the disputes raised in the Claimant's Demand for Arbitration and the affirmative defenses raised by Respondent Perles. JAMS Rule 29 authorizes drawing an adverse inference. An adverse inference is drawn that the Respondents are cloaking themselves in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he represents in the Peterson Action. The Arbitrator awards sanctions as authorized by JAMS Rule 29 in the form of payment to the Claimant of any shortfall in attorneys' fees from the Peterson plaintiffs that he represented when the QSF distributed the Clearstream I asset, due to his discharge of representation of any of them, and the attorneys' fees he collects from their recoveries in the 650 Fifth Avenue and USVSST matters, or any other matter from which these clients recover payments on their judgments. This shortfall, if any, shall be paid as a sanction by the Respondents, jointly and severally.

The Arbitrator further awards as a sanction pursuant to JAMS Rule 29, reimbursement of the Claimant's share of Arbitration fees, Arbitrator compensation and expenses, including compensation of the Research Assistant, as well as reasonable attorneys' fees paid by the Claimant to his counsel, Fox Rothschild, since December 18, 2024,[40] to address the issues in enforcing Order No. 7. The

---

[40] This is the date of Order No. 9 where the Respondents were found, as of that date, to have complied with Order No. 7 and No. 8, after timely responding to the directive

Claimant's attorney is directed to submit a detailed affidavit, within seven (7) days of the date of this **INTERIM AWARD**, specifying the attorneys' fees paid and time spent since December 18, 2024, to address the issues in enforcing Order No. 7.  This affidavit shall reveal the backgrounds of each timekeeper and the customary hourly rates charged and collected in like matters.  The affidavit should also set forth the amount of Arbitration fees, Arbitrator compensation and expenses, including compensation of the Research Assistant, the Claimant has paid relating to the enforcement of Order No. 7 since December 18, 2024.  The Respondents shall each respond within seven (7) days of the date of the Claimant's submission.  The Claimant shall reply within five (5) days after the date of the Respondents' submissions.

The Claimant's request in the alternative to amend the Demand for Arbitration is denied as unnecessary.

That branch of the Claimant's motion which was for an Order directing Respondents to cease and desist form facilitating the termination or purported termination of the Claimant's representation of the <u>Peterson</u> plaintiffs is denied, without prejudice to the Claimant's enforcement of the ongoing obligations of Order No. 7.

That branch of the Claimant's motion which was for an Order directing Respondents to comply with Order No. 7 by "provid[ing] the Claimant with information regarding any communications or meetings the Respondents had with the <u>Peterson</u> Plaintiffs, who are the Claimant's clients,  related to the Claimant, the letter dated April 16, 2024, or the subject of this arbitration," while also continuing to provide "the Claimant with the same detailed information for any past, present and future communications with the <u>Peterson</u> Plaintiffs who are the Claimant's clients," is denied as duplicative of the relief granted in Order No. 7 which remains in full force and effect, and without prejudice to the Claimant's enforcement of the ongoing obligations of Order No. 7.

That branch of the Claimant's motion which was for an order directing the Respondents to provide the Claimant with all written communications since April 16, 2024 (the date of the first letter) or in the future with any <u>Peterson</u> Plaintiff or such plaintiff's representative that reference or refer to the Claimant in any way whatsoever, is denied.

That branch of the Claimant's motion which was for an Order directing the Respondents to facilitate, and not contest, the Claimant's claim to direct payment of Claimant's *pro rata* share of

---

in Order No. 8 compelling them to comply with Order No. 7. The Respondents' obligations to comply with the directives in Order No. 7 remained ongoing after the issuance of Orders No. 7, 8, and 9.

legal fees from funds paid by the USVSST on account of the same individual Peterson Plaintiffs from whom the Claimant received legal fees in Peterson et al v Islamic Republic of Iran, No. 10-4518 (SDNY), is denied as unnecessary.

That branch of the Claimant's motion which was for an Order directing the Respondents to escrow legal fees payable to them from funds paid by the USVSST on account of the Indirect Follow-On Plaintiffs in an amount sufficient to cover the Claimant's claimed damages which will be determined once the details of any such payments are made available to the Claimant, is denied.

That branch of the Claimant's motion which was for an Order permitting the sharing of Order No. 7 and this **INTERIM AWARD** with anyone necessary to implement the relief in the context of the USVSST, is granted upon consent of Respondent Perles and without opposition from Respondent Fay.

## CONCLUSION

Any argument not addressed in this **INTERIM AWARD** was found to be unavailing, without merit, academic or unnecessary to reach.

The Arbitrator concludes and **AWARDS** as follows:

1. That branch of the Claimant's motion which was for sanctions under JAMS Rule 29 is granted.

2. Pursuant to JAMS Rule 29, an adverse inference is drawn that the Respondents are cloaking themselves in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he represents in the Peterson Action. The Arbitrator awards sanctions as authorized by JAMS Rule 29 in the form of payment to the Claimant of any shortfall in attorneys' fees from the Peterson plaintiffs that he represented when the QSF distributed the Clearstream I asset, due to his discharge of representation of any of them, and the attorneys' fees he collects from their recoveries in the 650 Fifth Avenue and USVSST matters, or any other matter from which these clients recover payments on their judgments. This shortfall, if any, shall be paid as a sanction by the Respondents, jointly and severally.

3. Pursuant to JAMS Rule 29, the Respondents shall reimburse the Claimant for his share of Arbitration fees, Arbitrator compensation and expenses, including compensation of the Research Assistant, as well as the reasonable attorneys' fees paid by the Claimant to his counsel, Fox Rothschild, since December 18, 2024, to address the issues in enforcing Order No. 7. The Claimant's attorney is directed to submit a detailed affidavit, within seven (7) days of the date of this **INTERIM AWARD**, specifying the attorneys' fees paid and time spent by Fox Rothschild since December 18, 2024, to address the issues in enforcing Order No. 7. This affidavit shall reveal the backgrounds of each timekeeper and the customary

hourly rates charged and collected in like matters. The affidavit should also set forth the amount of Arbitration fees, Arbitrator compensation and expenses, including compensation of the Research Assistant, the Claimant has paid relating to the enforcement of Order No. 7 since December 18, 2024. The Respondents shall each respond within seven (7) days of the date of the Claimant's submission. The Claimant shall reply within five (5) days after the date of the Respondents' submissions.

4.  That branch of the Claimant's request in the alternative to amend the Demand for Arbitration is denied as unnecessary.

5.  That branch of the Claimant's motion for an Order directing Respondents to cease and desist from facilitating the termination or purported termination of the Claimant's representation of the <u>Peterson</u> plaintiffs is denied, without prejudice to the Claimant's enforcement of the ongoing obligations of Order No. 7.

6.  That branch of the Claimant's motion for an Order directing Respondents to comply with Order No. 7 by "provid[ing] the Claimant with information regarding any communications or meetings the Respondents had with the <u>Peterson</u> Plaintiffs, who are the Claimant's clients, related to the Claimant, the letter dated April 16, 2024, or the subject of this arbitration," while also continuing to provide "the Claimant with the same detailed information for any past, present and future communications with the <u>Peterson</u> Plaintiffs who are the Claimant's clients," is denied as duplicative of the relief granted in Order No. 7 which remains in full force and effect, and without prejudice to the Claimant's enforcement of the ongoing obligations of Order No. 7.

7.  That branch of the Claimant's motion for an Order directing the Respondents to provide the Claimant with all written communications since April 16, 2024 (the date of the first letter) or in the future with any <u>Peterson</u> Plaintiff or such plaintiff's representative that reference or refer to the Claimant in any way whatsoever, is denied.

8.  That branch of the Claimant's motion for an Order directing the Respondents to facilitate, and not contest, the Claimant's claim to direct payment of Claimant's *pro rata* share of legal fees from funds paid by the USVSST on account of the same individual <u>Peterson</u> Plaintiffs from whom the Claimant received legal fees in <u>Peterson et al v Islamic Republic of Iran</u>, No. 10-4518 (SDNY), is denied as unnecessary.

9.  That branch of the Claimant's motion for an Order directing the Respondents to escrow legal fees payable to them from funds paid by the USVSST on account of the Indirect Follow-

On Plaintiffs in an amount sufficient to cover the Claimant's claimed damages which will be determined once the details of any such payments are made available to the Claimant, is denied.

10.  That branch of the Claimant's motion for an Order permitting the sharing of Order No. 7 and this **INTERIM AWARD** with anyone necessary to implement the relief in the context of the USVSST, is granted on consent of Respondent Perles and without opposition from Respondent Fay.


Attorneys' Fees and Costs Awarded As A Sanction in the CORRECTED INTERIM AWARD dated the same date as this FINAL AWARD, *nunc pro tunc* to April 10, 2025

The parties have made submissions pursuant to decretal paragraph 3 of the CORRECTED INTERIM A as follows: Affidavit of Peter C. Buckley, Esq., dated April 17, 2025, setting forth his hourly fee, attorneys' fees incurred and time spent since December 18, 2024, in enforcing Order No. 7, as well as Arbitrator compensation, Research Assistant compensation, and Arbitration fees, for the same time period; Respondent Fay's Objections dated April 24, 2025, to Claimant's Submitted Bill; and Supplemental Affidavit of Peter C. Buckley, Esq. dated April 30, 2025.

Decretal paragraph 3 directed Claimant's counsel to submit a detailed affidavit specifying attorneys' fees paid and time spent in enforcing Order No. 7.  It also directed that the affidavit reveal the background of each timekeeper and the customary hourly rates charged and collected in like matters.  Claimant's counsel's submission dated April 17, 2025, does not comply with the

75

directives contained in decretal paragraph 3 of the CORRECTED
INTERIM AWARD with respect to attorneys' fees.  In addition, the
document does not reveal that the Claimant has paid, or that he
will pay, the attorneys' fees set forth therein.  The Supplemental
Affidavit does not resolve the deficiencies of the initial
submission because it contains new matter not authorized to be
submitted for the first time on reply [see HSBC Bank USA v Lem,
236

AD3d 762, 764 (2d Dept 2025); St. Vincent's Hosp. & Med. Ctr. v
Nationwide Mut. Ins. Co., 42 AD3d 523, 524-525 (2d Dept 2007)].
Therefore, because Claimant's counsel's submission did not comply
with the directive contained in decretal paragraph 3 of the
CORRECTED INTERIM AWARD with respect to the award of attorneys'
fees, the sanctions awarded pursuant to JAMS Rule 29 will be
limited to the Claimant's share of Arbitration fees, Arbitrator
compensation and expenses, and compensation of the Research
Assistant, incurred since December 18, 2024, to address the issues
in enforcing Order No. 7.

    Eliminated from the Arbitrator's compensation as set forth in
the Statement of Account is the sum of $525.00 because that charge
is not related to any work performed to address issues in enforcing
Order No. 7.  Similarly, the sum of $3,056.25 is eliminated from
compensation for the Research Assistant as that charge is unrelated
to any work performed to address issues in enforcing Order No. 7.

Thus, the Claimant is awarded $8,225.00 as reimbursement for Arbitrator compensation, plus a 13% management fee of $1,069.25, plus reimbursement for compensation of the Research Assistant in the sum of $2,221.88, for a total of $11,516.13. This sum shall be paid as a sanction by the Respondents, jointly and severally.

Subsequent Motion Practice

On April 14, 2025, Respondent Fay moved to Reconsider and Vacate Order No. 7 dated May 15, 2024, and for Sanctions and Costs. By separate motion dated April 17, 2025, Respondent Fay moved to Reconsider and Vacate the Interim Award dated April 10, 2025, and for Sanctions and Costs. Respondent Perles moved by motion dated April 24, 2025, to Reconsider the Interim Award dated April 10, 2025. The Claimant opposed the motions in an Omnibus Brief in Opposition dated May 9, 2025. The Claimant also sought punitive damages against Respondents and injunctive relief. Respondent Fay and Respondent Perles filed separate Replies, each dated May 16, 2025.

By Order No. 10, dated the same date as the FINAL AWARD, the Respondents' motions were denied in their entirety. The Claimant's request for punitive damages and injunctive relief was also denied.

## CONCLUSION

Any argument not addressed in this **FINAL AWARD** was found to be unavailing, without merit, academic or unnecessary to reach.

Accordingly, the Arbitrator concludes and AWARDS as follows:

1.  That branch of the Claimant's motion which was for sanctions under JAMS Rule 29 is granted.

2.  Pursuant to JAMS Rule 29, an adverse inference is drawn that the Respondents are cloaking themselves in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he represents in the Peterson Action. The Arbitrator awards sanctions as authorized by JAMS Rule 29 in the form of payment to the Claimant of any shortfall between attorneys' fees from the Peterson plaintiffs that he represented when the QSF distributed the Clearstream I asset, due to his discharge of representation by any of them, and the attorneys' fees he collects from their recoveries in the 650 Fifth Avenue and USVSST matters, or any other matter from which these clients recover payments on their judgments. The Respondents are responsible for any loss of attorneys' fees from the Peterson clients who were coaxed to discharge the Claimant as co-counsel in the Peterson Action. This shortfall, if any, shall be paid as a sanction by the Respondents, jointly and severally.

3.    Pursuant to JAMS Rule 29, the Respondents shall reimburse the Claimant for his share of Arbitration fees, Arbitrator compensation and expenses, including compensation of the Research Assistant, in the sum of $11,516.13, incurred since December 18, 2024, to address the issues in enforcing Order No. 7.    This sum shall be paid as a sanction by the Respondents, jointly and severally.

4.    The claim to recover damages for breach of contract based upon the covenant of good faith and fair dealing in the November 27, 2007, Co-Counsel Agreement, is denied, and this claim is dismissed.

5.    That branch of the claim which was to recover damages under a theory of unjust enrichment pled as an alternative to the breach of contract claim, is denied in view of the finding that the November 27, 2007, Co-Counsel Agreement constitutes a valid contract, and this branch of the claim is dismissed.

6.    That branch of the claim which was to recover damages under a theory of unjust enrichment based upon the Respondents' negotiation of fees for themselves in the Indirect Follow-On Cases to the exclusion of the Claimant is granted, and the Claimant is hereby awarded the sum of $6,589.416.00 in damages which the Respondents, jointly and severally, are directed to pay to the Claimant.

7.    That  branch  of  the  claim  for  a  judgment  declaring  the
      Claimant's  entitlement  to  future  attorneys'  fees  pursuant  to
      the  November  27,  2007,  Co-Counsel  Agreement  sufficient  to
      remedy  the  dilution  of  his  attorneys'  fees  resulting  from  the
      _Peterson_  plaintiffs  entering  into  the  Marines  Cooperation
      Agreement,  is  denied,  and  IT  IS  HEREBY  DECLARED  that  the
      Claimant  is  not  entitled  to  future  attorneys'  fees  pursuant
      to  the  November  27,  2007,  Co-Counsel  Agreement  sufficient  to
      remedy  any  dilution  of  attorneys'  fees  resulting  from  the
      _Peterson_  plaintiffs  entering  into  the  Marines  Cooperation
      Agreement.    This  declaration  is  not  intended  to  interfere
      with  the  Claimant's  right  to  diminish  or  eliminate  his
      dilution  as  to  any  current  clients  by  recovering  his  fees  on
      the  clients'  future  enforcement  of  their  judgments.

8.    That  branch  of  the  claim  for  a  judgment  declaring  that  the
      Respondents  are  directed  to  facilitate  and  not  contest  in  any
      way  the  Claimant's  claim  to  direct  payment  of  his  one-third
      _pro rata_  share  of  legal  fees  from  any  future  recovery  by  the
      same  individual  _Peterson_  plaintiffs  from  whom  Claimant
      received  legal  fees  in  _Peterson v Islamic Republic of Iran_,
      No.  10-4518  (SDNY),  without  those  fees  coming  into
      Respondents'  possession,  is  denied.    The  denial  of  this  branch
      of  relief  does  not  alter  or  affect  the  sanctions  awarded  in
      decretal  paragraph  2  of  the  CORRECTED  INTERIM  AWARD  dated  the

same date as this FINAL AWARD, *nunc pro tunc* to April 10, 2025. Moreover, the denial of this relief is not intended to interfere with the Claimant's right to diminish or eliminate his dilution as to any current clients that have been <u>Peterson</u> plaintiffs by recovering his fees on the clients' future enforcement of their judgments.

9.  That branch of the claim for a judgment declaring that the Respondents pay to the Claimant 21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of the following Indirect Follow-On cases:

    <u>Valore</u>, <u>Arnold</u>, <u>Spencer I</u>, <u>Murphy</u>, <u>Bland</u>, <u>Taylor</u>, <u>O'Brien</u>, <u>Anderson</u>, <u>Brown</u>, <u>Spencer II</u> and <u>Ayers</u>, without Claimant's 21.61% of those fees coming into Respondents' possession, is granted, and IT IS HEREBY DECLARED that the Respondents, jointly and severally, shall pay to the Claimant 21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of the following Indirect Follow-On cases: <u>Valore</u>, <u>Arnold</u>, <u>Spencer I</u>, <u>Murphy</u>, <u>Bland</u>, <u>Taylor</u>, <u>O'Brien</u>, <u>Anderson</u>, <u>Brown</u>, <u>Spencer II</u> and <u>Ayers</u>, without Claimant's 21.61% of those fees coming into Respondents' possession.

10. That branch of the claim for a judgment declaring that the Respondents' obligations shall not be impacted in any way by,

81

among other things, whether the Claimant is counsel of record in the Indirect Follow-On Cases or whether any of the <u>Peterson</u> plaintiffs have purportedly discharged the Claimant, is denied as unnecessary.

11. That branch of the Claimant's request for the appointment of a Special Master and for a directive that all legal fees payable to any of the parties arising from the Beirut Marine plaintiff's future recoveries be paid to the Special Master to allocate consistent with this FINAL AWARD, is denied, and this request is dismissed.

12. Respondent Perles's first, second, fourth, fifth, and seventh through twentieth affirmative defenses as set forth in the Response to Demand for Arbitration dated October 8, 2021, are denied, and these affirmative defenses are dismissed.

13. Respondent Perles's fifteenth affirmative defense of unclean hands in his Response to the Demand for Arbitration, and as asserted in his Supplemental Response to the Demand for Arbitration dated January 20, 2022, as well as the affirmative defense of set-off asserted in the Supplemental Response to the Demand for Arbitration, are denied, and these affirmative defenses are dismissed.

14. Respondent Perlees's third affirmative defense of failure to state a claim is granted to the extent indicated in the dismissal of the claim to recover damages under a theory of

82

unjust enrichment, pled as an alternative to the breach of contract claim, and otherwise the third affirmative defense is denied and dismissed.

15. Respondent Perles's sixth affirmative defense of failure to satisfy the elements of the claims is granted to the extent indicated in the dismissal of the claim to recover damages for breach of contract based upon the covenant of good faith and fair dealing in the November 27, 2007, Co-Counsel Agreement, and the dismissal of that branch of the claim to recover damages under a theory of unjust enrichment, pled as an alternative to the breach of contract claim, and otherwise the sixth affirmative defense is denied and dismissed.

16. The Claimants' request for an award of pre-judgment interest is denied and dismissed.

17. The Claimant's request for an award of attorneys' fees and costs of this arbitration is denied and dismissed, except for the costs awarded pursuant to the CORRECTED INTERIM AWARD dated the same date as the FINAL AWARD, *nunc pro tunc* to April 10, 2025, as a sanction authorized by JAMS Rule 29.

This **FINAL AWARD** is in full and complete satisfaction of all claims and defenses submitted in this arbitration.

_Stephen G. Crane, Arbitrator_

State of New York )    :
            ss:
County of New York)

    I, Stephen G. Crane, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my **FINAL AWARD**.

July 7, 2025
    Date

_Stephen G. Crane_

84